**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**

H&R BLOCK, INC. and
HRB INNOVATIONS, INC.

                  Plaintiffs,

    v.

BLOCK, INC.,

                  Defendant.

Case No. 4:21-cv-00913-GAF

**ORAL ARGUMENT REQUESTED**

**SUGGESTIONS IN SUPPORT OF PLAINTIFFS'**
**MOTION FOR A PRELIMINARY INJUNCTION**

(author block)

David H. Bernstein (admitted *pro hac vice*)
Jyotin Hamid (admitted *pro hac vice*)
Jared I. Kagan (admitted *pro hac vice*)
Marissa MacAneney (admitted *pro hac vice*)
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
(212) 909-6000
dhbernstein@debevoise.com
jhamid@debevoise.com
jikagan@debevoise.com
mpmacaneney@debevoise.com

Anthony J. Durone (MO Bar #43872)
Stacey R. Gilman (MO Bar # 55690)
Elizabeth R. Martin (MO Bar #64129)
BERKOWITZ OLIVER, LLP
2600 Grand Boulevard Suite 1200
Kansas City, Missouri 64108
(816) 561-7007
adurone@berkowitzoliver.com
sgilman@berkowitzoliver.com
emartin@berkowitzoliver.com

*Attorneys for Plaintiffs H&R Block, Inc. and HRB Innovations, Inc.*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ......................................................................................................1

STATEMENT OF FACTS .........................................................................................................3

I. Block and Its BLOCK Marks .....................................................................................3

II. Block's Green Color Scheme and Green Square Logo ....................................................8

III. Block, Inc.'s Infringing Re-Branding as "Block" and its Competing Businesses ............8

IV. Block, Inc.'s Use of BLOCK is Creating Confusion ....................................................11

V. Procedural History ................................................................................................13

ARGUMENT ......................................................................................................................13

I. Legal Standard ......................................................................................................13

II. Block Is Likely to Succeed On The Merits Of Its Trademark Infringement
    Claim .................................................................................................................14

    A. The BLOCK Marks are Valid and Protectable. ...................................................14

    B. Block, Inc.'s Use of BLOCK is Likely to Cause Consumer Confusion .........................15

        1. Strength of the Marks ................................................................................16

        2. The Similarity of the Marks ........................................................................17

        3. The Competitive Proximity of the Parties' Products and Services ............................18

        4. The Defendant's Intent ..............................................................................20

        5. Instances of Actual Confusion ......................................................................20

        6. The Degree of Care Reasonably Expected of Potential Customers ............................21

III. Block Will Suffer Irreparable Harm Absent a Preliminary Injunction .......................22

IV. The Balance of Harms Weighs in Block's Favor .........................................................24

V. The Public Interest Will Be Served by Issuance of a Preliminary Injunction ..............25

CONCLUSION ....................................................................................................................26

# TABLE OF AUTHORITIES

**CASES**

*3M Co. v. Nationwide Source, Inc.*,
No. 20-CV-2694, 2021 WL 141539 (D. Minn. Jan. 15, 2021)......................................16, 24

*Advantus Capital Mgmt. v. Aetna, Inc.*,
2006 WL 2916840 (D. Minn. Oct. 11, 2006) ....................................................................21

*Am. Int'l Group, Inc. v. Am. Int'l Bank*,
926 F.2d 829 (9th Cir. 1991) ...........................................................................................22

*Anheuser-Busch, Inc. v. Balducci Publ'ns.*,
28 F.3d 769 (8th Cir. 1994) ........................................................................................14, 15

*Aveda Corp. v. Evita Mktg., Inc.*,
706 F. Supp. 1419 (D. Minn. 1989) ............................................................................14, 20

*Bd. of Trustees of Univ. of Ark. v. Prof. Therapy Servs.*,
873 F. Supp. 1280 (W.D. Ark. 1995) ................................................................................17

*Bebe Stores, Inc. v. May Dep't Stores Int'l*,
230 F. Supp. 2d 980 (E.D. Mo. 2002) ...................................................................15, 16, 17

*Cmty. of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's
Church*,
613 F. Supp. 2d 1140 (W.D. Mo. 2009)...........................................................................13

*Cmty. of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's
Church*,
683 F. Supp. 2d 1006 (W.D. Mo. 2010)...........................................................................20

*Cmty. of Christ Copyright Corp. v. Miller*,
2007 WL 4333192 (W.D. Mo. Dec. 7, 2007).....................................................................25

*Coca-Cola Co. v. Purdy*,
382 F.3d 774 (8th Cir. 2004) ...........................................................................................22

*Curtis 1000 v. Youngblade*,
878 F. Supp. 1224 (N.D. Iowa 1995) ...............................................................................13

*Dakota Indus., Inc. v. Ever Best Ltd.*,
28 F.3d 910 (8th Cir. 1994) .............................................................................................14

*Dataphase Sys., Inc. v. C L Sys., Inc.*,
640 F.2d 109 (8th Cir. 1981) (en banc) ........................................................... 13, 14, 24, 27

*Eveready Battery Co. v. Green Planet, Inc.*,
  91 U.S.P.Q.2d 1511 (T.T.A.B. July 21, 2009)..................................................................17

*First Nat'l Bank in Sioux Falls v. First Nat'l Bank S.D.*,
  2011 U.S. Dist. LEXIS 173812 (D.S.D. Mar. 3, 2011).......................................................25

*Ford Motor Co. v. Ford Fin. Sols., Inc.*,
  103 F. Supp. 2d 1126 (N.D. Iowa 2000) ............................................................................18

*General Motors, LLC v. Rapp Chevrolet, Inc.*,
  No. CIV 12-4209-RAL, 2013 WL 2245472 (D.S.D. May 21, 2013) ............................. 16, 22

*HealthNow N.Y. Inc. v. Romano*,
  2018 WL 4908107 (W.D.N.Y. Oct. 10, 2018) ...............................................................22-23

*Heaven Hill Distilleries v. Log Still Distilling*,
  2021 U.S. Dist. LEXIS 240373 (W.D. Ky. Dec. 16, 2021) .................................................21

*Hillerich & Bradsby Co. v. Christian Bros.*,
  943 F. Supp. 1136 (D. Minn. 1996) ....................................................................................24

*J&J Snack Foods Corp. v. McDonald's Corp.*,
  932 F.2d 1460 (Fed. Cir. 1991).........................................................................................15

*Kemp v. Bumble Bee Seafoods, Inc.*,
  398 F.3d 1049 (8th Cir. 2005) ...........................................................................................18

*Kroupa v. Nielsen*,
  731 F.3d 813 (8th Cir. 2013) ..............................................................................................13

