**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**

H&R BLOCK, INC. and HRB
INNOVATIONS, INC.,

                Plaintiffs,

      v.

BLOCK, INC.,

                Defendant.

Case No. 4:21-cv-00913-NKL

## <u>DEFENDANT BLOCK, INC.'S SUGGESTIONS IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION</u>

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................1

STATEMENT OF FACTS ..........................................................................................2

Block, Inc's Origins As Square ............................................................3

Square, Inc.'s Other Business Offerings Grew Larger Than The "Square" Brand ............4

Square, Inc.'s Rebrand As Block, Inc. ...............................................................5

"Block" Is Not A Brand For The Company's Customer-Facing Businesses .....................7

Cash App Taxes Is Offered Under Established Cash App Branding–Not "Block" Branding....................................................................................................7

The Parties Present A Different Marketplace Impression .................................................8

H&R Block Does Not Use The Word Block Alone ............................................................9

A Consumer Survey Of More Than 1,000 Respondents Establishes That Neither The "Block" Name Nor The Cash App Logo Are Likely To Cause Confusion With H&R Block. ............................................................10

LEGAL ARGUMENT....................................................................................................14

A. H&R Block Is Unlikely to Succeed on the Merits.............................................14

1. "Block" and Green Square Designs Are Commercially Weak Marks Afforded a Low Degree of Protection ............................................15

2. Consumers Perceive The Parties' Marks As Dissimilar ...........................17

3. The Parties Exist in Two Different Markets .............................................19

4. H&R Block Shows No Evidence of Intent to Trade On Its Name ...........20

5. H&R Block Offers No Evidence of Actual Confusion..............................21

6. The Products' Distinct Purchasing Processes Eliminate Any Confusion....................................................................................................22

B. H&R Block Cannot Show Irreparable Harm........................................................23

C. The Balance of Hardships Weighs Decidedly Against An Injunction. ................24

i

D.      An Injunction Is Not in the Public Interest. ...........................................................26

CONCLUSION.................................................................................................................27

**TABLE OF AUTHORITIES**

**Page**

**Cases**

*3M Co. v. Nationwide Source, Inc.*,
20-cv-2694 (WMW/KMM), 2021 WL 141539 (D. Minn. Jan. 15, 2021) ............................ 27

*Allied Servs., LLC v. Smash My Trash, LLC*,
No. 21-CV-00249-SRB, 2021 WL 1671675 (W.D. Mo. Apr. 28, 2021) ................................ 13

*Apple Inc. v. Samsung Elec. Co.*,
786 F.3d 983 (Fed. Cir. 2015), *rev'd on other grounds*, 137 S. Ct. 429 (2016)............... 16, 17

*Cmty. of Christ Copyright Corp. v. Devon Park Restoration*,
683 F. Supp. 2d 1006 (W.D. Mo. 2010) ................................................................. 21

*Council of Better Bus. Bureaus, Inc. v. Bailey & Assocs., Inc.*,
197 F. Supp. 2d 1197 (E.D. Mo. 2002).................................................................. 15

*Dakota Indus., Inc. v. Ever Best Ltd.*,
944 F.2d 438 (8th Cir. 1991) ............................................................................ 13

*Deflecto, LLC v. Dundas *Jafine Inc.*,
No. 13-0116-CV-W-ODS, 2014 WL 172218 (W.D. Mo. Jan. 15, 2014)............................... 26

*Duluth News-Trib., a Div. of Nw. Publications, Inc. v. Mesabi Pub. Co.*,
84 F.3d 1093 (8th Cir. 1996) .......................................................... 17, 22, 23, 24

*Eyebobs, LLC v. Snap, Inc.*,
259 F. Supp. 3d 965 (D. Minn. 2017).................................................................. 20

*First Nat. Bank in Sioux Falls v. First Nat. Bank, S. Dakota*,
153 F.3d 885 (8th Cir. 1998) ............................................................................ 24

*FirstBank Sw. v. Heartland Fin. USA, Inc.*,
No. 2:21-CV-024-Z, 2021 WL 3743806 (N.D. Tex. Aug. 24, 2021)...................................... 29

*Fischer & Frichtel Custom Homes, LLC v. Fischer Mgmt., LLC*,
No. 4:21-CV-00470-MTS, 2021 WL 1750174 (E.D. Mo. May 4, 2021)........................... 16, 18

*Frosty Treats Inc. v. Sony Computer Ent. Am. Inc.*,
426 F.3d 1001 (8th Cir. 2005) ............................................................................ 15

*Furminator, Inc. v. Ontel Prod. Corp.*,
429 F. Supp. 2d 1153 (E.D. Mo. 2006), *aff'd*, 214 F. App'x 982 (Fed. Cir. 2007)................ 25

*Gen. Mills, Inc. v. Kellogg Co.*,
  824 F.2d 622 (8th Cir. 1987) ........................................................................... 15, 17

*Graham Webb Int'l v. Helene Curtis Inc.*,
  17 F. Supp. 2d 919 (D. Minn. 1998) .......................................................... 14, 27, 30

*Jeld-Wen, Inc. v. Dalco Industries, Inc.*,
  198 F.3d 250, 1999 WL 1024002 (8th Cir. 1999) ................................................ 16

*JTH Tax, Inc. v. Freedom Tax, Inc.*,
  No. 3:19-CV-00085-RGJ, 2019 WL 2062519 (W.D. Ky. May 9, 2019) .................... 24, 25

*Kemp v. Bumble Bee Seafoods, Inc.*,
  398 F.3d 1049 (8th Cir. 2005) ........................................................................... 19

*Lovely Skin, Inc. v. Ishtar Skin Care Prod., LLC*,
  745 F.3d 877 (8th Cir. 2014) ............................................................................. 14

*Luigino's, Inc. v. Stouffer Corp.*,
  170 F.3d 827 (8th Cir. 1999) ........................................................................ 15, 18

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*,
  209 F. Supp. 3d 612 (S.D.N.Y. 2016), *aff'd* 720 F. App'x 24 (2d Cir. 2017) ............ 23

*Maritz, Inc. v. Cybergold, Inc.*,
  947 F. Supp. 1338 (E.D. Mo. 1996) ..................................................................... 22

*Michael Jaudes Fitness Edge, Inc. v. Edge Fitness Clubs, LLC*,
  No. 4:19-CV-01987-AGF, 2019 WL 11318383 (E.D. Mo. Sept. 6, 2019) ........ 13, 18, 22

*MPAY Inc. v. Erie Custom Computer Applications, Inc.*,
  970 F.3d 1010 (8th Cir. 2020) ........................................................................... 14

*Nail All., LLC v. Poly-Gel L.L.C.*,
  No. 17-CV-01026-FJG, 2019 WL 5295502 (W.D. Mo. Sept. 27, 2019) .................. 20, 21

*Northland Ins. Companies v. Blaylock*,
  115 F. Supp. 2d 1108 (D. Minn. 2000) ................................................................ 14

*Peaceable Planet, Inc. v. Ty, Inc.*,
  362 F.3d 986 (7th Cir. 2004) ............................................................................. 16

*Phoenix Ent. Partners, LLC v. Sports Legends, LLC*,
  306 F. Supp. 3d 1112 (E.D. Mo. 2018) ................................................................ 20

