H&R BLOCK, INC., a Missouri corporation
 and
HRB INNOVATIONS, INC., a Delaware
 corporation,

         Plaintiffs,

    v.

BLOCK, INC a Delaware corporation,

        Defendant.

Case No.: 4:21-CV-00913-NKL

# REBUTTAL DECLARATION OF SARAH BUTLER

# REBUTTAL DECLARATION OF SARAH BUTLER

## Table of Contents

| | | |
|---|---|---|
| I. | ASSIGNMENT AND SUMMARY OF OPINIONS | 3 |
| II. | BACKGROUND | 6 |
| III. | REVIEW OF WIND SURVEYS | 7 |
| | A. Inadequate Stimuli for Disproving Confusion | 7 |
| | B. Over and Underinclusive Populations | 10 |
| IV. | SURVEY METHODOLOGY | 13 |
| | C. Survey Population | 14 |
| | D. Sampling of the Relevant Population | 14 |
| | E. Quality Control Measures for the Survey | 15 |
| | F. Screening Questionnaire | 17 |
| | G. Main Questionnaire | 18 |
| | H. Stimuli Shown | 19 |
| V. | SURVEY RESULTS | 23 |
| VI. | QUALIFICATIONS | 24 |
| VII. | DOCUMENTS REVIEWED | 26 |
| VIII. | CONCLUSIONS | 26 |

Case 4:21-cv-00913-NKL   Document 56   Filed 01/21/22   Page 2 of 27

# I.  ASSIGNMENT AND SUMMARY OF OPINIONS

1.  I was asked by counsel for H&R Block, Inc. and HRB Innovations, Inc. (hereinafter "Plaintiffs" or "H&R Block") to evaluate the surveys submitted by Dr. Yoram Wind which, in part, inform his conclusion that "consumers are unlikely to confuse the brand name 'H&R Block' and/or its green square logo with the company name 'Block' and/or the green logo used by some of its brands."[1]  I also was asked, in rebuttal to Dr. Wind's opinions, to evaluate whether Square, Inc.'s name change to Block, Inc. (hereinafter "Defendant" or "Block, Inc.") is likely to cause consumers to confuse Block, Inc. and its products and services with Plaintiffs and their products and services.

2.  Based on my review of Dr. Wind's declaration, I conclude, for a number of reasons, that Dr. Wind's surveys do not reliably demonstrate that confusion is unlikely between Defendant and Plaintiffs. Generally, the stimuli Dr. Wind tested do not contemplate the range of ways that consumers could be exposed to Block, Inc. and the services it offers.  In two of the experiments (the Cash App experiment and the Cash App Taxes experiment), Dr. Wind fails to provide respondents with relevant context.  In particular, in the Cash App experiment, Dr. Wind does not provide respondents any context or reference for what they are viewing. Similarly, the Cash App Taxes experiment provides no context to respondents, and the webpage shown to respondents only references Block, Inc. once in small print, in a copyright notice at the bottom of a busy webpage. Neither of these tests sufficiently demonstrates that consumers are unlikely to be confused when meaningfully exposed to Block, Inc.'s name and its associated services.

---

[1] Declaration of Dr. Yoram (Jerry) Wind, *H&R BLOCK, INC. and HRB INNOVATIONS, INC. v. BLOCK, INC.,* United States District Court for the Western District of Missouri, Case No. 4:21-CV-00913-NKL, dated January 12, 2022 (hereinafter, "*Wind Declaration*"), ¶ 84.

3

3.     Dr. Wind's third experiment (the Corporate webpage experiment) tests a webpage that is misaligned with his survey population.  In this survey, respondents are asked to view Defendant's webpage at https://block.xyz as if they were considering investment or employment opportunities.  Dr. Wind, however, did not screen for respondents looking to invest in or work for a company like Block, Inc.  Accordingly, the results of that survey are essentially meaningless.  Moreover, this test, which evaluates a corporate webpage for Block, Inc., does not allow respondents to click on the links that appear on the webpage that would enable them to review information about Block, Inc.'s products and services.  For example, although the webpage lists "Cash App" as one of the building blocks in the Block family of companies, respondents in the survey were not able to click on that link to learn more about Cash App (including that it can be used to prepare and file tax returns).  Respondents also were not permitted to click on the links providing information about employment opportunities at Block, Inc. (a number of which are in the tax related field), providing information about investment opportunities, or linking to Block, Inc.'s Twitter account (@Blocks) (at which Block, Inc. disseminates social media tweets about its businesses, including Cash App and Square).  This experiment, therefore, cannot reliably measure the extent to which consumers who actually visit this website would be confused.

