# IN THE UNITED STATES DISTRICT COURT

# FOR THE WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| H&R BLOCK, INC. and<br>HRB INNOVATIONS, INC.<br><br>                        Plaintiffs,<br><br>v.<br><br>BLOCK, INC.,<br><br>                        Defendant. | Case No: 4:21-CV-00913-NKL |

# REBUTTAL EXPERT DECLARATION OF PROFESSOR DAVID REIBSTEIN

# JANUARY 21, 2022

# TABLE OF CONTENTS

I.    INTRODUCTION ........................................................................................................ 1

    A.    Assignment ................................................................................................... 1

    B.    Summary of Opinions ................................................................................... 2

    C.    Qualifications................................................................................................ 4

    D.    Compensation ............................................................................................... 6

    E.    Evidence Considered .................................................................................... 6

II.   BACKGROUND ....................................................................................................... 7

    A.    Parties and Their Trademarks ....................................................................... 7

        1.    H&R Block, Inc. and HRB Innovations, Inc. ................................... 7

        2.    Block, Inc. ........................................................................................ 8

    B.    Plaintiffs' Allegations ................................................................................. 10

    C.    Defendant's Response to Plaintiffs' Allegations ....................................... 10

III.  BRAND ASSOCIATIONS RESIDE IN THE MINDS OF CONSUMERS AND
ARE SHAPED BY A VARIETY OF FACTORS, INCLUDING FACTORS
OUTSIDE OF A COMPANY'S BRAND MANAGEMENT EFFORTS ...................... 11

    A.    Brands Create and Reflect Associations in Consumers' Minds ............................ 11

    B.    When Managed Properly, Brands Have the Potential to be Highly Valuable
Company Assets. ........................................................................................ 13

    C.    Brand Architecture Reflects a Company's Structuring of Its Corporate and
Product Brands............................................................................................ 14

    D.    Factors Outside of a Company's Brand Management Efforts Can and Often Do
Influence Consumer Brand Associations................................................... 18

IV.   EMPIRICAL ANALYSIS SHOWS THAT MEDIA COMMONLY ESTABLISH
LINKAGES BETWEEN CORPORATE AND PRODUCT BRANDS, EVEN FOR
COMPANIES THAT EMPLOY A "HOUSE OF BRANDS" ARCHITECTURE .......... 24

V.    THE USE OF "BLOCK" AS A CORPORATE BRAND BY A COMPETITOR
OFFERING TAX PREPARATION SERVICES CREATES THE POTENTIAL FOR
CONFUSION WITH H&R BLOCK ............................................................................. 27

    A.    Brands Are of Particular Importance to Consumers in Tax Preparation and
Personal Financial Services ....................................................................... 27

    B.    H&R Block Has a Longstanding Presence in Tax Preparation Services and Has
Invested in Its Brand, Including Promoting Its Associations with the Term
"BLOCK" .................................................................................................... 32

    C.    Consumer Evidence Indicates that Consumers Associate H&R Block with
"Block" ....................................................................................................... 38

    D.    Consumer Exposure to a Competitor's Use of "Block" Introduces the Potential
for Confusion with H&R Block.................................................................. 47

VI.    CONSUMERS HAVE BEEN EXPOSED TO LINKAGES BETWEEN THE "CASH APP" BRAND AND "BLOCK" AS A CORPORATE BRAND, AND ARE LIKELY TO CONTINUE TO BE EXPOSED TO SUCH LINKAGES ........................................ 49

    A.    Empirical Analysis Demonstrates That Media Has Historically Linked the "Cash App" Brand with the Brand of Its Owner ....................................... 49

    B.    Millions of Cash App Customers Have Encountered Linkages Between Cash App and Its Owner ................................................................................... 53

    C.    Block, Inc. Has Promoted Linkages Between Cash App and "Block" ................... 58

    D.    Media Are Already Beginning to Link Cash App with "Block" ............................ 64

    E.    Consumer-Generated Evidence Shows That Consumers Are Already Linking the "Cash App" Product Brand with "Block" ......................................................... 68

VII.    H&R BLOCK IS LIKELY TO SUFFER HARM TO ITS BRAND ASSOCIATIONS STEMMING FROM A LIKELIHOOD OF CONSUMER CONFUSION CAUSED BY BLOCK, INC.'S RENAMING AS WELL AS ITS "CASH APP TAXES" OFFERING ...................................................................................................................... 72

VIII.    OTHER OPINIONS OFFERED BY PROF. WIND AND PROF. DHAR REVEAL THEIR FAILURE TO RECOGNIZE THE LIKELY MECHANISM OF CONSUMER CONFUSION IN THIS MATTER ............................................................ 73

# I. INTRODUCTION

## A. Assignment

1.       I submit this rebuttal expert declaration on behalf of H&R Block, Inc. and HRB Innovations, Inc. ("Plaintiffs") in the above captioned dispute with Block, Inc. ("Defendant"). I have been asked by counsel for Plaintiffs to offer opinions relevant to this matter based on my expertise in the field of marketing and branding to comment on the opinions offered by Prof. Yoram (Jerry) Wind[1] and Prof. Ravi Dhar[2] on behalf of Defendant and the arguments made by Defendant in its "Suggestions In Opposition to Plaintiffs' Motion for Preliminary Injunction."[3] Specifically, I have been asked to:

- Describe and explain the marketing and branding principles relevant to assessing the potential for consumer confusion in this matter.

- Explain the role of media, both traditional and social media, as an influence on consumer brand associations, including the relationship between corporate brands and product brands.

- Discuss H&R Block's presence in the marketplace and its investment in its brand, including the extent to which H&R Block promotes its association with the term "Block"; and explain the conditions under which a competitor's use of the term "Block" as a corporate brand could introduce the potential for consumer confusion with H&R Block.

---

[1]    Declaration of Dr. Yoram (Jerry) Wind, *H&R Block, Inc. and HRB Innovations, Inc. v. Block, Inc.*, United States District Court For the Western District of Missouri, Case No. 4:21-cv-00913-NKL, January 12, 2022 ("Wind Declaration").

[2]    Declaration of Professor Ravi Dhar, *H&R Block, Inc. and HRB Innovations, Inc. v. Block, Inc.*, United States District Court For the Western District of Missouri, Case No. 4:21-cv-00913-NKL, January 12, 2022 ("Dhar Declaration").

[3]    Defendant Block, Inc.'s Suggestions in Opposition to Plaintiffs' Motion For Preliminary Injunction, *H&R Block, Inc. and HRB Innovations, Inc. v. Block, Inc.*, United States District Court For the Western District of Missouri, Case No. 4:21-cv-00913-NKL, January 12, 2022.

1

- Assess the extent, if any, to which consumers are likely to associate Defendant's "Cash App" brand with Defendant's use of "Block" as a corporate brand.

- Assess the likelihood of consumer confusion and harm to H&R Block stemming from Defendant's recent renaming to "Block, Inc." together with its plans to offer a tax preparation service called "Cash App Taxes."

- Respond to certain additional opinions offered by Prof. Wind and Prof. Dhar, including whether their assessments of likelihood of future confusion are based on the appropriate marketplace context and time period.

2.      This declaration summarizes the opinions that I have formed to date. I may modify my opinions, if necessary and allowed, based on further review and analysis of information provided to me after the date of this declaration.

**B.      Summary of Opinions**

3.       On the basis of my review of the information and documents made available to me, I have reached the following opinions:

- Brand associations reside in the minds of consumers. Brand associations are shaped by a variety of factors, including factors outside of a company's brand management efforts. When managed properly, brands have the potential to be highly valuable company assets. One aspect of brand management is specifying a brand architecture, which reflects a company's structuring of its corporate and product brands. One such brand architecture is termed the "House of Brands," in which a company's corporate brand name is distinct from those of its product brands. While in principle, this architecture can facilitate some degree of separation between the corporate brand and a product brand, the extent to which consumers actually keep these brands separate depends on a variety of factors, including linkages made by the media between these brands.

2

- Empirical analysis demonstrates that for many companies that employ a "House of Brands" architecture, the media expose consumers to substantial linkages between the corporate brand and product brands within the architecture.

- Brands are of particular importance to consumers in tax preparation and personal financial services. H&R Block has a longstanding presence in providing these services, and has invested significantly in building its brand, including by promoting its associations with the term "Block." Consumer evidence indicates that H&R Block has been successful at cultivating consumer associations between H&R Block and "Block." Due to H&R Block's strong brand presence associated with both "H&R Block" and "Block," consumer exposure to a competitor's use of "Block" introduces a likelihood of confusion with H&R Block, even if that competitor's use of "Block" is restricted to being a corporate brand.

- Consumers have been exposed to linkages between the "Cash App" brand and Defendant's use of "Block" as a corporate brand, and are likely to continue to be exposed to such linkages. Empirical analysis demonstrates that the media have historically linked the "Cash App" brand with the brand of its owner, and consumers have encountered and internalized such linkages. Given Defendant's recent name change (publicly announced on December 1, 2021), it is likely that on an ongoing basis, consumers will continue to encounter such linkages, but specifically between the "Cash App" brand and "Block" as Defendant's corporate brand. Defendant has promoted linkages between "Cash App" and "Block", and the media are already beginning to link "Cash App" with "Block." Further, consumer-generated evidence shows that consumers are already linking "Cash App" with "Block."

- H&R Block is likely to suffer harm to its brand associations stemming from a likelihood of consumer confusion caused by Block, Inc.'s renaming, as well as by its "Cash App Taxes" offering. This likelihood of confusion results from the overlap between the services offered by H&R Block and Block, Inc., as well as the likelihood that consumers will increasingly associate "Cash App" with Defendant's "Block" corporate brand as they are exposed to ongoing linkages between those two over time. The extent of this consumer confusion is likely to grow over time, but not necessarily in a steady or gradual pattern. For example, a serious deficiency in the "Cash App Taxes" product, such as a data breach, that results in widespread and negative media

3

coverage has the potential to both substantially increase consumer confusion and also result in permanent and irreparable harm to H&R Block's brand.

- Prof. Wind and Prof. Dhar fail to consider the likely mechanisms of consumer confusion in this dispute. Prof. Wind seeks to assess consumer confusion at a fixed point in time proximate to the filing of his declaration (e.g., his survey data were collected between January 6-9, 2022, approximately one month after the change of the corporate name to "Block, Inc."), but this does not address the likelihood of consumer confusion growing stronger over time as more consumers are exposed to linkages between "Cash App" and "Block". Prof. Dhar asserts the importance of considering marketplace context, but his opinions fail to take into account critical context, such as the role of media in shaping consumer brand associations. Both Prof. Wind and Prof. Dhar fail to consider relevant empirical evidence in this matter, including the extent of consumer exposure to linkages between "Cash App" and "Block", as well as evidence that consumers have begun internalizing this linkage and are likely to experience stronger associations between "Cash App" and "Block" given the passage of time.

### C.  Qualifications

4.       I am the William Stewart Woodside Professor and Professor of Marketing at the Wharton School of Business at the University of Pennsylvania. I have been teaching Marketing classes at the graduate level for more than 25 years. Classes that I have taught include Marketing Strategy and Marketing Research in the Wharton MBA Program, as well as Competitive Marketing Strategy, Marketing Metrics, Pricing Strategies, and various other programs for Wharton's Executive Education Program. I am currently teaching the Introductory Marketing classes for first-year MBA students at Wharton, Wharton's Executive MBA Program, senior executives in Wharton's Advancement Management Program, and in several other of Wharton's Executive Education Programs. Over the course of my teaching career, I have been honored with more than 30 teaching awards. For several years, I was the Vice Dean of the Wharton School of Business at the University of Pennsylvania and the Director of the Graduate Division.

5.     My research focuses on branding, competitive marketing strategies, marketing metrics, and product line decisions, among other areas. My research on competitive marketing strategies addresses competitors' reactions to marketing actions, offering companies insight into ways to anticipate these reactions and use them to develop effective strategies. I have authored or co-authored more than 50 articles published in top-tier academic journals, including *Marketing Science*, *Journal of Marketing Research*, *Journal of Consumer Research*, *Harvard Business Review*, *Marketing Letters*, *Journal of Marketing*, and *The International Journal of Research in Marketing*. I am the U.S. representative on the International Standards Board committee that is in charge of setting the international standards for measuring brand value and the use of brand names. I am also the author or co-author of several books and book chapters on subjects that include competitive marketing strategy, global branding, and marketing performance measurement, among others. I have published numerous papers on branding and brand value measurement. I have also applied survey analysis to determine brand value in practice through consulting engagements with major corporations. I have also been on the founding board of And1, a basketball apparel company that worked to build their brand and was named the number one "guerilla brand" in the country. Similarly, I was on the founding board of Bizrate, Inc. who built their brand and then chose to introduce a second brand, Shopzilla.

6.     I served on the Board of the American Marketing Association for several years, some of that time as the Chairman and several years on the Executive Committee of the Board. I am a former Executive Director of the Marketing Science Institute, and consult extensively on marketing issues with companies worldwide. Topics on which I have been asked to consult in the past include marketing strategy, marketing resource allocation, marketing metrics, sales force planning and incentives, branding, brand management, brand valuation, product line extensions, marketing research, and other marketing activities.

5

7.      I received my Ph.D. from Purdue University and B.S. and B.A. degrees from the University of Kansas. In 2005, I received the John S. Day Distinguished Alumni Academic Service Award from Purdue University's Krannert School of Management, an honor given to graduates whose service within the academic community reflects the spirit and service of former Krannert Dean John Day. A copy of my CV, together with a list of the trial and deposition testimony I have given in the last four years, is attached as Exhibit 1.

### D.      Compensation

8.      I have billed the Plaintiffs on a time-and-materials basis for my work. My hourly billing rate is $1,200, which is my standard rate. In addition, I receive compensation based on the professional fees of Analysis Group.[4] My compensation is not, nor has it ever been, contingent on my findings, testimony rendered, or the outcome of this litigation.

