# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

H&R BLOCK, INC. and
HRB INNOVATIONS, INC.

                  Plaintiffs,

v.

BLOCK, INC.,

                  Defendant.

Case No. 4:21-cv-00913-NKL

**ORAL ARGUMENT REQUESTED**

## REPLY SUGGESTIONS IN FURTHER SUPPORT OF
## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

David H. Bernstein (admitted *pro hac vice*)
Megan K. Bannigan (admitted *pro hac vice*)
Jared I. Kagan (admitted *pro hac vice*)
Marissa MacAneney (admitted *pro hac vice*)
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, New York 10022
(212) 909-6000
dhbernstein@debevoise.com
mkbannigan@debevoise.com
jikagan@debevoise.com
mpmacaneney@debevoise.com

Anthony J. Durone (MO Bar #43872)
Stacey R. Gilman (MO Bar # 55690)
BERKOWITZ OLIVER, LLP
2600 Grand Boulevard Suite 1200
Kansas City, Missouri 64108
(816) 561-7007
adurone@berkowitzoliver.com
sgilman@berkowitzoliver.com

*Attorneys for Plaintiffs H&R Block, Inc. and HRB Innovations, Inc.*

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................ 1

II.   SUPPLEMENTAL STATEMENT OF FACTS ............................................... 2

   A.   Block Owns A Family Of Strong BLOCK Marks .............................................. 2

   B.   Block Prominently Uses The Green Square Marks In Connection With Its Tax
      And Other Financial Services ........................................................................... 4

   C.   Third-Party Trademark Registrations Do Not Weaken the Strength of Block's
      Marks ................................................................................................................ 6

   D.   Block, Inc.'s Financial Offerings Directly Compete With Block's ................... 7

   E.   Block, Inc. Uses BLOCK As A Public-Facing Brand ...................................... 9

   F.   Block, Inc.'s Cash App Has Historically Been Branded With Square, Inc.; Block,
      Inc. Has Now Started Branding Cash App With Block, Inc. ........................... 11

   G.   Block's Rebuttal Survey Shows High Levels Of Consumer Confusion ........... 14

III.  ARGUMENT ..................................................................................................... 15

   A.   Block Is Likely to Succeed On The Merits Of Its Trademark Infringement Claim. ........ 15

     1.   Block Inc.'s Use Of BLOCK Is Infringing ................................................. 15

     2.   Block Has Established A Likelihood Of Confusion ..................................... 16

   B.   Block Will Suffer Irreparable Harm Absent a Preliminary Injunction ............ 21

   C.   The Balance of Harms Weighs in Block's Favor ............................................. 21

   D.   The Public Interest Will Be Served by Issuance of a Preliminary Injunction ......... 23

IV.   CONCLUSION ................................................................................................. 23

# TABLE OF AUTHORITIES

**CASES**

*Advantus Cap. Mgmt., Inc. v. Aetna, Inc.*,
 No. 06-CV-2855(JMR/FLN), 2006 WL 2916840 (D. Minn. Oct. 11, 2006) ..................19, 20

*Anheuser-Busch, Inc. v. Caught-on-Bleu, Inc.*,
 288 F. Supp. 2d 105 (D.N.H. 2003), *aff'd*, 105 Fed. Appx. 285 (1st Cir. 2004) ....................17

*Brooks Bros. v. Brooks Clothing of Cal.*,
 60 F. Supp. 442, 65 U.S.P.Q. 301 (S.D. Cal. 1945)................................................................17

*Dream Team Collectibles, Inc. v. NBA Props., Inc.*,
 958 F. Supp. 1401 (E.D. Mo. 1997)........................................................................................20

*E. & J. Gallo Winery v. Gallo Cattle Co.*,
 967 F.2d 1280 (9th Cir. 1992) ................................................................................................18

*First Nat'l Bank in Sioux Falls v. First Nat'l Bank S.D., SPC, Inc.*,
 655 F. Supp. 2d 979 (D.S.D. 2009) ........................................................................................20

*FirstBank S.W. v. Heartland Fin. USA, Inc.*,
 No. 2:21-CV-024-Z, 2021 WL 3743806 (N.D. Tex. Aug. 24, 2021)......................................22

*GoTo.com, Inc. v. Walt Disney Co.*,
 202 F.3d 1199 (9th Cir. 2000) ................................................................................................19

*Guthrie Healthcare Sys. v. ContextMedia, Inc.*,
 826 F.3d 27 (2d Cir. 2016).................................................................................................18, 19

*J & B Wholesale Distrib., Inc. v. Redux Beverages, LLC*,
 621 F. Supp. 2d 678 (D. Minn. 2007) .....................................................................................17

*Kemp v. Bumble Bee Seafood, Inc.*,
 398 F.3d 1049 (8th Cir. 2005) ...........................................................................................18, 19

*Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*,
 679 F.3d 410 (6th Cir. 2012) ..................................................................................................19

*Moon Seed LLC v. Weidner*,
 No. 3:20-cv-00104-RGE-SBJ, 2021 WL 2627455 (S.D. Iowa Apr. 22, 2021)......................16

*Mutual of Omaha Ins. Co. v. Novak*,
 836 F.2d 397 (8th Cir. 1987) ..................................................................................................20

*Nat'l Customer Eng'g Inc. v. Lockheed Martin Corp.*,
 No. 96–8938 DDP ANX, 1997 WL 363970 (C.D. Cal. Feb. 14, 1997) ..................................16

*Russell Road Food and Beverage, LLC v. Spencer*,
    2013 WL 321666 (D. Nev. Jan. 28, 2013).............................................................22

*Safeway Stores, Inc. v. Safeway Props., Inc.*,
    307 F.2d 495 (2d Cir. 1962).............................................................................16

*Scarves by Vera, Inc. v. Todo Imports Ltd.*,
    544 F.2d 1167 (2d Cir. 1976)...........................................................................17

*Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*,
    758 F.3d 1069 (9th Cir. 2014) ..........................................................................20

## STATUTES

15 U.S.C. § 1125(a)(1).............................................................................................16

## OTHER AUTHORITIES

Fed. R. Civ. P. Rule 65 ...............................................................................................1

Fed. R. Evid. 201 .........................................................................................................7

J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 9:3
    (5th ed. 2021).................................................................................................16

J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 7:18
    (5th ed. 2021)................................................................................................ 17

J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:106
    (5th ed. 2021).................................................................................................19

Local Rule 7(d) ............................................................................................................2

Block respectfully submits these suggestions in further support of its motion for a preliminary injunction, pursuant to Fed. R. Civ. P. Rule 65 ("Mot.").

