**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**

|  |  |
|---|---|
| H&R BLOCK, INC. and HRB INNOVATIONS, INC., | |
| Plaintiffs, | Case No. 4:21-cv-00913-NKL |
| v. | |
| BLOCK, INC., | |
| Defendant. | |

**SUR-REPLY IN FURTHER SUPPORT OF DEFENDANT BLOCK, INC.'S**

**OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

<u>**TABLE OF CONTENTS**</u>

<u>Page</u>

INTRODUCTION ...................................................................................................................1

STATEMENT OF SUR-REPLY FACTS .............................................................................2

ARGUMENT .......................................................................................................................13

I.      PLAINTIFFS REMAIN UNLIKELY TO SUCCEED ON THE MERITS......................13

        A.      H&R Block's Additional Evidence Does Not Address The Fundamental
                Question of Defendant's Trademark Use .............................................................13

        B.      H&R Block's "Confusion Evidence" Regarding "Block" Falls Short. ................14

                1.      The Butler Survey Does Not Show That Actionable Confusion Is
                        Likely. ......................................................................................................14

                2.      H&R Block's "Association" Evidence Does Not Show Likely
                        Confusion. ................................................................................................16

        C.      H&R Block Has Failed To Show Confusion From Use of "Block" Alone...........19

        D.      Plaintiffs Have No Evidence Of Bad Intent.........................................................20

        E.      H&R Block's Identification of Additional Services Does Not Save its
                Motion...................................................................................................................21

        F.      H&R Block Offers No Confusion Evidence As To The Cash App Logo .............21

II.     H&R BLOCK HAS NO EVIDENCE OF IRREPARABLE INJURY ..............................21

III.    H&R BLOCK'S REPLY FAILS TO REBUT BLOCK'S HARDSHIP ..........................21

## CASES

*Armstrong Cork Co. v. World Carpets, Inc.*,
    597 F.2d 496 (5th Cir. 1979) ............................................................................... 13, 14

*Astra Pharmaceutical Products, Inc. v. Beckman Instruments, Inc.*,
    1983 WL 51933 (D. Mass. Mar. 25, 1983) ............................................................ 20

*August Storck K.G. v. Nabisco, Inc.*,
    59 F.3d 616 (7th Cir. 1995) ................................................................................... 19

*Calvin Klein Cosms. Corp. v. Lenox Lab'ys, Inc.*,
    815 F.2d 500 (8th Cir. 1987) ................................................................................. 14

*Carpe v. Aquila, Inc.*,
    No. 02-0388-CV-W-FJG, 2005 WL 1138833 (W.D. Mo. Mar. 23, 2005)...................... 18

*Dakota Indus. Inc. v. Dayton Hudson Corp.*,
    2001 WL 1448600 (D.S.D. Sept. 13, 2001), *aff'd*, 37 F. App'x 846 (8th Cir. 2002)....... 20

*Everest Cap. Ltd. v. Everest Funds Mgmt. LLC*,
    393 F.3d 755 (8th Cir. 2005) ........................................................................ 13, 14, 15

*Kemp v. Bumble Bee Seafoods, Inc.*,
    398 F.3d 1049 (8th Cir. 2005) ............................................................................... 13

*Limited v. Macy's Merchandising Group Inc.*,
    2016 WL 4094913 (S.D.N.Y. Aug. 2, 2016), *aff'd*, 695 F. App'x 633 (2d Cir.
    2017) ...................................................................................................................... 15

*Microware Sys. Corp. v. Apple Computer, Inc.*,
    126 F. Supp. 2d 1207 (S.D. Iowa 2000),
    *aff'd,* 238 F.3d 989 (8th Cir. 2001) ....................................................................... 20

*Nat'l Customer Eng'g Inc. v. Lockheed Martin Corp.*,
    No. 96-8938-DDP-ANX, 1997 WL 363970 (C.D. Cal. Feb. 14, 1997) ......................... 14

*Nebraska Plastics, Inc. v. Holland Colors Amer., Inc.*,
    408 F.3d 410 (8th Cir. 2005) ................................................................................. 18

*Noem v. Haaland*,
    542 F. Supp. 3d 898 (D.S.D. 2021) ....................................................................... 21

*Polyform A.G.P., Inc. v. Xtreme Insulation Techs., LLC*,
    No. 17-735 (JRT/LIB), 2017 WL 4564719 (D. Minn. Oct. 11, 2017) ........................... 21

*Safeway Stores Inc. v. Safeway Props., Inc.*,
    307 F.2d 495 (2d Cir. 1962)................................................................................... 14

*Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.*,
   997 F.2d 484 (8th Cir. 1993) ......................................................................... 19

*Sensient Techs. Corp. v. SensoryEffects Flavor Co.*,
   613 F.3d 754 (8th Cir. 2010) ....................................................................... 18

*Valador, Inc. v. HTC Corporation*,
   242 F. Supp. 3d 448 (E.D. Va. 2017), *aff'd*, 707 F. App'x 138 (4th Cir. 2017)............... 16

*WE Media, Inc. v. Gen. Elec. Co.*,
   218 F. Supp. 2d 463 (S.D.N.Y. 2002).......................................................... 14

## STATUTES

15 U.S.C. §§ 1114.................................................................................................... 13

15 U.S.C. §1125(a) ................................................................................................. 13

# INTRODUCTION

Plaintiffs' preliminary injunction motion fails for three reasons. First, defendant Block, Inc. does not use its corporate name as a trademark for *any* of its customer-facing products, let alone products allegedly competing with H&R Block, so confusion is highly improbable. Second, though H&R Block bears the burden of proof, it has offered no evidence of consumer confusion caused by Defendant's *actual use* of its marks, as is required by the governing legal standard, instead offering a claimed "confusion survey" which tests doctored online magazine articles and is thus irrelevant. Third, Defendant has effectively shown an absence of confusion by introducing "among the most clear-cut survey results of 'no confusion'" that expert Dr. Jerry Wind has seen in over 40 years of designing and conducting consumer research.

A visual comparison of the brands confirms that consumer confusion is highly ***unlikely***:



As discussed in Block's motion to dismiss, this dissimilarity alone dooms H&R Block's claims.