*Mid-State Aftermarket Body Parts, Inc. v. MQVP, Inc.*,
  466 F.3d 630 (8th Cir. 2006) ..............................................................................................21

*MSP Corp. v. Westech Instruments, Inc.*,
  500 F. Supp. 2d 1198 (D. Minn. Aug. 6, 2007) ..................................................................25

*Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*,
  469 U.S. 189 (1985) ..................................................................................................... 14, 25

*Roederer v. J. Garcia Carrion, S.A.*,
  732 F. Supp. 2d 836 (D. Minn. 2010) .................................................................................17

*S&M Nutec, L.L.C. v. T.F.H. Publ'ns, Inc.*,
  No. 03-1033-CV-W-NKL, 2005 WL 1224607 (W.D. Mo. May 23, 2005)...........................14

*Select Comfort Corp. v. Baxter*,
  156 F. Supp. 3d 971, 984 (D. Minn. 2016).........................................................................16

*SquirtCo. v. Seven-Up Co.*,
    628 F.2d 1086 (8th Cir. 1980) ............................................................................ 15, 16, 20

*Sturgis Area Chamber of Commerce v. Sturgis Rally & Races, Inc.*,
    99 F. Supp. 2d 1090 (D.S.D. 2000)................................................................................24

*USA Visionary Concepts, LLC v. MR Int'l, LLC*,
    No. 4:09-CV-00874-DGK, 2009 WL 10672094 (W.D. Mo. Nov. 17, 2009) ......................16

*Zerorez Franchising Sys. v. Distinctive Cleaning, Inc.*,
    103 F. Supp. 3d 1032, 1042 (D. Minn. 2015)....................................................................16

## STATUTES

15 U.S.C. § 1065............................................................................................................4, 14

15 U.S.C. § 1072.................................................................................................................20

15 U.S.C. § 1115(a)............................................................................................................14

15 U.S.C. § 1116(a)............................................................................................................22

15 U.S.C. § 1125(a)(1)(A)..................................................................................................18

## OTHER AUTHORITIES

Fed. R. Civ. P. Rule 65.........................................................................................................1

Local Rule 7(d) .....................................................................................................................3

Thomas J. McCarthy, McCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:5
    (5th ed. 2021) ("McCARTHY")..........................................................................................19

Plaintiffs H&R Block, Inc. and HRB Innovations, Inc. (together with their subsidiaries and affiliates, "Block") respectfully submit these suggestions in support of their motion for a preliminary injunction against Defendant Block, Inc., pursuant to Fed. R. Civ. P. Rule 65.

## PRELIMINARY STATEMENT

More than 65 years ago, Henry and Richard Bloch founded Block to help consumers navigate the complexity of filing their taxes. Today, Block offers much more to its clients—customers turn to Block not only for tax preparation and filing, but also for loans, lines of credit, prepaid debit cards, access to bank accounts, small business services, and more. Block's success is built on the reputation and trust it has earned with its customers through decades of hard work. Consumers depend on Block because they know Block is experienced and reliable, and will keep their financial information safe and secure. That is why, every year, millions of consumers and businesses entrust Block with their most sensitive and personal financial information.

The goodwill that is the cornerstone of Block's reputation is now under attack by a Silicon Valley fintech company, Square, Inc., that has just announced that it is rebranding itself as Block, Inc. That name is likely to cause confusion given that Block and Block, Inc., through their respective subsidiaries, offer many of the same services including tax preparation and filing, loans, and payment cards. Consumers and potential business partners will be confused about which Block they are doing business with; prospective employees will be confused about the identity of their potential Block employer; charities will be confused about which Block is supporting their endeavors; and investors will be confused about the relationship between the parties and whether they are part of the same corporate group. Indeed, in the short time since the announced name change, the potential for confusion has been noted across multiple media platforms; even an employee in the Block, Inc. family of companies has recognized that confusion is likely: "I'm pretty sure folks are now going to think I work for H&R Block."

This confusion will cause grievous and irreparable harm to Block. The confusion unleashed by Block, Inc.'s new name will undermine Block's ability to control its public image and perception. Consumers will erroneously believe that Block is one of the "building blocks" in the Block, Inc. family of companies, or that Block, Inc. is associated with Block. Public critiques of Block, Inc. and its management will be wrongly attributed to Block. For example, Block would not want the public to mistake its CEO for that of Block, Inc. who, while at Twitter, was described as having "a reputation as a chaotic and distant manager who vexed Wall Street and sometimes befuddled his own employees."[1] Block also would not want news reports about Block, Inc.—from reports about risky new investments to catastrophic news like a data breach[2]—to be attributed to Block. Block's inability to control its own reputation is the quintessential type of irreparable harm that a preliminary injunction is intended to prevent.

Block, Inc. did not have to pick the name "Block." It had a virtually unlimited number of names it could have selected for the name of its company. But it should not have picked the name of a well-known competitor. Because it has only just announced this new name, it should not be difficult for Block, Inc. to revert to its old name or find a new, non-infringing name. In order to prevent the confusion and irreparable harm that is inevitable, Block respectfully requests that the Court enter a preliminary injunction and return the parties to the *status quo ante*.

---

[1] Elizabeth Dwoskin and Will Oremus, "In a surprise tweet, Twitter CEO Jack Dorsey said he's stepping down," WASHINGTON POST (Nov. 29, 2021), *available at* https://www.washingtonpost.com/technology/2021/11/29/dorsey-steps-down-twitter/.

[2] *Cf*. Alexis Keenan, "Square's Cash App vulnerable to hackers, customers claim: 'They're completely ghosting you'," YAHOO! FINANCE (Mar. 20, 2021), *available at* https://www.yahoo.com/now/squares-cash-app-vulnerable-to-hackers-customers-claim-113556593.html.

## I.     Block and Its BLOCK Marks

In 1955, brothers Henry and Richard Bloch transformed their bookkeeping business into a new company that specialized in income tax preparation. They called their company "H&R Block." Declaration of Jeffrey J. Jones II (Dec. 20, 2021) ("Jones Decl.") ¶ 3.

More than 65 years later, Block is a market leader and a brand icon in tax and other financial services, with over 9,000 company-owned and franchised locations in the United States alone, and nearly 1,500 additional offices in Canada and Australia. Block is one of the world's largest tax preparation companies, and has prepared more than 800 million tax returns for its customers. In the past six-plus decades, Block has expanded its services from tax preparation to a variety of other financial services, including electronic tax filing, refund advance loans, refund transfers, prepaid debit cards, lines of credit, providing credit scores, mobile banking platforms, tax refund identity theft protection, and small business services. Block already offers a number of these services through the MyBlock online account and mobile app, and has announced that, in January 2022, it will launch a new, innovative financial technology platform, SPRUCE, which will combine the best features of leading digital banks with Block's trusted brand and insights, gleaned from helping millions of customers every year. The SPRUCE financial technology platform will be promoted as having been "built by H&R Block." *Id.* ¶ 4.