*Roederer v. J. Garcia Carrion, S.A.*,
  732 F. Supp. 2d 836 (D. Minn. 2010) .................................................................. 17

*Russell Rd. Food & Beverage, LLC v. Spencer*,

No. 2:12-CV-01514–LRH-GWF, 2013 WL 321666 (D. Nev. Jan. 28, 2013) ....................... 29

*S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Disc.*,
   696 F.3d 771 (8th Cir. 2012) ................................................................. 26, 27

*Sanborn Mfg. Co. v. Campbell Hausfeld/Scott Fetzer Co.*,
   997 F.2d 484 (8th Cir. 1993) ..................................................................... 21

*Sensient Techs. Corp. v. SensoryEffects Flavor Co.*,
   613 F.3d 754 (8th Cir. 2010) ........................................................... 17, 22, 24

*Sola Franchise Corp. v. Solo Salon Studios Inc.*,
   No. 14-CV-0946, 2015 WL 1299259 (E.D.N.Y. Mar. 23, 2015)........................... 25

*SquirtCo v. Seven-Up*,
   628 F.2d 1086 (8th Cir. 1980) ................................................................... 14

*Sturgis Motorcycle Rally, Inc. v. Rushmore Photo & Gifts, Inc.*,
   908 F.3d 313 (8th Cir. 2018) ..................................................................... 15

*Two Men & a Truck/Int'l, Inc. v. Thomas*,
   908 F. Supp. 2d 1029 (D. Neb. 2012) ........................................................... 15

*United Indus. Corp. v. Clorox Co.*,
   140 F.3d 1175 (8th Cir. 1998) ................................................................... 26

*United States v. H&R Block, Inc.*,
   1:11-cv-948 (BAH) (D.C. Cir. Nov. 10, 2011).............................................. 24, 30

*USA Visionary Concepts, LLC v. MR Int'l, LLC*,
   No. 4:09-CV-00874-DGK, 2009 WL 10672094 (W.D. Mo. Nov. 17, 2009) ................. 14, 21

*Watkins Inc. v. Lewis*,
   346 F.3d 841 (8th Cir. 2003) ..................................................................... 13

*ZW USA, Inc. v. PWD Sys., LLC*,
   889 F.3d 441 (8th Cir. 2018) ............................................................... 21, 24

## Statutes

15 U.S.C. § 1116(a) ...................................................................................... 25

26 U.S.C. § 7206(1) ...................................................................................... 24

## Other Authorities

2 McCarthy on Trademarks and Unfair Competition .......................................... 16

5 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION  ................................. 14, 29

*Justice Department Requires Divestiture of Credit Karma Tax for Intuit to Proceed with Acquisition of Credit Karma* , https://www.justice.gov/opa/pr/justice-department-requires-divestiture-credit-karma-tax-intuit-proceed-acquisition-credit (Nov. 25, 2020), https://www.justice.gov/opa/pr/justice-department-requires-divestiture-credit-karma-tax-intuit-proceed-acquisition-credit ........................................................................... 29

## INTRODUCTION

Plaintiffs (collectively, "H&R Block") have not pled colorable trademark infringement claims, let alone met their burden of proving a likelihood of success and irreparable harm. They have provided this Court with no basis to compel Defendant Block, Inc. ("Block") to change its name or other branding, particularly on an emergency basis. Plaintiffs' allegations depend on a chain of unsupported inferences: they claim that consumers will identify Defendant's corporate identity as "a brand" for tax preparation services because Defendant owns Cash App, and Cash App offers tax preparation services under the brand Cash App Taxes. Their motion should be rejected for one simple reason: No reasonable consumer could possibly confuse Cash App-branded income tax services, known as Cash App Taxes, with Plaintiffs' H&R Block-branded income tax services. This is not a close call. The brands are just too dissimilar.

Plaintiffs predictably fail to submit any evidence to justify the extraordinary relief they seek. They offer no evidence that Defendant uses "Block" as a brand for tax services, because it does not. They offer no evidence that the Cash App logo is used for tax services without the well-known Cash App name, because it is not. And they offer no expert testimony or survey showing confusion. Instead, they present a few carefully-curated social media posts of supposed confusion. But even those posts fall short of showing confusion, demonstrating instead that people readily distinguish between Defendant's brands and H&R Block. On the basis of H&R Block's evidence, standing alone, the Court should deny the motion.

Yet H&R Block's evidence does not stand alone. It stands against the overwhelming evidence Defendant submits with its Opposition: declarations that establish "Block" is not and will not be used as part of the branding for Cash App Taxes, that Cash App has used its logo for years without complaint from H&R Block, and that the reason for rebranding from Square to Block was to reflect a company that has grown to offer a wider variety of services to a wider

variety of customers, as well as a declaration from a survey and marketing expert who describes his survey regarding consumer confusion as "among the most clear-cut survey results of 'no confusion' that I have seen in over forty years of designing and conducting consumer surveys," and a declaration from a consumer behavior expert who shows how unlikely it is that any user of Cash App or Cash App Taxes would be confused. This evidence establishes that there is no likelihood of consumer confusion and conclusively disproves Plaintiffs' need for an injunction.

The remedy sought by H&R Block is also inequitable. Defendant has used a white dollar sign on a green square with rounded corners as the logo for its Cash App business and as its app icon since 2013. That mobile app has been downloaded over 100 million times, and Defendant's 40+ million monthly active users have come to rely on that logo to find and access Cash App's features and Cash App's massive social media presence. A forced change of that logo would be tremendously disruptive to Defendant's customers and business. Further, an injunction barring Defendant from using its corporate name would be infeasible given commercial, technical, and regulatory restrictions. Defendant spent more than a year developing and implementing its new corporate identity. It cannot just flip a switch and go back to its former name.

Plaintiffs fail to cite a single case—from this Circuit or any other—in which a court granted a preliminary injunction requiring a party to change its corporate name on any facts, much less on facts comparable to those here. The Court should deny the motion.

## STATEMENT OF FACTS

Defendant ("Block" or the "Company") does not use "Block" as a brand for tax preparation or filing services. Jennings Decl. ¶15; Esperanza Decl. ¶18. Nor does it use the word "Block" to brand any financial advising services, banking services, or any other services Plaintiffs claim they offer. Esperanza Decl. ¶18. Simply put, "Block" is Defendant's corporate identity, which it does not use as a brand for any consumer-facing product or service. *Id.*

Instead, Defendant's income tax preparation services are offered exclusively under the Cash App brand as "Cash App Taxes," using a dollar sign on a green background logo.



Cash App has used that logo since 2017. During that period, tens of millions of consumers have used the Cash App mobile app interacting with that icon. Jennings Decl. ¶¶7, 9. In fact, Cash App's services have used the form of a dollar sign on a green background logo going back to 2013—almost a decade. *Id.* ¶5. During this period, H&R Block never complained. *Id.* ¶10.

**Block, Inc's Origins As Square**

Before December 10, 2021, Defendant was named Square, Inc., referencing its original, flagship product—a square-shaped credit card reader and point-of-sale software that streamlined the physical and economic process for small businesses and other sellers to accept credit card payments. Esperanza Decl. ¶¶6-8. Square, Inc. was founded in 2009 by St. Louis locals, and it continues to invest in its St. Louis operations, adding staff and opening a new office last year. *Id.* ¶4. In Missouri, the Company currently employs more than 900 people, partners with more than 65,000 Square merchants, and has more than 700,000 Cash App users. *Id.* ¶10.