4.     I understand that Defendant's name change is recent,[2] and the precise ways in which the new company name will be used by the Defendant and/or others, when referring to or discussing the products and services the Defendant offers, is evolving.  Although Dr. Wind has tested a set of stimuli that minimize the connection (or display no connection at all) between Block, Inc. and the services it offers to consumers, other materials provide examples of how the

---

[2] "Formerly known as Square, Inc., Block, Inc. announced its name change on December 1, 2021 and formally changed its name on December 10, 2021." Complaint, *H&R BLOCK, INC. and HRB INNOVATIONS, INC. v. BLOCK, INC.,* United States District Court for the Western District of Missouri, Case No. 4:21-CV-00913-GAF, dated December 16, 2021 (hereinafter, "*Complaint*"), ¶ 9.

4

name "Block" might appear in relation to consumer-facing products like Cash App.  For example, there are news and informational articles in the press illustrative of the manner in which the corporate name (Block, Inc.) and its services might appear to consumers.

5.      To evaluate the potential for consumer confusion when these errors in Dr. Wind's surveys are corrected, I conducted a consumer perception survey that showed respondents a news article that discussed Square, Inc.'s acquisition of Credit Karma Tax.  Because Square, Inc. is now Block, Inc., and that is how consumers will be exposed to the company, one group of respondents (the Test Group) was shown a stimulus that changed "Square, Inc." references in the article to "Block, Inc."  A second group of respondents (the Control Group) was shown the original article about Square, in order to account for guessing and survey "noise."  This test/control methodology—much like a clinical trial that tests a drug against a placebo—is the ideal way to assess the extent to which confusion is caused by the name change, since everything except the name is held constant.  As described in more detail below, my survey demonstrates that 36.2 percent of respondents believed that Block, Inc. was affiliated or associated with H&R Block.

6.      These results demonstrate that, in contrast to the surveys conducted by Dr. Wind, Block, Inc.'s name change is likely to cause consumers to be confused and to believe that Block, Inc. and its products and services are from Plaintiffs or are associated or affiliated with Plaintiffs.

## II.    BACKGROUND

7.      H&R Block, Inc. is a company organized under the laws of Missouri with a principal place of business in Kansas City, Missouri.[3]  HRB Innovations, Inc. is a company organized under the laws of Delaware with a principal place of business in Wilmington, Delaware.  HRB Innovations is the owner of the Block family of marks including H&R Block.[4] Plaintiffs offer a variety of tax and other financial services including income tax preparation and filing services, tax software, prepaid debit cards, and small business services.[5]

8.      Block, Inc. is a company organized under the laws of Delaware with a principal place of business located in San Francisco, California.[6]  Block, Inc., formerly known as Square, Inc., announced it was changing its name to Block, Inc. on December 1, 2021.[7]  Block Inc.'s business offerings include tax preparation and other financial services, such as prepaid debit cards, bank accounts, and payroll services that include the payment of payroll taxes.[8]

9.      Plaintiffs assert that Defendant directly competes with Plaintiffs in the areas of tax and other financial services.[9]  As an example, Plaintiffs note that Defendant acquired Credit Karma Tax, and related to this acquisition, Defendant is offering tax preparation and filing services through Cash App Taxes for the 2022 tax season.[10] Defendant's Cash App will also allow consumers to receive their tax refund into the app where they can then spend this money

---

[3] *Complaint,* ¶ 7.

[4] *Complaint,* ¶ 8.

[5] *Complaint,* ¶¶ 13-14. https://www.hrblock.com/, last accessed January 16, 2022. https://www.blockadvisors.com/, last accessed January 16, 2022.

[6] *Complaint,* ¶ 9.

[7] *Complaint,* ¶ 32.

[8] *Complaint,* ¶ 32.

[9] *Complaint,* ¶ 3.

[10] *Complaint,* ¶ 3; **Exhibit A**.

6

using the Cash App debit card.  These services are akin to those offered through Plaintiffs'

MyBlock app and the H&R BLOCK EMERALD CARD.[11]  Due to the similar services offered by

Plaintiffs and Defendant, Plaintiffs allege consumer confusion is inevitable.[12]

## III.   REVIEW OF WIND SURVEYS

     10.     Dr. Wind conducted three surveys of 1,023 respondents.  The first two

experiments screened for respondents who had used in the last twelve months, or were likely to

use in the next twelve months: 1) a financial platform (via website or mobile app) that allows one

to send and receive money (other than through auto-pay for recurring bills); 2) a mobile or online

tax preparation software; or 3) a mobile financial platform that allows one to buy and sell

Bitcoin.[13]  For Dr. Wind's third experiment, respondents qualified if they had visited or would be

likely to visit the website of a company that offered: 1) merchant payment processing services; 2)

online or mobile banking services and payment cards; 3) mobile stock and cryptocurrency

trading;  4) online or mobile income tax preparation; or 5) music streaming services.[14]

### A.    Inadequate Stimuli for Disproving Confusion

     11.     Dr. Wind tests three different stimuli, none of which are sufficient or reliable for

demonstrating that confusion is unlikely.