### E.      Evidence Considered

9.      In undertaking my analysis, I have considered information from a variety of sources, which are identified in this declaration and the accompanying exhibits or listed in the attached Exhibit 2. I also have relied upon my professional judgment and expertise, gathered from many years of marketing and branding analysis in a variety of industries.

---

[4]      In preparing this declaration, I have been assisted by employees of Analysis Group, who have provided support to me under my direction and supervision.

6

## II.     BACKGROUND

### A.     Parties and Their Trademarks

#### 1.     H&R Block, Inc. and HRB Innovations, Inc.

10.     H&R Block, Inc. ("H&R Block") was founded in 1955 by brothers Henry W. Bloch and Richard Bloch.[5] H&R Block describes itself as a market leader in tax preparation and other financial services, with over 10,000 office locations around the world, including in all 50 U.S. states.[6] Since its founding, H&R Block has expanded its business operations from tax preparation services to a variety of other financial services, including electronic tax filing, tax refunds, identity theft protection, small business services, refund transfers, and prepaid debit cards.[7] Additionally, through services branded as Block Advisors and Wave, the company provides small business owners with resources to help them automate bookkeeping and manage their taxes and payrolls needs.[8] H&R Block also offers two mobile applications, MyBlock and H&R Block Tax Prep, that allow users to access its tax preparation and personal financial services and get support from H&R Block professionals.[9] On January 20, 2022, H&R Block launched a new financial technology platform, called SPRUCE, to help consumers create personalized savings goals, earn automatic cash back rewards on everyday purchases, and view their credit score.[10]

---

[5]     H&R Block Website, "Our Company," <https://www.hrblock.com/corporate/our-company/>, accessed January 20, 2022.

[6]     H&R Block Website, "Our Company," <https://www.hrblock.com/corporate/our-company/>, accessed January 20, 2022; Complaint, ¶13; H&R Block Factsheet, <https://www.hrblock.com/corporate/pdfs/hrb-factsheet.pdf>, accessed January 20, 2022.

[7]     H&R Block Website, Taxes, <https://www.hrblock.com/filing-options-and-products/>, accessed January 16, 2022.

[8]     H&R Block Website, "H&R Block to introduce next phase of strategic transformation at virtual investor day," <https://www.hrblock.com/tax-center/newsroom/around-block/hr-block-introduces-strategic-transformation-at-virtual-investor-day/>, accessed January 20, 2022; H&R Block Factsheet, <https://www.hrblock.com/corporate/pdfs/hrb-factsheet.pdf>, accessed January 20, 2022.

[9]     H&R Block Website, "Mobile Tax Apps and Tools From H&R Block," <https://www.hrblock.com/mobile-apps>, accessed January 20, 2022.

[10]     Spruce Website, <https://www.sprucemoney.com/>, accessed January 20, 2022; "H&R Block Introduces Spruce Mobile Banking Platform to Help More Americans be Good with Money" (Press Release), January 20, 2022, <https://www.globenewswire.com/news-release/2022/01/20/2370093/0/en/H-R-Block-Introduces-Spruce-Mobile-Banking-Platform-to-Help-More-Americans-be-Good-with-Money.html>, accessed January 20, 2022.

11.     HRB Innovations, Inc. is a corporation located in Delaware and is a wholly-owned indirect subsidiary of H&R Block. HRB Innovations is the owner of H&R Block's family of trademarks.[11]

12.     H&R Block owns a number of registered trademarks, including H&R BLOCK, H&R BLOCK EMERALD CARD, BLOCKWORKS, BLOCK Advisors, and BLOCK HAS YOUR BACK.[12]  H&R BLOCK EMERALD CARD is for debit card and credit card goods and services, BLOCKWORKS is for computer software for tax return preparation, BLOCK Advisors is for tax preparation, business management, accounting, budgeting, and payroll goods and services, and BLOCK HAS YOUR BACK is a marketing slogan related to H&R Block's tax preparation services.[13] H&R Block also owns federally registered trademarks for the green square logo that appears in the branding of its products and services.[14]

### 2.     Block, Inc.

13.     Block, Inc. was formerly known as Square, Inc.[15]  Square, Inc. was founded in 2009 as a way to enable sellers to accept card payments.[16] Square, Inc. launched Cash App in 2013.[17] Cash App allows individuals to store, send, receive, spend, and invest monetary funds. Of significance, in 2020, Square, Inc. acquired Credit Karma Tax, a tax preparation service, for the purpose of allowing individuals to file their taxes within Cash App.[18] On December 1, 2021, Square, Inc. announced publicly that it would change its name to "Block, Inc."  Today, Block, Inc.

---

[11]    Complaint, ¶8.
[12]    Complaint, ¶15.
[13]    Complaint, ¶15.
[14]    Complaint, ¶¶28-29.
[15]    Square, Inc. changed its name to Block, Inc. legally on December 10, 2021. *See* "Square, Inc. Changes Name to Block" (Press Release), December 1, 2021, <https://squareup.com/us/en/press/square-changes-name-to-block>, accessed January 20, 2022.
[16]    Square, Inc., Form 10-K for the fiscal year ended December 31, 2020, p. 4.
[17]    Square, Inc., Form 10-K for the fiscal year ended December 31, 2020, p. 10; Kori Hale, "Hip-Hop's Role In Square's $40 Billion Cash App Business Success," *Forbes*, September 22, 2020, <https://www.forbes.com/sites/korihale/2020/09/22/hip-hops-role-in-squares-40-billion-cash-app-business-success/?sh=65152d9d7489>, accessed January 20, 2022.
[18]    Square, Inc., Form 10-K for the fiscal year ended December 31, 2020, p. 10.

8

offers customers a wide variety of financial services (such as prepaid debit cards, bank accounts, and payroll services) as well as tax preparation services due to Square, Inc.'s acquisition of Credit Karma Tax.[19] I understand that Block, Inc. has established a website offering tax preparation services under the name "Cash App Taxes," with an announcement that "Credit Karma Tax is now Cash App Taxes."[20]

14.　　Block, Inc. holds separate trademarks for "Cash App" and its logo of a white "$" symbol inside a green square.[21]

15.　　On December 1, 2021, the same day that it announced its name change, Square, Inc. filed an application to register the word "Block" as a trademark with the U.S. Patent and Trademark Office.[22]　The designated "Good and Services" associated with this trademark application included references to "holding company services," "charitable services," "providing investors with financial information," and "business administration and management."[23]

---

[19]　Complaint, ¶32, 37.

[20]　Complaint, ¶ 38; Cash App Taxes Website, <https://cash.app/taxes>, accessed January 20, 2022.

[21]　Declaration of Owen Jennings In Support of Block, Inc.'s Opposition to Plaintiffs' Motion for Preliminary Injunction, *H&R Block, Inc. and HRB Innovations, Inc. v. Block, Inc.,* United States District Court For the Western District of Missouri, Case No. 4:21-cv-00913-NKL, January 12, 2022 ("Jennings Declaration"), ¶6 and Exhibit A.

[22]　Trademark Serial No. 97151246, filed December 1, 2021, United States Patent and Trademark Office.

[23]　Trademark Serial No. 97151246, filed December 1, 2021, United States Patent and Trademark Office ("Holding company services, namely, providing business management, business administration services for subsidiaries and affiliates which provide tools and resources for economic empowerment; holding company services, namely, providing business management, business administration, business promotion, and business consulting services for subsidiaries; holding company services, namely, providing business management and administration, business operation consulting services, and identifying strategic alliances for affiliates; charitable services, namely, promoting public awareness about charitable, philanthropic, volunteer, public and community service and humanitarian activities" and "Holding company services, namely, investment management; holding company services, namely, financial reporting and financial advising to subsidiaries and affiliated companies; holding company services, namely, provision of investment capital, development, ownership, and operation relative to subsidiaries and affiliates; providing investors with financial information; holding company services, namely, financial management in the nature of allocation of investment capital; holding company services, namely, acquisition, management, and transfer of company stakes as well as the intermediation of equity capital financing of companies, namely, asset acquisition, consultation, development and management services; business administration and management, namely, controlling policies and management of the other companies").

9

## B. Plaintiffs' Allegations

16.     According to the Complaint, Plaintiffs allege that Block, Inc. is creating a high likelihood of confusion with Plaintiffs' services by using "Block" as its name in connection with its tax and other financial services businesses.[24] Plaintiffs allege that if Block, Inc. is not enjoined from infringing on Plaintiffs' family of "Block" trademarks, Plaintiffs will suffer irreparable harm and erosion of the goodwill that it has spent decades building.[25]  Plaintiffs are seeking an injunction to prevent Block, Inc. from continuing to use the name "Block" and the green square logo in connection with the advertising, distribution, marketing, offering for sale, or sale of any product or service neither originating from nor authorized by Plaintiffs.[26]

## C. Defendant's Response to Plaintiffs' Allegations

17.     In response to Plaintiffs' allegations, Block, Inc. asserts that it "does not use its Block brand to sell any customer-facing products or services at all."[27]  Block, Inc. asserts that it uses "Block" as "the name of a parent corporation whose business units and customer-facing brands … offer services that Plaintiffs have never offered, such as money transfers, cryptocurrency trading, and music streaming."[28] Block, Inc. asserts that "[t]his absence of an overlap in services offered under a similar same name cannot support a likelihood of confusion."[29] Further, Block, Inc. asserts that "the tax preparation services at issue … are branded as 'Cash App' [, which] is a name so unlike H&R Block … that no one plausibly could confuse one for the other."[30]

---

[24]    Complaint, ¶45.
[25]    Complaint, ¶45.
[26]    Complaint, Prayer for Relief ¶2.
[27]    Defendant Block, Inc.'s Suggestions In Support of Its Motion to Dismiss Plaintiffs' Complaint Pursuant to Rule 12(b)(6), *H&R Block, Inc. and HRB Innovations, Inc. v. Block, Inc.*, United States District Court For the Western District of Missouri, Case No. 4:21-cv-00913-NKL, January 7, 2022 ("Block, Inc. Motion to Dismiss"), p. 1.
[28]    Block, Inc. Motion to Dismiss, p. 15.
[29]    Block, Inc. Motion to Dismiss, p. 15.
[30]    Block, Inc. Motion to Dismiss, p. 11.

10

18.     Block, Inc. also defends the use of its green square logo for several reasons. First, Defendant asserts that the rounded rectangle shape of the Cash App logo is functional for smartphone applications and that that shape cannot be monopolized to prevent competition.[31] Second, Defendant alleges that the color green cannot be monopolized by H&R Block for financial services and claims that more than 300 registered marks currently feature a green square.[32] Third, Defendant claims that the green square logos used by H&R Block and Cash App are unlikely to cause confusion because in the marketplace, those logos are combined with the names of the related companies.[33]

### III.    BRAND ASSOCIATIONS RESIDE IN THE MINDS OF CONSUMERS AND ARE SHAPED BY A VARIETY OF FACTORS, INCLUDING FACTORS OUTSIDE OF A COMPANY'S BRAND MANAGEMENT EFFORTS

#### A.    Brands Create and Reflect Associations in Consumers' Minds

19.     Brands are a highly studied area of academic research.  A brand is intended to create "distinctive images and associations in the minds of stakeholders, thereby generating economic benefit/values."[34] Accordingly, a brand works by creating and then maintaining effective and beneficial brand associations in consumers' minds. Brand associations are "all brand-related thoughts, feelings, perceptions, images, experiences, beliefs, attitudes, and so on that become linked to the brand node."[35] Hence, a brand is much more than just a name.

20.     A variety of factors contribute to to the brand associations that are created in the minds of consumers.  One such factor is the product or service itself and the experience that customers have with the product or service.  In addition, brand associations can be influenced by

---

[31]    Block, Inc. Motion to Dismiss, p. 14.
[32]    Block, Inc. Motion to Dismiss, pp. 2, 14.
[33]    Block, Inc. Motion to Dismiss, p. 6.
[34]    "Brand Evaluation – Principles and Fundamentals," International Organization for Standardization, <https://www.iso.org/obp/ui/#iso:std:iso:20671:dis:ed-1:v1:en>, accessed January 20, 2022 (emphasis removed).
[35]    Keller, Kevin Lane, and Philip Kotler, *Marketing Management*, Fifteenth Edition, 2016, Pearson, p. 171.

other people's experiences with the product that are shared via word-of-mouth or social media, particularly if those communications are deemed to be credible.   A firm's marketing plan and actions, such as their advertising and other communications including what they post on their website, certainly contribute to brand associations.  In addition, consumer brand associations are often shaped by media.  For example, learnings from the media of what types of customer sets engage with particular products and services may influence consumer perceptions toward those products and services.   In sum, the impressions that consumers have about brands are not exclusively in the hands of the companies that promote those brands.

21.     An effective marketing plan can associate a brand with a number of characteristics in the minds of consumers as a result of exposure to and usage experiences with the product or service.[36] For example, consumers who use a product or service can transfer or associate their feelings and attitudes about the product or service to the brand, and effective marketing can faciliate such a connection. Such brand association enhances (or, in the case of negative feelings and attitudes, detracts from) the value of the brand. Over time, consumers' associations with, or exposures to, a brand can accumulate, and, if managed properly, these associations can increase the value and lifespan of the brand.

22.     From the perspective of consumers, a strong brand can signal high quality. The product quality perceived by consumers will directly influence consumer purchase decisions and brand loyalty, and may drive consumers to pay a premium price.[37] In particular, researchers have noted:

> Given the difficulty of assessing and interpreting product attributes
> and benefits for experience and credence goods, brands may be
> particularly important signals of quality and other characteristics to

---

[36]    Aaker, David A., *Managing Brand Equity: Capitalizing on the Value of a Brand Name*, 1991, The Free Press, pp. 69-70.
[37]    Aaker, D.A., *Managing Brand Equity: Capitalizing on the Value of a Brand Name*, The Free Press, 1991, p. 19.

12

consumers for these types of products. Brands can reduce the risks in product decisions.[38]

23.     In sum, companies invest in brands for a reason: typically, to build associations in the minds of consumers that will be of benefit to the company.