## I.   <u>INTRODUCTION</u>

This motion is straightforward.  For over 65 years, Block has provided high-quality and reliable tax and other financial services to its customers under the BLOCK Marks and the Green Square Marks (including ▮).  Now, Block, Inc. is offering competing services under the confusingly similar name BLOCK and the confusingly similar logo ▮.  Unable to escape these indisputable facts, Block, Inc. mounts a defense premised on misrepresentations and misdirection.

First, Block, Inc. argues that "Block Does Not Use The Word Block Alone."  Suggestions in Opposition at 9 (ECF No. 38) ("Opp.").  That argument is not only factually wrong, it is also legally irrelevant.  Even if Block has no rights in BLOCK standing alone, Block, Inc.'s use of BLOCK infringes Block's federally registered and incontestable H&R BLOCK trademark.  In any event, Block does own common law trademark rights in BLOCK based on its use in the marketplace.  Indeed, Block's rebuttal survey shows that 45% of the United States general consuming public recognizes BLOCK as a brand name for tax services.

Also false is Block, Inc.'s claim that it "does not use [BLOCK] as a brand for any consumer-facing product or service."  *Id.* at 2.  Block, Inc. has launched consumer-facing websites, social media channels, investor materials and job postings, all of which make extensive use of BLOCK.  That use is likely to cause confusion with the BLOCK Marks, which are used in all the same ways, a fact confirmed through Block's rebuttal survey that shows that 36% of consumers are confused by Block Inc.'s new name.  Equally confusing is Block, Inc.'s use of the ▮ logo that it is being used for the first time in connection with competing tax services.

This year's tax season opens next week, when the IRS starts accepting electronic filings of tax returns. If Block, Inc. is not stopped now from using BLOCK, consumers will increasingly be confused into believing that the tax services Block, Inc. provides come from, or are sponsored by or affiliated with, Block. Block asks the Court to nip this confusion in the bud, before tax season gets underway, to avoid harm to the brand associations that Block has cultivated over its more than 65 years of offering tax preparation and other financial services to the marketplace.

## II.   SUPPLEMENTAL STATEMENT OF FACTS[1]

### A.   Block Owns A Family Of Strong BLOCK Marks

H&R Block is one of the most well-known brands in the United States for its tax and other financial services. Although Block, the media, and its customers all recognize the full H&R BLOCK name, Block also frequently refers to its company as BLOCK, and customers and the general public recognize BLOCK as a shorthand reference to, and brand name of, H&R Block. As the declarations submitted by Block's CEO Jeffrey Jones set out, Block uses BLOCK by itself to promote its products and services (including in national, local and Internet advertising costing hundreds of millions of dollars), as well as on social media accounts, on the exterior and interior of its retail offices, in connection with Block's DIY (do-it-yourself) tax products, and in connection with Block's charitable services to the community. Consumers and the media[2], in

---

[1]   Pursuant to Local Rule 7(d)(2), the Statement of Facts does not count towards the page limitations set forth in Local Rule 7(d)(1), therefore Block has not moved the Court for leave to file excess pages. However, if necessary, Block respectfully requests the Court's leave to file a brief in excess of the 10-page limit.

[2]   The media has referred to Block as BLOCK for decades. Media outlets such as the Wall Street Journal, CNN, The New York Times, American Banker, The New York Post, Accounting Today, The Associated Press, Barron's, the Los Angeles Times, the Kansas City Star, The Boston Globe, The Orlando Sentinel, The Economist, and many more, have all referred to Block as BLOCK alone in headlines of published articles spanning back to the

turn, refer to Block as BLOCK as well. Reply Declaration of Jeffrey J. Jones II (Jan. 21, 2022) ("Jones Rebuttal Decl.") ¶¶ 18–21; Declaration of Jeffrey J. Jones II (Dec. 21, 2021) (ECF No. 16-1) ("Jones Decl.") Decl. ¶ 10; *see also* Rebuttal Declaration of Professor David Reibstein (Jan. 21, 2022) ("Reibstein Decl.") ¶¶ 55–61. Those uses of BLOCK are often (though not always) done in association with the full name H&R BLOCK, Jones Rebuttal Decl. ¶¶ 8–17, which makes the linkage between BLOCK and H&R BLOCK all the more powerful (and which makes the risk of confusion all the more strong when Block, Inc. uses BLOCK alone). Reibstein Decl. ¶¶ 63–67.

Although Block, Inc. submits academic opinions that Block is not known as BLOCK,[3] those opinions are based on speculation that is belied by objective evidence. The fact that H&R Block also is known as BLOCK is confirmed by a consumer recognition survey (the "Jay Survey") that found that 45% of all consumers in the general United States population recognize BLOCK as a brand name for tax preparation and filing services. Rebuttal Declaration of E. Deborah Jay, Ph.D. (Jan. 21, 2022) ("Jay Decl."). The Jay Survey—which was conducted amongst 500 adults who were representative of the general consuming public in the United States—establishes that a significant segment of consumers recognizes BLOCK as a brand name for tax products or services. *Id.* ¶¶ 6, 24. Given that H&R BLOCK is the clear brand (prior to Block, Inc.'s recent name change) that uses BLOCK for tax-related services, this is powerful evidence that a significant portion of the general consuming public recognizes that BLOCK is a shorthand reference for H&R BLOCK. *Id.* ¶¶ 6, 24. These results are also consistent with the

---

1980s. Rebuttal Declaration of Anthony J. Durone ¶¶ 14–19, Exs. 51–56 (Jan. 21, 2022) ("Durone Decl.").