Against this backdrop, H&R Block seeks extraordinary relief: to force Defendant to (a) change its entire corporate branding, which it has worked for over a year to develop and implement, and (b) change the white dollar sign Cash App logo, which it has used in commerce, with tens of millions of customers, for many years. Defendant respectfully requests that this Court follow established precedent, and common sense, and deny H&R Block's motion.

<u>**STATEMENT OF SUR-REPLY FACTS**</u>

<u>**Additional Information Concerning H&R Block's Reply Evidence**</u>

<u>**Report of Sarah Butler**</u>

H&R Block relies on the third of three surveys Sarah Butler conducted to claim confusion is likely from Defendant's use of the corporate name Block. Reply at 14-15. Ms. Butler's survey did not purport to test any of Defendant Block's advertising materials or any other use by Defendant. Butler ¶ 36; *id.* Ex. F (stimuli). Rather, Ms. Butler tested the consumer "perception" of a third-party media article (*Forbes Advisor*) from 2020 with no accompanying logos. *Id.* The article discusses the November 2020 acquisition of Credit Karma Tax by Square, Inc. (as the company was formerly known as). *Id.* Ms. Butler showed a "control" group of respondents the article as written—*e.g.*, with "Square" as the name of the company acquiring Credit Karma Tax. *Id.* She showed the "test" group a counterfactual version of the article that was changed to refer to "Block" as the company that acquired Credit Karma Tax. *Id.*

After displaying the article, Ms. Butler asked which of a list of brands the respondents recalled from the article. *Id.* ¶ 36; *id.* Ex. A at Q1. Ms. Butler did not ask any questions to determine if likely consumers of Cash App or Square (or any of Block's other businesses) read *Forbes Advisor*, or were likely to have seen the article she showed them. *Id.* Ex. A at Q0-10, Ex. E. Nor did she ask whether any of the respondents normally looked at, recalled, or relied on media reports, such as the one she showed them, when making purchase decisions for goods or services like those offered by Block's businesses. *Id.* ¶ 33. Ms. Butler did not conduct any survey that addressed the Cash App logo.

This survey was not the first one Ms. Butler ran for this case. Before running and reporting on this survey, she ran two prior ones. Butler ¶¶ 34-28, 40. Ms. Butler refers to her first survey as a "pilot" survey, even though each cell had 100 participants. *Id.* ¶ 40. The pilot

survey tested a different magazine article, although, as in her final survey, she altered it. For the pilot study, she substituted the name "Block" for "Square" in a March 2021 Yahoo! News article, which did not mention anything about taxes. *Id*. Ex. H. In this survey, ***none*** of the participants who saw the article altered to say "Block" answered that "H&R" was mentioned in the article. *Id*. ¶ 40; *see also* Sur-Rebuttal Declaration of Yoram Wind, submitted herewith ("Wind S.") ¶ 21. Ms. Butler states that "two [participants] specifically mentioned 'H&R Block.'" Butler ¶ 40 n. 51. However, those two were in the control group, for which the article did not even mention "Block." Wind S. ¶ 21.

Ms. Butler's second survey, which she refers to as a "pretest," used the same stimuli as the final one—the Credit Karma Tax acquisition article from *Forbes Advisor*. Butler ¶ 38. This second survey yielded a "confusion" level of only 14%. Butler Ex. G (back-up data); *see also* Wind S. ¶ 24. The sole difference between the second and third surveys is a question not included in the "pretest" survey: "By what other name(s), if any, is Block known by?"—with no separate predicate question of whether respondents believed Block is, in fact, known by any other names. Butler Ex. A (Q8).

The Sur-Rebuttal Declaration of Dr. Yoram Wind identifies multiple problems with Ms. Butler's survey design, methodology, and conclusions. Wind S. ¶¶ 8-47. These include that it is improper to use a test stimulus other than the junior user's actual marketing or packaging as it appears in the marketplace to attempt to show confusion. *Id.* ¶¶ 14-15. As such, Ms. Butler's survey functions as a memory test. *Id.* ¶ 9. In addition, Dr. Wind explains that the question Ms. Butler added to her final survey improperly sought and suggested an answer that would be favorable to H&R Block, creating a well-recognized problem called "demand effects" that causes biased responses. *Id.* ¶ 29. Dr. Wind notes that if any meaningful conclusions can be

drawn from Ms. Butler's multiple survey results, it is that they indicate confusion is unlikely.  He also responds to Ms. Butler's criticisms of his report.  *Id.* ¶¶ 32-46.

**Report of Deborah Jay**

H&R Block relies on the survey of Deborah Jay to argue that it "also is known as BLOCK."  Reply at 3.  Dr. Jay's survey asked respondents whether they had seen or heard of a number of "brand[s] of tax product or service," including brands such as TurboTax, Jackson Hewitt, and Liberty Tax.  Jay ¶¶ 21-22; *id.* App'x D.  Dr. Jay also tested a fictitious control brand called "DYO Returns."  *Id.*  Dr. Jay concluded from her survey results that "a significant segment (45%) of the general consuming public in the United States recognizes BLOCK as a brand name used in connection with a tax product or service."  *Id.* ¶ 24.

The Sur-Rebuttal Declarations of Dr. Yoram Wind and Dr. Ravi Dhar ("Dhar S.") identify several problems with Dr. Jay's survey design and conclusion.  Wind S. ¶¶ 48-73; Dhar S. ¶¶ 53-62.  These include that she (1) used an improper design for assessing consumer recognition as a brand, (2) improperly primed the respondents by suggesting and limiting responses to brands that offer a "tax product or service," and (3) used an implausible control that sounded "made up" or generic and therefore artificially depressed the control numbers.  Wind S. ¶¶ 48-73; Dhar S. ¶¶ 58-61.