Block offers its services under trademarks incorporating BLOCK (the "BLOCK Marks"), including a number for which it owns United States trademark registrations: H&R BLOCK (Reg. No. 3,338,962), H&R BLOCK EMERALD CARD (Reg. No. 3,392,368), H&R BLOCK

---

[3]     Pursuant to Local Rule 7(d)(2), the Statement of Facts does not count towards the page limitations set forth in Local Rule 7(d)(1), therefore Block has not moved the Court for leave to file excess pages. However, if necessary, Block respectfully requests the Court's leave to file a brief in excess of the 15-page limit.

EMERALD SAVINGS (Reg. No. 3,525,361), H&R BLOCK EMERALD ADVANCE (Reg. No. 3,532,084), BLOCKWORKS (Reg. No. 4,769,331), BLOCK ADVISORS (Reg. Nos. 5,055,458, 5,179,142), and BLOCK HAS YOUR BACK (Reg. No. 6,003,605), among others. *Id.* ¶ 5, Ex. A. The registrations for H&R BLOCK, BLOCKWORKS, H&R BLOCK EMERALD SAVINGS, H&R BLOCK EMERALD ADVANCE, and BLOCKWORKS are incontestable pursuant to 15 U.S.C. § 1065.

Block promotes and provides its services under the BLOCK Marks on its websites including https://hrblock.com/ and https://blockadvisors.com/. It also promotes its brand on Twitter under the handles @hrblock, @hrblocknews and @hrblockanswers. Under the @hrblockanswers handle, Block answers questions using the BLOCK ANSWERS logo, shown at right.



Block also promotes its services on Facebook under the name @hrblock; on Instagram under the name @hrblock; and on LinkedIn at https://www.linkedin.com/company/h&r-block/. *Id.* ¶ 6.

Block has made significant investment to develop its brand identity, including through community outreach programs and national advertising campaigns on television, in print, on the radio, on the Internet, and on social media channels, including Twitter, Instagram, Facebook and LinkedIn. Over the last three years alone, Block has spent nearly half a billion dollars advertising its products and services under the BLOCK Marks. *Id.* ¶ 7.

Through these campaigns, in addition to using the BLOCK Marks to promote its products and services, Block has prominently identified itself simply as BLOCK to promote its consumer services, as shown below (and in the Jones Decl. at ¶ 8).





Among the BLOCK Marks is "MyBlock," the online account and mobile app that consumers can use to get support from their Block tax professionals, access credit scores, manage their Tax Identity Shield membership (which helps protect against identity theft tax refund fraud), upload receipts, donations, and other tax-related items, and access other financial services, such as manage their H&R BLOCK EMERALD CARD debit payments card. *Id.* ¶ 9.

In addition to advertising its consumer services under the BLOCK Marks, Block refers to itself as BLOCK in recruiting new employees, such as inviting them to come to "Block Day" career events. In connection with recruiting full-time and seasonal employees, Block also uses phrases such as: "You've got Block potential"; "You'd rock at Block"; and "Make a difference at Block." Employees who go above and beyond in demonstrating Block's values can be awarded the title of "BLOCK MVP," and "BEST OF BLOCK," and featured on Block's social media channels. Block employees also frequently refer to their employer as "Block." *Id.* ¶¶ 11, 12.

In connection with its small business services, Block



uses the BLOCK ADVISORS registered trademark (Reg. No. 5,055,458) and the BLOCK ADVISORS and design registered trademark (Reg. No. 5,179,142, shown above). Block has over 300 BLOCK ADVISORS offices that serve more complex clients in both the small business and consumer spaces, and provide tax, bookkeeping, and payroll services. In addition, Block offers small business services through BLOCK ADVISORS small business certified tax professionals in its Block retail offices. In 2021 alone, Block served more than two million small businesses, many of which were under the BLOCK ADVISORS brand. *Id.* ¶ 13.

In addition to the tax and other financial services offered under the BLOCK Marks, in December 2019, Block formed a charitable community impact program under the name MAKE

EVERY BLOCK BETTER. Through this program, Block employees volunteer and give back to their local communities. Block partners with national organizations and those in its hometown of Kansas City—such as Habitat for Humanity, Nextdoor, the Urban Neighborhood Initiative, the Neighborhoods Rising Fund, the Ewing Marion Kauffman Foundation, and the Urban League of Greater Kansas City—to build connections among neighbors and provide resources and support in communities through efforts such as donating to food pantries, increasing access to quality housing and better neighborhood spaces, enhancing shared community spaces, and supporting small businesses. Since the launch of MAKE EVERY BLOCK BETTER, Block associates, franchisees, and franchise employees have recorded more than 200,000 volunteer hours. Block promotes the MAKE EVERY BLOCK BETTER program with its BLOCK branding at its various community programs, such as with t-shirts and other branding. *Id.* ¶ 15.

In 2020, Block announced "Block Horizons 2025," Block's five-year growth and transformation strategy focused on three imperatives: Small Business, Financial Products, and the "Block Experience." The program will leverage Block's client relationships and technology platforms to accelerate growth in small business and financial products, and will continue to modernize the consumer tax business to combine digital tools with human expertise and care. Block Horizons also will help provide access to financial services for customers who are "underbanked" (meaning, for example, consumers who do not have a relationship with a traditional bank because they do not trust such banks, find them inconvenient to use, or cannot afford the fees and minimums). Block publicized the "Block Horizons" strategy through its website, its LinkedIn page, and various media outlets, advertising that "There's a bigger, better Block on the horizon," and continues to use it as an anchor for its investor messaging. As part of the Block Horizons 2025 corporate growth strategy, Block has announced that it will launch its

SPRUCE financial technology platform in early 2022, which will provide consumers with a mobile banking platform and the ability to set and monitor savings goals, earn cash back on everyday purchases, get free credit scores, and get paychecks up to two days early with direct deposit. *Id.* ¶ 14.