Square started with the simple goal of empowering greater participation in the economy by enabling small merchants to more easily process customer payments. *Id.* ¶5. Since its introduction, Square products have revolutionized commerce, vastly expanding the ability of small businesses to move beyond cash-only payments and grow. *Id.* ¶9. From its founding, Square has used a black and white square shaped logo:



**Square, Inc.'s Other Business Offerings Grew Larger Than The "Square" Brand**

A few years after the launch of Square, the company developed a mobile app to facilitate greater participation in the digital economy among consumers, even those without credit cards. Jennings Decl. ¶2. This service, now known as Cash App, was launched in 2013 and provided users the ability to transfer money to others (such as a friend or family member) without a credit card and without being in the same place–i.e., "peer-to-peer money transfers." *Id.* ¶3. Cash App's original icon in 2013 featured a white dollar sign imposed on a green square with rounded corners, in a nod to its use as a form of digital money:



*Id.* ¶5. In 2017, the logo was updated to the version still in use today:



*Id.* ¶6.

Cash App proved very popular in the marketplace. The Cash App mobile application has been downloaded more than 100 million times, and Cash App had 40 million active users in the second quarter of 2021. *Id.* ¶7. It has been ranked the number one "finance app" in the Apple App Store for the last 5 years—above any bank, financial institution, or other financial technology application. *Id.* ¶8.

4

Over time, Square, Inc. expanded further to include:

- TIDAL, a music streaming platform that helps recording artists succeed as entrepreneurs and connect more deeply with their fans;

- Spiral, an initiative focused on advancing Bitcoin; and

- TBD54566975, which is in development to become an open developer platform that enables access to Bitcoin and other blockchain technologies without having to go through a bank or other financial institution.

Esperanza Decl. ¶¶13-16.

### Square, Inc.'s Rebrand As Block, Inc.

As the company's product offerings grew, the name Square, which remained strongly associated with the original credit processing software and hardware, seemed ill-suited to convey the expanded nature of the Company's product lines. Esperanza Decl. ¶17. Beginning in 2020, the Company decided it needed a new corporate name that would allow its merchant service business to keep its Square brand identity, while enabling the corporate name to more aptly reflect the multi-dimensional collection of products and services under its umbrella. *See id.* ¶¶17, 20, 25. To serve these goals, the company decided to pursue a "house of brands" model that would allow the customer-facing brands to have names distinct from the corporate company name. *Id.* ¶¶18-19.

A team of dozens of employees worked for months to develop a new name for the company that would serve its goals and reflect its values. Esperanza Decl. ¶75. It chose the name "Block," which has multiple meanings that reflect the Company's values and purpose, notably: "building blocks, neighborhood blocks and their local businesses, communities coming together at block parties full of music, a blockchain, a section of code, and obstacles to overcome." *Id.* ¶21.

Once the name was decided upon, the company designed a logo and visual branding to accompany the name change. *Id.* ¶22. The logo accompanying the new brand was designed to be a vibrant, digital-first design, with a multi-hued iridescence, and a constant sense of motion:



*Id.* On the homepage, music curated by the artist Jay-Z accompanies the shimmering and twisting shape. *Id.* The webpage lists Block's business brands, but does not describe their products or services. Rather, the webpage offers sections for investors and press. Compl. Ex. B, Dkt. 1-2. The logo, like the name "Block," represents a geometric play on expanding beyond the two-dimensional meaning of "square" and Square's static, monochromatic logo. Esperanza Decl. ¶21.

Implementing the new brand identity was a time and resource intense undertaking. *Id.* ¶25. The company secured new domain names and social media names, built a new website, redesigned internal computer systems, employee tools, and programs, built 3-D graphics, amended legal documents, and implemented the formal name change with the Delaware Secretary of State, the New York Stock Exchange, and other government agencies. *Id.* Although this work was kept to as tight a group as possible to minimize the chance of a leak, hundreds of employees worked for approximately eight months after the "Block" name was selected to make it a reality. *Id.* In total, from start to finish the project took over one year and

represented a substantial financial investment. *Id.*

## "Block" Is Not A Brand For The Company's Customer-Facing Businesses

Consistent with how the Company chose to implement this model, the "Block" corporate name is and will remain absent from the branding of its customer-facing businesses and will not be used as a "house mark" that unites its brands. For example, there will not be "Square by Block" or "Cash App by Block." Esperanza Decl. ¶18, Jennings Decl. ¶15. This differs from the "house mark" or "branded house" approach occasionally used by Marriott Hotels, with such sub-brands as "JW Marriott" and "Courtyard by Marriott." Wind Decl. ¶70. Rather, as with the "house of brands" model employed offered by Procter & Gamble, with its independent brands such as Bounty, Crest, Dawn, Febreze, Gillette, and so forth, Block's brands have their own names and identities for their customer-facing products and services that are separate from the corporate name and entity. *Id.* ¶70.

## Cash App Taxes Is Offered Under Established Cash App Branding–Not "Block" Branding

The sole income tax preparation service offered by any Block company is Cash App Taxes. Esperanza Decl. ¶12. Cash App Taxes offers free digital income tax preparation software services and is provided by Cash App Taxes, Inc. Jennings Decl. ¶13. Cash App Taxes, Inc. was previously known as Credit Karma Tax, Inc., but was acquired by the Company in 2020. *Id.* ¶15. Since its founding in 2018, Credit Karma Tax has been offered under the Credit Karma green and white rounded-corner square logo in connection with its tax offering:



*Id.* ¶14. The Cash App Taxes service is offered under the Cash App brand using Cash App's established name and logo.



*Id.* ¶¶15-19, 24.

Cash App Taxes is not available in retail stores and has no brick-and-mortar locations. *Id.* ¶16. Rather, to use Cash App Taxes, a user must download the Cash App mobile application. *Id.* Block branding is not used within the mobile application. *Id.* ¶17; *id.* Ex. B; Dhar Decl.¶26-31; id. Ex. D. Nor is "Block" used on the Cash App logo or as part of the Cash App branding, including branding for Cash App Taxes. Jennings Decl. ¶24; Dhar Decl. ¶29. Given the process through which consumers journey to become Cash App Taxes users, it is unlikely that any of them would believe it to be associated with H&R Block. Dhar Decl. ¶43. Plaintiffs identify no one who saw the Cash App logo and mistakenly believed it to be associated with Plaintiffs.

**The Parties Present A Different Marketplace Impression**

The parties' overall services differ significantly, as does their corporate visual branding. *See, e.g.,* Dhar Decl. ¶¶90-95; Wind Decl. ¶¶73-76; Esperanza Decl. ¶16.[1] In contrast to the two-dimensional 90-degree angled square that accompanies almost all of H&R Block's highlighted promotional uses (*see* Compl. ¶19, Dkt. 1; Wind Decl. ¶76), the visual logo for Block features a shimmering dynamic cube that twists, turns, and changes in geometrical appearance and color. Esperanza Decl. ¶22. Plaintiffs fail to identify a single person who saw

---

[1] H&R Block suggests that it is offering services under the name Spruce that will be somehow competitive with Defendant's offerings. (Mot. at 3, 7, 19.) But it has neither introduced evidence of any services offered under the name Spruce nor attempted to explain how a consumer could plausibly confuse "Spruce," which apparently will use forest green tree branding (*see* Compl.¶31), with Defendant or any of its brands, especially Cash App or Cash App Taxes. Plaintiff refers also to credit card services offered by its "Emerald Card" and payroll services offered by Block Advisors. (Mot. at 5, 15, 17.) But there, too, Plaintiff makes no effort to match them up by name *or* logo to any competing brand of Defendant or to explain how one might be confused for the other. *Cf.* Mot. at 10 (comparing to Square services); *see also* Wind Decl. ¶¶67, 70.