     12.     The first experiment (the Cash App experiment) designed by Dr. Wind tests only

the appearance of the Cash App icon (a green square with a white dollar sign in the center)

together with the words "Cash App" in black letters.  Respondents were not provided with any

---

[11] *Complaint,* ¶ 3.

[12] *Complaint,* ¶ 42.

[13] *Wind Declaration*, Exhibit H, pp. 223-224.

[14] *Wind Declaration*, Exhibit H, p. 225.

7

particular context for reviewing the stimulus.[15]  For example, respondents were not told that this was the logo of an application through which they could file their taxes or engage in other financial transactions; respondents also were not shown any of the materials available on the Cash App website or app.

13.     The second experiment (the Cash App Taxes experiment) designed by Dr. Wind evaluates the extent to which the Cash App Taxes webpage is likely to cause consumer confusion. As with the Cash App experiment, respondents were provided with no context for the information shown.[16]  The stimulus in the Cash App Taxes experiment included two small visual depictions of green and white blocks and a copyright notice at the bottom of the page referencing Block, Inc. While this experiment includes a reference to Block, Inc. it is not surprising that survey respondents did not recall (or perhaps even read) the reference at the very bottom of the page since respondents were not told anything when the page was first shown to them and they were not permitted to review the page after they were asked questions.[17]  Indeed, given that almost half of the respondents, or 46.4 percent, took this survey on a smartphone, it is not clear whether that copyright notice was even legible.  Dr. Wind does not provide any screen shots to demonstrate that his survey was optimized for mobile devices and it is therefore unclear how legible, if at all, the small text was in this experiment.

14.     Further, in the Cash App Taxes experiment (and also in the third Corporate webpage experiment), respondents were not able to go back and review or reference the webpage.

---

[15] Respondents are simply told they are going to be shown a "screen shot." *Wind Declaration*, Exhibit H, p. 227.

[16] Respondents are simply told they are going to be shown a "screen shot of a webpage." *Wind Declaration*, Exhibit H, p. 227.

[17] Even Dr. Wind refers to the reference of Block, Inc. as tiny: "Thus, the tiny "© 2021 Block, Inc." line at the bottom of the webpage (in Test 1) was inconsequential in terms of consumer confusion with H&R Block." *Wind Declaration*, ¶ 45.

8

Thus, Dr. Wind's survey is at best a reflection of respondents' ability to read, memorize, and recall a lengthy webpage, all in a survey that took less than 10 minutes to complete.[18]

15.     The fact that respondents are unable to recall a singular reference to Block, Inc., in small print, on this one webpage of the Cash App Taxes experiment, does not establish that consumers are not likely to be confused and believe that Block, Inc. is associated with Plaintiffs when consumers encounter Block, Inc. and its use of "Block" in other contexts (such as in the context of news reports about Block, Inc., its services, and news about the company).

16.     Dr. Wind's third experiment (the Corporate webpage experiment) tests the block.xyz home page.  Although Dr. Wind purported to provide respondents with some context for this webpage (in particular, he told respondents to review the information as though they were looking for investment or employment opportunities),[19] respondents were not permitted to interact with the stimulus in a way that would allow them to evaluate the employment or investment opportunities available from Block, Inc., or to view any of the products and services that Block, Inc. provides in the manner consistent with how they would encounter the actual website.[20]

17.     Dr. Wind easily could have shown respondents the landing page (which clearly references "Block") and allowed them to click on the product pages (e.g., Cash App), the career link, or the investor link, which would have given respondents the opportunity to interact with the

---

[18] I calculate the average time to complete the survey using the "TimeStamp" variable in Dr. Wind's 22-01001 Data Tables_01.12.22.xlsx file. I have not conducted a complete and thorough analysis of the data and responses from Dr. Wind's surveys. I may have additional responses to his survey once this review is complete.

[19] The context provided does not make sense as respondents in the survey were not screened to be consumers looking for investment or career opportunities. This is discussed more in paragraph 23.

[20] It is not entirely clear whether respondents were shown the page listing the "building blocks" and information in the upper right-hand corner. The actual webpage starts without this information, which then appears when the button in the bottom right-hand corner is clicked. The survey instructions in Dr. Wind's third experiment state "Click the square in the bottom right corner of the video to enlarge it." If the "square" moved respondents from the initial home page to the page with the listing of "building blocks" and other information, it is not clear that any respondents actually clicked to see the additional information.

9

webpage as they could in the real world. Dr. Wind did not allow respondents to do that, however. Instead, respondents were simply told to "Please look a look at the video below. Take as long as you'd like but please take at least 5 seconds to review it" and were only shown the page which displays a moving block, music, and a list of "building blocks," and a list in the upper right hand corner listing "careers, investors, media kit, and @blocks." Given the way that Dr. Wind displayed the block.xyz webpage, it was not clear to respondents that the list of "building blocks" were, in fact, links to the home pages for Block, Inc.'s services.