**B.      When Managed Properly, Brands Have the Potential to be Highly Valuable Company Assets**

24.     A strong brand is a valuable intangible asset. As of 2020, intangible assets accounted for 90 percent of the S&P 500's total assets, compared to only 17 percent in 1975.[39] Interbrand estimates that the combined value of the "Top 100" brands was $2.7 trillion as of 2021, an increase of 15 percent from 2020.[40] As Professor David Aaker has noted, "the establishment of a strong name anchored by high recognition creates an enormous asset," and "the asset gets stronger over the years as the number of exposures and experiences grows."[41] A strong brand can lead to a number of important market outcomes in terms of consumer loyalty, price premiums and, ultimately, profitability. As noted in the book *Marketing Metrics*, which I co-authored: "[w]hen consumers trust a brand and find it relevant, they may select offerings associated with that brand over those of competitors, even at a premium price. When a brand's promise extends beyond a particular product, its owner may leverage it to enter new markets. For all these reasons, a brand can hold tremendous value, known as brand equity."[42] A brand has "positive consumer-based

---

[38]     Keller, Kevin Lane and Vanitha Swaminathan, *Strategic Brand Management: Building, Measuring, and Managing Brand Equity*, Fifth Edition, 2020, Pearson, p. 7. I provide a definition and further discussion of experience and credence goods in **Section V.A** below.

[39]     "How Aon is redefining the value of intellectual property," *Business Insider,* April 26, 2021.

[40]     "Best Global Brands 2021," Interbrand, 2021, p. 8.

[41]     Aaker, David A., *Managing Brand Equity: Capitalizing on the Value of a Brand Name*, 1991, The Free Press, at pp. 70-71.

[42]     N.T. Bendle, Farris, P.W., P.E. Pfeifer, and D.J. Reibstein, *Marketing Metrics*, 3rd Edition, Pearson, 2016, p. 138 (emphasis removed).

13

brand equity when consumers react more favorably to a product and the way it is marketed when the brand is identified than when it is not."[43]

25.     Brand equity provides firms with a marketing advantage. This has been supported by many empirical studies. For example, scholars found that brand equity has a "predictable and meaningful impact on customer acquisition, retention, and profitability" and that "brand equity is a useful indicator for the effectiveness of marketing instruments."[44] Other scholars also observed that "[w]hen a brand has stronger equity, consumers hold more favorable, powerful, and unique associations with the brand and have a more established familiarity with the brand. Because of the highly firm-specific, legally protected, and socially complex processes by which a brand is created and managed over time, a positional barrier is generated that likely influences the effectiveness of its marketing promotions."[45]

### C.     Brand Architecture Reflects a Company's Structuring of Its Corporate and Product Brands

26.     An important aspect of a firm's marketing strategy is defining its brand strategy, which includes the brand hierarchy and the relationship among the brands contained in the firm's portfolio.  This includes defining the company's product brands and corporate brand.

27.     A product brand identifies a certain product or service used by consumers.  A product brand provides differentiation from competing products (e.g., General Mills' Cheerios cereal versus Post's Oh's cereal)[46] or other products within a firm's brand portfolio (e.g., General

---

[43]   Keller, Kevin Lane, *Strategic Brand Management: Building, Measuring, and Managing Brand Equity*, Fifth Edition, 2020, Pearson, p. 69.

[44]   Stahl, F., M. Heitmann, D.R. Lehmann, and S.A. Neslin, "The Impact of Brand Equity on Customer Acquisition, Retention, and Profit Margin," *Journal of Marketing*, Vol. 76, No. 4, 2012, pp. 44-63, p. 59.

[45]   Slotegraaf, R.J., and K. Pauwels, "The Impact of Brand Equity and Innovation on the Long-Term Effectiveness of Promotions," *Journal of Marketing Research*, Vol. 45, No. 3, 2008, pp. 293-306.

[46]   General Mills Website, "Brands, Cereals" <https://www.generalmills.com/en/Brands/Cereals>, accessed January 20, 2022; *See also* Kellogg's Website, "Cereals," <https://www.kelloggs.com/en_US/cereal.html>, accessed January 20, 2022.

Mills' Cheerios versus Annie's cereals, also owned by General Mills).[47]  Product brands owned

by the same company can be independent (e.g. Coca Cola's Coke Zero and Dasani)[48] or related

(e.g. Coca Cola's Coke Zero and Diet Coke).[49]

28.     A corporate brand relates to an entire company and represents the highest level of

hierarchy of a brand in a company's brand portfolio.[50]  A corporate brand (e.g., General Mills or

Apple) reflects consumer associations tied to the entire company making the products.

29.     A firm's brand architecture is the organizational structure of the firm's portfolio of

brands, including its corporate and product branding.[51]  One brand architecture option, called the

"Branded House," involves the company applying its corporate brand "as an umbrella brand across

their entire range of products."[52]  In contrast, the "House of Brands" architecture involves a

collection of differentiated product brands, some or all of which may involve no inherent

connection to the corporate brand.[53]  These two brand architecture strategies "represent two ends

of a continuum"[54] and companies can employ a mixed or hybrid strategy that falls in between these

two strategies.  For example:

- <u>House of Brands.</u>  Procter and Gamble markets its products under different brand
  names, such as Gillette for grooming products, Pampers for baby diapers, Tide for
  laundry products, and Head & Shoulders for hair care.

---

[47]   General Mills Website, "Brands, Cereals," <https://www.generalmills.com/en/Brands/Cereals>, accessed on
January 20, 2022.

[48]   The Coco-Cola Company Website, "Brands," <https://www.coca-colacompany.com/brands>, accessed on
January 20, 2022.

[49]   The Coco-Cola Company Website, "Brands," <https://www.coca-colacompany.com/brands>, accessed on
January 20, 2022.

[50]   Keller, Kevin Lane, and Vanitha Swaminathan, *Strategic Brand Management: Building, Measuring, and
Managing Brand Equity,* Fifth Edition, 2020, Pearson, p. 407.

[51]   Keller, Kevin Lane, and Vanitha Swaminathan, *Strategic Brand Management: Building, Measuring, and
Managing Brand Equity,* Fifth Edition, 2020, Pearson, p. 417.

[52]   Keller, Kevin Lane, and Philip Kotler, *Marketing Management*, Fifteenth Edition, 2016, Pearson, p. 322.

[53]   Keller, Kevin Lane, and Vanitha Swaminathan, *Strategic Brand Management: Building, Measuring, and
Managing Brand Equity,* Fifth Edition, 2020, Pearson, p. 402.

[54]   Keller, Kevin Lane, and Philip Kotler, *Marketing Management*, Fifteenth Edition, 2016, Pearson, p. 322.

**Figure 1: Procter & Gamble's "House of Brands"[55]**



- <u>Branded House.</u>  Sony applies its corporate brand to its individual offerings, such as Sony Music and Sony Bravia.

**Figure 2: Sony's "Branded House"[56]**



---

[55]   Identity Wise, Perspectives on Branding, "House of Brands, Branded House or Somewhere in Between?" *Frankie+Fiorella*, <https://frankefiorella.com/identitywise/house-of-brands-branded-house-or-somewhere-in-between/>, accessed January 20, 2022.

[56]   Sony Website, "About Sony Group," <https://www.sony.com/en/SonyInfo/CorporateInfo/Data/organization.html>, accessed January 20, 2022; *See also* Sony Website, "Products," <https://www.sony.com/en/SonyInfo/products/>, accessed January 20, 2022.

16

- <u>Hybrid.</u>  The Walt Disney Company uses a hybrid brand architecture with some product brands such as ESPN and ABC not inherently connected to the corporate brand, but with some product brands with direct links to the corporate brand (e.g., The Walt Disney Studios).

**Figure 3: Disney's Hybrid Brand Architecture[57]**



---

[57]    Identity Wise, Perspectives on Branding, "House of Brands, Branded House or Somewhere in Between?" *Frankie+Fiorella*, <https://frankefiorella.com/identitywise/house-of-brands-branded-house-or-somewhere-in-between/>, accessed January 20, 2022.

- <u>Hybrid.</u>  Coca-Cola brands a variety of soda products with the Coca-Cola or Coke name (*e.g.*, Coca-Cola, Coca-Cola Flavors, Coca-Cola Zero Sugar), but uses other brand names for different product categories (*e.g.*, Minute Maid for juices and fruit drinks and Dasani for bottled water).

**Figure 4: Coca-Cola's Hybrid Brand Architecture[58]**



### D.    Factors Outside of a Company's Brand Management Efforts Can and Often Do Influence Consumer Brand Associations

30.    While a company may promote a certain brand image using a mix of marketing communications (*e.g.,* advertising, sales promotions, public relations),[59], factors outside of a company's brand management efforts can also contribute to how a brand is perceived, as I discussed above. I find that companies are generally aware of the risks posed by external factors and that some companies, including Block, Inc., even disclose these reputational risks to the public. For example, in its 2020 Form 10-K filed with the U.S. Securities and Exchange Commission

---

[58]    The Coco-Cola Company Website, <https://us.coca-cola.com/>, accessed January 20, 2022; *See also*, Ned Dymoke, "10 Companies that Control Just about Everything You Eat," *Big Think*, April 10, 2017, <https://bigthink.com/technology-innovation/10-companies-own-you-and-what-you-eat/>, accessed January 20, 2022.

[59]    Kotler, Philip and Kevin Lane Keller, *Marketing Management,* 15th Ed., Pearson, 2016, pp. 559-560.

18

("SEC"), Block, Inc. (then Square, Inc.) disclosed to investors that "[its] business depends on a strong and trusted brand" and that "[h]arm to our brand can arise from many sources,"[60] including external factors. For example, Square, Inc. cautioned:

> We have also been […] the target of incomplete, inaccurate, and misleading or false statements about our company and our business that could damage our brand and deter customers from adopting our services. Any negative publicity about our industry or our company […] could adversely affect our reputation and the confidence in and use of our products and services. If we do not successfully maintain a strong and trusted brand, our business could be materially and adversely affected.[61]

31.     As evidenced by this disclosure, Block, Inc. understands that external factors outside of its control may damage or otherwise influence how the public perceives its brand. H&R Block's filings include similar disclosures regarding reputational harm that could be inflicted by external factors. For example, H&R Block's 2020 Form 10-K states that "[its] business depends on [its] strong reputation and the value of [its] brands" and warns that "[a]dverse publicity (whether or not justified) relating to events or activities involving or attributed to us […] which may be enhanced due to the nature of social media, may tarnish our reputation and reduce the value of our brands."[62]

32.     There are many examples of consumers' brand associations being altered due to unexpected events or "crises" outside of a company's brand management efforts. For example, in 1982, seven people in Chicago died after taking capsules of Johnson & Johnson's Extra-Strength Tylenol that had been contaminated with cyanide.[63] The U.S. Food and Drug Administration issued a warning to the public and Johnson & Johnson ordered one of the largest-ever recalls for

---

[60]   Square, Inc., Form 10-K for the fiscal year ended December 31, 2020, p. 20.
[61]   Square, Inc., Form 10-K for the fiscal year ended December 31, 2020, p. 20.
[62]   H&R Block, Inc., Form 10-K for the fiscal year ended April 30, 2021, p. 11.
[63]   McFadden, Robert D., "Poison Deaths Bring U.S. Warning on Tylenol Use," *The New York Times,* October 2, 1982.

19

the industry at that time.[64] The incident had damaging consequences for the Johnson & Johnson brand as it prompted "widespread fears" that consumers would continue to be hurt by the product.[65] As another example, in 2016, a Colorado bookstore named "Isis Books & Gifts" was forced to change its sign after its sign was smashed and owners harassed.[66] Even though the bookstore did not intend to be associated with the terrorist network, that association formed in the minds of consumers and not only damaged the brand, but also forced the bookstore to change the name on its sign entirely.[67] When a brand is damaged, this reputational harm can also be magnified by the media. Social media, for example, may act as an "amplifier of information about brands"[68] and, as a result, play a meaningful role in shaping consumer perceptions and associations.

33.    While publicity (positive or negative) stemming from one-time events can have reputational consequences, the way in which consumers interact with a brand on a regular basis can also shape brand perceptions and associations. This is true even for corporations that have adopted a "House of Brands" architecture, where the company's marketing strategy deliberately maintains distance between its product brands and corporate identity. In these cases, media coverage can nonetheless establish linkages between corporate and product brands, and thus influence how those brands are perceived.

34.    For example, Waymo was founded in 2009 as Google's self-driving car project, but was not branded with the Google name.[69] Waymo garnered attention from the public and media,

---

[64]   McFadden, Robert D., "Poison Deaths Bring U.S. Warning on Tylenol Use," *The New York Times,* October 2, 1982.

[65]   McFadden, Robert D., "Poison Deaths Bring U.S. Warning on Tylenol Use," *The New York Times,* October 2, 1982.

[66]   Flood, Alison, "US bookstore changes Isis branding after attacks," *The Guardian*, January 5, 2016.

[67]   Flood, Alison, "US bookstore changes Isis branding after attacks," *The Guardian*, January 5, 2016.

[68]   Keller, Kevin Lane, *Strategic Brand Management: Building, Measuring, and Managing Brand Equity*, Fifth Edition, 2020, Pearson, p. 491.

[69]   Waymo Website, "Waymo Story," <https://waymo.com/company/#story>, accessed January 20, 2022.

and I observe that the media frequently associated the Waymo brand with Google, as shown in the image below.

**Figure 5: Select Media Coverage Associating Waymo with Google[70]**



35.    In 2015, Google announced a restructuring and became a wholly-owned subsidiary of Alphabet, Inc.[71] In 2017, Waymo became an independent autonomous driving technology company under the Alphabet brand.[72] Media recognized the change, and subsequent discussion of Waymo in the media frequently associates the Waymo brand with Alphabet. Examples of this media coverage are provided in the image below.