[3] Professor Yoram Wind has opined, that the name "Block" (standing alone) does not represent "H&R Block" and that "H&R Block itself does not believe consumers associate H&R Block with 'Block.'" Wind Decl. ¶ 59. Similarly, Professor Ravi Dhar has opined that "'Block' by itself is not a source identifier for H&R Block." Dhar. Dec. ¶ 54.

conclusions of Wharton Professor David Reibstein, a preeminent marketing expert who, after reviewing the many ways in which Block has emphasized use of the name BLOCK as part of its corporate brand, including through its advertising, employee initiatives, investor presentations, ad charitable efforts, confirmed that Block has been successful at cultivating consumer associations between Block and the name BLOCK.  *See* Reibstein Decl. ¶¶ 55–61.

### B. Block Prominently Uses The Green Square Marks In Connection With Its Tax And Other Financial Services

Block owns three federally registered trademarks for the Green Square Marks,[4] including for the green square by itself (Reg. No. 3,656,593), which is independently protected and incontestable in connection with tax preparation services, among other services.



| | | |
|---|---|---|
| (Reg. No. 2,533,014) [Note: The mark includes a green square; it was registered at a time when trademark applications indicated color through shading rather than use of the actual color] | (Reg. No. 3,656,593) | (Reg. No. 5,179,142) |

Block uses the Green Square Mark across all of its branding including office signage, advertisements, its website, and social media, both in combination with the words H&R BLOCK and by itself.  A few examples from television commercials are shown below:

---

[4]     Capitalized terms not defined herein shall have the same meaning as ascribed in Block's Suggestions in Support of Plaintiffs' Motion for a Preliminary Injunction (ECF 17) ("Mot.").





*Available at*:
https://www.ispot.tv/ad/IYcL/h-and-r-block-refund-advance-piece-of-cake

*Available at;*
https://www.youtube.com/watch?app=desktop&v=jIX2H81sGmk

Jones Rebuttal Decl. ¶¶ 31-32.

The Credit Karma green square logo that Block, Inc. references in its Opposition, Opp. at 7, is distinguished from the Green Square Marks. That logo prominently contained the letters "CK" and was in a different shade of green. Block does not object to all square logos using any shade of green; rather, it objects to logos that are highly similar to its logo and that use a highly similar shade of green to promote highly similar services. And unlike the Credit Karma logo, the green square logo that Block, Inc. uses in connection with Cash App Taxes was only first used in connection with tax preparation and filing services in the last several weeks.

Notably, Block itself has, on occasion, used a white dollar sign with its Green Square logo. For example, in a 2014 commercial, Block portrayed its logo as follows:[5]

---

[5]     Available at:  https://www.youtube.com/watch?app=desktop&v=jIX2H81sGmk



Block, Inc.'s use of the ⓈＳ logo (which began three years later, and at that time only in connection with non-tax-related services) is indistinguishable from Block's use of the same image. Jones Rebuttal Decl. ¶ 32.

C.    **Third-Party Trademark Registrations Do Not Weaken the Strength of Block's Marks**

Professor Dhar, one of Block, Inc.'s experts, has cited a list of what it appears to be over 200 trademarks using the word "Block." These trademarks are not relevant to this case. The vast majority relate to goods and services having absolutely nothing to do with the goods and services at issues here, including pesticides, makeup, sunscreen, drinking glasses, extension cords, musical instruments, the construction industry, entertainment, healthcare, transportation, technology like cloud-based computing, food, beverage and restaurant industries, real estate and apparel. *See* Declaration of Marissa MacAneney (Jan. 22, 2022) ("MacAneney Decl."), Exhibits A, B. Those marks have no bearing on whether Block, Inc.'s use of Block for tax and related financial services are likely to be confused with Block and its BLOCK Marks.

With respect to the 62 marks Professor Dhar identifies as being related to the "financial services" industry, these are generally registered for either cryptocurrency or financial services that are wholly unrelated to the issues at this case, such as financial trading, investment management, real estate, insurance, brokerage services, consulting services, private equity and

venture capital.[6]  None of the companies who hold these marks actually offer tax preparation and filing services, mobile banking or any of Block's other goods and services.  And even if they did provide the same goods and services, even a quick glance at the list shows that many of the marks would not in fact be confusing. Admittedly, one mark included on Block, Inc.'s list *does* cover the financial goods and services Block provides, but that mark is owned by Block. (See BLOCKWORKS, Reg. No. 4,769,331).

Similarly, Block, Inc. also provides a list of "Green Square Registered Trademarks," but none of them are used in connection with the goods and services Block offers.  In fact, very few of them are related to the financial services industry at all.  The list includes 35 marks related to computer software and graphics; 23 marks related to construction and maintenance; 23 marks related to healthcare; 34 marks related to consumer products including magnets, office supplies, lubricants, screws, toys, furniture, cleaning supplies and more; 32 marks related to food, drinks, and restaurant services; 32 marks related to transportation, 16 related to entertainment; 6 related to real estate, and 5 related to animals. *See* MacAneney Decl., Exhibit B. Block is not seeking to prevent use of the word "Block" or color green for goods and services that are unrelated; rather, it only seeks to prevent use of confusingly similar trademarks and logos used in connection with Block's core services, such as Block, Inc.'s use of BLOCK and .