To confirm his opinion that Dr. Jay's survey overstated recognition of the name "Block"—standing alone—as a brand for tax preparation or services, Dr. Wind also relied on a survey conducted to address the improper aspects of Dr. Jay's survey, the "Corrected BLOCK Recognition Survey."  Wind S. ¶¶ 63-72.  The Corrected BLOCK Recognition Survey did not prime the respondents to think about a "tax product or service" before testing recognition. Participants were asked instead: "Have you seen or heard of ____ as a brand?," *id.* Ex. Q (Q.B1);

4

those answering affirmatively were asked: "What products or services are offered under the brand name _____?," *id*. (Q.B2). In addition, the Corrected BLOCK Recognition Survey did not prime the respondents by asking them about multiple tax preparation brands. Instead, it consisted of three separate cells. In each, respondents were shown a single "brand": BLOCK, a fictitious control (SPHERE TAXES), or a comparative name (TURBOTAX), so that each respondent was asked about only one "brand." *Id.* ¶ 65. The results of the Corrected BLOCK Recognition Survey, after deducting for the "noise" shown by the control stimulus, show that only 3.5% of respondents thought of "Block" as a brand. *Id.* ¶ 68.

Dr. Wind and Dr. Dhar also responded to Dr. Jay's criticisms of their reports. Wind S. ¶¶ 48-73; Dhar S. ¶ 41.

**Report of David Reibstein**

H&R Block relies on the report of David Reibstein to argue that confusion is likely and that the testimony of Doctors Wind and Dhar is deficient because they did not employ his methodology and reasoning. Reply at 15. Dr. Reibstein did not conduct any surveys. Instead, he bases his report on Internet research, academic articles, and speculation about what Defendant's branding may look like in the future and what news stories might be written about it in the future. Reibstein ¶¶ 72-92.

Dr. Reibstein's Association Opinion

Dr. Reibstein opines that customers are likely to associate Cash App with Block, and as a result of that association become confused as to their relationship with H&R Block. Reibstein ¶¶ 91-92. Relying on a third party provider's database, he calculates the percent of the media articles over the past five years that mention Cash App and that mention Square. He then uses this to conclude there is "linkage" between Cash App and its parent company, and he speculates

that "future media coverage will contribute to increasingly strong linkage between Cash App and the term 'Block' as a corporate brand." *Id.* ¶¶ 72-74. Dr. Reibstein concludes that this "linkage" is likely to lead to consumer confusion. *Id.* ¶ 93.

As further claimed evidence of this "linkage," Dr. Reibstein cites media articles, Block's website, and profiles on the job networking site LinkedIn, that say that Cash App and Square are Block brands. Reibstein ¶¶ 83-91. He hypothesizes that, in the future, this fact of ownership will become more prominent and, as an example, features an image that he describes as "Apple App Store Listing Associating 'Cash App' with Owner," which displays "Block, Inc." as the developer of Cash App. *Id.* ¶ 77. The image in Dr. Reibstein's report is altered, and does not accurately reflect what the consumer sees when viewing the App Store listing for Cash App. In fact, the developer is listed as "Square, Inc.", not "Block, Inc." *See* Sur-rebuttal Declaration of Owen Jennings ("Jennings S.") ¶ 13; *id.* Ex. A; Dhar S. ¶¶ 23-28.[1] The screen shows "Square, Inc." briefly before it is replaced by a description of the app ("P2P, Bitcoin, Stocks, Banking"), and the screen contains additional information and context. Jennings S. ¶ 13.

With regard to how a person interested in downloading and using the Cash App mobile app would find it, Cash App Head of Product and Business, Owen Jennings, confirms that searches for "Cash App" and variants or misspellings of that term accounted for 91% of the Cash App downloads from searches in the Google Play Store from December 1, 2021 (the date the name change to Block was announced), to January 30, 2022. Jennings S. ¶ 8. Google Play

---

[1] On the afternoon of February 4, hours before Defendant's deadline to file these Suggestions and supporting declarations (and after most of the Declarations had been finalized and signed), H&R Block filed a Corrected Rebuttal Expert Declaration of Dr. Reibstein in which he replaced this doctored image from the App Store with a cropped image that correctly lists "Square, Inc." as the developer of Cash App. That H&R Block's expert himself did not notice the name of the developer in his image, or that it was incorrect, undermines his opinion that consumers would recognize, process, or make purchasing decisions based on such information.

reports the top 500 search terms consumers used to find and then download the Cash App mobile application.  *Id.* ¶ 9.  That list accounts for 97.6% of all search-based downloads.  Neither "Block" nor "H&R Block" are among them.  *Id.*  As for Cash App's developer name on the Apple App Store and Google Play Store, which remains "Square," Mr. Jennings confirms that Cash App plans to change that name to the product's brand, "Cash App," rather than to the parent company name "Block."  *Id.* ¶ 13-14.  Cash App is actively engaged with the app stores to make this change.  *Id.* ¶ 14.

The Sur-Rebuttal Declarations of Dr. Yoram Wind and Dr. Ravi Dhar identify multiple problems with Dr. Reibstein's methodology and conclusions.  Wind S. ¶¶ 74-111; Dhar S. ¶¶ 3-14, 20-33, 63-66.  One problem is the evidentiary gaps in Dr. Reibstein's logic.  He does not point to any empirical data that likely customers of Cash App or Square (or other Block businesses) are likely to encounter the types of "association" evidence between the corporate name Block and any of the brands for its customer facing products and services.  Wind S. ¶ 75; Dhar S. ¶¶ 3-14, 20-22, 30-32.  Dr. Wind explains that it is not reasonable to assume, for example, that a prospective Cash App customer will search the LinkedIn profiles of employees who work at Cash App before deciding whether to use Cash App.  Wind S. ¶¶ 103-05.

Nor does Dr. Reibstein identify any empirical data that, even if likely customers of Cash App or Square (or other Block businesses) encounter "association" evidence, they are likely to remember this corporate relationship or that it will affect their purchasing decisions.  Dhar S. ¶¶ 5-8.  Dr. Dhar explains that this is not a reasonable assumption to make.  To illustrate, he points to other consumer brands, such as Bounty, Viva, and Brawny paper towels, Ben & Jerry's and Häagen-Dazs ice cream, and Dove and Dial hand soap.  *Id.* ¶¶ 16-18.  Each has a corporate brand behind it, such as Procter & Gamble, Kimberly-Clark, Georgia-Pacific, Unilever, General Mills,

or Henkel. *Id.* ¶¶ 16, 18. These corporate brands all have websites that identify their customer-facing brands, and many actively promote them on their corporate social media accounts. *Id.* ¶¶ 17-18. But this does not mean customers seek out that information, remember it if they come across it, or base their purchase decisions on it. *Id.* ¶ 19.