Block also uses the BLOCK Marks in connection with its diversity, inclusion, and belonging initiative, BELONGING@BLOCK, with a focus on building a culture where every associate has a voice and a sense of belonging. The initiative has already led to national recognition for pledging to achieve pay equality and gender equality, with Block being recognized in 2020 as one of the best places to work for LGBTQ equality by the Human Rights Campaign, being scored 100% on the Corporate Equality Index, and joining the Catalyst CEO Champions for Change pledge to increase the representation of women, including women of color, among senior leadership. Block promotes the BELONGING@BLOCK initiative on its social media pages under the BLOCK Marks, and with the phrase BLOCK PROUD, as shown below. Block frequently uses the hashtags #BlockPride and #BelongingatBlock on its social media channels. *Id.* ¶ 16.



## II. **Block's Green Color Scheme and Green Square Logo**

As the images above show, Block consistently and prominently uses the color green in connection with its BLOCK Marks. Block owns federally registered trademarks for its green square logo (the "Green Square Marks"), shown below. *Id.* ¶ 20.



| | | |
|---|---|---|
| (Reg. No. 2,533,014) [Note: The mark consists in part of a green square] | (Reg. No. 3,656,593) | (Reg. No. 5,179,142) |

As an extension of its green branding, Block offers the H&R BLOCK EMERALD CARD prepaid MasterCard, which allows customers to deposit money onto a prepaid debit card (including direct deposit of tax refunds and payroll). The Emerald Card can be used as an everyday account to pay bills and to make purchases anywhere Mastercard® debit cards are accepted. The Emerald Card is the fourth most popular prepaid debit card in the United States. Block also offers the Emerald Savings account (which can be used in conjunction with the Emerald Card to make deposits and withdrawals), and Emerald Advance (a line of credit with year-round access). Consumers can manage their Emerald Card and Emerald Savings accounts through Block's MyBlock mobile app or through the login page on Block's website (https:/hrblock.com/emeraldcard). *Id.* ¶ 21.

## III. **Block, Inc.'s Infringing Re-Branding as "Block" and its Competing Businesses**

On December 1, 2021, Block, Inc., formerly known as Square, Inc., publicly announced through a press release that it was changing its name to "Block, Inc." In the "About Block" section of its press release, Block, Inc. describes the company as "a global technology company

with a focus on financial services." Block, Inc.'s CEO, Jack Dorsey, stated: "Block is a new name, but our purpose of economic empowerment remains the same. No matter how we grow or change, we will continue to build tools to help increase access to the economy." Jones Decl. ¶ 22, Ex. E. The press release also stated that Block, Inc. selected the name BLOCK because of its association with "building blocks, neighborhood blocks and their local businesses, communities coming together at block parties full of music, a blockchain, a section of code, and obstacles to overcome." *Id.* Block, Inc.'s businesses include offering tax preparation and other financial services, such as prepaid debit cards, bank accounts, and payroll services that include the payment of payroll taxes. Jones Decl. ¶ 22.

Block, Inc. has launched a website at https://block.xyz, which identifies its brands, including Square and Cash App, as the "building blocks" of the BLOCK brand. Block, Inc.'s website visually depicts its brands as "building blocks," and includes a music playlist called "BLOCK VIBES." The bottom of the website includes a trademark notice that states "BLOCK and the Block Logo are trademarks of Block, Inc." Jones Decl. ¶ 23, Ex. F. Block, Inc. also has a careers page on its website (https://block.xyz/careers) titled "WORK AT BLOCK," which states: "Across each of our building blocks, we're creating better tools to help everyone access the economy. Every challenge creates possibilities, and we need different perspectives to see them all. Bring yours to Block." Jones Decl. ¶ 24; Ex. G. Block, Inc. has established "BLOCK" social media accounts, including a "BLOCK" LinkedIn page with the tagline "joinblock" in the URL. Block, Inc.'s Twitter handle is "@blocks" and "@blockir." Jones Decl. ¶ 25, Ex. H.

According to the December 1 press release, Block, Inc.'s Square brand "helps sellers run and grow their business with its integrated ecosystem of commerce solutions, business software, and

banking services." Ex. E. Block, Inc.'s Square's website (at https://squareup.com/us/en/banking) explains that, with Square, "[y]our payments, business banking accounts, and cash flow [are] synced together seamlessly." Square also offers checking account services with a linked debit card. These services overlap with Block's, which also include savings accounts linked with its H&R BLOCK EMERALD debit card.

Block, Inc.'s Cash App (from which Block, Inc. derives over 62% of its revenue) is a mobile payment service that offers users direct deposit, a debit card connected to the user's balance that can be used anywhere Visa is accepted, and money transfer services. Cash App uses a green square logo that is nearly identical in color and very similar in shape (a square with rounded corners) to Block's federally registered Green Square Marks (shown at right). The Cash App website (https://cash.app) also advertises that it is associated with Block, Inc. (shown at right). As Block strives to do, Cash App has stated that it also seeks to help underbanked consumers. Jones Decl. ¶ 29, Ex. I.





On November 25, 2020, Square, Inc. (which has since been renamed Block, Inc.) announced that it entered into an agreement, on behalf of Cash App, to acquire Credit Karma's tax business. The Cash App Taxes website (https://cash.app/taxes) uses green branding that is similar to Block's branding, and green squares that are similar to Block's Green Square Marks. News reports from November 2021 stated that "Cash App is currently working on integrating the Credit Karma Tax platform," and that "customers will access the tax prep software through Cash

App instead of Credit Karma." Jones Decl. ¶ 31, Ex. K. These services compete directly with Block's tax filing services. The Cash App Taxes website states that "Credit Karma Tax is now Cash App Taxes." Jones Decl. ¶ 31.

On December 1, 2021, Block, Inc. (under its then-name Square, Inc.) filed an application with the United States Patent and Trademark Office to register BLOCK as a trademark for use in connection with, among other services, "charitable services, namely, promoting public awareness about charitable, philanthropic, volunteer, public and community service and humanitarian activities." Block, Inc. also has filed applications to register its block logos. Jones Decl. ¶ 32, Ex. L (App. Ser. Nos. 97/151,246; 97/151,249; 97/151,255).

## IV.  Block, Inc.'s Use of BLOCK is Creating Confusion

In the short time since Block, Inc. changed its name to Block, Inc. and became known as BLOCK, there has been significant discussion on social media reflecting that consumers are drawing a link between the companies based on the confusingly similar names. For example, users have tweeted in response to Block, Inc.'s name change (Jones Decl. ¶ 34; Ex. M):







Similarly, on Reddit and LinkedIn, Block, Inc.'s name change announcement prompted discussion underscoring the potential for confusion, with users writing (*see* Jones Decl. ¶¶ 35, 36, Ex. N):



Even employees in the Block, Inc. family of companies recognize the risk of confusion. For example, one of those employees tweeted: "Folks regularly mistook me working a[t] Square Enix. Now, I'm pretty sure folks are now going to think I work for H&R Block." Jones Decl. ¶ 38, Ex. O.