Defendant's corporate logo and mistakenly believed the logo to be associated with Plaintiffs.



**H&R Block Does Not Use The Word Block Alone**

H&R Block points to a handful of cherry-picked examples of how it "promotes and provides its services under the BLOCK Marks" on its websites and through social media accounts in an attempt to showcase use of "Block" alone.  Suggestions In Supp. of Pls' Mot. for a Prelim. Inj. ("Mot.") at 9-12, Dkt. 17; Decl. of Jeffrey J. Jones II ("Jones Decl.") ¶¶6-16, Dkt. 16-1.  However, as Ravi Dhar, Professor of Management and Marketing at the Yale School of Management, explains in his declaration submitted herewith ("Dhar Decl."), most representations of H&R Block and most of H&R Block's marketing materials display the full "H&R Block" name.  For example, every single social media accounts of H&R Block use "hr" or "h&r" before block.  Compl. ¶17; Wind Decl. ¶54 & Ex. L.  Even in the few images provided by Plaintiffs where the word Block seems to appear without the "H&R" prefix or green square logo, the uncropped images retrieved from H&R Block's website or social media account confirms that the word Block is used in close proximity to the full "H&R Block" name or logo.  *See* Dhar. Decl. ¶55 (showing examples of uncropped images).  Below are just two examples of H&R Block's misleading cropping.  In both, the image on the right is what H&R Block presented to the Court.  The image on the left shows the image without H&R Block's airbrushing.



**A Consumer Survey Of More Than 1,000 Respondents Establishes That Neither The "Block" Name Nor The Cash App Logo Are Likely To Cause Confusion With H&R Block.**

To assess H&R Block's allegations that the Company's name change to "Block, Inc.," would cause consumer confusion, Defendant engaged Dr. Yoram (Jerry) Wind to conduct a consumer survey on whether there was a likelihood of confusion here. His finding is unequivocal: there is no likelihood of consumer confusion.

By way of background, Dr. Wind is one of the world's pre-eminent marketing and consumer behavior experts. To test Plaintiffs' assertions, he designed an "*Eveready*" survey—a commonly accepted survey format designed to gauge the likelihood of confusion between two

marks. Wind Decl. ¶¶24-40. Dr. Wind showed respondents one of three different stimuli associated with Cash App, Cash App Taxes, or Block, and asked questions designed to test whether the respondents confused the Cash App name and logo, the Cash App Taxes webpage, or the Block corporate website with H&R Block. *Id.* The stimuli (*i.e.*, the images shown) for the control groups were the same as the test stimuli but without the elements alleged by H&R Block (where/if present) to cause likely confusion—*i.e.,* green was changed to blue, the word "block" was changed to "square," and the visual image of blocks or cubes was removed from the webpages. *Id.* Thus, in testing the Cash App name and logo, the test and control stimuli appeared as this:

| Cash App Test and Control Stimuli | |
| --- | --- |
| Test | Control |
|  |  |

Dr. Wind thus tested whether the allegedly infringing elements made any difference in consumers' perception and caused consumers to associate Block's businesses with H&R Block. It turns out, they did not. As reflected in the chart below, fewer than 10 of the more than 1,000 respondents who saw stimuli with allegedly infringing elements, thought they had anything to do with H&R Block. Wind Decl. ¶42.

| Reference to H&R Block in response to the following questions | Experiment K | Experiment N | Experiment X | | | | |
|---|---|---|---|---|---|---|---|
| | Cash App Name/Logo | Cash App Taxes Webpage | Block Webpage | | | | |
| | Test (N=161) | Control (N=157) | Test (1) (N=134) | Test (2) (N=135) | Control (N=134) | Test (N=152) | Control (N=150) |
| Q2. H&R Block mentioned as the source | 0% | 0% | 1% (two mentions) | 1% (two mentions) | 1% (one mention) | 0% | 0% |
| Q3. H&R Block mentioned as a company with a business connection or association | 0% | 0% | 1% (one mention) | 0% | 0% | 0% | 0% |
| Q4. H&R Block mentioned as a company that was required to give permission or authorization | 0% | 0% | 0% | 1% (one mention) | 0% | 0% | 0% |
| Net Confusion | 0% | 1% | 1% | 0% | | | |

In other words, not only was there no meaningful "confusion" in the test groups above that in the control groups, there was virtually no confusion *at all*. As Dr. Wind explains: "These are among the most clear-cut survey results of 'no confusion' that I have seen in over forty years of designing, conducting, and evaluating thousands of consumer surveys." Wind. Decl. ¶6. They provide powerful, empirical evidence—something H&R Block has none of, despite bearing the burden of proof—that consumers are not likely to confuse Block's businesses or brands with H&R Block. The survey and its results are detailed more fully in Dr. Wind's declaration.

H&R Block offers no consumer survey. Instead, it points to a handful of carefully-selected social media posts as a substitute for proof of actual confusion. Mot. at 16-17. Those

posts, however, do not show confusion, much less by actual or prospective consumers of Defendant's products. They show that the posters readily ***differentiated*** between H&R Block, on the one hand, and Defendant and its companies, on the other. *See* Dhar Decl. ¶¶71-82.

Further, if social media sentiment is the touchstone by which this motion is to be decided, H&R Block must lose. The social media sphere abounds with posts calling out the absurdity of H&R Block's assertions of confusion in this case:

- "literally nobody would confuse Block with H&R Block."

- "Hate to break it to them but I never once thought of H&R Block when I heard of the Square rebrand"

- "H&R Block ≠ Block (On all points. I don't understand why they get involved in this conflict.)"

- "Like anyone is going to be confused between Block and H&R Block. Nobody thin[k]s of [t]hem as 'Block.' That's just dumb."

- "H&R Block is seriously stretching this …."

- "Is anyone really confusing H&R Block, the vaguely exploitative tax prep company, with Block (nee Square), the …payment processing-turned-cryptoverse company?"

- "Just wait until H&R Block finds out about the blockchain …"

- "... @HRBlock Thinks people will confuse Block w it … nah man we wont"

- "H&R Block sues over Square's new name 'Block' lol pure comedy."

- "I believe people know the difference between H&R Block vs. Block …"

- "No one is going to confuse them. No one."

- "Literally nothing even remotely similar between the logo or the font."

- "H&R Block doesn't do remotely the same thing. So frivolous."

*See* Dhar Decl. Ex. O.