18.     Given this presentation, it is not surprising that respondents were generally confused about the nature of stimuli shown in the third experiment. Dr. Wind's data show that, over 40% of respondents in the Test Group were unable to provide any description of the company whose website they viewed. For example, one respondent said that the site was "confusing"; another explained, "I'm not even sure what it was. It was just a video of some image spinning around"; and another stated that it was "Weird, vague."[21] These data demonstrate that, for a large number of respondents, the corporate webpage, with no other information or context and no ability for interaction with links, was not a meaningful stimulus. As such, the results of the Dr. Wind's third experiment do not provide a reliable measure of the extent to which consumers would potentially be confused by Block, Inc.

## B.     Over and Underinclusive Populations

19.     In addition to the issues with the stimuli, the populations for Dr. Wind's surveys are both over and underinclusive. It is important to define and survey the relevant population because systematic differences may exist between the appropriate population and non-members.[22]

---

[21] See **Exhibit B** for the list of respondents and accompanying description.

[22] As S. Diamond notes, "A survey that provides information about a wholly irrelevant population is itself irrelevant." Diamond, S. S. (2011). "Reference Guide on Survey Research," *Reference Manual on Scientific*

A survey population can be overinclusive, *i.e.*, includes members whose opinions are not relevant to the matter at issue, and underinclusive, *i.e.*, excludes members whose opinions do matter. Both overinclusive and underinclusive populations can render the survey unreliable because the responses may simply be a reflection of the wrong groups being surveyed.[23]

20.     For Dr. Wind's first two experiments (the Cash App experiment and the Cash App Taxes experiment) respondents could qualify if they used a financial platform that allows one to send and receive money. This definition of the universe would include anyone who has access to a mobile bank account. A total of 25.8% of respondents qualified solely on this basis.[24] Accordingly, Dr. Wind's survey likely included some number of respondents who have never used, and do not plan to use, a mobile app like Cash App or its tax services.

21.     In fact, in Dr. Wind's second experiment in which respondents were shown the Cash App Taxes page, 25.8% of respondents indicated that they had not used, and did not intend to use, mobile or online tax preparation software.[25]

22.     Thus, the screening for the first two experiments was overinclusive as the survey population likely included survey respondents not in the market for services offered through Cash App or by Plaintiffs. In addition, the second experiment included a number of respondents who have not used, and would not use, mobile or online tax preparation software.

---

*Evidence*, Committee on the Development of the Third Edition of the Reference Manual on Scientific Evidence; Federal Judicial Center; National Research Council (hereinafter, "*Diamond*"), p. 377.

[23] S. Diamond states, "An overinclusive sampling frame generally presents less of a problem for interpretation than does an underinclusive sampling frame.87 If the survey expert can demonstrate that a sufficiently large (and representative) subset of respondents in the survey was drawn from the appropriate sampling frame, the responses obtained from that subset can be examined, and inferences about the relevant population can be drawn based on that subset. If the relevant subset cannot be identified, however, an overbroad sampling frame will reduce the value of the survey. If the sampling frame does not include important groups in the target population, there is generally no way to know how the unrepresented members of the target population would have responded." *Diamond*, p. 379.

[24] This applies only to the respondents in Experiments 1 and 2.

[25] 22-01001 Data Tables_01.12.22.xlsx, *Wind Declaration,* Backup.

23.     The population as defined by Dr. Wind for his third experiment is even more problematic because it is underinclusive.  Unlike in the first two experiments, the third experiment provided some context for the stimuli shown, and instructed respondents to "Imagine that you are looking for some information about or opportunities for investment or employment with a company, and found the website that we will show you an image of."[26]  While respondents were instructed to consider investment or employment opportunities, Dr. Wind did not screen for respondents who actually were interested in employment or investment opportunities.  In fact, according to Dr. Wind's own data, less than 10% of the survey respondents in the third experiment were currently seeking some type of employment.  Of those searching for employment, it is unclear if *any* would have been searching for the types of employment opportunities available through the block.xyz careers link.[27]  It is also unclear that *any* respondent had or would be likely to search for investment opportunities in the particular industries related to Block, Inc.  Thus, there is a mismatch between the population and the stimulus in Dr. Wind's third experiment.  Without the relevant population as defined for his own experiment, the survey results are irrelevant.[28]

24.     In my opinion, Dr. Wind's surveys are unreliable for demonstrating that consumers will not be confused.  The first experiment simply demonstrates that green Cash App logo, without any context, does not call Plaintiffs to mind.  The second experiment demonstrates, at best, that consumers (some of whom are not part of the relevant market and others who may not have been able to visibly read the fine print) do not recall the copyright reference to "Block"

---

[26] *Wind Declaration*, Exhibit H, p. 227. Respondents in this survey were told they were going to look at a video. Perhaps the "video" is meant to reference the moving square shown on the homepage.

[27] These jobs include developers, finance, legal, marketing, and public policy jobs. See, https://block.xyz/careers, last accessed January 16, 2022.