---

[70]   *See also,* **Exhibit 3.**
[71]   Hern, Alex, "Why Google is restructuring, why the name Alphabet and how it affects you," *The Guardian,* August 11, 2015.
[72]   Waymo Website, "Waymo Story," <https://waymo.com/company/#story>, accessed January 20, 2022.

**Figure 6: Select Media Coverage Associating Waymo with Alphabet[73]**



36.    As another example, Microsoft launched Xbox in 2001 as a response to Sony's successful launch of the PlayStation gaming consoles.[74] Since 2001, the Xbox brand has grown and evolved into Microsoft's "gaming brand across all devices,"[75] and is ranked as one of the top brands in the world.[76] In 2019, Microsoft rebranded Microsoft Studios (its game development arm) as Xbox Game Studios to leverage the Xbox brand.[77] Since 2001, the Xbox brand logo has not featured the Microsoft name, as shown in Figure 7 below, but I find nevertheless that media coverage of Xbox often associates the brand with Microsoft. I provide select examples of this media coverage in Figure 8.

---

[73]   *See also,* **Exhibit 3.**
[74]   "Xbox and PlayStation: How Sony and Microsoft changed the way we play video games," *USA Today*, November 14, 2020.
[75]   Booty, Matt, "Introducing Xbox Game Studios," Xbox, February 5, 2019, <https://news.xbox.com/en-us/2019/02/05/introducing-xbox-game-studios/>, accessed January 20, 2022.
[76]   Dalton Cooper, "Report: Xbox Brand is More Valuable than Sony and Nintendo," *Gamerant*, June 17, 2019.
[77]   Booty, Matt, "Introducing Xbox Game Studios," Xbox, February 5, 2019, <https://news.xbox.com/en-us/2019/02/05/introducing-xbox-game-studios/>, accessed January 20, 2022.

22

**Figure 7: Evolution of the Xbox Logo[78]**



**Figure 8: Select Media Coverage Associating Xbox with Microsoft[79]**



37.     These examples show how even for companies that have adopted a "House of Brands" architecture, the media can establish and reinforce linkages between corporations and their product brands.   In the next section, I discuss the results of my empirical analysis that

---

[78]   Logos-World Website, "Xbox Logo," <https://logos-world.net/xbox-logo/>, accessed January 21, 2022.
[79]   *See also,* **Exhibit 3.**

quantitative confirmation of the role of the media in perpetuating linkages between corporations and their product brands.

## IV. EMPIRICAL ANALYSIS SHOWS THAT MEDIA COMMONLY ESTABLISH LINKAGES BETWEEN CORPORATE AND PRODUCT BRANDS, EVEN FOR COMPANIES THAT EMPLOY A "HOUSE OF BRANDS" ARCHITECTURE

38.      A company's marketing strategy will be informed by its brand architecture, and one motivation for adopting a "House of Brands" architecture could be to attempt to limit associations between a product brand and other brands within the architecture, including the corporate brand. As discussed in **Section III.D,** however, factors outside of a company's brand management efforts can influence consumer brand associations, so consumers may nevertheless associate product and corporate brands within a "House of Brands" architecture.

39.      To examine how external factors may influence brand associations within a "House of Brands" architecture, I conducted an empirical analysis of media articles discussing select product brands and their owners. First, as shown in **Table 1** below, I selected 12 pairs of product and corporate brands that fall within a "House of Brands" architecture, including seven pairs in the technology sector. Second, relying on the Dow Jones Factiva news archive, which provides access to news articles going back over 40 years and from more than 30 thousand sources[80], I determined how many news articles (published over approximately the last five years) discuss the product brands in question. As shown in Column B, I find that the number of news articles discussing these brands ranged from 417 (Beats Fit Pro) to nearly 695K (YouTube).

---

[80]   "Factiva provides access to a global news archive going back more than 40 years, a collection of ~33,000 sources (both licensed sources and crawled websites) in 28 languages from over 200 countries and territories. This collection includes local and global newspapers, newswires, trade journals, newsletters, magazines, transcripts, and thousands of pictures from 6 sources, including Reuters Pictures and Tribune Photo Service. Factiva offers access to ~18,000 licensed sources, and over ~13,000 key Websites and Blogs that have a rolling 90-day archive." Dow Jones Factiva, "How many sources are available in Factiva?" <https://customer.dowjones.com/faq/list/3831?pos=2&page=1> (subscription required).

**Table 1: Media Articles Referencing Associations of Corporations and Product Brands**
*2017-2021*

| Product Brand and Corporation | Articles Mentioning Both the Product Brand and Corporation ("Joint Articles") [A] | Articles Mentioning the Product Brand [B] | Joint Articles as Share of Articles Mentioning Product Brand [C] = [A]/[B] |
|---|---|---|---|
| *Technology Examples* | | | |
| Beats Fit Pro AND Apple | 380 | 417 | 91% |
| Facebook AND Meta | 8,039 | 189,035 | 4% |
| Motorola AND Lenovo | 1,220 | 23,162 | 5% |
| Waymo AND Alphabet | 6,160 | 14,779 | 42% |
| Waymo AND Google | 8,600 | 14,779 | 58% |
| Xbox AND Microsoft | 12,116 | 45,825 | 26% |
| YouTube AND Google | 73,832 | 694,712 | 11% |
| *Other Examples* | | | |
| Bisquick AND General Mills | 72 | 1,169 | 6% |
| Lexus AND Toyota | 10,808 | 39,109 | 28% |
| Roper AND Whirlpool | 102 | 43,990 | <1% |
| Vaseline AND Unilever | 480 | 3,702 | 13% |
| Dove AND Unilever AND (Soap OR Skin OR Lotion) | 1,168 | 5,326 | 22% |

Notes:
[1] Column [C] calculates the number of articles that reference both a corporation and its product brand divided by the number of articles that mention the product brand but not necessarily in conjunction with the corporation.
[2] For each search conducted in Factiva, duplicates were set to "off", source was set to United States, and language was set to English.
[3] Unless indicated otherwise, reported counts reflect the number of media articles available in Factiva for the period 2017-2021. Facebook announced that it would change its corporate name to Meta on October 28, 2021. Accordingly, I restricted my Factiva search for this product brand/corporation pair to include only articles published on or after this date.
[4] The keywords "Soap", "Skin", and "Lotion" were included in the Factiva search for the Dove/Unilever pair in an effort to reduce instances of false positives.

Sources:
[1] Factiva (Corporate Version).
[2] Rodriguez, Salvador, "Facebook changes company name to Meta," CNBC, October 28, 2021.

40.     Last, I determined the number of news articles that discussed *both* the product brand and its owner (Column A), and divided these counts by the corresponding numbers of articles that mentioned only the product brands (Column B). For each product brand, the resulting ratio conveys how often a product brand is associated with its owner in the media (Column C). For every row in the table, there are articles linking the product brand with the corporate brand. There is substantial variation in the ratios that I compute for these product/corporate brand pairs, with values ranging from close to 0 percent to above 90 percent. I conclude that, to varying extents,

the media associates all of the product brands in my analysis with their owners *despite* the fact that these pairs exist within a "House of Brands" architecture.

41.     I observe that some of the corporate brands included in this analysis also serve as brands for product offerings (*e.g.,* Apple and Toyota), while others do not (*e.g.,* Alphabet and Unilever). I observe that, in either case, the extent to which media link product and corporate brands can be high relative to the other listed brand pairs. For example, I find that 91 percent of media articles that mention Beats Fit Pro also mention Apple, while 42 percent of media articles that mention Waymo also mention Alphabet. Thus, my analysis demonstrates not only that the media commonly establishes linkages between corporate brands and product brands that exist within a "House of Brands" architecture, but also that this result is not contingent on the owner being a consumer-facing brand.

42.     As an additional observation, I note that the reverse might be true as well; that is, that a significant number of media articles mentioning a corporate brand might also reference the product brand within the same "House of Brands" architecture. For example, I discovered that for the time period October 28, 2021 (when Facebook rebranded as Meta) to the end of 2021, 57 percent of articles that mentioned "Meta" also included a reference to Facebook.[81]

43.     To gain a greater understanding of the results displayed in **Table 1**, I engaged with manual review of a sample of articles for each brand pair. Consistent with my ex ante expectations, my review found that articles that jointly referenced the product brand and the corporate brand were a mix between articles that explicitly identified some corporate relationship between the two, and articles that did not identify such a relationship, which I term "false positives." This finding indicates that the percentages calculated in **Table 1**, if updated to account for the presence of false

---

[81]     For this time period, I identified 14,165 articles that mentioned Meta, and 8,039 articles that mentioned both Facebook and Meta, or approximately 57 percent.

positives, would generally decrease. However, this finding also indicates that these percentages, if updated to account for the presence of false positives, would still support the conclusion that media articles contain linkages between corporate brands and product brands, and that the extent of this linkage can vary based on the brand pair. I use the insights gleaned from this manual review in two ways. First, given the variation in linkage across brand pairs, I conclude that best way to analyze potential future media linkage between Cash App and "Block" is to analyze historical linkage between Cash App and "Square". Second, I conclude that in conducting this analysis of historical linkage between Cash App and "Square", it is important to conduct a manual review of a sufficiently sized sample of articles to account for the potential presence of false positives. I discuss this analysis further in **Section VI.A**.

## V. THE USE OF "BLOCK" AS A CORPORATE BRAND BY A COMPETITOR OFFERING TAX PREPARATION SERVICES CREATES THE POTENTIAL FOR CONFUSION WITH H&R BLOCK

### A. Brands Are of Particular Importance to Consumers in Tax Preparation and Personal Financial Services

44.     As I discuss in **Section III.B,** brands have the potential to be highly valuable company assets when managed properly. In fact, and as I discuss below, brands can be particularly valuable for companies operating in certain industries including, for example, providers of tax preparation and personal financial services.

45.     In studying the role that brands play in influencing consumers' purchasing decisions, researchers often group goods and services into three categories: search goods, experience goods, and credence goods. While consumers can assess the characteristics of search goods (such as furniture and clothing) by visually examining them, consumers can evaluate the quality of experience goods (such as beauty salons and vacations) only once the service has been purchased and provided. *Credence goods*, such as legal services and medical exams, may be

27

difficult for consumers to evaluate even after the services have been provided.[82] As a result, purchases of experience and credence goods are higher risk, and some consumers may choose to manage this risk by purchasing from well-known providers.[83] Brands, thus, are particularly important signals of quality to consumers of experience and credence goods.[84]

46.    Tax preparation and personal financial services, like those offered by H&R Block, are generally high in experience and credence qualities, and researchers find that consumers of these types of services are loyal to providers who satisfy them.[85] In the tax preparation services industry, in particular, consumers typically return to a firm that they *trust*.[86] In addition, because customers typically purchase tax preparation services only once a year subject to an externally imposed deadline, choosing trusted, well-known brands may be a helpful "short cut" that relieves customers of the time-consuming burden of researching potential options. My review of marketing materials from leaders in the tax preparation services industry reveals that these companies do, in fact, make an effort to promote trust in their corporate brands. For example, as shown below, H&R Block guarantees that it will get customers the biggest refund possible. By offering to refund the cost of its tax preparation services if the customer discovers that he or she was owed a bigger refund, H&R Block aims to eliminate some of the risk inherent in purchasing a service high in

---

[82]    Lane Keller, Kevin and Vanitha Swaminathan, *Strategic Brand Management: Building, Measuring, and Managing Brand Equity,* Fifth Ed., Pearson, 2020, p. 7.

[83]    Lane Keller, Kevin and Vanitha Swaminathan, *Strategic Brand Management: Building, Measuring, and Managing Brand Equity,* Fifth Edition, Pearson, 2020, p. 7.

[84]    Lane Keller, Kevin and Vanitha Swaminathan, *Strategic Brand Management: Building, Measuring, and Managing Brand Equity,* Fifth Edition, Pearson, 2020, p. 7.

[85]    Kotler, Philip and Kevin Lane Keller, *Marketing Management,* 15th Ed., Pearson, 2016, p. 401.

[86]    Because purchasers of experience and credence goods are loyal to providers that they trust, succeeding in providing a high quality of service and promoting brand trust can allow a provider to attract and retain customers over time. In fact, industry analysts observe that providers in the tax preparation services industry do, in fact, compete on customer service and satisfaction in order to retain customers. Patel, Kush, "Tax Preparation Services in the US" (Industry Report 54121D), IBISWorld, December 2020, p. 27.

experience and credence qualities. By emphasizing the expertise of its tax advisors and transparent pricing[87], similarly, H&R Block endeavors to promote trust between provider and consumer.

**Figure 9: Maximum Refund Guarantee from H&R Block Website[88]**

## Max Refund Guarantee

Get every credit and deduction you deserve. Find a bigger refund somewhere else? Your tax prep is free. ⁶

47.     Intuit Inc.'s TurboTax, a competitor to H&R Block, has adopted a similar strategy to promote brand trust. For example, TurboTax advertises "10 ways TurboTax has you covered" that includes, *inter alia,* its "world class" teams of tax professionals, its innovative technology, and a guarantee that it will find the maximum refund possible for its customers.[89] In fact, TurboTax represents that its online tax returns are backed by a total of *five* different guarantees,[90] messaging designed to promote confidence in the TurboTax brand. Liberty Tax Inc., another industry player,[91] reports ratings from Google reviewers on its website, using evidence of customer satisfaction as a means of earning the trust and confidence of potential customers.[92]

---

[87]  For example, H&R Block emphasizes that its tax professionals have "an average of 10 years' experience" and offers "[u]pfront transparent pricing" with a "No Surprise Guarantee." H&R Block Website, Taxes, <https://www.hrblock.com/filing-options-and-products/>, accessed January 16, 2022.

[88]  H&R Block Website, Homepage, <https://www.hrblock.com>, accessed January 19, 2022.

[89]  TurboTax Website, "10 ways TurboTax has you covered," <https://turbotax.intuit.com/personal-taxes/online/turbotax-has-you-covered/>, accessed January 16, 2022.

[90]  TurboTax Website, "TurboTax Online Guarantees," <https://turbotax.intuit.com/corp/guarantees/>, accessed January 16, 2022.