### D.  Block, Inc.'s Financial Offerings Directly Compete With Block's

Although tax filing and preparation are at the core of Block's business, Block offers a

---

[6]  Professor Dhar's declaration includes Exhibit M which purports to include "BLOCK" marks "relating to financial goods and services."  While Professor Dhar does not identify the goods and services for which those marks are registered, the trademark registrations for those marks are publicly available on the United States Patent and Trademark website (https://uspto.gov) and are facts readily determined from sources whose accuracy cannot reasonably be questioned. As such the court can take judicial notice of these records under Federal Rule of Evidence 201.

suite of financial services and products that, contrary to Block, Inc.'s claims, compete directly

with Block, Inc., and Block actively is offering new services in its natural zone of expansion:

| Block, Inc. | | Block |
| --- | --- | --- |
| **Square** | Small business services | Block Advisors<br>Wave |
| | Payroll services | Block Advisors<br>Wave |
| | Create invoices and estimates | Wave |
| | Accept payments online | Wave |
| | Business banking accounts | Wave |
| | Physical/virtual debit cards | Wave |
| **Cash App** | Mobile banking platform for individuals | Block Advisors<br>H&R Block<br>Spruce |
| | Physical/virtual debit cards | Block Advisors<br>H&R Block<br>Spruce |
| | Direct deposit | Block Advisors<br>H&R Block<br>Spruce |
| | Spending rewards program | Spruce |
| | Small dollar lending products | Block Advisors<br>H&R Block |

*See* Jones Rebuttal Decl. ¶¶ 22-23.

Wave Financial is owned by Block and provides a money management tool and all-in-

one solution for small businesses to manage their business finances, including payment

processing, payroll, bookkeeping and taxes and no-fee banking accounts. Under its WAVE

brand, Block offers free invoicing and free accounting products to small business owners,

primarily microbusinesses with fewer than 5 employees and with less than $50,000 in yearly revenue. More than 90% of Block's revenue from WAVE is derived primarily from the payments processing business, which competes directly with Block, Inc.'s SQUARE. WAVE enables small business owners to invoice payments and get paid directly through a link sent to a customer with an invoice. And like Block, Inc. does under its SQUARE brand, Block collects a flat fee for every eligible WAVE transaction. WAVE products and services are actively cross-sold to current and potential BLOCK ADVISORS customers and promoted alongside BLOCK branding, primarily BLOCK ADVISORS. Block also provides tax, bookkeeping and payroll services to larger customers, generally through its BLOCK ADVISORS business. Jones Rebuttal Decl. ¶¶ 24–27.

SPRUCE is Block's new, innovative mobile banking platform that offers debit cards, direct deposit, a cash back rewards program, credit scores, and overdraft protection services. The SPRUCE financial technology platform, as well as the SPRUCE debit card, are also promoted alongside BLOCK branding, and are identified as having been "built by H&R BLOCK." *Id.* ¶¶ 28–30.

**E.    Block, Inc. Uses BLOCK As A Public-Facing Brand**

Although Block, Inc. claims that BLOCK is not a "brand" for Block, Inc.'s "customer-facing" businesses and is only "an official corporate name," Opp. at 7, that simply is not true.

Block, Inc. has flooded the marketplace with usage of BLOCK since the announcement of its rebrand. Block, Inc. launched public websites at http://block.xyz and http://investors.block.xyz, and introduced consumer-facing social media channels including on Twitter (@blocks and @blockir), Instagram (@block.xyz) and LinkedIn ("BLOCK," which also uses the tagline "joinblock" in the URL). Block, Inc. publicly uses the BLOCK name in its websites, investor materials and job postings, and throughout its social media pages. Jones

Rebuttal Decl. ¶¶ 33–41; Jones Decl. ¶¶ 23–25.

For example, on December 31, 2021, Block, Inc. posted on its Twitter and Instagram accounts a video that prominently displayed "BLOCK" in different typefaces with the text "WHEN THE BLOCK STRIKES MIDNIGHT." Jones Rebuttal Decl. ¶ 41. The dissemination of these BLOCK-branded social media posts to consumers is further indication of Block, Inc.'s use of BLOCK as an umbrella brand for its businesses and its intention for consumers to know that the business that owns and operates such popular services as SQUARE and CASH APP is BLOCK.

Block, Inc.'s own employees (including one of Block, Inc.'s declarants, Owen Jennings) have promoted the BLOCK brand and posted Block, Inc. job opportunities on their social media accounts. Jones Rebuttal Decl. ¶ 44. Additionally, on LinkedIn, more than 1,000 Block, Inc. employees describe themselves as employees at "Block," rather than of Cash App, Square, Tidal or TBD54566975. *Id.* ¶¶ 42–43.

Picking up on Block, Inc.'s own use of BLOCK, the media frequently refers to Block, Inc. simply as BLOCK when discussing Block, Inc.'s financial performance, new product launches, and other news and developments. Jones Rebuttal Decl. ¶ 45. For example, a January 11, 2022 Reuters article was titled "Afterpay's $29bln buyout by Block set to close after Spain nod"[7]; similarly, a January 12, 2022 Wall Street Journal was titled "Biogen, PayPal, Block, Ally Financial: What to Watch in the Stock Market Today."[8]

---

[7]    Available at: https://www.reuters.com/technology/afterpays-29-bln-buyout-by-block-set-close-after-spain-nod-2022-01-11/

[8]    Available at: https://www.wsj.com/articles/kidpik-biogen-block-ally-financial-what-to-watch-when-the-stock-market-opens-today-11641988019/

**F.**     **Block, Inc.'s Cash App Has Historically Been Branded With Square, Inc.; Block, Inc. Has Now Started Branding Cash App With Block, Inc.**

Block, Inc. has claimed that, since Cash App's rebranding from "Square Cash" to "Cash App" in 2017, Block, Inc. stopped using "Square" in any of the branding and marketing materials associated with Cash App. Block, Inc. makes this argument to suggest that it similarly will not use "Block" in connection with Cash App. Opp. at 7-8. However, Cash App's mobile application, Facebook page, sponsored advertisements, and e-mail communications over the past five years indicate that this is not true—Cash App has been displayed with "Square" in multiple branding and marketing materials for Cash App, including as recently as January 22, 2022. For example:

- In the Apple and Android mobile application stores, "Square, Inc." appears immediately under the "Cash App" name. Square, Inc. also is listed as Cash App's developer and is identified in the app's copyright notice and licensing agreement.