Dr. Wind separately opines that Dr. Reibstein's analysis is also missing necessary evidentiary support. Wind S. ¶¶ 82-87. Dr. Wind points out that the "media linkage" Dr. Reibstein cites is not reproducible. Dr. Reibstein based his analysis on summary tables generated by the research software Factiva, but his summary is based on a non-representative sample. *Id.* ¶¶ 83-84. In addition, Dr. Reibstein's conclusions about consumers linking Cash App with its corporate parent's name are inconsistent with data from Dr. Wind's consumer surveys concerning the Cash App name and logo, which showed that just four respondents who identified Cash App associated it with Square or Block, or thought it needed permission from Square or Block. *Id.* ¶ 106. Dr. Wind's results are corroborated by real-world consumer search data provided by Mr. Jennings. Mr. Jennings confirmed that in the Google Play Store, searches for "Cash App" and related variants on that term accounted for at least 91% of the Cash App downloads by search between December 1, 2021 and January 30, 2022, whereas searches for "Block" or "H&R Block" did not appear anywhere in the top 500 search terms—which in total accounted for 97.6% of all searches leading to downloads—during the same period. Jennings S. ¶ 9. Similarly, for the month before the announcement of the Block name change, searches for "Square"-related terms accounted for just five one-hundredths of one percent of all Cash App downloads from the Google Play Store." *Id.* ¶¶ 10-11.

Dr. Wind points out that Dr. Reibstein does not identify any actual marketplace images from which it would be reasonable to conclude that Cash App customers draw an association

between Cash App and Block, given the "consumer journey" that consumers undertake.  Wind S. ¶¶ 78-82.  Dr. Dhar explains that the Cash App branding at every stage of the customer journey makes any confusion unlikely.  Dhar S. ¶¶ 34-37.

Dr. Reibstein's "Block" As A Brand Opinion

Dr. Reibstein states: "Consumer evidence indicates that consumers      associate H&R Block with the term 'Block.'"  Reibstein ¶ 58.  He relies on three points to support this conclusion: (a) the survey of Dr. Jay, (b) consumer reviews on Amazon, and (c) Google Trends information concerning searches consumers do to reach H&R Block's website, which he states, "suggest[s] that consumers are more likely to seek out H&R Block's website through the Google search engine using the term "block" in conjunction with "taxes" than the term "h&r block" in conjunction with "taxes."  *Id.*  ¶¶ 58-61.

The problems with Dr. Jay's survey are discussed above.  And as Dr. Wind explains, the three Amazon consumer reviews Dr. Reibstein relies on are not representative of consumer reviews on Amazon for H&R Block's tax preparation software.  A review of all 1,077 customer reviews of H&R Block's products on Amazon.com shows that just 2.3% of those reviews refer to H&R Block as "block" alone, without any use of the "H&R" prefix.  The reviews Dr. Reibstein relies on are cherry-picked from that 2.3%.  Wind S. ¶ 96.

Dr. Wind also explains that Dr. Reibstein's description of the portrayal of Google Trends results is inaccurate.  Wind S. ¶¶ 90-95.  This is because the search query that yielded the data reflected in the "block taxes" line of Dr. Reibstein's chart included ***all*** user search queries that include block and taxes—not just those consisting of the search query "block taxes."  *Id*.  In other words, what is represented by the blue lines in Dr. Reibstein's charts (Reibstein ¶ 60), also includes data for "H&R block taxes" as well as other variations like "HandR Block taxes" or

"HR Block taxes." *Id.* Dr. Wind also shows that by far the most popular search to lead to H&R

Block's website is "H&R Block," with approximately 1.2 million searches monthly, as compared

to 500 searches for "block tax," a ratio of 0.04%. *Id.* ¶ 94. Dr. Wind accordingly concludes that

Dr. Reibstein's opinion about consumer perception of "Block" as a brand for H&R Block is

unwarranted. *Id.* ¶¶ 90-95.

Dr. Reibstein also points to data concerning how H&R Block markets its services. *See*

Reibstein ¶¶ 54-56. Dr. Dhar explains that the overwhelming majority of images Dr. Reibstein

relies on show the "H&R Block" branding nearby, and that the "marketing spends" Dr. Reibstein

references are not limited to advertising that includes the word "Block" alone. Dhar S. ¶¶ 42-46.

### Rebuttal Declaration of Jeffrey Jones II

Mr. Jones's declaration identifies an H&R Block business, Wave, not identified in H&R

Block's complaint or opening papers. He contends that Wave competes with some of the

services offered by Cash App and Square. Rebuttal Declaration of Jeffrey Jones II ("Jones R.")

¶¶ 24-27. The Surreply Declaration of Chrysty Esperanza ("Esperanza S.") provides more detail

about the services offered by Block's business units, reflecting how different they are from the

services Mr. Jones describes. Esperanza S. ¶¶ 3-15.

Mr. Jones also identifies additional examples of the types of information Dr. Reibstein

addresses. These include: (a) advertising purporting to use "Block" alone (Jones R. ¶¶ 10-17),

(b) Amazon reviews purporting to use "Block" alone (*id.* ¶ 20), and (c) associations between

Cash App and Square and Cash App and Block (*id.* ¶¶ 48-54), including employee LinkedIn and

Twitter posts proffered as evidence that Cash App can be "identified as part of Block" (*id.* ¶¶ 57-

59). The same points Professors Dhar and Wind made about that evidence, discussed above,

apply to Mr. Jones's evidence. *See also* Dhar S. ¶¶ 45-46. (discussing examples Mr. Jones cited

that use the term "H&R Block" in close proximity to "Block"); Wind S. ¶ 96 (describing quantitative analysis of Amazon.com reviews of H&R Block's products showing that Mr. Jones's sample is not representative because of all available Amazon reviews, only 2.3% referred to "Block" without making any reference to H&R Block).