## V.    **Procedural History**

On December 16, 2021, Block filed the Complaint in this action, alleging claims for

trademark infringement under the Lanham Act, and related state law claims. That same day,

Block wrote to Block, Inc. to seek assurances that Block, Inc. would discontinue use of the

BLOCK mark during the pendency of this action. Kagan Decl. ¶ 2, Ex. 1. Because Block, Inc.

has refused to do so, Block now brings this motion for a preliminary injunction to promptly halt

Block, Inc.'s infringing use of the BLOCK Marks and to return the parties to their position prior

to Block, Inc.'s December 1, 2021 announcement.

## ARGUMENT

## I.    **Legal Standard**

A court has "broad discretion" to grant a preliminary injunction. *Kroupa v. Nielsen*, 731

F.3d 813, 818 (8th Cir. 2013). In deciding whether to exercise that authority, courts consider the

four *Dataphase* factors: (1) the probability that the movant will succeed on the merits; (2) the

threat of irreparable harm to the movant; (3) the state of the balance between the harm to plaintiff

and the harm that granting the injunction will inflict on the other party; and (4) the public

interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc).

"[T]he Eighth Circuit Court of Appeals has recognized that the purpose of issuing a

preliminary injunction in a lawsuit is to preserve the status quo and to prevent irreparable harm

until the court has an opportunity to rule on the lawsuit's merits." *Curtis 1000 v. Youngblade*, 878

F. Supp. 1224, 1244–45 (N.D. Iowa 1995). "In trademark cases, the status quo 'refers not simply

to any situation before the filing of a lawsuit, but instead to the last uncontested status which

preceded the pending controversy.'" *Cmty. of Christ Copyright Corp. v. Devon Park Restoration

Branch of Jesus Christ's Church*, 613 F. Supp. 2d 1140, 1145 (W.D. Mo. 2009) (citation

omitted). Thus, "[t]he status quo in this case is the period before [the defendant] began using the

infringing marks." *Id.*

As discussed below, the *Dataphase* factors weigh in favor of a preliminary injunction.

## II. <u>Block Is Likely to Succeed On The Merits Of Its Trademark Infringement Claim.</u>

To prevail on a trademark infringement claim under the Lanham Act, the plaintiff "must prove ownership of a valid trademark and a likelihood that the allegedly infringing mark would be confused with the registered mark." *Aveda Corp. v. Evita Mktg.*, Inc., 706 F. Supp. 1419, 1426 (D. Minn. 1989). The Eighth Circuit has adopted an "expansive interpretation of likelihood of confusion, extending 'protection against use of plaintiff's mark on any product or service which would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner.'" *Anheuser-Busch, Inc. v. Balducci Publ'ns.*, 28 F.3d 769, 774 (8th Cir. 1994) (citation omitted).

### A. **The BLOCK Marks are Valid and Protectable.**

"If a trademark is registered on the USPTO's registry [as the BLOCK Marks are], then the registration is *prima facie* evidence that the trademark is valid." *S&M Nutec, L.L.C. v. T.F.H. Publ'ns, Inc.*, No. 03-1033-CV-W-NKL, 2005 WL 1224607, at *10 (W.D. Mo. May 23, 2005) (citing 15 U.S.C. § 1115(a)). Pursuant to 15 U.S.C. § 1065, many of the BLOCK Marks have become incontestable. An incontestable trademark registration "is conclusive evidence of the registrant's exclusive right to use the mark, as well as the registrant's ownership of the trademark." *Dakota Indus., Inc. v. Ever Best Ltd.*, 28 F.3d 910, 912 (8th Cir. 1994) (*citing Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 196 (1985)).

In addition to its many registered trademarks (including H&R BLOCK, BLOCK ADVISORS, BLOCKWORKS, and BLOCK HAS YOUR BACK), Block is known colloquially as "Block." The company frequently refers to itself as "Block," standing alone, including in advertising, recruiting efforts, in connection with its community impact program, and through its

diversity, inclusion, and belonging initiative, BELONGING@BLOCK. Jones Decl. ¶ 16. Consumers refer to the company as "Block" as well (*e.g.*, calling the offices where they go for Block's services as "Block" offices). *Id.* ¶ 10, Ex. 14.

There can be no dispute that the family of BLOCK Marks is valid and protectable. *See J&J Snack Foods Corp. v. McDonald's Corp.*, 932 F.2d 1460, 1462 (Fed. Cir. 1991) ("A family of marks is a group of marks having a recognizable common characteristic, wherein the marks are composed and used in such a way that the public associates not only the individual marks, but the common characteristic of the family, with the trademark owner.") (recognizing McDonald's "Mc" family of marks).

### B. Block, Inc.'s Use of BLOCK is Likely to Cause Consumer Confusion.

The Eighth Circuit has enumerated six factors for courts to consider in assessing likelihood of confusion: "(1) the strength of the trademark; (2) the similarity between the plaintiff's and defendant's marks; (3) the competitive proximity of the parties' products; (4) the alleged infringer's intent to confuse the public; (5) evidence of any actual confusion; and (6) the degree of care reasonably expected of the plaintiff's potential customers." *Anheuser-Busch, Inc.*, 28 F.3d at 774 (citing *SquirtCo. v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980)) (the "*SquirtCo* factors"). The ultimate inquiry is whether, considering all the circumstances, Block, Inc.'s use of "BLOCK" "creates a likelihood of confusion, deception or mistake among an appreciable number of ordinary buyers" as to the source of or association between the two companies. *See Bebe Stores, Inc. v. May Dep't Stores Int'l*, 230 F. Supp. 2d 980, 991 (E.D. Mo. 2002) (citation omitted).

As discussed below, every one of the *SquirtCo* factors weighs in Block's favor.

1.     Strength of the Marks

 "A strong and distinctive trademark is entitled to greater protection than a weak or commonplace one." *SquirtCo.*, 628 F.2d at 1091. A trademark's overall strength is measured by both its conceptual and commercial strength. *See 3M Co. v. Nationwide Source, Inc.*, No. 20-CV-2694, 2021 WL 141539, at *4 (D. Minn. Jan. 15, 2021).