## LEGAL ARGUMENT

A preliminary injunction "is an extraordinary remedy." *Allied Servs., LLC v. Smash My Trash, LLC*, No. 21-CV-00249-SRB, 2021 WL 1671675, at *2 (W.D. Mo. Apr. 28, 2021) (quoting *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003)). As the movant, H&R Block bears the "complete burden" of showing that: (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in its favor, and (4) that an injunction is in the public interest. *See Michael Jaudes Fitness Edge, Inc. v. Edge Fitness Clubs, LLC*, No. 4:19-CV-01987-AGF, 2019 WL 11318383, at *3 (E.D. Mo. Sept. 6, 2019) (citation omitted) (denying injunctive relief upon finding that plaintiff failed to demonstrate a likelihood of confusion and irreparable harm "as a result of a confusion between two marks" at issue). This burden "is a heavy one where, as here, granting the preliminary injunction will give [the movant] substantially the relief it would obtain after a trial on the merits." *Dakota Indus., Inc. v. Ever Best Ltd.*, 944 F.2d 438, 440 (8th Cir. 1991) (citations omitted) (affirming the denial of preliminary injunction).

H&R Block fails to cite a single case in which any court has ordered such a drastic remedy as the one it seeks—the rebranding of the Defendant's company at the outset of the case.

### A.      H&R Block Is Unlikely to Succeed on the Merits.

H&R Block cannot show a likelihood of success on the merits—the "most significant" factor for determining the propriety of preliminary relief. *MPAY Inc. v. Erie Custom Computer Applications, Inc.*, 970 F.3d 1010, 1015 (8th Cir. 2020) (citations omitted).

To prevail on claims of trademark infringement and unfair competition, a plaintiff must establish that "defendant's use of a similar mark or name is likely to cause confusion as to the source of the products sold by the defendant." *USA Visionary Concepts, LLC v. MR Int'l, LLC*, No. 4:09-CV-00874-DGK, 2009 WL 10672094, at *3 (W.D. Mo. Nov. 17, 2009) (citations

omitted); *see also Graham Webb Int'l v. Helene Curtis Inc.*, 17 F. Supp. 2d 919, 931 (D. Minn. 1998) (denying preliminary injunction where plaintiff failed to show a sufficient likelihood of confusion among consumers). The likelihood of confusion must be probable, not merely possible. *See Lovely Skin, Inc. v. Ishtar Skin Care Prod., LLC*, 745 F.3d 877, 887 (8th Cir. 2014) (citation omitted). This means a plaintiff must demonstrate "a very clear and strong case"; "if there is doubt as to the probability of plaintiff's ultimate success on the merits, the preliminary injunction must be denied." 5 McCarthy on Trademarks and Unfair Competition § 30:45 (5th ed.) (citations omitted). Thus, where the plaintiff fails to submit "specific evidence" showing more than a "minimal" likelihood of confusion, as here, a preliminary injunction is not warranted. *Northland Ins. Companies v. Blaylock*, 115 F. Supp. 2d 1108, 1122 (D. Minn. 2000)

To determine whether confusion, courts assess six factors, each of which shows that confusion is highly ***un***likely here. *See SquirtCo v. Seven-Up*, 628 F.2d 1086 (8th Cir. 1980).

1. "Block" and Green Square Designs Are Commercially Weak Marks Afforded a Low Degree of Protection

The "strength of the mark" factor starts with an analysis of the allegedly infringed mark. *See, e.g.*, *Frosty Treats Inc. v. Sony Computer Ent. Am. Inc.*, 426 F.3d 1001, 1008 (8th Cir. 2005). A mark that is strong conceptually and commercially (i.e., is widely recognized by consumers) favors a likelihood of confusion where the defendant uses a similar name. *See, e.g.*, *Two Men & a Truck/Int'l, Inc. v. Thomas*, 908 F. Supp. 2d 1029, 1037 (D. Neb. 2012).

Plaintiffs suggest the name "Block" and the use of a green square are strong commercial marks. But the strength of H&R Block's asserted marks lies in their nature as composite marks that include "H&R Block"—not the word "BLOCK" or a green square alone. This is demonstrated by the evidence H&R Block submitted (including the names of its website, social

media handles), as well as what it concealed through selective cropping.[2] *See also Sturgis Motorcycle Rally, Inc. v. Rushmore Photo & Gifts, Inc*., 908 F.3d 313, 337 (8th Cir. 2018) ("The commercial impression of a trade-mark is derived from it as a whole, not from its elements separated and considered in detail." (citation omitted)); *Council of Better Bus. Bureaus, Inc. v. Bailey & Assocs., Inc.*, 197 F. Supp. 2d 1197, 1215 (E.D. Mo. 2002) (considering the strength of composite mark). Indeed, H&R Block does not even take basic search engine optimization steps with its website to promote itself as "block" alone. Wind Decl. ¶¶57-60.

The element of their marks over which Plaintiffs seek a monopoly is the word BLOCK, a commercially weak mark, as shown by the hundreds of coexisting registrations for BLOCK-formative marks, including for financial services. *See* Dhar Decl. Exs. L, M; *Jeld-Wen, Inc. v. Dalco Industries, Inc.*, 198 F.3d 250, 1999 WL 1024002, *4 (finding the mark "elite" weak because it is commonly used alone or with other terms to describe many products and services).[3]

Similarly, a green square design is a commercially weak mark. Hundreds of coexisting

---

[2]   For example, all but one example H&R Block provides uses the name "Block" in close proximity to the full H&R Block name and logo. *See* Compl. ¶19; Mot. at 9 (showing "BLOCK ANSWERS" logo next to "H&R Block Answers" Twitter handle); Dhar Decl. ¶¶54-64 (showing the proximity in numerous annotated pictures). *See Luigino's, Inc. v. Stouffer Corp.*, 170 F.3d 827, 831 (8th Cir. 1999) (the use of "Lean" in Lean Cuisine and in Lean 'N Tasty did not render the marks similar because "the prominent display of the house marks convey perceptible distinctions between the products"); *Gen. Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 627 (8th Cir. 1987) (confusion was not likely because both brands are "widely recognized and . . . both appended their house marks in a sufficiently prominent manner"). In other words, consumers rarely (if ever) see the word "Block" or a green square in isolation. In addition, all of H&R Block's social media accounts are labeled under the name "H&R Block"—not "Block" alone. Compl. ¶17, 19–22; *see also* Wind Decl. ¶54 & Ex. L.

[3]   Plaintiffs cite an out-of-circuit case suggesting that BLOCK is conceptually strong because it was derived from the founder's last name. *See* Mot. at 21. But courts in this district have found to the contrary—that "[t]he law affords less trademark protection to common personal names." *Fischer & Frichtel Custom Homes, LLC v. Fischer Mgmt., LLC*, No. 4:21-CV-00470-MTS, 2021 WL 1750174, at *5 (E.D. Mo. May 4, 2021) (quoting 2 McCarthy on Trademarks and Unfair Competition § 13:3; *Peaceable Planet, Inc. v. Ty, Inc.*, 362 F.3d 986, 989 (7th Cir. 2004)).

16

use-based registered marks feature a green square. Dhar Decl. ¶66 n.71. Indeed, a green square with a white symbol within its borders may be the most ubiquitous icon on all mobile phone apps. *See Apple Inc. v. Samsung Elec. Co.*, 786 F.3d 983, 995 (Fed. Cir. 2015) (addressing use of green square icons with rounded edges and white phone symbols on Apple smartphones and Samsung smartphones), *rev'd on other grounds*, 137 S. Ct. 429 (2016). The presence of so many other "block" and green square marks that have peacefully coexisted with H&R Block's asserted marks undermines both its confusion arguments and its professed need for emergency relief.