[28] *Diamond*, pp. 376-379.

shown in small print, at the bottom of the page. The last experiment only establishes that an inappropriately screened survey population cannot determine the source of the corporate page shown.

## IV.   SURVEY METHODOLOGY

25.      In order to more accurately measure the extent to which the Block, Inc. name is likely to cause confusion, I designed a rebuttal survey that corrects flaws I have identified in Dr. Wind's surveys. As described in detail below, I corrected the fundamental flaw of Dr. Wind's surveys (the use of the wrong stimuli) by testing an example of information that consumers might reasonably encounter, and that describes Block, Inc. and the services and products it provides.

26.      I surveyed a total of 399 respondents who indicated that they are likely to get a new prepaid debit card for their personal use or who are likely to use tax preparation and filing services or software, or to use bookkeeping and payroll services for a small business. I piloted an additional stimulus and collected pretest data. These are described in greater detail in paragraphs 38-40.

27.      The design of my research follows the generally accepted principles for the design of surveys to be used as evidence in litigation.[29] In general, the design of a reliable survey requires careful attention to the following key areas:

- The definition of the relevant population;

- The procedures for sampling from the relevant population;

- The survey questions used;

- The stimuli shown to respondents; and

- The protocol for calculating the results from the survey.[30]

---

[29] *Diamond*, pp. 359-423.

28.     The discussion of the survey I conducted is organized around each of these key areas.

## C.     Survey Population

29.     The appropriate population for a likelihood of confusion survey is the group of consumers in the market for the relevant products and services.  The population for this study is comprised of individuals likely to get a new prepaid debit card for their own personal use, those who are likely to use tax preparation and filing services or software, and/or those who indicate that they are likely to use bookkeeping or payroll services for small business in the next twelve months.  These are services that are offered by both Plaintiffs and Defendant.[31]

## D.     Sampling of the Relevant Population

30.     Potential survey respondents were contacted using an internet panel hosted by Prodege Market Research (Prodege), an online panel and data collection services company.[32] Prodege is the same internet panel provider used by Defendant's expert, Dr. Wind.[33] Prodege complies with the standards and ethics for online survey data panels set forth by the Insights Association,[34] and Prodege's standard quality control measures were applied in this study.

---

[30] The Federal Judicial Center's (2004) *Manual for Complex Litigation, Fourth Edition*, §11.493, p. 103 phrases these key areas as:

  • the population was properly chosen and defined;
  • the sample chosen was representative of that population;
  • the data gathered were accurately reported; and
  • the data were analyzed in accordance with accepted statistical principles.

[31] *Complaint*, ¶¶ 2-3, 32.

[32] Additional information about Prodege is available on its website at https://www.prodege.com, last accessed January 16, 2022.

[33] *Wind Declaration*, ¶ 31. I ensured that respondents from Prodege's panel who completed Dr. Wind's survey were precluded from participating in my survey.

[34] The Insights Association is an organization representing the industry and profession of market research and analytics (https://www.insightsassociation.org/about, last accessed January 16, 2022).

14

31.     The data for this survey were collected between January 15, 2022 and January 17, 2022. Potential respondents were unaware of the purpose or topic of the survey and needed to meet the screening criteria outlined below to qualify for the survey.  A total of 1,228 potential respondents began the survey and, of these, 399 qualified for and completed the survey.[35]  The complete questionnaire is provided in **Exhibit A**, and screenshots of the survey as it appeared to respondents are included as **Exhibit D**.

### E.     Quality Control Measures for the Survey

32.     To ensure that my data are of the highest quality, I implemented quality control measures in addition to those undertaken by Prodege:

    a.  As is standard survey practice for litigation, the survey was conducted in a "double-blind" fashion; that is, neither the staff at Prodege nor any of the respondents were aware of the survey sponsor or the ultimate intention of the survey.[36]

    b.  Respondents were able to take the survey on a desktop, laptop, or tablet, computer or mobile phone or cell phone.[37]

    c.  Respondents had to correctly answer a Google reCAPTCHA question to ensure that a person, and not a computer or "bot," was taking the survey.[38]

---

[35] The invitation for the survey is included in **Exhibit C**.

[36] *Diamond*, pp. 410-411.

[37] The percentage of respondents who took the survey on a mobile device was capped at 25% of the sample. The survey was operationalized for mobile viewing and the mobile screen shots are included in **Exhibit D**.