[91]  Patel, Kush, "Tax Preparation Services in the US" (Industry Report 54121D), IBISWorld, December 2020, pp. 30-32.

[92]  Liberty Tax Inc. Website, <https://www.libertytax.com>, accessed January 16, 2022.

48.     I observe that similar strategies are employed by providers of personal financial services. For example, from 2003 to 2007, Bank of America promoted its services using the slogan "Higher Standards."[93] Introduced in the aftermath of a number of Wall Street scandals, Bank of America's slogan may have been designed to distance the bank from these scandals and promote an image of trust and integrity. The slogan was popular with consumers,[94] which supports the view that brands are important signals of quality for consumers of experience and credence goods. I observe a similar emphasis on trust with respect to H&R Block's strategic approach to marketing its financial services.  In discussing the company's Financial Products segment in H&R Block's Annual Report for 2021, President and CEO Jeffrey J. Jones observed: "By leveraging our **trusted brand** […] we will accelerate growth in this area to a more meaningful part of our business…."[95]

49.     Historically, companies that offer experience and credence services have invested heavily in promoting their brands as a means of differentiating their offerings. Because the services provided by these companies are generally highly regulated (and may be viewed by consumers as near-commodities) firms in these industries aim to develop brands they hope consumers will be familiar with. For example, many consumers may recognize the slogans and celebrity spokespeople used by American Express and Capital One,  insurer Aflac's duck mascot, and State Farm's fictional representative "Jake." Critically, these companies hope that consumers will recognize their brands even if they do not have a close understanding of the goods and services they provide, and that that familiarity will promote brand *trust*.

50.     Based on a review of financial information, I find that providers of experience and credence goods (including tax preparation and personal financial services) do appear to invest heavily in developing and maintaining brand image. For example, American Express reported total

---

[93]    Dash, Eric, "Bank of America Tagline Has Run Its Course," *The New York Times,* February 20, 2007.
[94]    Dash, Eric, "Bank of America Tagline Has Run Its Course," *The New York Times,* February 20, 2007.
[95]    H&R Block, 2021 Annual Report, p. 2 (emphasis added).

marketing and business development expenses of $7.1 billion in 2019 and $6.7 billion in 2020.[96] Aflac Inc. reported total advertising expenses of $219 million and $184 million in 2019 and 2020, respectively, also noting that its duck mascot "has become one of the most familiar advertising icons in the world".[97] Square, Inc. reported advertising costs of $224.7 million for 2020[98], while H&R Block reported marketing and advertising expenses of $262.0 million, $255.1 million, and $269.8 million for fiscal years 2021, 2020, and 2019,[99] respectively. Intuit, Inc. reported advertising expense of approximately $1.1 billion for the 2021 fiscal year.[100] The considerable marketing expenses incurred by these companies support the view that providers of services high in experience and credence qualities understand the importance of their brands as signals of quality, and invest heavily in protecting their brands as a result. Consistent with this view, I observe that of the "Top 100" brands identified by Interbrand for 2021, at least 12 brands relate to providers of financial services and insurance.[101] I discuss H&R Block's extensive brand promotion efforts further below.

51.     Prof. Wind asserts that tax preparation services are high-involvement and that for such high-involvement services, consumers are "often closely attuned to differences between brands, and actively research such differences themselves before making a purchase."[102] Yet, Prof. Wind fails to provide any evidence that tax preparation service consumers actually engage in this type of research. Even if some consumers do, as Prof. Wind posits, engage in research to discern differences across a set of trusted tax preparation products, this does not mean that all or even an appreciable percentage do so. Consumers are not identical in their preferences or buying

---

[96] American Express Company, Form 10-K for the fiscal year ended December 31, 2020, p. 47.
[97] Aflac Inc., Form 10-K for the fiscal year ended December 31, 2020, pp. 2, 152.
[98] Square, Inc., Form 10-K for the fiscal year ended December 31, 2020, p. 93.
[99] H&R Block, Form 10-K for the fiscal year ended April 30, 2021, p. 45.
[100] Intuit, Inc., Form 10-K for the fiscal year ended July 31, 2021, p. 67.
[101] These include: J.P. Morgan, American Express, Allianz, Visa, PayPal, Axa, MasterCard, Citi, Goldman Sachs, HSBC, Morgan Stanley, and Santander. "Best Global Brands 2021," Interbrand, 2021, pp. 9-12.
[102] Wind Declaration, ¶ 68.

31

processes, and all tax filers face strict deadlines for filing their taxes. As I note above, I would argue that because customers typically purchase tax preparation services only once a year subject to an externally imposed deadline, consumers may opt for well-known brands in order to be spared the time-consuming burden of researching other providers.

52.    Further, given the importance of trust in this category, it is important to consider the harm that could befall a brand that becomes *less* trusted due to an incident of consumer confusion. Under such circumstances, some consumers may eliminate the brand from their consideration set, even if they were to engage in research to try to discern differences among the set of more trusted brands. In similar fashion, a new brand that is confused for a trusted brand has the ability to benefit from this confusion, by entering the consumer's consideration set and potentially being selected when it otherwise would not have been considered by the consumer.

**B.    H&R Block Has a Longstanding Presence in Tax Preparation Services and Has Invested in Its Brand, Including Promoting Its Associations with the Term "BLOCK"**

53.    H&R Block's presence in the tax preparation marketplace is longstanding. H&R Block has offered tax preparation services for more than 65 years, and has prepared more than 800 million tax returns, including 21.6 million U.S. tax returns in its 2021 fiscal year.[103] The company markets itself as "the only company to offer complete choice for consumers to get tax help on their terms with in person, online, and virtual options."[104] H&R Block offers more than 10,000 retail locations, employing (with its franchisees) more than 70,000 tax professionals across "all 50 states, Puerto Rico and other U.S. territories, on U.S. military bases internationally and around the

---

[103]    H&R Block Website, "Our Company," <https://www.hrblock.com/corporate/our-company/>, accessed January 20, 2022; H&R Block Factsheet, <https://www.hrblock.com/corporate/pdfs/hrb-factsheet.pdf>, accessed January 20, 2022.
[104]    H&R Block Website, "Our Company," <https://www.hrblock.com/corporate/our-company/>, accessed January 20, 2022.

world."[105]   From a marketing perspective, the storefront of each of these retail locations acts as a billboard to advertise the company's services and build their brand.

54.     As discussed above, H&R Block's annual marketing and advertising expenditures were $262.0 million, $255.1 million, and $269.8 million in fiscal years 2021, 2020, and 2019 respectively.[106] H&R Block spends their marketing and advertising budget in the following mediums: radio, television, online, print, and mailing.[107]

55.     H&R Block's external communications have featured the term "Block" in connection with H&R Block's corporate brand.  For example, as shown below, H&R Block's "Corporate Responsibility Report" for 2021 is titled "We're Making Every Block Better" and includes the message: "Make Every Block Better".[108] Below, I provide an overview of how the term "Block" is featured in this report and in other external communications.

[105]   H&R Block Website, "Our Company," <https://www.hrblock.com/corporate/our-company/>, accessed January 20, 2022; "We're making every block better," <https://www.makeeveryblockbetter.com/>, accessed January 20, 2022.
[106]   H&R Block, Inc., Form 10-K for the fiscal year ended April 30, 2020, p.45.
[107]   H&R Block, Inc., Form 10-K for the fiscal year ended April 30, 2020, p.45.
[108]   "2021 Corporate Responsibility Report," H&R Block, 2021, <https://www.makeeveryblockbetter.com/H&R-Block-Corporate-Social-Responsibility-2021.pdf>, accessed January 20, 2022.

**Figure 10: H&R Block's Corporate Responsibility Report, "We're Making Every Block Better"[109]**





- The corporate responsibility report notes the breadth of the impact of its "Make Every Block Better" program, as depicted in the image below. The report also observes that "since the launch of Make Every Block Better in December 2019, H&R Block associates, franchisees, and franchise employees have recorded more than 205,000 total volunteer hours."[110]

---

[109] *See also,* **Exhibit 3.**
[110] "2021 Corporate Responsibility Report," H&R Block, 2021, <https://www.makeeveryblockbetter.com/H&R-Block-Corporate-Social-Responsibility-2021.pdf>, accessed January 20, 2022, p. 12.

34

**Figure 11: Breadth of Impact of "Making Every Block Better"[111]**

| 2025 GOAL | PROGRESS TO-DATE | PERCENT COMPLETED |
|---|---|---|
| 500 communities impacted by Make Every Block Better in all 50 states | 258 | 52% |
| 500,000 small business owners supported, 15% of which are historically underrepresented | 304,000 | 61% |
| 1 million volunteer hours | 205,000 | 20% |

- The "Make Every Block Better" website includes a quote from an H&R Block employee referencing his office as "Our Block office":

**Figure 12: H&R Block Employee Quote Regarding "Our Block Office"[112]**

> "Today we delivered over 393 pounds of food to the Murphysboro Food Pantry. Our Block office matched those donations given by the community. To say they were appreciative of the donations would be an understatement."
>
> James Wood
> Tax Lead, Senior Tax Specialist

- H&R Block employees participating in the "Make Every Block Better" initiative wear clothing with the word "Block" in green as seen below:

---

[111] *See also,* **Exhibit 3.**
[112] *See also,* **Exhibit 3.**

35

**Figure 13: H&R Block Employees and Their Families Wearing "Block" Branded Clothing While Participating in the "Make Every Block Better" Initiative**[113]



- H&R Block's investor relations materials include a theme of green blocks below, and use the title "Block Horizons 2025" to describe the company's "next phase of strategic transformation.

**Figure 14: Use of Green Blocks and "Block Horizons" on H&R Block's Investor Relations Website**[114]



---
[113] *See also,* **Exhibit 3.**
[114] *See also,* **Exhibit 3.**

36

- H&R Block's 2021 Investor Deck Presentation refers to one of the company's three strategic initiatives as the "Block Experience":

**Figure 15: H&R Block Investor Deck Presentation "Block Experience"[115]**



56.    In addition to the above information, I reviewed the declaration of Jeffery J. Jones regarding H&R Block's promotion of the "BLOCK" family of marks.[116] This testimony was consistent with my assertions above that H&R Block has, in fact, invested significantly in promoting brand associations with the term "BLOCK." The following examples further illustrate this point:

- H&R Block "has invested billions of dollars to advertise and promote the BLOCK Marks and brand."[117]

---

[115]  H&R Block Investor Deck, December 2021, p. 14.
[116]  Declaration of Jeffery J. Jones II, *H&R Block, Inc. and HRB Innovations, Inc. v. Block, Inc.*, United States District Court For the Western District of Missouri, Case No. 4:21-cv-00913-NKL, January 21, 2022 ("Jones Declaration").
[117]  Jones Declaration, ¶ 4.

37

- "[W]e, along with the media and regulators, also frequently refer to our company as BLOCK, and, therefore, our customers also know us as BLOCK."[118]

- "[H&R] Block has invested significant resources in advertisements using BLOCK alone. For instances [sic], Block invested over $100 million in television and online video advertising alone to promote the tagline 'BLOCK HAS YOUR BACK.'"[119]

57.     H&R Block has invested millions of dollars in paid search advertising that associates H&R Block with the term "Block." Phrases such as: "Switch to Block"; "More than Block"; and "Free with Block" have been used in paid search advertising.[120] Additionally, H&R Block also bids on paid search keywords that feature "BLOCK" such as "block tax" and "myblock com."[121]


**C.     Consumer Evidence Indicates that Consumers Associate H&R Block with "Block"**

58.     Consumer evidence indicates that consumers associate H&R Block with the term "Block," including the following examples of consumer reviews from Amazon.

---

[118]   Jones Declaration, ¶ 8.
[119]   Jones Declaration, ¶ 11.
[120]   Jones Declaration, ¶ 15.
[121]   Jones Declaration, ¶ 15.

38

**Figure 16: Customer Reviews from Amazon Associating H&R Block With "Block"[122]**


John Szychowski

★★★★☆ **A chip off the old block**
Reviewed in the United States on May 23, 2021
Platform: PC Download | Edition: Deluxe + State | **Verified Purchase**

Been using Block for years. Easy to use, and no complaints. Especially glad the IRS police haven't kicked my door down yet. After all, they got to Capone. I'll buy it again next year too.


Sailorman

★★★★★ **Never Had A Problem With This Software**
Reviewed in the United States on August 8, 2021
Platform: PC Download | Edition: Deluxe + State | **Verified Purchase**

I've used Block software for 8 or 10 years and the IRS has never had a problem with my returns which are slightly complicated. Works for me.


MS

★★★★★ **Does the job for me, great service from Amazon this time**
Reviewed in the United States on March 5, 2021
Platform: PC Download | Edition: Deluxe + State | **Verified Purchase**

I have used this tax software for years. It does the job for me.
This is the first time purchasing from Amazon. I bought the mail out key code version. I ordered the Deluxe with State, which is the package I received, but the download key code produced the Basic version. I thought I had thrown out the mailer, so couldn't verify the packaging when I contacted Block support. They stated that the key code was only for Basic, not Deluxe. Then I contacted Amazon and explained the situation. Amazon made good in my awkward situation and replaced it with the software I had paid for.

As it turned out, I later found the packaging, and it indeed was the Deluxe with State SW. So it was Block's error--they put the Basic version code in the Deluxe version mailer. Thank you Amazon for covering Block's error.

---

[122] *See also,* **Exhibit 3**.

59.     I also considered a consumer survey conducted by Dr. Deborah Jay, an expert retained by counsel for H&R Block.[123] Dr. Jay's survey, conducted between January 18, 2022 and January 20, 2022, asked respondents: "Have you ever seen or heard of this brand of tax product or service: [NAME]", where [NAME] cycled through each of the following seven brands in random order:  1040.COM; BLOCK; DYO RETURNS; JACKSON HEWITT; LIBERTY TAX; OLT; TURBOTAX.[124] Respondents had the option of selecting one of three responses:  "Yes, have seen or heard of this brand"; "No, have not seen or heard of this brand"; "Don't know".[125] Dr. Jay's survey found that "47% of the survey respondents indicated they had seen or heard of a tax product or service with the BLOCK brand name," whereas only 2 percent said the same for "DYO RETURNS", which was a fictitious brand.[126] The net percentage of 45 percent is consistent with other consumer-based evidence presented in this section that consumers recognize and use "Block" to identify H&R Block as a provider of tax products and services.