- Cash App's sponsored advertisements, which frequently appear on Facebook and other social media channels, indicate that Cash App Investing LLC is "a subsidiary of Square."

- On Cash App's Facebook page, available at the URL www.facebook.com/SquareCash (and which also is identified by the handle @SquareCash), Square, Inc. is listed as the entity responsible for the page (in addition to being included in the URL and the handle). In other advertisements, including a series of ads featuring Megan Thee Stallion, the ads disclose: "Bitcoin trading offered by Square, Inc." These videos have been promoted on Cash App

social media channels and shared by Megan Thee Stallion, who has over 7 million followers on Twitter.

- Cash App has run a number of sweepstakes on its social media pages, including one in November of 2021 called "Fortune Four Days," where Cash App gave away prizes to its followers. The sweepstakes was "sponsored by Square, Inc." and the terms and conditions for the sweepstakes, which were linked in each "Fortune Four Days" post for all of Cash App's 2+ million followers to see, included several references to Square.

- As Professor Dhar points out, Cash App collaborated with Justin Bieber and Chance the Rapper for the #JBChanceHoly giveaway in September 2020. According to Prof. Dhar, this post was posted on Twitter and Instagram, and "received 59,000 likes on Twitter and over 1 million likes on Instagram." Dhar Decl. ¶ 50. What Professor Dhar fails to mention is that this sweepstakes, which was so widely promoted it was publicly identified as having been "sponsored by Square, Inc."

- Cash App's post in collaboration with Aaron Rodgers, which, according to Professor Dhar, "received over 2.9 million views and 68,100 likes on Twitter and 290,000 likes on Instagram," Dhar Decl. ¶ 51, also was "sponsored by Square, Inc." The accompanying materials indicated that "Square, Inc. was licensed to engage in virtual currency business activity by the New York State Department of Financial Services," that the prize was "subject to the Square 'Conversion Rate,'" and that the sweepstakes was subject to the "Square Privacy Policy."

- Consumers have also recognized the association between Cash App and its corporate parent, including in comments where they angrily report fraudulent transactions, making statements such as "my bank account was drained by this company, Square Up, my bank advised it was done using their phone app, 'Cash App'" and "I was told Square owned CASH APP."

Jones Rebuttal Decl. ¶¶ 47–60; Reibstein Decl. ¶¶ 76–86, 91-92.

As these examples show, Cash App and Square, Inc. have been inextricably intertwined for years. Given the connection, promotion, and public association between Cash App and Square, Inc., now that Square, Inc. no longer is the name of the defendant, all "Square, Inc." references will likely be replaced by "Block, Inc."[9] It is not only likely, but inevitable, that Cash App will be identified as coming from BLOCK instead of SQUARE as Block, Inc. continues its integration and rolls out its full rebranding. *See* Reibstein Decl. ¶¶ 80–81, 93–94.

These results are consistent with an empirical analysis performed by Professor Reibstein, who looked at media coverage of Cash App between the years 2017 through 2021. Professor Reibstein found that, over the last five years, 27-81% of articles mentioning Cash App also mentioned its corporate parent, Square, Inc. This analysis strongly suggests that, with "Block" taking the place of "Square," future media coverage will identify Cash App as coming from Block Inc, which will contribute to an increasingly strong linkage between Cash App and the term BLOCK as a corporate brand. Reibstein Decl. ¶¶ 72–74. Because consumers are being exposed to linkages between Cash App and BLOCK in the marketplace (a linkage which is expected to grow stronger with the passage of time) and because Block's services overlap with

---

[9] To the extent Block, Inc. has not yet changed many of these references from Square, Inc., that will lessen the burden that Block, Inc. will face in complying with any injunction that may be issued by the Court.

those offered by Block, Inc. (and increasingly will do as Cash App moves into the tax business and as Block continues its expansion into other financial services), the likelihood of consumer confusion is significant. *Id.* ¶ 86-94

Block, Inc.'s assertion that BLOCK will be "completely absent from" the brand identity of Cash App Taxes, Esperanza Decl. ¶ 18, is similarly incorrect. Moreover, Cash App Taxes already is being promoted as being part of the BLOCK family of companies. Cash App Taxes employee accounts, terms of service, privacy notice, disclosure forms, and media reports already reference "Block" in numerous ways. Jones Rebuttal Decl. ¶¶ 57–60.

Just as the media already has begun referring to "Block" when discussing Cash App, the media has similarly begun associating "Block" with Cash App Taxes. Several news outlets and individuals have posted on social media about "Block" and Cash App Taxes, with several even adding "$HRB" to their posts, a reference to Block's (not Block, Inc.'s) stock ticker symbol. Jones Rebuttal Decl. ¶¶ 57–60.

Despite Block, Inc.'s assertions to the contrary, the reality is that Cash App and Cash App Taxes are already associated with "Block." As Block, Inc. continues its integration and begins promoting Cash App Taxes heavily with tax season looming, this use of "Block" in connection with Cash App and the tax services that it plans to offer will increase exponentially. *See* Reibstein Decl. ¶¶ 86–94.

### G. Block's Rebuttal Survey Shows High Levels Of Consumer Confusion

Although Block, Inc. submitted survey evidence purporting to show that confusion is unlikely, Block's expert, Sarah Butler, has explained that Professor Wind's survey is unreliable because, among other critical flaws, he showed respondents the wrong materials to gauge their opinions (he also failed to provide appropriate context for the materials he showed and questioned the wrong demographic of consumers). Rebuttal Declaration of Sarah Butler ¶¶ 2–3

(Jan. 21, 2022) ("Butler Decl.").  To further demonstrate the flaws in Professor Wind's survey, Ms. Butler designed a rebuttal survey to correct those flaws in order to more appropriately assess the likelihood of confusion.  *Id.* ¶ 5. That survey showed a high degree of confusion, with more than a third of relevant consumers confused into believing that a news report about Block, Inc. was actually about Block. *Id.* ¶¶ 5, 51.