Mr. Jones also includes examples of the use of "Square, Inc." and instances of "Block, Inc. (formerly known as 'Square, Inc.')," including in Cash App Taxes' licensing agreement and terms of service. (Jones R. ¶¶ 47-53). Dr. Dhar explains that such disclaimers and notices are not part of Cash App's branding and promotion, but rather govern the legal contract between Cash App and its users. Dhar S. ¶ 38. Further, he explains that, just because a notice exists, does not mean a consumer will pay attention to it and internalize it. *Id.* Mr. Jones's "mock-up" of the App Store image showing Block is altered and does not reflect any actual marketplace condition. Jones R. ¶ 55; Jennings S. ¶ 13. Nor does it reflect what Cash App plans to use as the developer name in the App Store listing—the brand name, Cash App. Jennings S. ¶ 14. The marketplace context of the App Store download screen makes it improper to speculate that consumers would be confused by this. Dhar S. ¶ 28.

### Rebuttal Declaration of Anthony Durone

H&R Block cites materials attached to the Rebuttal Declaration of Anthony Durone ("Durone R.") (Exs. 1-50) to argue that "Block, Inc.'s federal and state licenses are still held in the name "Square, Inc.," and that the name change process "is not onerous." Reply at 22.

Ms. Esperanza responds to this evidence. She details the numerous documents that would need to be submitted in connection with getting Block Inc.'s money transmission and virtual currency licenses changed to Block's name, including:

- Amended Articles of Incorporation;

- Amended registration for U.S. Department of Treasury Financial Crimes Enforcement Network ("FinCEN");
- Updated customer receipts for all money transmission products;
- Evidence that the new name has been registered with each jurisdiction's Secretary of State—i.e. a revised/amended certification from each of Secretary of State, which depends on those Secretaries of State having processed Block's amended name change certificate and/or certificate of good standing from Delaware, the state of incorporation;
- Board of Directors' resolution approving the name change;
- Block's Financial statements, such as 10Q, 10K, and interim monthly and quarterly statements;
- Amended W-9;
- Amendment to all documentation that is provided to states via the Nationwide Multistate Licensing System & Registry ("NMLS") to reflect the new name:
  - Organization chart
  - Management Chart
  - Business Plan
  - Trust account authorizations
  - Policies and Procedures
- Letters from Block to each state's money transmission regulatory agency stating there has not been a change to Block's Employer Identification Number (EIN);
- Letters from Block to each state's money transmission regulatory agency stating that there has been no change to Block's structure or Officers/Directors;
- Return of original licenses issued to Square, Inc.;
- Amendments to surety bond, which is an agreement for a third-party to pay the debt obligations of Block in case of its default.

Esperanza S. ¶ 20.

Ms. Esperanza also explains that, although Block initiated the name change last year, not all states have completed processing it. *Id.* ¶ 22. For those states, the change is currently in their hands. *Id.* It cannot be "called off" via email or a phone call. Because the Company's legal

name has already been changed to Block, Inc., any name change, including to "Square, Inc.," would require regenerating and resubmitting all supporting materials under a new name. *Id.* Ms. Esperanza also notes there are certain licenses that do not need to be changed. *Id.* ¶ 25.

Also attached to the Rebuttal Declaration of Anthony Durone are 107 examples of news coverage of H&R Block to suggest that H&R Block is also known as "Block." Durone R. Exs. 51-56. In each article, H&R Block is referred to at some point by the shortened term "Block," but there are no examples of H&R Block being referred to as Block without a reference to H&R Block. Dhar ¶ 52. Dr. Dhar further notes that H&R Block provides no evidence that any consumers have seen these articles. *Id.*

## ARGUMENT

### I.    PLAINTIFFS REMAIN UNLIKELY TO SUCCEED ON THE MERITS

#### A.    H&R Block's Additional Evidence Does Not Address The Fundamental Question of Defendant's Trademark Use

H&R Block must prove that "Defendants' use of their marks [i]s 'likely to cause confusion' as to the origin of their products and services, or whether they are affiliated with" H&R Block. *Everest Cap. Ltd. v. Everest Funds Mgmt. LLC*, 393 F.3d 755, 759 (8th Cir. 2005); *see also* 15 U.S.C. §§ 1114, 1125(a). This focuses on "how consumers encounter the products," taking into account the "overall impression" of the marks in "the manner in which a particular mark or designation is to be used." *Kemp v. Bumble Bee Seafoods, Inc.*, 398 F.3d 1049, 1054 (8th Cir. 2005); *Armstrong Cork Co. v. World Carpets, Inc.*, 597 F.2d 496, 502 (5th Cir. 1979).

H&R Block ignores the essential question of how Square and Cash App are offered and marketed to customers. Instead, it argues that consumers will be confused by *other* mentions of Block, such as stories mentioning Block in media outlets, or by LinkedIn profiles and Twitter posts. *See, e.g.,* Reply at 20; Reibstein ¶¶ 88, 91, 83; Jones ¶ 45. These uses are not part of any

expected customer experience—much less one likely to affect purchase decisions.  *See, e.g.*, Dhar S. ¶¶ 9-13, 33, Wind S. ¶¶ 103-05, Esperanza S. ¶ 16.  No court has adopted H&R Block's unprecedented theory of trademark infringement—that liability may be premised on third-party media mentions rather than "Defendant['s] use."  *Everest Capital*, 393 F.3d at 759.

H&R Block suggests that its departure from accepted legal standards is justified because it is attacking Defendant's corporate name, as opposed to the name of a product, citing two cases.  Reply at 16.  But there, the challenged corporate name was itself the only brand identified for the goods and services.  *Nat'l Customer Eng'g Inc. v. Lockheed Martin Corp.*, No. 96-8938-DDP-ANX, 1997 WL 363970 (C.D. Cal. Feb. 14, 1997); *Safeway Stores Inc. v. Safeway Props., Inc.*, 307 F.2d 495, 499 (2d Cir. 1962).  Here, by contrast, the allegedly competing products and services have their own unique brands.  Esperanza Decl. ¶ 16.  Analogously, in *Armstrong Cork*, the Fifth Circuit reversed an injunction because the use of a corporate name in fine print on a label was not enough to create a likelihood of confusion, as the "attention-getting feature" of the label was the junior user's brand.  *Armstrong Cork,* 597 F.2d at 504-06.  As in *Armstrong Cork*, and the cases cited in Opposition (at 17-18), the labels used for Square and Cash App are so ***dis***similar from H&R Block's labels that H&R Block cannot succeed on the merits.  *Compare* Esperanza ¶ 16 *and* Jennings ¶ 6 *with* Jones ¶ 5, Wind ¶ 70, *and* Dhar ¶ 53.