The conceptual strength of a mark depends on whether the mark is classified, from least protectable to most protectable, as (1) generic; (2) descriptive; (3) suggestive; or (4) arbitrary or fanciful. *See USA Visionary Concepts, LLC v. MR Int'l, LLC*, No. 4:09-CV-00874-DGK, 2009 WL 10672094, at *3 (W.D. Mo. Nov. 17, 2009). "Arbitrary marks are words, symbols, or pictures with common linguistic use but which, when used with the goods or services in issue, neither suggest nor describe any ingredient, quality, or characteristic of those goods or services." *Select Comfort Corp. v. Baxter*, 156 F. Supp. 3d 971, 984 (D. Minn. 2016). The BLOCK Marks, which have no meaning in relation to tax and financial services, are therefore conceptually strong. *See General Motors, LLC v. Rapp Chevrolet, Inc.*, No. CIV 12-4209-RAL, 2013 WL 2245472, at *5 (D.S.D. May 21, 2013) (finding the mark "Chevrolet," named from Louis Chevrolet, in use for decades, promoted nationally, and highly recognizable to the public, to be "somewhat 'arbitrary or fanciful' in nature" and "entitled to a high level of protection").

The BLOCK Marks also are commercially strong, based on Block's continuous and long-term commercial use, and extensive advertising and marketing. *See Bebe Stores, Inc.*, 230 F. Supp. 2d at 992 (considering plaintiff's market presence, and significant expenditures of money and effort over years to expand its brand and recognition, "especially through [] sustained advertising campaigns," when concluding that plaintiff's mark was "very strong"); *see also Zerorez Franchising Sys. v. Distinctive Cleaning, Inc.*, 103 F. Supp. 3d 1032, 1042 (D. Minn. 2015) (considering plaintiff's and plaintiff's franchisees' continuous use of the mark, market

16

share, publicity, and annual advertising expenditures when finding plaintiff's mark to be commercially strong). Block uses the BLOCK Marks to advertise and promote its business, recruit employees, engage in community outreach, contribute to charitable efforts, and promote diversity and inclusion. Over the last three years alone, Block has spent nearly half a billion dollars advertising its products and services under the BLOCK Marks. Under the BLOCK Marks, Block has become one of the world's largest tax preparation companies, with more than 800 million tax returns prepared for its customers. Additionally, Block's successful enforcement efforts against infringers—including against the confusingly similar marks TAX BLOCK, THINK OUTSIDE THE BLOCK, THINKING OUTSIDE THE BLOCK, and T&R BLOCK (Jones Decl. ¶¶ 18-19)—reinforces the commercial strength of the BLOCK Marks. *See Roederer v. J. Garcia Carrion, S.A.*, 732 F. Supp. 2d 836, 868 (D. Minn. 2010) (finding a plaintiff's successful enforcement of its trademark rights "enhances the commercial strength" of its mark); *see also Bd. of Trustees of Univ. of Ark. v. Prof. Therapy Servs.*, 873 F. Supp. 1280, 1288 (W.D. Ark. 1995) (finding "owner's actions to protect its marks through the use of cease and desist letters and litigation" is an additional "indicia of strength").

    2. <u>The Similarity of the Marks</u>

   When considering this factor, courts analyze "similarities of sight, sound, and meaning." *Bebe Stores, Inc.*, 230 F. Supp. 2d at 992 (citation omitted). "Similarity in any one of these elements is sufficient to support a determination of likelihood of confusion." *Eveready Battery Co. v. Green Planet, Inc.*, 91 U.S.P.Q.2d 1511 (T.T.A.B. July 21, 2009).

   Block, Inc.'s BLOCK mark is very similar to the family of BLOCK Marks, including BLOCK, H&R BLOCK, BLOCK ADVISORS, BLOCKWORKS, and BLOCK HAS YOUR BACK. Block, Inc. announced that "BLOCK" would be its new name, with its other companies, including Square and Cash App, comprising the "building blocks" of "BLOCK." Block, Inc. is

using the BLOCK mark in connection with a "BLOCK" website (https://block.xyz/), which includes a music playlist called "BLOCK VIBES," "BLOCK" social media accounts, a "BLOCK" LinkedIn page with the phrase "joinblock" in the URL, a "BLOCK" copyright and trademark policy, a "BLOCK" contact for press and investor relations, and a career page on its website titled "WORK AT BLOCK," all of which are confusingly similar to the BLOCK Marks.

To further compound the similarity between the marks, Block, Inc. selected "@blocks" and "@blockir" as its Twitter handles, which are confusingly similar to Block's "@hrblock" Twitter handle. Where, as here, "the distinguishing word or feature of a trademark is copied and used with similar goods or services, the consuming public is likely to be confused." *See Ford Motor Co. v. Ford Fin. Sols., Inc.*, 103 F. Supp. 2d 1126, 1128 (N.D. Iowa 2000).

### 3. The Competitive Proximity of the Parties' Services

This factor looks to the "degree of competition" between the services, which requires a "broad[] examination of the [services'] relationship in the market." *Kemp v. Bumble Bee Seafoods, Inc.*, 398 F.3d 1049, 1056 (8th Cir. 2005) (citing 15 U.S.C. § 1125(a)(1)(A)). The "proper application of this factor requires exploration of the likelihood that consumers would draw a connection between the two [services] and be confused as to the identities of their respective sources." *Id.* Block, Inc.'s tax and other financial services are similar to and in direct competition with Block's, which weighs in favor of a likelihood of confusion. *See Ford Motor Co.*, 103 F. Supp. 2d at 1128 (enjoining "Ford Financial Services" where defendant's services were "similar to" and "compete with the financial services that Ford [Motor Co.] provides").

Block, Inc. touts itself as a financial services and digital payments company. Moreover, Block, Inc. acquired Credit Karma Tax—which is a competitor of Block's tax-related businesses—and offers competitive tax preparation and filing services through what it has now renamed Cash App Taxes. Once Block, Inc. completes the integration of Credit Karma Tax,

customers will be able to receive their tax refunds via Block, Inc.'s Cash App and will be able to save those funds or spend them through the Cash App or through Cash App's Cash Card debit card. That is all exactly the same as what Block provides—its customers can, for example, access, save or spend their tax refunds using Block's MyBlock mobile app and the integrated H&R BLOCK EMERALD CARD.

Block's planned launch of the SPRUCE financial platform in early 2022 further reinforces the similarities between the parties' services. SPRUCE will provide consumers with a mobile banking platform and the ability to set and monitor savings goals, earn cash back on everyday purchases, get free credit scores, and get paychecks up to two days early with direct deposit. Block's expansion of its online financial tools under the BLOCK Marks will compete even more directly with the services offered by the Block, Inc. family of companies.

Block, Inc. also has indicated that it intends to offer charitable services under the BLOCK mark. Those BLOCK charitable services will compete with Block's charitable community impact programs under the MAKE EVERY BLOCK BETTER mark.