Moreover, because squares and squarish shapes are so ubiquitous on mobile devices, consumers are accustomed to not viewing those shapes as source identifying, and they cannot be monopolized. *See, e.g.*, *Apple Inc.*, 786 F.3d at 995 (vacating trade dress infringement judgment because the appearance and shape of rounded-rectangle app icons was functional). Such commonly used shapes and words are unlikely to lead to confusion about the source of the allegedly infringing product, because "the public can easily distinguish slight differences in the marks, even if the goods are related." *Roederer v. J. Garcia Carrion, S.A.*, 732 F. Supp. 2d 836, 865 (D. Minn. 2010) (citation omitted).

2.    Consumers Perceive The Parties' Marks As Dissimilar

In assessing similarity, courts look to "the impression that each mark in its entirety is likely to have on a purchaser exercising the attention usually given by purchases of such products." *Duluth News-Trib., a Div. of Nw. Publications, Inc. v. Mesabi Pub. Co*., 84 F.3d 1093, 1097 (8th Cir. 1996) (citation omitted). "The use of identical, even dominant, words in common does not automatically mean that two marks are similar." *Sensient Techs. Corp. v. SensoryEffects Flavor Co.*, 613 F.3d 754, 764 (8th Cir. 2010) (citation omitted).

Plaintiffs offer income tax-related services under the "H&R Block" brand. Defendant offers income tax preparation and filing services under the brands "Cash App" and "Cash App

17

Taxes." Esperanza Decl ¶12, Jennings Decl. ¶15. These are not similar by any measure. *See* Wind Decl. ¶¶73-76.

To create the impression of similarity where none exists, H&R Block misleadingly compares its green square logo to Cash App's green rectangle dollar sign logo:



*See* Mot. at 15, 22–23; *see also* Jones Decl. ¶8; Jennings Decl. ¶6.

H&R Block shows no examples of its green logo being used alone in the marketplace. *Cf.* Jones Decl. ¶¶8-9, 11-12, 14-16. But marketplace context is critical because courts "must consider the marks' similarity consistent with the context in which consumers would encounter the marks . . . ." *Fischer & Frichtel Custom Homes, LLC*, 2021 WL 1750174, at *4. Here, the logos are accompanied in the marketplace by their associated brands, and their lack of similarity is self-evident. *See* Dhar Decl. ¶¶18-44; Wind Decl. ¶¶ 73-77.

Further, the H&R Block and Cash App logos use different shapes, designs, shades of green, and typefaces. All of these differences together "convey perceptible distinctions between the products." *Luigino's*, 170 F.3d at 831 (collecting cases with no likelihood of confusion based on distinctions in marketplace context); *see also Michael Jaudes Fitness Edge, Inc.*, 2019 WL 11318383 at *5 (noting significant visual differences between the two marks at issue, including typefaces, and capitalization); *see also* Wind Decl. ¶¶73-76.

When H&R Block's two-dimensional green square logo is compared to Block's visual logo, the difference is even more stark. Even when compared to Block Advisors' green cube (*see* Compl. ¶28), Block's three-dimensional, twisted cube is incontrovertibly different. It is multi-colored, shimmering, animated, twisted cube-ish form that spins, twists, turns, and changes colors as it dances to the beat of the background music. *See* Esperanza Decl. ¶22.

### 3. The Parties Exist in Two Different Markets

The third factor looks to the degree of competition between products. "[P]roper application of this factor requires exploration of the likelihood that consumers would draw a connection between the two products and be confused as to the identities of their respective sources." *Kemp v. Bumble Bee Seafoods, Inc.*, 398 F.3d 1049, 1056 (8th Cir. 2005). Given the differing origin, history, and business focus of Cash App and H&R Block, ordinary customers are not likely to draw a connection between Cash App's products and H&R Block's products.

H&R Block's mix-and-match framing of the parties' names and offerings cannot override the fundamental asymmetry of the parties' services. *See* Wind Decl. ¶¶ 78. Defendant does not use Block as a brand for any consumer-facing goods or services; Block is the name of a parent corporation whose diverse business units offer many services H&R Block never claimed to offered, including money transfers, eCommerce storefront development, cryptocurrency trading, and music streaming. *See* Esperanza Decl. ¶¶12-16. In contrast, H&R Block "specialize[s] in income tax preparation." Compl. ¶13; *see also* Wind Decl. ¶78 (showing that at least 80% of H&R Block's total revenue in 2021 came from tax-related services).

Even as to the Cash App brand under which Defendant offers tax preparation services, H&R Block does not claim to offer services that compete with its leading offerings—peer-to-peer money transfers and Bitcoin purchasing, much less its many other services like clothing sales and an initiative designed to help independent creatives, including artists, musicians,

directors, and designers, fund their projects. Jennings Decl. ¶4; Wind Decl. ¶¶77-78. Further, less than 10% of H&R Block's revenue comes from "U.S. DIY tax-preparation." Dhar Decl. ¶9.

This absence of an overlap in services under a similar name cannot support a likelihood of confusion.[4] Cash App's distinct visual and brand identity, associated in the minds of consumers with frequent celebrity and sports figure partnerships, diverges significantly from H&R Block's brand and public image, which, as captured in its complaint, rely primarily on H&R Block's history and legacy in its expertise in tax preparation services. Jennings Decl. ¶10, Dhar Decl. ¶¶ 45-53; *see also* Compl. Ex. A.[5]

4.     <u>H&R Block Shows No Evidence of Intent to Trade On Its Name</u>

H&R Block introduced no evidence that Block intended to trade on its name. *See Nail All., LLC v. Poly-Gel L.L.C.*, No. 17-CV-01026-FJG, 2019 WL 5295502, at *10 (W.D. Mo. Sept. 27, 2019). Nor could it because Block did not. *See* Esperanza Decl. ¶24; Jennings Decl. ¶21. This distinguishes Block from the defendants in the sole case H&R Block cites to support of its argument, who admitted "intentionally cop[ying] Plaintiff's precise marks and continu[ing] to use them." *Cmty. of Christ Copyright Corp. v. Devon Park Restoration*, 683 F. Supp. 2d 1006, 1014 (W.D. Mo. 2010).

Mere awareness of a plaintiff's trademark does not show that a defendant "intended to

---

[4]   *See Phoenix Ent. Partners, LLC v. Sports Legends, LLC*, 306 F. Supp. 3d 1112, 1118 (E.D. Mo. 2018) (finding no competition between plaintiff karaoke software developer and defendant karaoke DJ); *see also Eyebobs, LLC v. Snap, Inc.*, 259 F. Supp. 3d 965, 976 (D. Minn. 2017) (considering the "similarity of the products, target customers, marketing channels, and advertising" and concluding that a small-town eyeglasses retailer would not be confused with a tech company offering glasses with built-in video camera).

[5] H&R Block's assertions regarding other product lines are equally meritless (Mot. at 8, 12, 14-15); Block's debit cards are branded as Cash App, and its small business services are branded as Square. H&R Block offers no evidence that anyone could possibly be confused as between Square or Cash App on one hand and H&R Block on the other.

promote confusion or exploit any goodwill associated with [plaintiff]'s product." *USA Visionary Concepts, LLC*, 2009 WL 10672094, at *4; *Nail All., LLC*, 2019 WL 5295502, at *10; *see also ZW USA, Inc. v. PWD Sys., LLC*, 889 F.3d 441, 447 (8th Cir. 2018).