[38] "reCAPTCHA protects your website from fraud and abuse without creating friction. reCAPTCHA uses an advanced risk analysis engine and adaptive challenges to keep malicious software from engaging in abusive activities on your website." (https://www.google.com/recaptcha/intro/v3.html, last accessed January 16, 2022).

d.   Respondents were also required to enter their state of residence and zip code, and if these data conflicted with one another, the respondent was excluded.

e.   Click balancing was implemented to ensure that those who clicked-into the survey were representative of the U.S. population for age, gender, and region.

f.   At the conclusion of the survey, respondents were asked an industry screener question. Respondents who indicated that they work for or have a household member who works for a company that provides prepaid debit cards, a company that provides tax preparation and filing services or tax software, or a company that provides bookkeeping or payroll services for small businesses were flagged for identification.  Respondents were also flagged if they, or someone in their household, works for a market research or advertising company.[39]  Respondents who indicated they were unsure whether they or anyone in their household worked for any of the following were screened out for not responding carefully to the survey questions.

g.   Respondents who indicated that they had in the last six months completed a survey about prepaid debit cards, tax preparation and filing services or tax software, or bookkeeping or payroll services for small business were also flagged.[40]

---

[39] Responses were analyzed by excluding those who may work for a company that has specialized knowledge about the survey topic or the survey methodology. Conclusions from my survey data do not differ regardless of whether these respondents are included or excluded from the sample. These data are contained in **Exhibit E**.

[40] Respondents who indicated "Don't know / unsure" to this question were screened out. Responses were again analyzed by excluding those who indicated they had taken a survey on the any of the following topics. Conclusions

16

h.   Respondents who indicated that they did not understand or were unwilling to adhere to the survey instructions were screened out of the survey.

i.   Respondents who did not pass the quality control question (S10) were screened out of the survey.

j.   The survey was tested, and the initial results were reviewed to ensure that there were no errors in the programming and that respondents were able to understand and answer the questions as asked.  I conducted a pretest of 100 respondents. I added one additional question to my survey[41] (for clarity) but no other changes were made.

k.   Respondents who participated in the pilot or pretest were not permitted to participate in the full survey.  Prodege also ensured any respondent who had completed the Wind Surveys did not receive an invitation to participate in my survey.

## F.   Screening Questionnaire

33.    To ensure that respondents were part of the relevant population, I asked a series of screening questions.[42]  Only respondents who met the criteria for qualifying were able to continue with the main survey.  In order to qualify, respondents had to meet the following criteria:

a.   Be 18 years of age or older.

b.   Reside in the United States.

---

from my survey data do not differ regardless of whether these respondents are included or excluded from the sample.

[41] See ¶ 40.

[42] The questionnaire can be found in **Exhibit A**.

c.  Indicate that they were either likely to get a prepaid debit card for their own personal use in the next twelve months, or indicate they were likely to use tax preparation and filing services or tax software in the next twelve months, or indicate that they were likely to use bookkeeping and payroll services for a small business in the next twelve months.

## G.  Main Questionnaire

34.      Because Dr. Wind used a methodology known as an Eveready survey,[43] I used the same basic approach in my survey.  An Eveready survey shows respondents the allegedly infringing mark and asks participants to identify the source or affiliation.

35.      After answering the screening questions, qualified respondents were taken to the main questionnaire.  Prior to viewing the stimulus, respondents were provided with the following set of instructions:

> Thank you for participating in today's survey. We are interested in your honest opinions. There are no right or wrong answers.  If for any question you don't know the answer or don't have an opinion, you may say so— please do not guess.

> Please look at the following information. There will be a delay before you can proceed in the survey. Once you are finished reviewing the information, scroll to the bottom of the page to click "Continue."

36.      Respondents were then presented with a news article discussing Square, Inc.'s acquisition of Credit Karma's free tax prep service.[44]  Because Square, Inc. is now Block, Inc., and that is how consumers will be exposed to news about the company now that its name has

---

[43] *Wind Declaration,* ¶ 24. Before asking Eveready confusion questions, Dr. Wind first asks respondents to "describe the business/company shown." He indicates that this question allowed respondents to "reveal" possible confusion and confirm that they paid attention (*Wind Declaration,* ¶ 36). It is not clear that any respondent was screened out for "inattention" at this question or why Dr. Wind believed it would reveal confusion.

[44] https://www.forbes.com/advisor/credit-score/square-will-buy-credit-karmas-free-tax-prep-service-what-does-that-mean-for-consumers/, last accessed Jan 16, 2022. The article is explained in detail in ¶ 41 and presented in full in **Exhibit F**.

changed, one group of respondents (the Test Group) was shown a stimulus that changed "Square, Inc." references in the article to "Block, Inc."  Respondents had to confirm that they could clearly see the article and if not, they were screened out of the survey.[45]  After respondents reviewed the article, they could not view it for the remainder of the survey.[46]

37.     Respondents were then asked a series of questions to identify the company or companies described in the article.  Respondents who identified "Block" as one of the companies described in the article were asked a series of follow-up questions, including questions about what products or services were provided by Block and whether Block was affiliated with any other companies.  The full set of questions is included in **Exhibit A**.