60.     Google Trends is a website that allows one to study the relative prevalence of different searches made through the Google search engine.  As shown below in **Figure 17**, Google Trends results illustrate that "block taxes" has trended seasonally with "h&r block taxes" since 2004.  In fact, searches for "block taxes" exceed searches for "h&r block taxes", suggesting that consumers are more likely to seek out H&R Block's website through the Google search engine using the term "block" in conjunction with "taxes" than the term "h&r block" in conjunction with "taxes".  I observe a similar pattern when comparing "block tax" to "h&r block tax", as shown in **Figure 18**.

---

[123]   Rebuttal Declaration of E. Deborah Jay In Support Of Plaintiffs' Motion For A Preliminary Injunction, *H&R Block, Inc. and HRB Innovations, Inc. v. Block, Inc.*, United States District Court For the Western District of Missouri, Case No. 4:21-cv-00913-NKL, January 21, 2022 ("Jay Declaration").
[124]   Jay Declaration, ¶¶ 5, 10-11.
[125]   Jay Declaration, ¶ 10.
[126]   Jay Declaration, ¶ 14.

40

**Figure 17: Google Trends Comparison of "block taxes" and "h&r block taxes" searches, 2004-present**[127]



---

[127] *See also,* **Exhibit 3.**

**Figure 18: Google Trends Comparison of "block tax" and "h&r block tax" searches, 2004-present[128]**



61. Google Trends also provides data on "related queries." For example, if a consumer searched for "block taxes", and also searched for "file taxes", then these two searches would be considered related queries. Google Trends presents, for a given search term, the most popular related queries. As shown below in **Figure 19**, among all users who searched for "block taxes" during 2004 to present, the two most popular related queries were "taxes h&r block" and "h&r block". In fact, 7 of the top 10 searches related to "block taxes" referenced H&R Block. I observe similar results for "block tax": 8 of the top 10 searches related to "block tax" referenced H&R Block.[129]

---

[128] *See also,* **Exhibit 3.**
[129] Google Trends, <https://trends.google.com/trends/explore?date=all&geo=US&q=block%20tax>, accessed January 21, 2022.

42

**Figure 19: Users Searching for "block taxes" Also Performed Searches Specifically for H&R Block[130]**



---

[130]   *See also,* **Exhibit 3.**

62.     As Prof. Wind observes, the "advent of internet search functions" has given today's consumers the option of "searching for products and services," and "consumers are increasingly likely to conduct online searches before making a purchase… ."[131]  It is striking, then, that neither Prof. Wind nor Prof. Dhar consider evidence from consumer internet searches like those I present above.

63.     Indeed, Prof. Wind and Prof. Dhar fail to recognize *any* evidence of consumer associations between H&R Block and "Block", though as I show above, such evidence clearly exists.  Instead, Prof. Wind and Prof. Dhar focus their attention on the extent to which H&R Block's marketing communications using "Block" have also contained H&R Block branding. Prof. Wind seeks "to see if H&R Block's own branding and marketing rely on the standalone word 'Block' or a green square logo without other H&R Block branding."[132]  He concludes that "even when H&R Block refers to itself as 'Block' on a webpage or slogan, it is, and has been over time, in the context of the use of its full name" and that "H&R Block's use of its green square logo is, and has been over time, routinely accompanied by the name 'H&R Block.'"[133] He states that "H&R Block's own marketplace behavior does not reflect a position that 'Block' by itself represents the company, and that H&R Block itself does not believe consumers associate H&R Block with 'Block.'"[134] Prof. Dhar reviews "examples provided by H&R Block to the Court" of H&R Block's advertising and communications to consumers and concludes that "'Block' by itself is not a source identifier for H&R Block" because it is "used in proximity with the full 'H&R Block' name… ."[135]

---

131   Wind Declaration, ¶¶ 67, 69.
132   Wind Declaration, ¶ 48.
133   Wind Declaration, ¶ 7.
134   Wind Declaration, ¶ 60.
135   Dhar Declaration, ¶ 54.

44

64.     In reaching these conclusions, Prof. Wind and Prof. Dhar commit two critical oversights.  The first oversight stems from their failure to consider evidence on whether *consumers* associate "Block" by itself with H&R Block.  While evidence on how a *company* conducts its marketing communications provides helpful context to understanding the associations that consumers may make, evidence on the actual associations that consumers have, when available, is of particular importance to consider.  As shown above, consumers do indeed use "Block" to identify H&R Block.  The second oversight is based in flawed logic that if the term "Block" always has a nearby occurrence of "H&R Block" in H&R Block's marketing communications, then "Block" cannot possibly serve as a source identifier for H&R Block.  This view ignores that the joint occurrence of "H&R Block" and "Block" in marketing communications is a way to *build* associations between the two in the minds of consumers, to a degree that "Block" may in fact serve to identify H&R Block.  The consumer-based evidence above indicates that H&R Block has indeed been successful in cultivating "Block" as a source identifier.

65.     In addition, Prof. Wind and Prof. Dhar fail to recognize that many brands can be identified by either a longer form or shorter form name, and many brands have embraced a shortened form of their name.  For example:  Starbucks was branded as Starbucks Coffee before deciding to remove "Coffee";[136] Kentucky Fried Chicken adopted the abbreviation KFC as a brand identifier;[137] Dunkin' Donuts rebranded to Dunkin';[138] and Weight Watchers rebranded to WW.[139] My employer, the Joseph A. Wharton School, is commonly recognized as "Wharton", and is

---

[136]  Lisa Baertlein, "Starbucks cuts name and "coffee" from logo," *Reuters*, January 5, 2011, <https://www.reuters.com/article/us-starbucks-starbucks-cuts-name-and-coffee-from-logo-idUSTRE7045YF20110106>, accessed January 20, 2022.

[137]  Emily DiNuzzo, "The Real Reason KFC Changed Their Name from Kentucky Fried Chicken," *Yahoo News*, March 28, 2019, <https://news.yahoo.com/real-reason-kfc-changed-name-152801317.html>, accessed Janaury 20, 2022.

[138]  Kate Taylor, "Dunkin' Donuts is officially dropping the 'Donuts' from its name despite earlier backlash," *Business Insider*, September 25, 2018, <https://www.businessinsider.com/dunkin-donuts-changes-name-no-donuts-2018-9>, accessed January 20, 2022.

[139]  Miller, Jess, "Weight Watchers Isn't Fooling Anyone," *Slate,* March 8, 2021.

45

affiliated with the University of Pennsylvania, which is commonly recognized as "Penn" or "UPenn". Consumers commonly encounter these shortened forms of brands, and it is clear that they can perceive both the longer and shorter forms as source identifiers, even when both forms are presented together. For example, the University of Missouri is commonly recognized as "Mizzou", and these two identifiers are presented together in the web page banner for the university.

**Figure 20: "University of Missouri" and "Mizzou"[140]**



66.     Prof. Wind also reviews "how H&R Block markets itself on third-party websites such as Wal-Mart, Target, and Amazon"[141] as well as whether "H&R Block relied on 'Block' without any source-identifying language in its [search engine optimization] marketing efforts."[142] He concludes that consumers at Wal-Mart, Target, and Amazon "see the products listed with the full 'H&R Block' name and its green square logo"[143] and that H&R Block "does not use 'block' in its online Search Engine Optimization (SEO) strategy."[144] But taking these conclusions at face value, neither implies that "Block" cannot serve as a source identifier for H&R Block, just as usage of "University of Pennsylvania" does not imply that "Penn" cannot serve as a source identifier for that institution. In fact, as I demonstrated above, Amazon customers do use "Block" to refer to "H&R Block", notwithstanding Prof. Wind's claims about H&R Block's marketing on Amazon.

---

[140]   University of Missouri Website, <https://missouri.edu/>, accessed January 20, 2022.
[141]   Wind Declaration, ¶ 49.
[142]   Wind Declaration, ¶ 50.
[143]   Wind Declaration, ¶ 56.
[144]   Wind Declaration, ¶ 57.

46

67.     Prof. Dhar asserts that "Block" in isolation is unlikely to be seen as an identifier of source for H&R Block due to "hundreds of active registered trademarks that use BLOCK in their names."[145]   Again, this view is contradicted by the above consumer-based evidence.  Moreover, use of "Block" by companies in other product categories does not bear on whether it may identify H&R Block in the context of H&R Block's product categories, just as the existence of Delta Faucets does not preclude "Delta" from being a source identifier for an airline.

### D.     Consumer Exposure to a Competitor's Use of "Block" Introduces the Potential for Confusion with H&R Block

68.     Having established that H&R Block has cultivated consumer brand associations with "H&R Block" and "Block", I now assess the key conditions under which another company's use of "Block" would introduce the potential for confusion with H&R Block.  These conditions are: (i) that the company is a competitor to H&R Block, i.e., the company offers a product or service that overlaps with the products or services offered under the H&R Block brand; and (ii) that consumers are exposed to that company's use of "Block" to identify either itself as a company or its overlapping product or service.  These conditions are applicable regardless of whether one accepts Prof. Wind's and Prof. Dhar's view that "Block" does not serve as a source identifier for H&R Block, or one accepts my view that "Block" does in fact serve as a source identifier for H&R Block.  In the former case, the assumed competitor's "Block" has substantial overlap with the source identifier "H&R Block"; in the latter case, the assumed competitor's use of "Block" has complete overlap with the source identifier "Block".  Therefore, my conditions for the potential for confusion to exist are valid regardless of whether one believes that "Block" is a source identifier for "H&R Block".  In sum, while the potential for confusion is enhanced by H&R Block's use of

---

[145]   Wind Declaration, ¶ 65.

"Block" as a source identifier, this does not preclude the potential for confusion in a world where only "H&R Block" were used as a source identifier.

69.     Block, Inc. asserts that it "does not use its Block brand to sell any customer-facing products or services at all."[146]  Prof. Wind asserts that "Block is a corporate name and not the brand of any customer-facing product or service… ."[147] Prof. Dhar asserts that Block, Inc. "does not use 'Block' as a brand for its Cash App Taxes service."[148]  Nonetheless, one must account for the fact that potential consumer confusion is rooted in the brand associations that reside in the minds of consumers, rather than strictly dictated by a company's brand management efforts.  As I have discussed above, other factors beyond a company's brand management efforts influence consumer brand associations.  Hence, to assess the potential for confusion in this matter, one must consider all mechanisms by which consumers may be exposed to Block, Inc.'s use of "Block" to identify itself, in addition to analyzing Block, Inc.'s claims that its "Block brand" is not consumer-facing.

70.     Prof. Wind and Prof. Dhar suggest that the potential for confusion should be evaluated in a particularly narrow context.

- Prof. Dhar opines that "the marketplace context of how current or prospective users of Cash App and Cash App Taxes **use the app** makes any confusion with H&R Block highly unlikely."[149] But this view ignores that the relevant marketplace context is not narrowly limited to how consumers "use the app"; one must consider all mechanisms by which marketplace context may lead to consumer confusion.

---

[146]   Block, Inc. Motion to Dismiss, p. 1.
[147]   Wind Declaration, ¶ 70.
[148]   Dhar Declaration, ¶ 17a.
[149]   Dhar Declaration, ¶ 17a (emphasis added).

48

- Prof. Wind, meanwhile, focuses his assessment on the likelihood of consumer confusion at a fixed point in time proximate to the filing of his declaration (e.g. his survey data were collected between January 6-9, 2022[150]). But this ignores the fact that Block, Inc. only recently changed its name, and that the potential for confusion may strengthen over time as consumers (i) are introduced to the "Cash App Taxes" tax preparation product offered by Block, Inc.; and (ii) face greater exposure to linkages between "Cash App" and "Block." My focus is not on current confusion, as it has had limited time in which to materialize, but rather on the future likelihood of confusion. I particularly note that the tax filing season for the U.S. will take place over the coming few months, which is likely to exacerbate both of these factors and strengthen the potential for confusion.

71.     In sum, a proper assessment of the likelihood of confusion in this matter should not be limited to a narrow marketplace context or a narrow window of time subsequent to Block, Inc.'s name change. A proper assessment of the likelihood of confusion must take into account all mechanisms by which consumer brand associations may be shaped by exposures to Block, Inc.'s forthcoming "Cash App Taxes" product as well as exposures to linkages between "Cash App" and "Block".

## VI.     CONSUMERS HAVE BEEN EXPOSED TO LINKAGES BETWEEN THE "CASH APP" BRAND AND "BLOCK" AS A CORPORATE BRAND, AND ARE LIKELY TO CONTINUE TO BE EXPOSED TO SUCH LINKAGES

### A.     Empirical Analysis Demonstrates That Media Has Historically Linked the "Cash App" Brand with the Brand of Its Owner

72.     Notwithstanding the recency of Block, Inc.'s name change, there is a longer history available for analyzing the relationship between the "Cash App" brand and the brand of its

---

[150]   Wind Declaration, ¶ 39.

49

owner—specifically, the period from 2013 to late 2021 when that owner was named Square, Inc. Media coverage of this historical time period yields clear examples of linkages between "Cash App" and the brand of its owner.  For example:

- A July 8, 2021 article from The Verge stated that "You can already buy and sell bitcoin from Square's Cash App."[151]

- An October 28, 2021 article from CNN mentioned that "More consumers, especially younger ones, are using services like Square's Cash App and Paypal's Venmo for mobile payments."[152]

- An article published by the Wall Street Journal on December 5, 2020 indicated that "Square's Cash App has allowed customers to buy and sell bitcoin since 2018."[153]

- A Forbes article published on May 22, 2020 reiterated that "People could already store money, make purchases, invest in stocks and buy bitcoin with Square's Cash App by early 2018."[154]

- "Cash App, by Square, is a convenient peer-to-peer money transfer app that allows you to exchange money with friends and family on your phone, without any actual money actually changing hands." Business Insider, December 12, 2019.[155]

---

[151] Peters, Jay, "Square is going to make a hardware wallet for bitcoin," *The Verge,* July 8, 2021, <https://www.theverge.com/2021/7/8/22569309/square-hardware-wallet-bitcoin-jack-dorsey>, accessed January 20, 2022.