Ms. Butler surveyed 399 consumers who were in the market for prepaid debit card, tax preparation services or software, or bookkeeping/payroll services for small businesses.  *Id.* ¶ 26. She showed the respondents a news article describing Defendant's acquisition of a tax-related service.  *Id.* ¶¶ 5, 36, 41. As Professor Reibstein explains, such news articles can have a significant impact on consumer's perceptions of brands and their source.  Reibstein Decl. ¶¶ 33– 37.  More than 36 percent of respondents believed that H&R Block was either described in the article or believed that H&R Block was affiliated with Block, Inc.  Butler Decl. ¶ 43. In contrast to the surveys conducted by Dr. Wind, these results demonstrate that Block, Inc.'s rebranding from Square Inc. is likely to cause consumers to confuse Block, Inc. and its products and services with Block.  *Id.* ¶ 51.

## III.  ARGUMENT

### A.  Block Is Likely to Succeed On The Merits Of Its Trademark Infringement Claim.

#### 1.  Block Inc.'s Use Of BLOCK Is Infringing

Block, Inc.'s argument that it "does not use [BLOCK] as a brand for any consumer-facing product or service," Opp. at 2, is factually wrong and legally irrelevant.  There is no logical reason that Block, Inc. would devote "a team of dozens of employees [to] work[ ] for months to develop a new name for the company," Opp. at 5, if it was not planning to use that name as a brand, in a consumer-facing manner, as it already has begun to do.  Block, Inc.'s

argument also is belied by the fact that it filed an application with the United States Patent and Trademark Office to register BLOCK as a trademark. Jones Decl. Ex. L.

Even if Block, Inc. was using BLOCK only as a company "name," that would be sufficient to establish infringement. 15 U.S.C. § 1125(a)(1). Contrary to Block, Inc.'s suggestion, Opp. at 2, a company name can be found infringing. J. Thomas McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 9:3 (5th ed. 2021) ("MCCARTHY") ("defendant's use of plaintiff's trademark as part of defendant's corporate title and name, can be viewed as trademark infringement"); *Safeway Stores, Inc. v. Safeway Props., Inc.*, 307 F.2d 495, 499 (2d Cir. 1962) (affirming preliminary injunction against defendant's use of plaintiff's SAFEWAY trademark in its corporate name, Safeway Properties, Inc.); *Nat'l Customer Eng'g Inc. v. Lockheed Martin Corp.*, No. 96–8938 DDP ANX, 1997 WL 363970, at *6 (C.D. Cal. Feb. 14, 1997) (enjoining defendants' use of corporate name, MountainGate Systems, Inc.).

### 2. Block Has Established A Likelihood Of Confusion

#### (a) *The BLOCK and Green Square Marks are Strong*

Block's extensive use of the BLOCK Marks—including BLOCK alone and H&R BLOCK—demonstrates their strength in the market. *See* Jones Rebuttal Decl. ¶¶ 4–21; Reibstein Decl. ¶¶ 55–67. Indeed, Block, Inc. concedes that the H&R BLOCK mark is strong. Opp. at 15. The strength of the H&R BLOCK mark is itself sufficient to tip this factor in favor of Block; that BLOCK also is strong in its own right further supports a finding that confusion is likely.

"BLOCK" is arbitrary and distinctive as applied to the tax, financial and charitable services Block offers. *See Moon Seed LLC v. Weidner*, No. 3:20-cv-00104-RGE-SBJ, 2021 WL 2627455, *4 (S.D. Iowa Apr. 22, 2021) (finding "MOON," the last name of the company's founder, "arbitrary and inherently distinctive" because, Moon is "not typically associated with

agricultural seed"). As the Jay Survey shows, consumers recognize Block by the shorthand BLOCK. *See* MCCARTHY § 7:18 ("If the public has come to shorten a trademark into a nickname, then the nickname is entitled to legal protection as a mark."); *Brooks Bros. v. Brooks Clothing of Cal.*, 60 F. Supp. 442, 454, 65 U.S.P.Q. 301 (S.D. Cal. 1945) ("Brooks" is abbreviation for BROOKS BROTHERS; defendant enjoined from using BROOKS for clothing stores); *Anheuser-Busch, Inc. v. Caught-on-Bleu, Inc.*, 288 F. Supp. 2d 105, (D.N.H. 2003), *aff'd*, 105 Fed. Appx. 285 (1st Cir. 2004) (finding infringement of BUD, an abbreviation for BUDWEISER, by use of BILLY BUDD for ale).

The registered Green Square Marks (including Reg. No. 3,656,593 for ) also are distinctive for tax and financial services, and have been used by Block for many years. Whether "green square icons with rounded edges and white phone symbols," Opp. at 17, are protectable as trade dress is irrelevant to the strength of Block's registered Green Square Marks.

The purported "hundreds of coexisting registrations for BLOCK-formative marks, including for financial services" Block, Inc. cites, *id.* at 16, do not undermine the strength of the BLOCK Marks and the Green Square Marks because third-party marks are only relevant where they are used in connection with similar goods and services, and that is not the case for the third-party registrations Block, Inc. cites. *See* MacAneney Decl. ¶¶ 3, 4; *J & B Wholesale Distrib., Inc. v. Redux Beverages, LLC*, 621 F. Supp. 2d 678, 685 (D. Minn. 2007) (holding that third party uses "should not be given much weight" when such uses were in connection with unrelated goods); *see also Scarves by Vera, Inc. v. Todo Imports Ltd.*, 544 F.2d 1167, 1173 (2d Cir. 1976) ("The significance of third-party trademarks depends wholly upon their usage.").