**B.**      **H&R Block's "Confusion Evidence" Regarding "Block" Falls Short.**

1.      The Butler Survey Does Not Show That Actionable Confusion Is Likely.

H&R Block's surveys do not test the appearance of *any* of Block's goods and services or other marketing.  They therefore fail "to recreate the conditions in which buying decisions are made."  *Calvin Klein Cosms. Corp. v. Lenox Lab'ys, Inc.,* 815 F.2d 500, 504 (8th Cir. 1987); *see also, WE Media, Inc. v. Gen. Elec. Co.,* 218 F. Supp. 2d 463, 474 (S.D.N.Y. 2002) ("Germane

survey evidence should make some effort to compare the impressions the marks have on potential customers under marketplace conditions."); Wind S. ¶ 13; *id.* Ex. O.

Courts reject survey stimuli that use the defendant's branding but remove distinguishing context. *E.g.*, *Limited v. Macy's Merch. Group Inc.*, 2016 WL 4094913, at *9 (S.D.N.Y. Aug. 2, 2016) (giving survey "little weight" where stimulus "remov[ed] the Macy's logo and Macy's URL from the image shown to respondents," depriving "respondents of context that they would unavoidably encounter in the actual marketplace"), *aff'd*, 695 F. App'x 633 (2d Cir. 2017).[2] Ms. Butler's surveys use stimuli that do not even start with any of Block's branding, website, or other marketing materials. Her test stimuli were doctored third-party articles about Square, Inc., which she changed to look as if they were written about "Block." Butler ¶ 40, Ex. H. This renders the surveys improper, not only under Rule 702, but also under Rules 401 and 402; they simply are not probative of whether "Defendant['s] use … [i]s 'likely to cause confusion.'" *Everest Capital Ltd*, 393 F.3d at 759; *see also* Wind S. ¶ 9. No authority supports admitting such flawed surveys.

Ms. Butler's survey suffers from other problems. It took her three tries to come up with her results. Her "pilot test" of 200 respondents showed that ***no*** respondents who saw the "test" condition mentioning "Block" identified H&R Block. Butler, Ex. H, Wind S. ¶ 21. After she swapped that article that didn't mention tax prep services with another one that did, she got 14%

---

[2]  *See also Kargo Global, Inc. v. Advance Magazine Publishers, Inc.*, 2007 WL 2258688, at *11 (S.D.N.Y. Aug. 6, 2007) (excluding survey where stimulus was unrepresentative snippets of marketing material); *American Footwear Corp. v. General Footwear Co.*, 609 F.2d 655 n.4 (2d Cir. 1979) (same); *Playtex Prods., Inc. v. Georgia-Pacific Corp.*, 390 F.3d 158, 168 (2d Cir. 2004) (survey results not relevant because stimulus did not replicate the marks as "presented and packaged" in the marketplace); *Juicy Couture, Inc. v. L'Oreal USA, Inc.,* No. 04 CIV 7203 (DLC), 2006 WL 1012939, at *25 (S.D.N.Y. Apr. 19, 2006) (survey that did not show actual cosmetic product in its packaging had no value); *WE Media, Inc.,* 218 F. Supp. 2d at 474 (survey that "did not use pictures or advertisements that approximate what a potential customer would encounter in making her [purchase] choices" did not "provide support for [plaintiff's] case").

of respondents to mention H&R Block—a low number given the leading and improper stimulus and priming of the respondents.  Butler ¶ 40; *id.* Ex. H; Wind S. ¶ 21.  A deeper examination shows that only **3%** of respondents mention both Block and H&R Block in answers to the open-ended questions.  Wind S. ¶ 25.  To exceed 20%, she had to revise the survey yet again.  *Id.*  So she added a question: "By what other name(s), if any, is Block known by?"—with no separate predicate question of whether Block *is* known by any other name.  Butler Ex. A (Q.8).  This was improper because it created "demand effects" that suggested to respondents that "Block" is known by other names.  Wind S. ¶ 29.  That H&R Block veered so far from acceptable methods, and needed three bites at the apple to arrive at numbers above an acceptable threshold, confirms the absence of evidence to support its claim of potential confusion.[3]

### 2.    H&R Block's "Association" Evidence Does Not Show Likely Confusion.

H&R Block also relies on David Reibstein, whose declaration is founded on the same false premise: that actionable confusion can result from something **other than** Defendant's actual packaging, marketing, or promotion to customers.  Reply at 9-10.  Dr. Reibstein strung together information from the Internet to suggest that, because Block's corporate name is not a secret, customers of Cash App and Square will: (1) encounter third party references connecting Cash App and/or Square with their corporate parent Block, (2) retain "Block" as being associated with the customer-product facing brands Cash App and Square, (3) in later interactions with Cash

---

[3]  Unlike Dr. Wind, Ms. Butler did not conduct an "*Eveready*" survey—a design choice that none of H&R Block's experts challenged.  Butler ¶ 38, Ex. A; Wind S. ¶ 8.  She gave her respondents a useless memory test.  Butler ¶ 38; *id.* Ex. A; Wind S. ¶ 9.  Ms. Butler skewed her results by improperly limiting the population to likely H&R Block customers, excluding core customers of Cash App (and other Block businesses) *id.*, even though forward confusion studies must be based on the customers of the junior user (Defendant) not the senior user (Plaintiff).  *E.g., Valador, Inc. v. HTC Corporation*, 242 F. Supp. 3d 448, 461 (E.D. Va. 2017) (excluding survey that "did not cover the prime market for defendants' product"), *aff'd*, 707 F. App'x 138 (4th Cir. 2017).