Given the many similarities between the parties' services, consumers are likely to incorrectly assume that Block, Inc.'s services are affiliated with Block, or vice versa. This is particularly true given Block, Inc.'s claims that "Block" will own a number of companies which will serve as "building blocks" of the larger "Block" brand, which could lead some consumers to believe that Block is one of those "building blocks," or that Block, Inc.'s "building blocks" are associated with Block. Other stakeholders, such as potential employees, business partners, charitable partners, and investors, are likely to be confused as well. *See* MCCARTHY § 23:5 ("Damage to reputation and good will can be triggered by confusion among non-purchasers").

4. The Defendant's Intent

Block, Inc. stated that it selected the name BLOCK because of its association with "building blocks, neighborhood blocks and their local businesses, communities coming together at block parties full of music, a blockchain, a section of code, and obstacles to overcome." Jones Decl. ¶ 22; Ex. E. But Block, Inc. must have done a trademark search when it selected this name, and it must have been aware of Block, its trademarks, and the many tax and financial services it offers under the BLOCK Marks when it decided to proceed with the BLOCK name.[4] Its decision to ride roughshod over Block and its BLOCK Marks is relevant to assessing Block, Inc.'s intent, including its intention to pass off its services as being related to Block. Although intent is not a required element of a claim for trademark infringement, "[i]ntent on the part of the alleged infringer to pass off its goods as the product of another raises an inference of likelihood of confusion." *SquirtCo.*, 628 F.2d at 1091. Block, Inc.'s knowledge of Block and its BLOCK Marks is alone enough to raise an inference that Block, Inc. intended to trade on Block's goodwill when it decided to proceed with the adoption of the BLOCK mark despite the limitless number of alternative names available. *See Cmty. of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church*, 683 F. Supp. 2d 1006, 1015 (W.D. Mo. 2010) ("An inference of an intent to trade upon the plaintiff's good will arises if the defendants, with knowledge of plaintiff's mark, chose a mark similar to that mark from the infinite number of possible marks.") (citation omitted).

5. Instances of Actual Confusion

Although "[t]he plaintiff is not required to prove any instances of actual confusion," *Aveda Corp. v. Evita Mktg., Inc.*, 706 F. Supp. 1419, 1430 (D. Minn. 1989), in the short time

---

[4]    In addition, Block, Inc. is presumed to have constructive knowledge of the registered BLOCK Marks. 15 U.S.C. § 1072 ("Registration of a mark on the principal register . . . shall be constructive notice of the registrant's claim of ownership thereof.").

since Block, Inc. issued a press release announcing its name change, consumers and the media have already recognized the potential for confusion, which is highly indicative of the confusion that will result if Block, Inc. is permitted to continue to use the BLOCK mark. *See* Jones Decl. ¶¶ 34-37 ; *see also Heaven Hill Distilleries v. Log Still Distilling*, 2021 U.S. Dist. LEXIS 240373, at *75–76 (W.D. Ky. Dec. 16, 2021) (although defendant had customers only "for a couple months," online posts which "created such early confusion represent[ed] meaningful evidence of actual confusion"); *see also Mid-State Aftermarket Body Parts, Inc. v. MQVP, Inc.*, 466 F.3d 630, 634 (8th Cir. 2006) ("Confusion is relevant when it exists in the minds of the persons in a position to influence the purchasing decision or persons whose confusion presents a significant risk to the sales, goodwill, or reputation of the trademark owner.") (citation omitted).

Moreover, many people have already questioned Block, Inc.'s choice to brand itself as "BLOCK" given Block's reputation in the financial services industry, and the likelihood that other customers will be confused. *See* Jones Decl. ¶¶ 34-37. Even one of Block, Inc.'s own employees indicated on Twitter that consumers are likely to draw a link between Block, Inc. and Block because of Block, Inc.'s choice to co-opt the BLOCK name. Jones Decl. ¶ 38. As Block, Inc. moves beyond the announcement phase and starts to actively market, advertise and sell its competing tax and other financial products and services, even more consumer confusion and deception inevitably will follow. *See Advantus Capital Mgmt. v. Aetna, Inc.*, 2006 WL 2916840, at *4 (D. Minn. Oct. 11, 2006) (as defendant's business "starts to expand, there is a great possibility that [defendant] may overflow into the [broader] financial services market," colliding with plaintiff, which weighs in plaintiff's favor for a preliminary injunction analysis).

6.  The Degree of Care Reasonably Expected of Potential Customers

When determining the degree of care consumers exercise, the court "must stand in the shoes of the ordinary [customer], buying under the normally prevalent conditions of the market,"

and giving the attention such a customer would usually give in buying the type of goods or services at issue. *General Motors, LLC v. Rapp Chevrolet, Inc.*, 2013 WL 2245472, at *6 (D.S.D. May 21, 2013) (citation omitted).

Many of Block's customers are not necessarily well versed about corporate affiliations including, but not limited to, the underbanked customers that both Block and Block, Inc. serve. Additionally, Block's services are increasingly being accessed on the Internet and through mobile applications, including the "MyBlock" app. Block, Inc.'s services and products are accessed the same way, including through Cash App. Given the similarity of the marks, the overlap in products and services, and the identical channels of trade, even the most careful consumers are likely to be confused.

## III.     **Block Will Suffer Irreparable Harm Absent a Preliminary Injunction**

Given that Block has demonstrated that it is likely to succeed on the merits of its claim, Block is entitled to a statutory presumption of irreparable harm. 15 U.S.C. § 1116(a) ("A plaintiff seeking any such injunction shall be entitled to a rebuttable presumption of irreparable harm . . . upon a finding of likelihood of success on the merits . . . in the case of a motion for a preliminary injunction. . . ."); *see also Coca-Cola Co. v. Purdy*, 382 F.3d 774, 789 (8th Cir. 2004) ("[a] showing that confusion is likely supports a strong presumption of irreparable harm").

In addition to the presumption, irreparable harm is very likely. Given the similarities between the tax and other financial services both parties offer (and are likely to offer in the future), Block "could well be harmed by customer confusion, particularly if [Block, Inc.] at some point plunges into . . . [an] unfortunate condition of financial instability." *Am. Int'l Group, Inc. v. Am. Int'l Bank*, 926 F.2d 829, 832 (9th Cir. 1991). Block is entrusted with customers' most sensitive financial and personal data, so any negative publicity Block, Inc. garnishes would lead to incalculable and non-compensable harm to Block. *See, e.g., HealthNow N.Y. Inc. v. Romano*,

2018 WL 4908107, at *5 (W.D.N.Y. Oct. 10, 2018) (plaintiff sufficiently "alleged likelihood of confusion and thus also established irreparable injury" by showing consumers may misattribute fault to plaintiff for defendant's data breach) (citation omitted).