Far from showing bad faith, the undisputed evidence demonstrates that Defendant adopted the "Block" corporate name in good faith to "distinguish[] the corporate entity from its businesses, or building blocks," and strengthen separate brand identities of Square, Cash App, and TIDAL. Compl. Ex. A at 3; *see also* Esperanza Decl. ¶¶18, 22.[6] Thus, this factor weighs decidedly in favor of Block.

5.    <u>H&R Block Offers No Evidence of Actual Confusion</u>

H&R Block identifies no evidence of actual confusion from a consumer survey or from actual instances of consumer confusion. It cites six Twitter posts, four of which are replies to Block's Tweet announcing its name change, three posts on Reddit and one post on LinkedIn. *See* Compl. ¶ 43; Mot. at 28. Even if they reflected actual confusion, these anecdotal posts—plucked from hundreds of such posts—would not justify relief.[7] *See* Dhar Decl. ¶¶71-82.

Five of the six Tweets and all three Reddit posts show that the posters clearly understand that two corporate entities are distinct, and thus do not indicate actual confusion. Compl. ¶43; Jones Decl. ¶35. The last Tweet and the single LinkedIn post to which Plaintiffs point were inquiries about the relationship between Plaintiffs and Defendant, which are "not probative of

---

[6]    In addition, after receiving the complaint, in a gesture of goodwill, Block removed the copyright notice from the Cash App Taxes webpage. Jennings Decl. ¶¶22-23. *See also Sanborn Mfg. Co. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 489 (8th Cir. 1993) (affirming the district court's denial of "a prohibitory preliminary injunction" where defendant "has voluntarily taken remedial action" (citation omitted)).

[7]    *See, e.g., Michael Jaudes Fitness Edge, Inc.*, 2019 WL 11318383, at *6; *see also Maritz, Inc. v. Cybergold, Inc.*, 947 F. Supp. 1338, 1342 (E.D. Mo. 1996); *Duluth News–Tribune*, 84 F.3d at 1098 ("[W]hen determining whether there exists a likelihood of confusion, weight is given to the number and extent of instances of actual confusion.").

actual confusion." *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.,* 209 F. Supp. 3d 612, 672 (S.D.N.Y. 2016), *aff'd* 720 F. App'x 24 (2d Cir. 2017). Questions about relationships or affiliations of two companies actually "indicates a ***distinction*** in the mind of the questioner, rather than confusion." *Duluth News-Trib.*, 84 F.3d at 1098 (emphasis added) (citation omitted) .

Finally, H&R Block cites one Tweet from one of Defendant's employees who joked that "folks are now going to think I work for H&R Block." Jones Decl. ¶44. Even if taken as a serious comment, this does not provide evidence that "consumers are likely to draw a link between Block, Inc. and [H&R Block]." Mot. at 26. But it was not serious. The employee's declaration explains that the post was intended as an inside joke. Ng Decl. ¶¶5–7.

In contrast to Plaintiffs' negligible evidence, Block has submitted evidence of a consumer survey overwhelmingly reflecting that consumers are not likely to be confused by any of Defendant's allegedly infringing branding. Wind Decl. § V.A. Further, it has submitted declarations from two esteemed marketing professors explaining in detail why based on the available and undisputed facts, consumers are unlikely to be confused as to the affiliation of either Cash App or Block with Plaintiffs. *See generally* Dhar Decl., Wind Decl.

6.    The Products' Distinct Purchasing Processes Eliminate Any Confusion

The sixth factor considers "the sophistication of the customers and the nature of the purchasing process." *Sensient Techs. Corp.*, 613 F.3d at 765. Even if customers are not familiar with corporate structures (*cf.* Mot. at 27), those customers who are using the tax services of H&R Block or Cash App Taxes are likely to exercise a higher degree of care because tax preparation "require[s] inquiries into one's financial and personal life." *JTH Tax, Inc. v. Freedom Tax, Inc.*, No. 3:19-CV-00085-RGJ, 2019 WL 2062519, at *8 (W.D. Ky. May 9, 2019) (finding consumer care weighed against confusion); *see also First Nat. Bank in Sioux Falls v. First Nat. Bank, S. Dakota*, 153 F.3d 885, 889–90 (8th Cir. 1998). Indeed, a higher level of involvement and care is

required to select such services because customers prepare and submit documents under the penalty of misrepresentation and other fines. *See, e.g.*, 26 U.S.C. § 7206(1); *United States v. H&R Block, Inc.* 1:11-cv-948 (BAH) (D.C. Cir. Nov. 10, 2011) ("[T]ax returns are highly personal documents that carry significant financial and legal consequences for consumers."); *see also* Wind Decl. ¶¶10, 68.

Even where low sophistication is presumed because the products are not expensive, different distribution channels cut against a likelihood of confusion. *ZW USA, Inc. v. PWD Sys., LLC*, 889 F.3d at 447–48; *Duluth News-Tribune*, 84 F.3d at 1099 (attributing care to purchase of newspapers, 92% of which were sold via subscriptions); *see also JTH Tax, Inc.*, 2019 WL 2062519 at *7 ("consider[ing] the respective marketing channels of the parties … and 'how and to whom the respective goods or services of the parties are sold") (citation omitted).

Here, any likelihood of confusion is eliminated or significantly diminished by the process by which an ordinary consumer encounters and engages with each product in the marketplace. Dhar Decl. ¶18-43. For example, to access Cash App's tax services, a customer must first download Cash App mobile app. Jennings Decl. ¶16. By contrast, H&R Block largely offers in-person services in its physical offices, which are conspicuously branded with the H&R name and logo. Dhar Decl. ¶9. Even considering its online and mobile services, they can be accessed through clearly branded "H&R Block" channels or retailers who sell products clearly branded with "H&R Block." Wind Decl. ¶56. While each entity's tax services *can* be accessed in a similar way, consumers are unlikely to confuse the sources of each service because the services are distributed in a way that clearly identifies the source.

### B. H&R Block Cannot Show Irreparable Harm.

Having failed to show it is likely to succeed on the merits, H&R Block is not entitled to a presumption of irreparable harm. 15 U.S.C. § 1116(a). As a result, "the court must actually

consider the injury the plaintiff has suffered …, paying particular attention to whether the remedies available at law, such as monetary damages, are inadequate to compensate for that injury." *Sola Franchise Corp. v. Solo Salon Studios Inc.*, No. 14-CV-0946, 2015 WL 1299259, at *17 (E.D.N.Y. Mar. 23, 2015) (citations omitted).[8]

To obtain an injunctive relief, the injury must be "certain and great and of such imminence that there is clear and present need for equitable relief." *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Disc.*, 696 F.3d 771, 778 (8th Cir. 2012). H&R Block has failed to make such a demonstration here. Instead, it offers only speculation—all of which is premised on the faulty assumption of confusion between the parties. *See* Mot. 23; Wind Decl. ¶ 79 & n.45.[9] This is not enough. *E.g., Graham Webb Int'l v. Helene Curtis Inc.*, 17 F. Supp. 2d 919, 924 (D. Minn. 1998) ("Possible or speculative harm is not enough."). H&R Block's "failure to demonstrate the threat of irreparable harm is, by itself, a sufficient ground upon which to deny a preliminary injunction." *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1183 (8th Cir. 1998).