38.     After an initial pretest, and my review of Dr. Wind's surveys, I also included a question to help me further distinguish respondents who had a specific company in mind from respondents who were simply repeating back "Block" from the article.[47]  Respondents were asked the following question:

> Q. You indicated that the article mentioned BLOCK. What other name(s), if any, is BLOCK known by? *(Please type in your response and be as specific as possible)[48]*

## H.     Stimuli Shown

39.     To evaluate the potential for consumer confusion between Plaintiffs and Defendant, I evaluated and considered a number of potential articles and stimuli that would reasonably expose survey respondents to Block, Inc. and its products and services.  Because the

---

[45] Nine respondents were screened out for indicating that they could not clearly see the information.

[46] This is conservative and consistent with the surveys conducted by Dr. Wind. Of course, unlike Dr. Wind's survey, the reference to Block, Inc. was not at the bottom of the page, in small print, potentially illegible to some number of respondents.

[47] Dr. Wind includes in his surveys the following for any respondent who answered "Block," "Who or what are you referring to when you say Block?" *Wind Declaration*, Exhibit H, p. 228.

[48] The pretest data collected prior to the inclusion of this question are included as **Exhibit G**.

19

precise ways in which Block, Inc.'s new name will be used in connection with its products and services is still evolving, I piloted one article and conducted a full survey using another article.[49]

40.     The first article I evaluated discussed Cash App and other payment apps' vulnerability to hackers.[50] The article references Cash App's parent company, Square.  Due to the article's length, I needed to shorten it for legibility in the survey.  Even after shortening, the article spanned nine pages, which may have overwhelmed respondents.  I collected interviews from a total of 200 respondents, split between one group that was shown the article with references to "Square" replaced by "Block," and a second group that was shown the same article with references to Square.  While slightly more than 30 percent of respondents who viewed the "Block" stimulus identified Block as a company mentioned in the article, the exact company that many of these respondents were thinking of was unclear because I had not (in this pilot version of the survey) included a question that would allow me to identify what portion of respondents who identified "Block" were thinking of H&R Block (an ambiguity I corrected in my final survey).[51] Given my additional survey work (discussed below), there is strong evidence that some number of respondents identifying "Block" in this pilot survey were thinking of H&R Block.  I have included the materials from this pilot as **Exhibit H**.

---

[49] "The fact that properly conducted pilot work was conducted should increase the court's perception of the care the expert took in ensuring that the survey was designed to be as reliable and valid as possible. Pilot work is consistent with the scientific perspective that the Supreme Court expressed in *Daubert* because its purpose is to increase the quality of survey evidence." Ross, I. (2012). "The Use of Pilot Tests and Pretests in Consumer Surveys," *Trademark and Deceptive Advertising Surveys: Law, Science, and Design*. S. S. Diamond & J. B. Swann (Eds). Chicago, IL: ABA Section of Intellectual Property Law, p. 12.

[50] https://www.yahoo.com/now/squares-cash-app-vulnerable-to-hackers-customers-claim-113556593.html, last accessed December 28, 2021.

[51] A total of 33 respondents selected Block from the list and indicated that Block provided some services. The majority of respondents in this survey appeared to be simply repeating back Cash App as the owned service and may have been interpreting the question as referencing services described in the article. Four respondents specifically referenced "tax" or "tax preparation" and two specifically mentioned "H&R Block."

20

41.     After this initial pilot, I tested with a full sample of respondents a different news article that discussed Defendant's (formerly Square, Inc.'s) acquisition of Credit Karma's free tax preparation service. As described above, to evaluate the potential for confusion, I replaced "Square" with "Block." A portion of the article shown in the survey is included in Figure 1 and the full article shown to respondents is included in **Exhibit F**.

**Figure 1. Test Stimuli**



42.     My survey also included a control stimulus shown to a separate group of respondents. A survey designed to measure likelihood of confusion may include survey "noise" or responses that are unrelated to the stimulus being tested—this "noise" may include guessing, yea-saying, or responses generated resulting from demand effects. Responses that are "noise" should not count as confusion and should be removed from the final calculations. As a means of doing this, it is standard practice for researchers to include a group in their research to account for

the potential impact of guessing or other forms of survey noise.[52]  The control stimulus was the same article shown to Test Group respondents, but with the prior company name, "Square," instead of "Block."  A portion of this article is shown in Figure 2 and the complete article shown to respondents is included in **Exhibit F.**

**Figure 2: Control Stimulus**



---

[52] More specifically, Diamond writes that "[c]ontrol groups and, as a second choice, control questions are the most reliable means for assessing response levels against the baseline level of error associated with a particular question," *Diamond*, p. 401.

## V.   SURVEY RESULTS

43.     My survey included 399 respondents who indicated they are likely to get a prepaid debit card for their personal use, use tax preparation and filing services or tax software, or use bookkeeping and payroll services for a small business in the next twelve months.  The results of my survey demonstrate the following:

- A total of 26 of the 199 Test Group respondents (13.1 percent) identified H&R Block as the company discussed in the article. In the Control Group, shown the same article that referred to "Square," no respondent believed that H&R Block was described in the article.