[152] La Monica, Paul R., "Fintechs are the new corner bank, but big financial firms are fighting back," *CNN,* October 28, 2021, <https://www.cnn.com/2021/10/28/investing/big-banks-fintechs/index.html>, accessed January 20, 2022.

[153] Pellejero, Sebastian, "These Investors Are Riding the Bitcoin Wave to New Highs," *The Wall Street Journal,* December 5, 2020, <https://www.wsj.com/articles/these-investors-are-riding-the-bitcoin-wave-to-new-highs-11607166333>, accessed January 20, 2022.

[154] Kauflin, Jeff, "Covid Crisis May Accelerate Square's Move Into Consumer Banking," *Forbes,* May 22, 2020, <https://www.forbes.com/sites/jeffkauflin/2020/05/22/covid-crisis-may-accelerate-squares-move-into-consumer-banking/?sh=27616ae915f1>, accessed January 20, 2022.

[155] Weir, Melanie, "How to change your Cash App PIN on an Android or iPhone," *Business Insider,* <https://www.businessinsider.com/how-to-change-cash-app-pin>, accessed January 20, 2022.

- "The following week, Peak was highlighted as the top featured app in the App Store's Finance category, alongside established industry leaders including the Cash app by Square and Credit Karma." Business Wire, February 7, 2019.[156]

- "Others may have thought the implication of Dorsey's tweet was that he was "boosting" Chick-fil-A, when he appeared to be promoting the "boost" or cash back received when using Square's Cash app debit card." The Washington Post, June 11, 2018. [157]

- "In addition to touting new hardware, Apple announced its new mobile operating system, bolstered augmented and virtual reality tools for developers, an expanded Apple Pay to facilitate person-to-person money transfers (similar to Venmo and Square's Cash app), and a revamped app store." Los Angeles Times, June 6, 2017.[158]

73.     Drawing on the Factiva media article database, the table below shows substantial linkage between Cash App and Square from 2017 to 2021, in terms of the share of articles mentioning Cash App that also mention Square.[159]  The number of articles referencing Cash App has been growing over time, as has the number of articles referencing Cash App and Square jointly. This pattern is consistent with the notion that Cash App's linkage to its owner has become stronger and more prevalent over time.

---

[156]  "Peak Money's Mindfulness-Focused Savings App Recognized by Apple," *Business Wire,* February 7, 2019, <https://www.businesswire.com/news/home/20190207005235/en/Peak-Money%E2%80%99s-Mindfulness-Focused-Savings-App-Recognized-by-Apple>, accessed January 20, 2022.

[157]  McGregor, Jena, "Square CEO Jack Dorsey Gets Blasted From Both Sides After A Tweet About Chick-fil-A," *The Washington Post,* <https://www.washingtonpost.com/news/on-leadership/wp/2018/06/11/square-ceo-jack-dorsey-gets-blasted-from-both-sides-after-a-tweet-about-chick-fil-a/>, accessed January 20, 2022.

[158]  Lien, Tracey, "Apple takes on smart speakers," *PressReader,* June 6, 2017, <https://www.pressreader.com/usa/los-angeles-times/20170606/281900183178949>, accessed January 20, 2022.

[159]  I understand that Cash App was originally named SquareCash, and Square, Inc. changed its name to Cash App in 2017. *See,* Jennings Declaration, ¶6.

51

**Figure 21: Historical Linkage of "Cash App" to "Square" in Media Articles**

|  | _2017_ | _2018_ | _2019_ | _2020_ | _2021_ |
|---|---|---|---|---|---|
| Cash App AND Square | 81 | 248 | 326 | 620 | 1,428 |
| Cash App | 100 | 388 | 730 | 2,043 | 3,563 |
| Ratio | 81% | 64% | 45% | 30% | 40% |
| Ratio (Adjusted) | 81% | 61% | 41% | 27% | 32% |

74.    To confirm the inference that can be made from the results presented in **Figure 21**, I engaged with manual review of 400 articles that jointly referenced "Cash App" and "Square" from October 15, 2013 through November 30, 2021.  Of these, 365 articles were contained within the years 2017 to 2021, corresponding to the time period during which Square, Inc. used the name "Cash App."  I use these 365 articles to assess the rate of "false positives" (i.e., articles that contain "Cash App" and "Square" but do not indicate an explicit relationship between the two) in each calendar year.  I conclude that the rate of false positives is low, 9 percent in the aggregate.  I then adjust the ratios in the table to account for these false positives.  I find that across individual calendar years from 2017 to 2021, the resulting percentages of media linkage between "Cash App" and "Square" range from 27 percent to 81 percent.  These findings indicate a substantial degree of media linkage between "Cash App" and "Square" over this time period, suggesting that, with "Block" taking the place of "Square," future media coverage will contribute to increasingly strong linkage between Cash App and the term "Block" as a corporate brand.

75.    Both Prof. Wind and Prof. Dhar fail to account for this empirical evidence and, more generally, the role of media in shaping consumer brand associations.  Prof. Dhar seeks to "describe the marketplace context of how current and prospective users encounter Cash App and Cash App Taxes,"[160] but does not recognize that media exposure is a critical piece of marketplace context.  Prof. Wind, likewise, does not recognize the importance of media.

---

[160]    Dhar Declaration, ¶ 18.

**B.** **Millions of Cash App Customers Have Encountered Linkages Between Cash App and Its Owner**

76.     The Cash App website directs the user to download Cash App from an app store, as illustrated in the images below.

**Figure 22: Instruction to Download Cash App on Cash App Website[161]**



---

[161]   Cash App Website, <https://cash.app>, accessed January 20, 2022.

**Figure 23: Instructions to "Download Cash App" on Cash App Website (Mobile)[162]**



77.     Clicking on these download links directs the user to an app store listing for Cash App, which displays the Cash App name along with the name of its owner. This implies that every user who has downloaded Cash App through one of these app stores has been exposed to this linkage between Cash App and its owner.

[162]   Cash App Website, <https://cash.app>, accessed January 20, 2022.

**Figure 24: Google Play Store Listing Associating "Cash App" with Owner**[163]



**Figure 25: Apple App Store Listing Associating "Cash App" with Owner**[164]



---

[163]  *See also,* **Exhibit 3.**
[164]  *See also,* **Exhibit 3.**

78.     I note that the Cash App Taxes website, on both desktop and mobile, contains similar instructions to download Cash App which redirect to the above app store listings.[165]

79.     Consumers have recognized the associations between Cash App and its owner, as shown, for example, in the below posts in a forum about fraudulent transactions.

**Figure 26: "SQC is the Square Cash App"[166]**



SQC is the Square Cash App, if any of you use the app. I almost reported fraud because I didn't recognize a small amount of money that I sent to a person for covering my dinner and drinks when I left my wallet at work.

posted 11/30/2018 by **Phill**          👍 Helpful (12)   ▬▬▬▬   Not So Much (14) 💬

**Figure 27: "I was told Square owned CASH APP"[167]**

I had a withdrawal of $700 from my bank through CASH APP using my Mastercard debit card without my authorization on Aug 2, 2021. I do not have an account with CASH APP. 08/02/2021 DBT CRD 0512 08/02/21 00008294 CASH APP*TONIJA 4153753176 CA -$700.00 I called the number listed here and was not able to speak to anyone at Square but I was able to contact them through their chat and was told I had to contact CASH APP that they couldn't help me. I was told Square owned CASH APP so they are just as responsible. I want my money returned ASAP!

⚠️ posted 08/03/2021 by **Patsy**          👍 Helpful (1)   🔴🟢   Not So Much (0) 💬

---

[165]   Cash App Taxes Website, <https://cash.app/taxes>, accessed January 20, 2022.
[166]   *See also,* **Exhibit 3.**
[167]   *See also,* **Exhibit 3.**

56

**Figure 28: "[M]y bank account was drained by this company, Square Up, my bank advised it was done using their phone app, 'Cash App'"[168]**

Same as with everyone else one here, my bank account was drained by this company, Square Up, my bank advised it was done using their phone app, "Cash App". Only my transactions do no list any names, only SQC*Square Cash followed by their # 4153753176, that no one will answer unless you are their customer, w/a valid customer #. By force I have to file a police report because my bank is not so friendly when it comes to this type of stuff. I also ready on Square Up website, that if you see SQC on your bank statement, this is a money transfer from the "Cash App" which allows their member/user to easily & quickly transfer funds from their (stolen from us obviously) bank account to their friends/family using only an email. BUT WHY DOES SQUARE UP NOT VERIFY THESE BANK ACCOUNTS? So I will go to my bank tomorrow report this fraud, police report filed and also report to US Attorney General's Consumer Fraud division, just as previous respondent did. Hopefully we can shut these guys down. BUT know if they have your bank card, they have more. A verizon cell phone was also attempted, and multiple CC were applied for in my name:(*

⚠️ posted 07/29/2018 by Laura D'Elia           Helpful (11)           Not So Much (5) 💬

80.     These posts illustrate another potential mechanism by which consumers may be exposed to linkages between Cash App and its owner. As described above, one consumer discusses that they were informed by their bank of a fraudulent charge through Cash App, which the bank explained was owned by Square. Another consumer post highlights the mechanism of word-of-mouth, saying "I was told Square owned CASH APP… ." Given the recent name change from Square, Inc. to Block, Inc., it is likely that in the future, these mechanisms would result in consumer exposures to linkages between Cash App and "BLOCK".

81.     Notwithstanding the above evidence and his goal to "describe the marketplace context of how current and prospective users encounter Cash App and Cash App Taxes,"[169] Prof. Dhar asserts that "[f]rom 2017 through December 1, 2021 (the date of the corporate name change), Square was not used in any of the branding and marketing materials associated with Cash App."[170] The app store evidence—representing a consumer touchpoint that millions of Cash App users have engaged with—clearly contradicts this view. Moreover, it is clear that Prof. Dhar's review of the

---

[168] *See also,* **Exhibit 3.**
[169] Dhar Declaration, ¶ 18.
[170] Dhar Declaration, ¶ 48.

"marketplace context" ignores the above mechanisms by which consumers may be exposed to the owner of Cash App, as revealed by the consumer-based forum postings.

82.    Even ignoring the above app store evidence, to the extent that Prof. Dhar is correct that "Square was not used in any of the branding and marketing materials associated with Cash App,"[171] this observation is superseded by the fact that media and other mechanisms still exposed consumers to linkages between Cash App and its owner, and consumers internalized these linkages.

**C.    Block, Inc. Has Promoted Linkages Between Cash App and "Block"**

83.    In the wake of its name change announcement, Block, Inc. promoted its new "Block" corporate brand and also promoted linkages between Cash App and "Block".  For example:

- Block, Inc. created a LinkedIn page linking Cash App to the "Block" name

---

[171]    Dhar Declaration, ¶ 48.

**Figure 29: Block, Inc. LinkedIn Page**[172]



- Block, Inc. also created a Twitter account that accumulated more than 74K followers in only 6 weeks.

---

**Figure 30: Block, Inc. Twitter Account[173]5**



84.     Block, Inc.'s Twitter account made posts connecting Block, Inc. to Cash App and its other product brands, as demonstrated in the images below.

---

[173]    *See also,* **Exhibit 3.**

60

**Figure 31: Block, Inc. Twitter Posting Saying "Block is @Square, @Cash App, …"[174]**



**Figure 32: Block, Inc. Twitter Posting Linking "Block" and Cash App[175]**



85.    On December 1, 2021, Block, Inc. also published a video on its Instagram account linking Block, Inc. to Cash App and its other product brands, as shown below.

---

[175]  *See also,* **Exhibit 3.**

**Figure 33: Block, Inc. Instagram Video Linking Block, Inc. to Its Product Brands**[176]



      86.    The above evidence further demonstrates that the mechanisms of consumer confusion contemplated by Prof. Wind and Prof. Dhar are too narrow. Block, Inc.'s promotions of its new "Block" corporate brand and its linkages of that corporate brand to Cash App constitute relevant marketplace context for assessing likelihood of confusion. Prof. Dhar's claim that Block, Inc. "does not use 'Block' as a brand for its Cash App Taxes service" ignores this context. Prof. Wind's claim that "Cash App Taxes does not use the 'Block' name in its branding and marketing efforts" also fails to recognize this context.

---

[176] *See also,* **Exhibit 3.**

87.     Prof. Dhar observes that the day after Block, Inc.'s name change, the official Bitcoin Twitter account tweeted "Welcome to the club, Block".[177] The official Bitcoin Twitter account has 4.3 million worldwide followers.[178] This constitutes a substantial consumer exposure to Block, Inc.'s corporate brand.  Such exposures serve as relevant marketplace context for assessing confusion, because greater consumer familiarity with Block, Inc.'s corporate brand can contribute to greater consumer brand associations between that corporate brand and the Cash App product brand.