        (b)     *Block, Inc.'s Use Of BLOCK Is Identical to the BLOCK Marks; Its Use of The Green Square Logo is Very Similar to Block's Green Square Marks*

Block, Inc.'s use of BLOCK is confusingly similar to the BLOCK Marks.  Block, Inc.'s focus on the differences between "H&R Block" and "Cash App"/"Cash App Taxes," Opp. at 16–17, entirely disregards that similarity.  Even if the proper comparison were between BLOCK and H&R BLOCK, those marks share a dominant feature, BLOCK, which renders them similar.  *See Kemp v. Bumble Bee Seafood, Inc.*, 398 F.3d 1049, 1055 (8th Cir. 2005) (finding confusion where plaintiff's and defendant's marks shared dominant feature "Louis Kemp"); *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1291–92 (9th Cir. 1992) ("shared dominant element of GALLO" in JOSEPH GALLO for cheese and E. & J. GALLO for wine is "sufficient evidence to support a finding of similarity").

Block, Inc. also disregards the similarities between Block's registered trademark and Block, Inc.'s logo.  Whether the parties' logos are used with other words is irrelevant under this factor.  *See Guthrie Healthcare Sys. v. ContextMedia, Inc.*, 826 F.3d 27, 39 (2d Cir. 2016) ("Nor is likelihood of confusion dispelled by the fact that Defendant often uses its name, ContextMedia, alongside the logo.").

        (c)     *Block, Inc. and Block Compete Directly*

Block and Block, Inc. both offer tax, small business, payroll, and invoicing services, as well as, business banking accounts, debit cards, mobile banking platforms, direct deposit, spending rewards programs and small dollar lending programs.  *See* Table, *supra*, at p. 8.  Block, Inc. also has indicated that it intends to offer BLOCK charitable services, which will compete directly with Block's BLOCK charitable community impact programs.  Block, Inc.'s argument that there is a "fundamental asymmetry of the parties' services," Opp. at 19, is simply wrong.

There can be no dispute that the services the parties offer are related. That is all that is required. *Kemp*, 398 F.3d at 1056 ("Where products are related…it is reasonable for consumers to think that the products come from the same source, and confusion, therefore, is more likely.").

(d)    *Block, Inc.'s Intent*

Block, Inc.'s assertion that it adopted the BLOCK mark in good faith, Opp, at 21, does not favor Block, Inc. because "[i]ntent is an issue whose resolution may benefit only the cause of the senior user, not of an alleged infringer." *See Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410, 424 (6th Cir. 2012) (alteration in original) (citation and quotation marks omitted); *see also GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1208 (9th Cir. 2000) ("*no intent to copy or appropriate…is necessary to demonstrate a likelihood of confusion*") (emphasis in original); MCCARTHY § 23:106 ("The good faith intentions of an infringer are no defense to a finding of liability.").

Notably, Block, Inc. does not dispute that it knew of the BLOCK Marks when it selected the name BLOCK, nor does Block, Inc. offer evidence that it received an opinion of counsel that BLOCK was clear to use. *See Guthrie Healthcare Sys.*, 826 F.3d at 50 ("Had Defendant exercised the precaution of running a trademark search before launching its marks, it would have learned that they were unavailable and would surely have had the good sense not to proceed with a [mark] so nearly identical to one for which trademark rights were already established.").

(e)    *Actual Confusion Is Likely*

The test of infringement is the **likelihood** of confusion (not proof of ***actual*** confusion). Block is not required to prove actual confusion in order to prevail. *See Advantus Cap. Mgmt., Inc. v. Aetna, Inc.*, No. 06-CV-2855(JMR/FLN), 2006 WL 2916840, at *4–5 (D. Minn. Oct. 11, 2006). This is especially true at the preliminary injunction stage, where "parties rarely have

amassed significant evidence of actual confusion." *Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, 758 F.3d 1069, 1072–73 (9th Cir. 2014) (actual confusion is of "diminished importance" at the preliminary injunction stage); *see also Advantus*, 2006 WL 2916840, at *4 ("The Court declines [defendant's] offer to penalize plaintiffs for their ardor and expedition in seeking to protect their name and their effort to preclude—rather than suffer—marketplace confusion.").

Nonetheless, here, Block has provided evidence of actual confusion. For example, in response to Block, Inc.'s name change, one user tweeted: "Are you talking about H&R Block?" Jones Decl. ¶ 34. Other individuals have posted on social media about "Block" and Cash App Taxes, with several even writing "$HRB," a reference to Block's (not Block, Inc.'s) stock ticker symbol, which indicates that these consumers believed Block, Inc.'s Cash App tax services to come from, or to be related to, Block. Jones Rebuttal Decl. ¶ 58. At the minimum, these posts "are relevant, admissible and should be viewed in conjunction with other evidence of actual confusion." *Dream Team Collectibles, Inc. v. NBA Props., Inc.*, 958 F. Supp. 1401, 1415 (E.D. Mo. 1997) (inquiries about relationship between plaintiff and defendant inform confusion).

Block also has provided a survey showing that 36% of consumers are confused into believing that an article about Defendant's acquisition of a tax service was about Block. *See* Butler Decl. 51; *First Nat'l Bank in Sioux Falls v. First Nat'l Bank S.D., SPC, Inc.*, 655 F. Supp. 2d 979, 999, 1000 (D.S.D. 2009) (survey "evidence 'should be given substantial weight unless seriously flawed'"; surveys showing 13–19% confusion "supports a finding of actual confusion and the likelihood of confusion"); *Mutual of Omaha Ins. Co. v. Novak*, 836 F.2d 397, 400 (8th Cir. 1987) (finding actual confusion when survey evidence showed 10% confusion).