App or Square, believe them to be associated with H&R Block, and (4) make a purchase decision on that basis.  Reibstein ¶ 3.  Neither H&R Block nor Dr. Reibstein cites any authority for this novel theory of divorcing confusion from the defendant's actual branding and customer marketing.  *Cf.* Reply at 13-14.  Nor do they offer evidence that any Cash App or Square customers would be confused into associating "Block" with H&R Block.  *See* Wind S. ¶¶ 78-82, Dhar S. ¶¶ 4-5, 12, 31-32, 65-66.

Dr. Reibstein's analysis regarding the number of times third parties have mentioned Cash App in proximity to Square (Reply at 11-12) likewise has no bearing on the likelihood of confusion.  Not only is the former connection between Cash App and Square no indication of future connection between Cash App and Block, but H&R Block offers no evidence that consumers associated Cash App with Square, Inc.  *See* Dhar S. ¶ 30; Esperanza ¶¶ 12, 13, 18; Wind S. ¶¶ 101-10.  In fact, data from Dr. Wind's original surveys show that they do not.  Wind S. ¶¶ 106-09.  Dr. Wind's surveys are corroborated by real-world data showing that searches for "Cash App" (and variants) accounted for at least 91% of the Cash App downloads from search in the Google Play Store from December 1, 2021 (when the Block name was announced), to January 30, 2022.  Jennings S. ¶ 8.  By contrast, searches for "Square"-related terms accounted for just five one-hundredths of one percent (.05%) of search-based downloads of Cash App in the month leading up to the Block name change.  *Id.* ¶¶ 10-11.

Nor does H&R Block offer any evidence that if any Cash App and Square customers read communications targeted to the corporate audience for Block—current and potential employees and investors—they are likely to be confused by them.  *See* Esperanza S. ¶ 16; Dhar S. ¶¶ 14-15.  Likewise, LinkedIn profiles and Twitter posts of Block employees are far afield from the customer journey.  Reply at 9-10; Wind S. ¶¶ 103-05, Dhar S. ¶ 21.

H&R Block's submission fails to connect what is *available* online and what customers are likely to see, remember, and base their purchase decisions on. *See* Dhar S. ¶¶ 16-19; Wind S. ¶¶ 78-82. For example, although the parent companies of brands like Bounty, Brawny, Viva, Ben & Jerry's, Haagen Dazs, Dial, and Dove might have their own websites and social media accounts that proclaim their affiliations, that does not mean consumers recall which products are owned by Procter & Gamble, Kimberly-Clarke, Unilever, Georgia-Pacific, General Mills, or Henkel—much less, make purchase decisions based on that. *Id.*

As for the actual consumer journey, the sole "evidence" from Dr. Reibstein that Cash App customers might encounter "Block" in the purchase process is a doctored image from the App Store listing for Cash App. Reibstein Figure 25, *see* Jennings S. ¶ 13. As noted in the Statement of Facts, this doctored image does not accurately reflect the listing for Cash App in the App Store. Nor is Defendant planning to replace the developer name with "Block," as Dr. Reibstein presumes. Jennings S. ¶¶ 13-14. Rather, Defendant plans to change the developer name to the brand name, "Cash App." *Id.* ¶ 13. Further, even if the download screen image identified Block, Inc. as the developer, confusion is unlikely because of the manner in which nearly all consumers get to that screen in the first place – by searching for "Cash App." Jennings S. ¶ 8. Because the Court must look to "the impression that each mark in its entirety is likely to have on a purchaser," *Sensient Techs. Corp. v. SensoryEffects Flavor Co.*, 613 F.3d 754, 764 (8th Cir. 2010), H&R Block's speculation is insufficient to satisfy Rule 702's requirements for the admissibility of its experts' testimony.[4] Nor does it justify the extensive emergency relief

---

[4]  *E.g.*, *Nebraska Plastics, Inc. v. Holland Colors Amer., Inc.*, 408 F.3d 410, 416 (8th Cir. 2005) (affirming exclusion of "fundamentally unsupported" expert testimony); *Carpe v. Aquila, Inc.*, No. 02-0388-CV-W-FJG, 2005 WL 1138833, at *4 (W.D. Mo. Mar. 23, 2005) (excluding expert who "failed to follow the accepted methodology").

H&R Block seeks. *See e.g.*, *August Storck K.G. v. Nabisco, Inc.*, 59 F.3d 616, 618 (7th Cir. 1995) ("possibility of confusion cannot support an injunction"); *Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 490 (8th Cir. 1993) (affirming denial of injunction when plaintiff's arguments were "speculative"); *see also* Opp at 15, 24.

### C.     H&R Block Has Failed To Show Confusion From Use of "Block" Alone

H&R Block has no registered trademark in the word "Block" alone, so it attempts, but fails, to establish common law rights. Reply at 5. H&R Block insists that it uses "Block" alone. Reply at 6-7, 20. Yet the evidence shows that, in customer marketing, H&R Block uses "Block" within the context of H&R Block house brands. *Compare* Jones R. ¶¶ 11-21, Durone R. ¶¶ 14-19, Reibstein ¶¶ 55-61 *with* Dhar S. ¶¶ 43-45, Wind S. ¶¶ 89-100. H&R Block also claims that consumers know it as "Block" alone, pointing to select consumer reviews, media articles, Google Trends results, and a "consumer perception" survey. Reply at 6-7. Each fails to establish common law rights in "Block" alone.

First, the cherry-picked consumer reviews H&R Block relies on are not representative of the reviews from which they were selected. *Compare* Reibstein ¶ 58, Jones R. ¶ 20 *with* Wind S. ¶ 96 (**only 2.3%** of the reviews refer to H&R Block as "block" alone without any use of the "H&R" prefix). And all are discussing services that bear the full H&R Block brand. They show only that consumers sometimes use shorthand when the full meaning is obvious from the context. *See* Wind S. ¶ 96. The same is true for H&R Block's third-party media reports, all of which refer to "H&R Block." Durone R. Exs. 51-56; Dhar S. ¶ 52.