In addition, Block has no means of controlling the quality of Block, Inc.'s advertised offerings under the BLOCK mark. If Block, Inc.'s BLOCK services or products are not consistent with the high quality of Block's services and products, there is a substantial risk that consumers who are confused as to the source of Block, Inc.'s BLOCK and dissatisfied with its quality may incorrectly form a negative view of Block. This harm is evident from a recent Tweet (shown at right) reflecting a mistaken belief that Block "bought Square" and noting that the user "never trusted Square."



Block, Inc.'s use of the BLOCK Marks will also hamper Block's ability to control its image and perception. For example, when consumers see news stories that refer to Block, Inc. as "Block" (like the one shown at right) they may mistakenly believe that the stories are about Block. *See* Jones Decl. ¶ 42, Ex. P. Block would not want the public to believe that its CFO



"[b]elieves that bitcoin should be a part of every major company's financial war chest." As another example, earlier this year, under the headline "**Square's Cash App vulnerable to hackers**," the media reported that some consumers' accounts on the Block, Inc.'s Cash App were hacked, and that the consumers lost all of the money in their account.[5] Now that Square has

---

[5]     *See* Alexis Keenan, *Square's Cash App vulnerable to hackers, customers claim: "They're completely ghosting you"*, YAHOO! FINANCE (Mar. 20, 2021), https://www.yahoo.com/now/squares-cash-app-vulnerable-to-hackers-customers-claim-113556593.html.

changed its name to Block, reports like this in the future will be headlined: "**Block's Cash App vulnerable to hackers**"—a headline that would be devastating to Block's reputation.

All of this harm is particularly likely given that Block, Inc. occupies the same markets that Block currently occupies. By its nature, such harm is irreparable. *See Sturgis Area Chamber of Commerce v. Sturgis Rally & Races, Inc.*, 99 F. Supp. 2d 1090, 1101 (D.S.D. 2000) ("In evaluating the threat of irreparable harm, the court may . . . consider the potential loss of control over the quality of plaintiff[s'] services, [and] the risk of damage to . . . plaintiff[s'] reputation and service mark from continuing use of an infringing mark. When a likelihood of confusion exists, plaintiffs' lack of control over the quality of defendants' services constitutes an immediate and irreparable injury, regardless of the actual quality of those services.") (citation omitted); *see also Hillerich & Bradsby Co. v. Christian Bros.*, 943 F. Supp. 1136, 1141–42 (D. Minn. 1996) (when evaluating the threat of irreparable harm, it is appropriate for the court to consider the "loss of control over the quality of plaintiff's product and the risk of damage to a plaintiff's reputation and trademark from the continued use of an infringing mark").

## IV.   The Balance of Harms Weighs in Block's Favor

This *Dataphase* factor requires the Court to weigh the irreparable harm to Block against the injury a preliminary injunction would cause Block, Inc. "When considering the balance of hardships between the parties in infringement cases, courts generally favor the trademark owner." *3M*, 2021 WL 141539, at *6 (citation omitted).

As described above, Block will suffer irreparable harm to its brand and to the reputation it has built for high-quality service and reliability with respect to consumers' most sensitive financial information for decades. In contrast, Block, Inc. announced its planned name change only 20 days ago, and formally changed it just 11 days ago; given the short time, Block, Inc. should be able to revert to its old name. Under these circumstances, the balance of hardships tips

decidedly in Block's favor. *See MSP Corp. v. Westech Instruments, Inc.*, 500 F. Supp. 2d 1198, 1217-18 (D. Minn. Aug. 6, 2007) ("[Plaintiff] has advertised and sold its [products] for seven years . . . it has invested time, resources, and reputation to develop a product and should be protected from newcomers using shortcuts to capitalize on that hard work and good will.").

Any harm Block, Inc. may suffer from an injunction is entirely of its own making. Block, Inc. has no right to engage in its infringing activities, and it knowingly incurred the risk of an injunction when it chose to use the BLOCK name with full knowledge of the BLOCK Marks and Block's longstanding use of the BLOCK Marks for similar tax and other financial services. Any loss of goodwill that Block, Inc. may suffer from an injunction is "essentially goodwill that already belonged to [Block]." *First Nat'l Bank in Sioux Falls v. First Nat'l Bank S.D.*, 2011 U.S. Dist. LEXIS 173812, at *17 (D.S.D. Mar. 3, 2011).

**V.     The Public Interest Will Be Served by Issuance of a Preliminary Injunction**

"The public has an interest in the enforcement of validly registered trademarks," and "the right not to be deceived or confused as a result of the infringement of established trademarks." *Cmty. of Christ Copyright Corp. v. Miller*, 2007 WL 4333192, at *3 (W.D. Mo. Dec. 7, 2007). Enforcement of trademark laws also serves the public by "protect[ing] the ability of consumers to distinguish among competing producers," and incentivizing businesses to procure consumer goodwill by serving their customers' interests. *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 190 (1985).

Block, Inc. is engaged in infringing activity, which violates both federal and state law, and which defrauds the public into thinking either that its services are endorsed by or affiliated with Block, or vice versa. It is in the public's interest that Block, Inc. cease using a mark that is confusingly similar to the family of BLOCK Marks.

## CONCLUSION

For the foregoing reasons, all *Dataphase* factors strongly favor granting an injunction.

Accordingly, Block respectfully requests that the Court grants its Motion for Preliminary

Injunction, and has submitted a proposed Order herewith for the Court's consideration.


Dated: December 21, 2021                    Respectfully submitted,

**DEBEVOISE & PLIMPTON LLP**

*/s/ David H. Bernstein*
David H. Bernstein (admitted *pro hac vice*)        Anthony J. Durone (MO Bar #43872)
Jyotin Hamid (admitted *pro hac vice*)              Stacey Gilman (MO Bar #55690)
Jared I. Kagan (admitted *pro hac vice*)            Elizabeth R. Martin (MO Bar #64129)
Marissa MacAneney (admitted *pro hac vice*)         BERKOWITZ OLIVER LLP
919 Third Avenue                                    2600 Grand Blvd., Suite 1200
New York, New York 10022                            Kansas City, Missouri 64108
(212) 909-6000                                      Telephone:(816) 561-7007
dhbernstein@debevoise.com                           Facsimile:(816) 561-1888
jhamid@debevoise.com                                adurone@berkowitzoliver.com
jikagan@debevoise.com                               sgilman@berkowitzoliver.com
mpmacaneney@debevoise.com                           emartin@berkowitzoliver.com

**ATTORNEYS FOR PLAINTIFFS**

26