### C. The Balance of Hardships Weighs Decidedly Against An Injunction.

An injunction would inflict far more harm on Block than H&R Block would face without

---

[8] *See also Furminator, Inc. v. Ontel Prod. Corp.*, 429 F. Supp. 2d 1153, 1179 (E.D. Mo. 2006), *aff'd*, 214 F. App'x 982 (Fed. Cir. 2007) (denying a motion for preliminary injunction while noting that plaintiff has failed to show "money damages are an inadequate remedy at law"); *Deflecto, LLC v. Dundas *Jafine Inc.*, No. 13-0116-CV-W-ODS, 2014 WL 172218, at *4 (W.D. Mo. Jan. 15, 2014) (finding that plaintiff "failed to meet its burden with regard to irreparable harm because it never established that monetary damages would be insufficient").

[9] For example, H&R Block speculates that "if [Block, Inc.] *at some point* plunges into . . . [an] unfortunate condition of financial instability," H&R Block "could well be harmed." Mot. at 22. This hardly merits a response given the parties' relative financial positions. Publicly available data reflects that Block's market capitalization is more than 17 times greater than H&R Block's. *See* YCharts.com, H&R Block Market Cap (ycharts.com); Block Market Cap (ycharts.com). And according to the parties' most recent 10-Q filings, Block's revenues are nearly 20 times that of H&R Block and it has nearly four times as much cash on hand as H&R Block. Similarly, H&R Block next surmises that it might be harmed if Block has a data breach, even though H&R Block has had data breaches resulting in negative press. Wind Decl. ¶79 & n.46.

one, particularly because H&R Block is not likely to succeed on the merits, has been coexisting with hundreds of other "block" and green square marks for years, and has offered nothing but speculation about future possible negative associations.

If an injunction were issued, the resulting hardship to Defendant would be tangible, extensive, and affect tens of millions of consumers. If Block were forced to change its name, it would incur substantial financial hardship, requiring extensive time and money to develop and implementing a new rebranding, including securing domain name and social media rights, modifying computer and IT systems, and the like—a process that would again take more than one year and negatively affect employee morale and recruiting.[10] *See* Esperanza Decl. ¶¶27-28. Much worse, an immediate name change would run afoul of state and federal money transmission and virtual currency laws. Defendant's regulators expect, and in many cases require, advance notice of any name change and some assert the right to approve any change. Those regulators could even revoke Block's licenses in an extreme case, which would cause substantial harm to the tens of millions of customers who rely on Square and Cash App for their financial needs. *Id.* ¶29.

In addition, an injunction barring use of the Cash App logo would be harmful and disruptive to Cash App's tens of millions of customers who recognize the Cash App logo and tap on it at least 40 million times each month. Jennings Decl. ¶25. Forcing Cash App to create and

---

[10] *See Russell Rd. Food & Beverage, LLC v. Spencer*, No. 2:12-CV-01514–LRH-GWF, 2013 WL 321666, at *5 (D. Nev. Jan. 28, 2013) ("balance of hardships tips in favor of" defendant based on "significant amounts in rebranding" and period where it may have "no presence"); *FirstBank Sw. v. Heartland Fin. USA, Inc.*, No. 2:21-CV-024-Z, 2021 WL 3743806, at *7 (N.D. Tex. Aug. 24, 2021) (in addition to "immediate financial and technical costs," rebranding "may have an effect of making the preliminary injunction a permanent injunction").

use a different logo, which Cash App's customers will not know or recognize, would cause immense harm in the form of lost transactions, customers and goodwill. *Id.*

This concrete evidence of harm to Block from an injunction far outweighs the speculative harm H&R Block has articulated. Given these stakes, courts often decline to "require a defendant to make a costly and irrevocable change of its main identifying mark" because a premature grant of preliminary injunction means allowing plaintiff to "prevail[] on the underlying lawsuit without ever having to try it because it would be highly unlikely that the defendant would change back to its original [mark] once it had been forced to abandon them." 5 McCarthy on Trademarks and Unfair Competition § 30:50 (5th ed.) (citations omitted).

### D. An Injunction Is Not in the Public Interest.

Because the likelihood of confusion is so remote, the public interest consideration disfavors injunctive relief. Further, the public interest favors allowing Cash App to continue using the name and logo to which its customers have become accustomed, and to continue to provide free income tax services for the millions of Americans who need it. Jennings Decl. ¶25.

Recent filings by the Department of Justice suggests that the federal government is also keen on keeping a close eye on the competitive landscape of the income tax services industry, particularly for what it classifies as "digital do-it-yourself" offerings.[11] This Court should not permit H&R Block to stifle competition, in a marketplace where barriers to market entry are already high and only limited competition exists, especially at the onset of tax season. *See*

---

[11] *See Justice Department Requires Divestiture of Credit Karma Tax for Intuit to Proceed with Acquisition of Credit Karma* (Nov. 25, 2020), https://www.justice.gov/opa/pr/justice-department-requires-divestiture-credit-karma-tax-intuit-proceed-acquisition-credit (Justice Department requiring Intuit Inc. and Credit Karma, Inc. to divest Credit Karma Tax to Defendant, because the merger plan without the divestiture "would substantially lessen competition for digital do-it-yourself (DDIY) tax preparation products.").

*United States v. H&R Block, Inc.*, 1:11-cv-948 (BAH) (D.C. Cir. Nov. 10, 2011); *see also Graham Webb Int'l*, 17 F. Supp. 2d at 931 (finding that public interest favors "allowing continued competition between the products" in a case where questions as to likelihood of consumer confusion remain).

**CONCLUSION**

The Court should deny Plaintiffs' motion for preliminary injunction.

January 12, 2022                                Respectfully submitted,


                                                By: */s/      David Jermann*


Margret Caruso (*pro hac vice*)                 David A. Jermann, II (MO Bar #51389)
**QUINN EMANUEL URQUHART &**                    **ARMSTRONG TEASDALE LLP**
**SULLIVAN LLP**                                2435 Grand Blvd., Suite 1500
555 Twin Dolphin Dr., 5th Floor                 Kansas City, Missouri 64108
Redwood Shores, California 94065                Telephone: (816) 221-3420
Telephone: (650) 801-5000                       djermann@atllp.com
margretcaruso@quinnemanuel.com


Robert M. Schwartz (*pro hac vice*)             Rachel Herrick Kassabian (*pro hac vice*)
**QUINN EMANUEL URQUHART &**                    **QUINN EMANUEL URQUHART &**
**SULLIVAN LLP**                                **SULLIVAN LLP**
865 S. Figueroa Street, 10th Floor              555 Twin Dolphin Dr., 5th Floor
Los Angeles, California 90017                   Redwood Shores, California 94065
Telephone: (213) 443-3000                       Telephone: (650) 801-5000
robertschwartz@quinnemanuel.com                 rachelkassabian@quinnemanuel.com

**CERTIFICATE OF SERVICE**

This is to certify that on Wednesday, January 12, 2022, a true and accurate copy of the above and foregoing was e-filed with the Court using the CM/ECF system which sent notification to all parties entitled to service.

By:      */s/ David A. Jermann*
          Attorney for Defendant