- A total of 129 of the 199 Test Group respondents (64.8 percent) selected Block from a list of companies mentioned in the article and were asked subsequent follow-up questions about Block.  1 of 200 Control Group respondents (0.5 percent) erroneously identified Block as a company mentioned in the article and were asked follow-up questions.

- A total of 19 of the 199 Test Group respondents (9.5 percent) identified H&R Block when asked to identify the company or companies affiliated or associated with Block.  In the Control Group, no respondent identified H&R Block.

- A total of 55 of the 199 Test Group respondents (27.6 percent) identified Block as being mentioned in the article and indicated that this Block is known by H&R Block.  In the Control Group, no respondent who identified Block as being mentioned in the article indicated that this Block is known by H&R Block.

23

- To estimate overall confusion, I tallied the total number of identifications of H&R Block across the company identification and affiliation questions, and I included those who identified Block as the company named in the article and indicated that "Block" is also known as H&R Block. In the Test Group, a total of 72 respondents or 36.2 percent believed that H&R Block was described in the article, indicated that H&R Block and its services were offered by Block, or indicated that Block was affiliated or associated with H&R Block. No one in the Control Group articulated a similar belief. Using the Control Group responses to account for guessing or other potential sources of survey noise, yields an overall net confusion rate of 36.2 percent.

## VI. QUALIFICATIONS

44. I am a Managing Director at NERA Economic Consulting ("NERA"), where I am the Chair of the Survey and Sampling Practice and a member of the Intellectual Property, Product Liability, Antitrust, and Labor Practices. My business address is 4 Embarcadero Center, San Francisco, CA 94111. NERA is a firm providing expert statistical, survey, economic, and financial research analysis.

45. Among my responsibilities, I conduct survey research and market research and design and implement statistical samples for matters involving business and consumer decision-making, consumer choice, and consumer behavior. In the course of my career, I have conducted research for leading corporations and government agencies on consumers, employees, and businesses. My work has been included in numerous lawsuits involving issues related to trademark and trade dress confusion, secondary meaning, false advertising, and patent infringement, as well as in antitrust and employment-related litigations. I am a member of the American Association of Public Opinion Research, the American Statistical Association, the

Intellectual Property Section of the American Bar Association, and the International Trademark Association (INTA).

46.     I have also worked as a market researcher conducting surveys of consumers and professionals, focus groups, and in-depth interviews. I worked as an independent consultant conducting research for the Department of Environment and Rural Affairs in the United Kingdom. I have taught courses focused on or involving research methodologies in both the United States and Europe. I hold a Master's Degree from Trinity College, Dublin and another Master's Degree from Temple University.

47.     I have substantial experience conducting and using surveys to measure consumer opinions and behaviors regarding products and services including purchase processes, product attributes, branding awareness and strength, new product research, and communications strategies. During my career in academic and commercial research, I have personally facilitated a wide range of research including large-scale surveys, in-depth interviews, focus groups, and observational studies.

48.     I have submitted expert reports, been deposed, and have testified at trial within the last five years. A list of my testimony is included on the copy of my current resume, which is attached as **Exhibit I**.

49.     NERA is being compensated for my services in this matter at my standard rate of $700 per hour. Members of the staff at NERA have worked at my direction to assist me in this engagement. No part of my compensation or NERA's compensation depends on the outcome of this litigation. Throughout this report, I have used the terms "I" and "my" to refer to work performed by me and/or others under my direction.

## VII. DOCUMENTS REVIEWED

50.     As part of my work, I reviewed the Complaint and the Declaration submitted by Dr. Yoram (Jerry) Wind. A list of the specific materials I reviewed and relied upon can be found in **Exhibit J**.

## VIII. CONCLUSIONS

51.     The surveys conducted by Dr. Wind fail to reliably demonstrate that confusion is unlikely between Defendant and Plaintiffs, in part, because the surveys used a set of stimuli that minimized the connection (or displayed no connection at all) between Block, Inc. and the services it offers to consumers.  In light of the flaws in Dr. Wind's surveys, I conducted a rebuttal survey of 399 consumers in the market for prepaid debit card, tax preparation services or software, or bookkeeping/payroll services for small businesses.  I used a survey design in which respondents were shown a new article about the Defendant acquiring a tax related service. A net 36.2 percent of respondents believed the H&R Block was either described in the article or believed that H&R Block was affiliated with Block, Inc.  In contrast to the surveys conducted by Dr. Wind, these results demonstrate that Defendant's name change to Block, Inc. is likely to cause consumers to confuse the Defendant and its products and services with Plaintiffs.

52.     My conclusions have been reached through the proper application of survey methods and using standard methodologies relied upon by experts in the field of survey and market and consumer research.  My opinions will continue to be informed by any additional material that becomes available to me.  I reserve the right to update and or supplement my opinions if I am provided with additional information.

26

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 21st day of January, 2022 at San Francisco, California.

Sarah Butler, Managing Director
January 21, 2022