**D.     Media Are Already Beginning to Link Cash App with "Block"**

88.     In the wake of its renaming, Block, Inc. has already generated substantial media attention for itself, including media attention that provides linkages between Block, Inc. and Cash App.  For example:

- A January 13, 2022 article from Fortune about Block, Inc.'s intentions to build a Bitcoin mining system stated "Block … lets users buy and sell Bitcoin through its Cash App"[179]

- A January 13, 2022 article from Bloomberg about Block, Inc.'s intentions to build a Bitcoin mining system stated that "Block, which lets users buy and sell Bitcoin through its Cash App, is also building a physical Bitcoin wallet"[180]

- A January 11, 2022 article from Market Insider about NBA All-Stars Klay Thompson and Andre Iguodala receiving part of their NBA salary in Bitcoin stated

---

[177]   Dhar Declaration, ¶ 69.
[178]   Bitcoin Twitter, <https://twitter.com/bitcoin>.
[179]   Wagner, Kurt, et al., "Jack Dorsey's Block wants to make Bitcoin mining 'more distributed and efficient in every way,'" *Fortune,* January 13, 2022, <https://fortune.com/2022/01/13/jack-dorsey-block-bitcoin-mining-square-crypto/>, accessed January 20, 2022.
[180]   Wagner, Kurt and Sarah Frier, "Jack Dorsey's Block Confirms Plans for Bitcoin Mining System," *Bloomberg,* January 13, 2022, <https://www.bloomberg.com/news/articles/2022-01-13/jack-dorsey-s-block-confirms-plans-for-bitcoin-mining-system>, accessed January 20, 2022.

64

that "The two All-Stars will use Cash App, which is owned by crypto-bull Dorsey's financial services company Block, to facilitate the conversion of their salaries as well as the bitcoin giveaways."[181]

- A January 17, 2022 article from Benzinga, a media and data technology company, stated that "Green Bay Packers quarterback Aaron Rodgers partnered with Block Inc. … and its CashApp unit" so that Rodgers would receive a portion of his salary in Bitcoin.[182]

- A January 18, 2022 article from The Motley Fool listed among its Key Points at the top of the article: "Block has made a number of strategic investments as it looks to differentiate itself from the competition. The explosive growth of Cash App and the company's strategic acquisitions might be under-appreciated."[183]

- A December 2, 2021 article from Forbes stated that "Block holdings also include mobile money transfer service Cash App, music subscription service TIDAL, and cryptocurrency businesses Spiral and TBD54566975."[184]

- A December 28, 2021 article from The Wall Street Journal stated that "PayPal's Venmo app and the Cash App from Block (formerly Square) now make it easy to buy cryptocurrency and send it to others."[185]

[181] Rosen, Phil, "Two NBA All-Stars to accept salary in bitcoin in partnership with Jack Dorsey's Cash App," *BusinessInsider,* January 11, 2022, <https://markets.businessinsider.com/news/currencies/bitcoin-cashapp-dorsey-warriors-klay-thompson-andre-iguodala-crypto-salary-2022-1>, accessed January 20, 2022.

[182] Katje, Chris, "9 Star Athletes Who Take Salary & Endorsement Money In Bitcoin: Aaron Rodgets, Klay Thompson And More," *Benzinga,* January 17, 2022, <https://www.benzinga.com/markets/cryptocurrency/22/01/25069731/9-star-athletes-who-take-salary-endorsement-money-in-bitcoin-aaron-rodgers-klay-thompson-a>, accessed January 21, 2022.

[183] Spatacco, Adam, "Is Block Stock Undervalued?" The Motley Fool, January 18, 2022, <https://www.fool.com/investing/2022/01/18/is-block-stock-undervalued/>, accessed January 21, 2022.

[184] Saul, Derek, "Jack Dorsey-Led Square Changes Name to Block, Doubling Down On Crypto Focus," *Forbes,* December 2, 2021, <https://www.forbes.com/sites/dereksaul/2021/12/01/jack-dorsey-led-square-changes-name-to-block-doubling-down-on-crypto-focus/?sh=587fa4c535a5>, accessed January 21, 2022.

[185] Stern, Joanna, et al., "Tech That Will Change Your Life in 2022," *The Wall Street Journal,* December 27, 2021, <https://www.wsj.com/articles/tech-that-will-change-your-life-in-2022-11640613604>, accessed January 20, 2022.

- A December 14, 2021 article from TechCrunch stated that "There are already a number of ways to gift cryptocurrencies, but today Cash App will make doing so simpler with a new feature rolling out to its peer-to-peer payments app. The app, owned by Block (the company formerly known as Square) will now allow users in the U.S. to send bitcoin, as well as traditional stocks, as gifts to other U.S. Cash App users."[186]

- A YouTube video published on December 14, 2021 of a CNBC television show includes the caption "BLOCK UNVEILS NEW CASH APP FEATURE TO GIFT STOCKS & BITCOIN":

---

[186]  Perez, Sarah, "Cash App now lets users 'gift' stock and bitcoin using their USD balance or a debit card," TechCrunch, December 14, 2021, <https://techcrunch.com/2021/12/14/cash-app-now-lets-users-gift-stock-and-bitcoin-using-their-usd-balance-or-a-debit-card//>, accessed January 21, 2022.

66

**Figure 34: CNBC Caption Stating "BLOCK UNVEILS NEW CASH APP FEATURE TO GIFT STOCKS & BITCOIN," with Similar YouTube Title[187]**



89.     I note that there has been particular recent media attention stemming from Block, Inc. CEO Jack Dorsey's decision to step down as CEO of Twitter.[188]  Given Mr. Dorsey's status as a billionaire and head of a technology company that is showing particular interest in Bitcoin, it is likely that media will continue to provide coverage of Block, Inc. on an ongoing basis, thereby contributing to the potential for continued and increasing consumer exposures to linkage between Cash App and "Block".

90.     Prof. Wind and Prof. Dhar fail to consider the importance of this media evidence. Prof. Dhar asserts that a "house of brands" architecture "allows a corporate entity to develop its

187   *See also,* **Exhibit 3.**
188   See, for example,  "Twitter's Jack Dorsey Steps Down From C.E.O. Role," *The New York Times,* November 29, 2021, <https://www.nytimes.com/2021/11/29/technology/jack-dorsey-twitter.html>; "Jack Dorsey steps down as Twitter chief executive," *The Guardian,* <https://www.theguardian.com/technology/2021/nov/29/twitter-chief-executive-jack-dorsey>.

own identity distinct from its portfolio brands and vice versa."[189]  Yet, he fails to acknowledge the critical role of media in influencing the extent to which these brand identities are truly distinct. Indeed, he states that "Alphabet … is not considered by the company to be a consumer-facing brand."[190]  However, as my empirical analysis in **Section IV** showed, the media exposes consumers to substantial linkages between product brand Waymo and Alphabet as a corporate brand.  Similarly, these results contradict Prof. Wind's assertion that confusion is unlikely "given that Block is a corporate name and not the brand of any customer-facing product or service (unlike, say, 'Marriott')."[191]  Alphabet fits this criterion of being a "corporate name and not the brand of any customer-facing product or service," yet it ends up facing consumers due to the influence of media, as is likely to be the case with Block, Inc.'s "Block" corporate brand.  Other examples of corporate names that are not product brand but still end up facing consumers due to the influence of media include Anheuser-Busch and General Motors.

E. **Consumer-Generated Evidence Shows That Consumers Are Already Linking the "Cash App" Product Brand with "Block"**

91.  Consumer-generated evidence shows that consumers are already linking the "Cash App" product brand with "Block".  For example:

- A Twitter post in January 2022, in retweeting a post about Cash AppTaxes, associates the "@CashApp" Twitter handle with Block, Inc.'s "@blocks" handle:

---

[189]  Dhar Declaration, ¶ 87.
[190]  Dhar Declaration, ¶ 87.
[191]  Wind Declaration, ¶ 70.

68

**Figure 35: User Tweet Linking Cash App and Block[192]**



- A Twitter post in January 2022 shares that it is the poster's "first week @Blocks on the @CashApp Design Systems team," while another from December 2021 states that the poster is "happy to announce that I started my new role as the Crypto Operations Senior Manage on the @CashApp team @blocks." The takeaway from these posts is not that these users are confused, but rather, that they are generating linkages between Cash App and Block, Inc. to which other users of Twitter will be exposed.

---

[192]  *See also,* **Exhibit 3.**

**Figure 36: Tweets from Block Employees Linking Cash App and Block[193]**



- The below tweets on January 18, 2022 are from media outlets that follow the technology space: Tech Times (with 10.5K followers) and TechCrunch (with 10.1 million followers). The Tech Times post states that "Block Cash App is now rolling out its so-called Lightning Network" while the TechCrunch post states that "Block's Cash App adopts Lightning Network for free bitcoin payments".

---

[193] *See also*, **Exhibit 3.**

**Figure 37: Tweets from Media Sources Linking Cash App and Block[194]**



- A December 2021 Twitter post from The Mac Observer (25.2K followers) states that "Block updated Cash App recently to let people gift each other Bitcoin and traditional stocks.  It works with a USD balance or debit card."[195]



---

[194]  *See also,* **Exhibit 3.**
[195]  *See* **Exhibit 3.**

92.     The Wikipedia page for Cash App states that "Cash App (formerly known as Square Cash) is a mobile payment service developed by Block, Inc. that allows users to transfer money to one another using a mobile phone app."[196]  Because Wikipedia can be edited by its users, this could either be evidence of Block, Inc. promoting its connection to Cash App, or alternatively, evidence of consumer association between Block, Inc. and Cash App.  In either case, consumers that visit the Wikipedia page would be exposed to this linkage.

## VII.  H&R BLOCK IS LIKELY TO SUFFER HARM TO ITS BRAND ASSOCIATIONS STEMMING FROM A LIKELIHOOD OF CONSUMER CONFUSION CAUSED BY BLOCK, INC.'S RENAMING AS WELL AS ITS "CASH APP TAXES" OFFERING

93.     As I have explained above, the key conditions for assessing the likelihood of confusion in this matter are: (i) the extent to which Block, Inc.'s offerings overlap with the products or services offered under the H&R Block brand; and (ii) the extent to which consumers are exposed to Block, Inc.'s use of "Block" to identify either itself as a company or its overlapping product or service.  As demonstrated by the available evidence in this matter, both of these key conditions are satisfied and are likely to grow stronger with time.  Consumers are already being exposed to linkages between "Cash App" and "Block" in the marketplace, and this linkage can be expected to grow stronger with the passage of time.  In addition, the introduction of "Cash App Taxes" into the marketplace creates an even more significant overlap between the services offered under the H&R Block brand and the services that Block, Inc. offers through Cash App.  In my opinion, this creates a likelihood of consumer confusion between the two parties in this case.  Such confusion has the potential to harm the brand associations that H&R Block has cultivated over its more than 65 years of offering tax preparation and other personal financial services to the marketplace.

---

[196]   Cash App Wikipedia Page, <https://en.wikipedia.org/wiki/Cash_App>, accessed January 20, 2022.

94.     The pattern by which consumer confusion is likely to strengthen over time is not necessarily gradual or steady, given its dependence on the extent to which external factors such as media are likely to influence this pattern.  As a consequence, the potential for harm to H&R Block's brand associations is also not necessarily likely to be gradual or steady over time.  As an illustrative demonstration of this point, one can consider the event of a serious deficiency in the "Cash App Taxes" product, such as a data breach, that results in widespread and negative media coverage.   To the extent that this media coverage links "Cash App Taxes" with "Block", as the historical record suggests that it would, this is likely to result in permanent and irreparable harm to H&R Block's brand.

## VIII.   OTHER OPINIONS OFFERED BY PROF. WIND AND PROF. DHAR REVEAL THEIR FAILURE TO RECOGNIZE THE LIKELY MECHANISM OF CONSUMER CONFUSION IN THIS MATTER

95.     In this declaration, I have explained the likely mechanism of consumer confusion in this matter. Prof. Wind and Prof. Dhar fail to recognize this mechanism due to the narrow context in which they seek to evaluate the potential for consumer confusion.

96.     Prof. Wind states that "the visual comparison of the H&R Block green squares … to Block [Inc.]'s logo reveals stark differences."[197] Prof. Dhar agrees, stating that "Block's corporate brand identity is … dissimilar to H&R Block's branding."[198]  He further states that "Block[, Inc.] chose a new logo and visual identity that is distinct from Cash App."[199]  Taken together, Prof. Wind's and Prof. Dhar's statements imply that both H&R Block's logo and Cash App's logo are visually distinct from the logo of Block, Inc.  When combined with the observation that H&R Block's logo is a green square and Cash App's logo is a rounded green square with a

---

[197]   Wind Declaration, ¶ 76.
[198]   Dhar Declaration, ¶ 17.
[199]   Dhar Declaration, ¶ 88.

73

"$" symbol, the logical implication is that Cash App's logo is more distinct from the logo of Block, Inc. than it is from the logo of H&R Block. Indeed, based on my expertise with branding and brand elements, the Cash App logo is a far better visual fit with the H&R Block family of logos than with the logo of Block, Inc. This facilitates the likelihood of consumer confusion that Cash App is associated with H&R Block, rather than diminishing it as suggested by Prof. Wind and Prof. Dhar. This conclusion is further supported by Prof. Wind's observation that "[t]ax preparation services constitute the central part of H&R Block's business" and "[i]n contrast, Block offers many products unrelated to income tax."[200] This is all the more reason why a confused consumer may associate "Cash App Taxes"—a tax preparation service with a green rounded square logo—with H&R Block rather than Block, Inc.

97. Prof. Wind states that "H&R Block never complained about [Cash App's] branding until the instant suit."[201] As I have explained above, the potential for confusion is facilitated by the recent developments of Block, Inc.'s renaming as well as its plans to offer the "Cash App Taxes" product.

98. Prof. Dhar states that "the Cash App name and logo are widely recognized in the marketplace" and that as a consequence, "confusion is generally unlikely to occur between [Cash App] and other well-known brands, such as H&R Block."[202] This is flawed reasoning that fails to recognize that consumers are accustomed to linking together well-known corporate brands and well-known product brands, such as Toyota and Lexus, Apple and iPhone, or Anheuser-Busch and Budweiser. There is no contradiction between a consumer recognizing Cash App as a well-known product brand and also thinking that it is associated with H&R Block.

---

[200]  Wind Declaration, ¶ 78.
[201]  Wind Declaration, ¶ 62.
[202]  Dhar Declaration, ¶ 53.

74

Signed on the 21st Day of January, 2022

_____

Professor David Reibstein