(f)     *Consumer Sophistication/Purchasing Process*

Block, Inc. argues that, because consumers have to download Cash App before using its tax filing services, they are unlikely to be confused.  Opp. at 23.  That conclusion does not follow; consumers who download Cash App because they believe it comes from a company called BLOCK are very likely to believe that these services come from H&R Block.  Equally without merit is Block, Inc.'s suggestion that consumers will not be confused because Block, Inc. offers its services online, whereas Block "largely offers in-person services in its physical offices."  Opp. at 23.  That is factually wrong—given Block's software and DIY offerings (Jones Rebuttal Decl. ¶ 19)—and in event unpersuasive.  Even those consumers who are familiar with Block's in-person offices are likely to be confused into thinking that the online tax services offered by BLOCK's Cash App come from, or are sponsored or approved by, Block.

**B.      Block Will Suffer Irreparable Harm Absent a Preliminary Injunction**

Given that Block is likely to prevail on the merits, irreparable harm is presumed.  *See* Mot. at 22.  In addition to the presumption, irreparable harm is shown based on Block's inability to control its reputation when the media refers to Block, Inc. as BLOCK.  *Id.* at 23–24.  Block, Inc.'s only response is the bald assertion that Block "offers only speculation—all of which is premised on the faulty assumption of confusion between the parties."  Opp. at 24.  But, as Professor Reibstein and Mr. Jones both explain, this harm is real and will cause Block permanent damage if Block, Inc. is not enjoined.  Reibstein Decl. ¶¶ 86–94; Jones Rebuttal Decl. ¶¶ 61–65.

**C.      The Balance of Harms Weighs in Block's Favor**

Block, Inc. cannot infringe the BLOCK Marks and then be heard to complain that it will be harmed when it is forced to stop its infringing activity.  *See* Mot. at 25.  In any event, the harm Block, Inc. will purportedly suffer is overstated and contradicts its arguments on the merits.

Block, Inc. is wrong that "an immediate name change would run afoul of state and federal money transmission and virtual currency laws." Opp. at 25. As an initial matter, it appears that Block, Inc.'s licenses are still held in the name "Square, Inc." and have not yet been changed to "Block, Inc." Durone Decl. ¶¶ 8–10 at Exs. 45–47. These sources further reflect that some licenses associated with the services offered by Block, Inc.'s businesses are not held by Block, Inc. at all. *Id.* ¶¶ 10-13 at Exs. 47–50. In any event, even if a name change is needed, the process to change an entity's legal name on a money transmission or virtual currency license is not onerous. At least 20 states have no advance notice or approval requirement. *Id.* ¶¶ 3–5 at Exs. 1–21. Those states that may require some advance notice or approval typically just require the submission of an electronic form via the Nationwide Multistate Licensing System and Registry ("NMLS"), and the notice periods are short. *Id.* ¶¶ 6–7 at Exs. 21–44.

Block, Inc.'s argument that it will need to "implement[ ] a new ***rebranding***, including securing domain name and social media rights," Opp. at 25 (emphasis added),[10] should not impose any significant financial burden given that the amount Block spent on the name change in the first place is an immaterial amount of its $55 billion market cap (and a small fraction of the hundreds of millions of dollars it spends annually on marketing, Reibstein Decl. ¶ 50).[11]

---

[10] That Block, Inc. itself describes this as a "rebranding" demonstrates that Block, Inc. is using BLOCK as a brand, despite its argument to the contrary.

[11] The two cases Block, Inc. cites to support its hardship claim, Opp. at 25 n.10, are inapposite. *Russell Road Food and Beverage, LLC v. Spencer*, 2013 WL 321666, at *2, *5 (D. Nev. Jan. 28, 2013) (where "territorial divisions may prevent confusion," counterclaim plaintiffs were "not similarly burdened by the lack of an injunction" where their brick and mortar business was not located in the same city as counterclaim defendant's brick and mortar business); *FirstBank S.W. v. Heartland Fin. USA, Inc.*, No. 2:21-CV-024-Z, 2021 WL 3743806, at *7 (N.D. Tex. Aug. 24, 2021) (finding it "unnecessary" to discuss the remaining three elements for a preliminary injunction where plaintiff was not likely to succeed on the merits).

**D. The Public Interest Will Be Served by Issuance of a Preliminary Injunction**

Given that Block, Inc. is engaged in infringing activity, an injunction is in the public interest. *See* Mot. at 25. An injunction requiring Block, Inc. to change its name and revert to the status quo *ante* will not "stifle competition," Opp. at 26, as Block, Inc. suggests because it will not require Block, Inc. to stop providing any of the services that it offers. Block, Inc. remains free to offer its tax and other financial services and products under a different, non-infringing name.

## IV. <u>CONCLUSION</u>

For the foregoing reasons, and those discussed in Block's Suggestions in Support of its Motion for Preliminary Injunction, Block respectfully requests the Court enter a preliminary injunction enjoining Block, Inc.'s use of BLOCK and the green square logo.

Dated: January 25, 2022

Respectfully submitted,

**DEBEVOISE & PLIMPTON LLP**

*/s/ Anthony J. Durone*

David H. Bernstein (admitted *pro hac vice*)
Megan K. Bannigan (admitted *pro hac vice*)
Jared I. Kagan (admitted *pro hac vice*)
Marissa MacAneney (admitted *pro hac vice*)
919 Third Avenue
New York, New York 10022
(212) 909-6000
dhbernstein@debevoise.com
mkbannigan@debevoise.com
jikagan@debevoise.com
mpmacaneney@debevoise.com

Anthony J. Durone (MO Bar #43872)
Stacey Gilman (MO Bar #55690)
BERKOWITZ OLIVER LLP
2600 Grand Blvd., Suite 1200
Kansas City, Missouri 64108
Telephone:(816) 561-7007
Facsimile:(816) 561-1888
adurone@berkowitzoliver.com
sgilman@berkowitzoliver.com

**ATTORNEYS FOR PLAINTIFFS**