Second, H&R Block posits that Google users reach H&R Block's website by searching for "block taxes" far more than they search for "h&r block taxes." Reibstein R. ¶ 60. They do not. Dr. Reibstein erred when using the Google Trends tool. Wind S. ¶¶ 90-92. When properly used, the tool shows that "H&R" and "H&R Block" used far more than "block tax." *Id.* ¶ 92.

Third, H&R Block's "recognition" survey regarding "Block" alone as a brand for H&R Block was too biased to support H&R Block's claim. That survey improperly "primed" respondents to consider brands in the tax preparation industry and anything they might be able to tie to "Block." Jay ¶ 10; Dhar S. ¶¶ 58. Wind S. ¶¶ 56-61. And its fictitious control brand "DYO Taxes," Jay ¶ 11, was so implausible that it artificially inflated net recognition. Wind S. ¶¶ 62, 72. H&R Block identifies no cases endorsing a survey such as the one Dr. Jay conducted to establish trademark rights in an unregistered mark or to prove that consumers recognize a name as a brand. The extreme effect of Dr. Jay's improper methodology is evident from the Corrected BLOCK Recognition Survey, which shows that at most *5.4*% of respondents thought of "Block" as a brand for H&R Block, which is too low to have significance. Wind S. ¶ 67.

**D.      Plaintiffs Have No Evidence Of Bad Intent.**

In Reply, H&R Block concedes by its silence that it has no evidence that Block "intended to trade on [H&R Block]'s good will". *Microware Sys. Corp. v. Apple Computer, Inc.*, 126 F. Supp. 2d 1207, 1215 (S.D. Iowa 2000), *aff'd,* 238 F.3d 989 (8th Cir. 2001). It cites out-of-circuit cases holding that the defendant's good faith cannot tip the balance in favor of a defendant. Reply at 19. This Circuit holds otherwise. *E.g., Dakota Indus. Inc. v. Dayton Hudson Corp.*, 2001 WL 1448600, *4 (D.S.D. Sept. 13, 2001), *aff'd,* 37 F. App'x 846 (8th Cir. 2002); *Microware Sys. Corp.*, 126 F. Supp. 2d at 1215. Plaintiffs also fault Block for not waiving privilege concerning any trademark clearance work it might have done. Reply at 19. That cannot be deemed evidence of intent. *See, e.g., Astra Pharmaceutical Products, Inc. v. Beckman Instruments, Inc.*, 1983 WL 51933, at *4 (D. Mass. Mar. 25, 1983) (refusing to draw adverse inference from assertion of privilege regarding documents relating to a trademark search).

### E.    H&R Block's Identification of Additional Services Does Not Save its Motion.

H&R Block introduces in its reply a product that does not even use H&R Block branding, called "Wave."  Reply at 8-9; Wind S. ¶ 88 n.78.  Assuming that Plaintiffs did not waive this argument by failing to raise it in opening, *see, e.g., Noem v. Haaland*, 542 F. Supp. 3d 898 (D.S.D. 2021) ("A party's failure to make an argument in its [opening] brief may constitute waiver of that argument."), it does not create a basis for finding a likelihood of confusion as Wave looks entirely different from Defendant's branding. *See* Wind S. ¶ 88 n.78.

### F.    H&R Block Offers No Confusion Evidence As To The Cash App Logo

H&R Block's reply papers proffer no evidence the Cash App logo is likely to cause confusion, and none of its surveys tested the Cash App logo.

## II.    H&R BLOCK HAS NO EVIDENCE OF IRREPARABLE INJURY

H&R Block bears the burden of establishing irreparable injury.  Yet it offered no evidence of lost market share, price erosion, or other form of injury.  *See, e.g., Polyform A.G.P., Inc. v. Xtreme Insulation Techs., LLC,* No. 17-735 (JRT/LIB), 2017 WL 4564719, at *5 (D. Minn. Oct. 11, 2017) (finding no irreparable harm where plaintiff failed to provide evidence of lost market share, price erosion, or other form of injury).  H&R Block simply does not want Defendant's customers to think they are using products and services sponsored by H&R Block. The record evidence shows that they do not and will not.  Plaintiff is thus left with nothing but rote and conclusory assertions that the consequences of confusion, were it to occur, would be "irreparable."  *See* Jones R. Decl. ¶¶ 61-64.  Those words are not a substitute for evidence of actual irreparable harm, without which, H&R Block is not entitled to a preliminary injunction.

## III.    H&R BLOCK'S REPLY FAILS TO REBUT BLOCK'S HARDSHIP

H&R Block suggests that because many state regulators have not yet processed Block's paperwork, the regulatory component of Block's name change is not onerous.  Reply at 22.  That

is backwards.  *See* Esperanza S. ¶¶ 17-24.  That state regulators are ***still*** working to process the paperwork Block submitted confirms how burdensome the process is.  *Id.* ¶ 23.  Further, if Block were required to change its name, it could not simply issue a "stop" order to the regulators; it would need to generate, procure, and resubmit everything anew.  *Id.* ¶ 22.  H&R Block fails to identify any other evidence rebutting the hardships Block identified.  *See* Reply at 22.

## CONCLUSION

The Court should deny Plaintiffs' motion.

February 4, 2022

Respectfully submitted,

By: ____/s/ David Jermann_____
David Jermann

Margret Caruso (*pro hac vice*)
**QUINN EMANUEL URQUHART &
SULLIVAN LLP**
555 Twin Dolphin Dr., 5th Floor
Redwood Shores, California 94065
margretcaruso@quinnemanuel.com

David A. Jermann, II (MO Bar #51389)
**ARMSTRONG TEASDALE LLP**
2435 Grand Blvd., Suite 1500
Kansas City, Missouri 64108
djermann@atllp.com

Robert M. Schwartz (*pro hac vice*)
**QUINN EMANUEL URQUHART &
SULLIVAN LLP**
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
robertschwartz@quinnemanuel.com

Rachel Herrick Kassabian (*pro hac vice*)
**QUINN EMANUEL URQUHART &
SULLIVAN LLP**
555 Twin Dolphin Dr., 5th Floor
Redwood Shores, California 94065
rachelkassabian@quinnemanuel.com