**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**

|  |  |
|---|---|
| H&R BLOCK, INC. and | |
| HRB INNOVATIONS, INC. | |
| Plaintiffs, | |
| v. | Case No: 4:21-CV-00913-NKL |
| BLOCK, INC., | |
| Defendant. | |

**REPLY EXPERT DECLARATION OF PROFESSOR DAVID REIBSTEIN IN
SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

**FEBRUARY 9, 2022**

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................. 4

II.  PROF. DHAR AND PROF. WIND FAIL TO RECOGNIZE THAT DEFENDANT'S "HOUSE OF BRANDS" ARCHITECTURE IS PARTICULARLY UNLIKELY TO PREVENT CONSUMERS FROM LINKING CASH APP AND CASH APP TAXES TO "BLOCK" .................................. 7

A.  Even in a "House of Brands" Architecture, Product Brands Can Develop an Association with the Corporate Brand .............................................. 8

B.  Block, Inc.'s "House of Brands" Is Particularly Unlikely to Stop Consumers from Associating Cash App and Cash App Taxes with "Block" ....................................... 13

III.  PROF. DHAR'S AND PROF. WIND'S CRITIQUES OF MY EMPIRICAL MEDIA ANALYSIS ARE UNFOUNDED .................................................. 17

A.  My Empirical Media Analysis Is Based on a Sound Methodology, Relies on Data from a Widely-Used Media Database, and I Confirmed Its Findings via Manual Review .............................................................. 18

B.  My Empirical Media Analysis is Replicable ........................................... 24

C.  My Empirical Media Analysis Is Based on a Wide-Ranging Sample of Media Sources Reflective of the Broad Base of Taxpayers ............................. 24

IV.  PROF. WIND AND PROF. DHAR INAPPROPRIATELY DISMISS CLEAR EVIDENCE THAT CONSUMERS RECOGNIZE "BLOCK" AS AN IDENTIFIER FOR H&R BLOCK, A RESULT THAT IS ENTIRELY CONSISTENT WITH H&R BLOCK'S INVESTMENTS IN PROMOTING ASSOCIATIONS BETWEEN "BLOCK" AND H&R BLOCK ..................................... 27

A.  Joint Promotion of "Block" in Conjunction with "H&R Block" Reflects H&R Block's Successful Efforts to Build Associations Between the Two ..................... 28

B.  Consumers Recognize that "Block" is a Source Identifier for H&R Block, Even If "H&R Block" May Be a More Popular Source Identifier ................................. 28

V.  PROF. WIND'S AND PROF. DHAR'S REJECTION OF THE IMPORTANCE OF MEDIA IS NOT CREDIBLE .......................................... 35

A.  There is Ample Evidence that Media with Widespread Reach Will Continue to Expose Consumers to Linkages Between Cash App And "Block" .............................. 37

2

B.   Media Linkages of Cash App and Cash App Taxes to "Block" Will Continue to Grow, Both During the Coming Tax Season and More Generally with the Passage of Time ............................................................................................................ 42

VI.  PROF. WIND AND PROF. DHAR IGNORE THE LIKELY MECHANISMS OF CONFUSION IN THIS CASE........................................................ 44

VII. PROF. DHAR AND PROF. WIND FAIL TO RECOGNIZE THE PERMANENT AND IRREPARABLE HARM THAT WILL LIKELY RESULT FROM THE H&R BLOCK BRAND BEING AT THE MERCY OF BLOCK, INC.'S ACTIONS.......................................................................................................... 49

## I.    INTRODUCTION

1.    I submit this reply declaration in support of Plaintiffs' H&R Block, Inc. and HRB Innovations, Inc. ("Plaintiffs") Motion for a Preliminary Injunction.   I have reviewed the February 4, 2022 sur-rebuttal declarations of by Prof. Ravi Dhar and Prof. Yoram Wind submitted by Defendant Block, Inc. ("Defendant"). I have also relied upon the materials cited in this reply declaration, including the listed exhibits.

2.    Nothing in Prof. Dhar's or Prof Wind's sur-rebuttal declarations change the opinions I set out in my initial declaration (the "Reibstein Declaration").[1] I maintain my opinion that H&R Block is likely to suffer permanent and irreparable harm to its brand associations stemming from a likelihood of consumer confusion caused by Block, Inc.'s renaming, in association with its Cash App Taxes offering.   In particular:

a.    Regardless of Defendant's "House of Brands" structure and whether Defendant itself uses the Block, Inc. name to describe its Cash App Taxes offerings, media exposure will link Cash App Taxes with Block and media are likely to describe Cash App Taxes as coming from Block.

b.    This association between Cash App Taxes and Block is likely to lead to consumer confusion with the Plaintiff, H&R Block.  In addition, the consumer confusion is likely to grow over time as a result of Defendant's

---

[1]    Rebuttal Expert Declaration of Professor David Reibstein, *H&R Block, Inc. and HRB Innovations, Inc. v. Block, Inc.,* United States District Court for the Western District of Missouri, Case No: 4:21-CV-00913-NKL, filed January 21, 2022 ("Reibstein Declaration").

renaming to "Block, Inc.", its entry into tax preparation services, and continued media coverage.

c.  The confusion is likely to be amplified given the fact that Block, Inc. is an innovative technology company, with a founder and Chief Executive Officer who garners extensive attention and has millions of followers on social media, and has recently stepped down as CEO of Twitter (which he founded) to focus his efforts on Block, Inc.

d.  This consumer confusion is likely to cause harm to H&R Block, by permanently and irreparably altering its brand associations.

3.  Prof. Dhar and Prof. Wind agree with me in several important ways. They agree that brand associations exist in the minds of consumers, that media can influence those brand associations, and that it is not uncommon for media to create linkages between product brands and corporate brands. Strikingly, however, they apparently seem to doubt that consumers will pay attention, now and in the future, to repeated media and social media mentions of linkages between Cash App, Cash App Taxes, and Block, Inc. The first problem with this view is the fact that the fundamental purpose of media is to communicate to the public, and accordingly, influence their perceptions. Second, Prof. Dhar and Prof. Wind ignore clearcut evidence that media are already focusing on linkages between Cash App and Block, Inc., and that these media linkages—and further, linkages between Cash App Taxes and Block, Inc.—are likely to grow stronger over time, particularly with the coming tax season. These linkages will be internalized by consumers, and to a greater extent as time passes. Prof. Dhar and Prof. Wind instead

focus their attention on the likelihood of confusion from today's perspective, but as I discussed in my first declaration, the passage of time is a key determinant of the likely mechanism of consumer confusion in this matter.

4. Prof. Dhar and Prof. Wind ignore the likely mechanism of consumer confusion in other ways, as well. They focus on the potential for confusion in the context of a user already interacting with the Cash App Taxes website, or interacting with the Cash App logo, and they assert that interactions with the media are too "distant" from the consumer journey to result in confusion. But this is an inappropriately narrow lens for assessing likely confusion. As I explain in this declaration, consumer confusion can occur as part of the consumer journey even if the consumer has never yet interacted with the Cash App Taxes website or the Cash App logo. For example, exposure to media linkages between Cash App Taxes and "Block" may cause confused consumers to become interested in seeking out the Cash App Taxes websites, because they believe that it is offered by H&R Block, a trusted brand in tax preparation services for over 65 years. In addition, exposure to media linkages that discuss negative events relevant to Cash App or Cash App Taxes may cause confused consumers to avoid H&R Block when they file their taxes, and instead seek out competitors like TurboTax. Neither of these mechanisms of confusion rely on consumers having pre-existing exposure to the Cash App Taxes website or the Cash App logo. The key driver of the mechanism is consumer exposure to the media, which again, Prof. Dhar and Prof. Wind fail to recognize.

5. Ultimately, Prof. Dhar and Prof. Wind fail to recognize the permanent and irreparable harm that will likely result from the H&R Block brand being at the mercy of

Block, Inc.'s actions.  While this likelihood of harm could grow steadily or gradually over time, it is also possible that a substantial, rapid, and irreparable harm could result based on the actions of Block, Inc.  In my opinion, a court injunction issued subsequent to such an event would be too late to preclude such irreparable harm from occurring.

## II.   PROF. DHAR AND PROF. WIND FAIL TO RECOGNIZE THAT DEFENDANT'S "HOUSE OF BRANDS" ARCHITECTURE IS PARTICULARLY UNLIKELY TO PREVENT CONSUMERS FROM LINKING CASH APP AND CASH APP TAXES TO "BLOCK"

6.      Both Prof. Wind and Prof. Dhar suggest that Block, Inc.'s use of a "House of Brands" will serve to prevent consumers from linking Cash App and Cash App Taxes with "Block."  Prof. Wind states that with its renaming, Block, Inc. "transitioned to what is sometimes known as a 'House of Brands' model" and that "[g]iven this change in Block, Inc's branding, it does not make sense to infer from *past* linkages between 'Square, Inc.' and 'Cash App' that consumers or the media will link 'Block, Inc.' with Cash App or Cash App Taxes going forward."[2]  Prof. Dhar uses "House of Brands" examples in the paper towel category—specifically, Brawny, Viva, and Bounty—to assert that "consumers of paper towels are unlikely to link the corporate parent with the brand association of these well-known brands when making purchasing decisions."[3]

7.      The problem with Prof. Wind's and Prof. Dhar's opinions is that they are incomplete on theoretical grounds and, further, they do not properly address the specific

---

[2]    Wind Sur-Reply, ¶ 102.

[3]    Dhar Sur-Reply, ¶ 17.

context of this case. While I agree that, as a theoretical or general matter, a House of Brands can and often does offer some distance between the product brands and the corporate brand, that is not always the case in practice. In the specific context of this case, it is likely that Defendant's "House of Brands" will not afford this protection. This view is well grounded in the theoretical underpinnings of the factors that affect brand associations as well as the empirical evidence available in this case, as I explain below.

### A. Even in a "House of Brands" Architecture, Product Brands Can Develop an Association with the Corporate Brand

8.      There are clear reasons why, even in a "House of Brands" architecture," product brands can develop an association with the corporate brand as a result of a variety of factors. While the corporation may control advertising and marketing activities (outlined below in green), the corporation cannot control many other factors that influence brand associations. The corporation can only influence but cannot control media coverage, including from news outlets, social media and market research, as well as customer experiences and the word-of-mouth by which consumers affect each others' brand associations (each of these factors is outlined in red in the figure below).



9.      Prof. Wind contends that my position is based on "the simplistic Stimulus-Response model ('consumer sees ad and buys the product')… ."[4]  He contends that "Dr Reibstein knows better than to advocate in 2022 for a passive consumer 'Stimulus-Response' model."[5]  And his latter contention is correct:  I do know better.  But his former contention is not an accurate characterization of my position.  In the Reibstein Declaration, I explained that brand associations are shaped by a variety of factors, including factors outside of a company's control.[6] My previously expressed views are perfectly consistent with the figure above, which clearly does not reflect a simplistic view of "consumer sees ad and buys the product," as Prof. Wind mistakenly asserts.

---

[4]     Wind Sur-Reply, ¶ 81.

[5]     Wind Sur-Reply, ¶ 81.

[6]     Reibstein Declaration, ¶ 3.

10. Prof. Wind points to his prior academic writings to support his claim that the "consumer journey approach shows the limited role the media plays in today's consumer behavior."[7] I am quite familiar with Prof. Wind's prior writings. He has written extensively that we cannot assume that consumer brand impressions are derived from simple models of advertising. In doing so, he has emphasized, consistent with my own opinions, that companies are not completely in control of their brand associations and that other factors, such as media, affect those associations. For example, he has written the following:

a. "In order to reach, serve, and stay connected with people in comprehensive and effective ways, advertising's scope must go beyond its traditional reach to encompass the entire firm. The boundaries between external and internal touchpoints are blurring and will continue to do so [….] Consider the many different ways that we now encounter brands on a daily basis – tv, radio, print; online searches; mobile apps; websites; billboards and digital out-of-home ads; branded social media posts; offline and online conversations; personal interactions; web browsing; store design and displays; package design and packaging; conversations with sales people; in-store promotions. And that is all just the "before purchase" exposure [….]"[8]

---

[7] Wind Sur-Reply, ¶ 81.

[8] Wind, Yoram (Jerry), et al., *Beyond Advertising: Creating Value Through All Customer Touchpoints*, John Wiley & Sons, Inc., 2016, p. 74.

b.    "Advertising management today means much more than commissioning content for commercial media. Advertisers now have to embrace the art of influencing (rather than controlling) media such as word of mouth, social networks, product placement, and a variety of other new advertising opportunities."[9]

c.    "While branding and brand strategy are important and often viewed as key elements of the CMO's role, it is important to note that it is consumers' perceptions of, preference for, conversations about and behaviour towards your brand that determine its value – and hence, increasingly, companies have less control over their brands."[10]

11.    I agree with Prof. Wind's above opinions from his prior writings, and they are consistent with my position in this case. I also agree with related statements that Prof. Wind makes in his sur-reply. For example, Prof. Wind acknowledges that media are "part of the overall consumer journey"[11] and "it is correct that media and external events can affect brands… ."[12]

---

[9]    Sharp, Byron and Yoram (Jerry) Wind, "Today's Advertising Laws: Will They Survive the Digital Revolution?" *Journal of Advertising Research,* June 2009, p. 120.

[10]    Wind, Yoram, "Beyond the 4Ps: A New Paradigm Emerges," *Rotman Management* (Spring 2014), pp. 39-40.

[11]    Wind Sur-Reply, ¶ 80.

[12]    Wind Sur-Reply, ¶ 80.

12.     Notwithstanding the above, Prof. Wind points to his prior declaration to support his opinion of the "limited role the media plays in today's consumer behavior."[13] This is curious, because the paragraphs to which Prof. Wind refers do not discuss media. In paragraphs 67 to 69 of his prior declaration, Prof. Wind discusses that: "especially with the advent of internet search functions," consumers actively "pull" information about products and services;[14] "consumers are often closely attuned to differences between brands" for products like tax preparation services;[15] and "consumers are increasingly likely to conduct online searches before making a purchase."[16]  None of these suggest a limited role for media.  In fact, the advent of the internet has enabled a multitude of digital touchpoints by which consumers interact with media.  And the growth of those digital touchpoints has made it all the easier for consumers to receive information from media about brands, including when searching for those brands.  For example, Google's search engine commonly embeds social media content and news media content into its results page.  Yet, Prof. Wind ignored the role of media in his initial declaration, and in his sur-reply, attempts to downplay the importance of media in contrast to his previous writings.

---

[13]    Wind Sur-Reply, ¶ 81.

[14]    Wind Declaration, ¶ 67.

[15]    Wind Declaration, ¶ 68.

[16]    Wind Declaration, ¶ 69.

**B. Block, Inc.'s "House of Brands" Is Particularly Unlikely to Stop Consumers from Associating Cash App and Cash App Taxes with "Block"**

13.     Prof. Dhar uses "House of Brands" examples in the paper towel category—specifically, Brawny, Viva, and Bounty—to assert that "consumers of paper towels are unlikely to link the corporate parent with the brand association of these well-known brands when making purchasing decisions."[17] While I have not conducted any empirical analysis of paper towels in this matter, my *a priori* expectation is that Prof. Dhar is correct on this point. But this dispute is not about paper towels. The specific context of this dispute is critical, and as Prof. Wind explains, it is important to make "assess[ments] in the context of specific reported events and evidence… ."[18] It is striking, then, that Prof. Dhar and Prof. Wind have failed to consider critical context in this case relevant to the role of media in unravelling Block Inc.'s "House of Brands," as I explain below, and as I have explained previously.

14.     Technology companies are not like companies that make paper towels. And the companies cited by Prof. Dhar and Prof. Wind—e.g., Procter & Gamble,[19] Unilever,[20] and General Mills[21]—are not like Block, Inc. They of course differ greatly in the nature of the products that they offer, but they also vary tremendously in terms of the public's interest in the activities undertaken by these companies and their founders and

---

[17]     Dhar Sur-Reply, ¶ 17.

[18]     Wind Sur-Reply, ¶ 80.

[19]     Wind Sur-Reply, ¶ 103; Dhar Sur-Reply, ¶ 16.

[20]     Dhar Sur-Reply, ¶ 18.

[21]     Dhar Sur-Reply, ¶ 18.

executives. As I explained in the Reibstein Declaration, Block, Inc.'s CEO is Jack

Dorsey.[22] Mr. Dorsey is a tech billionaire who co-founded both Square, Inc. and Twitter,

and who recently stepped down as CEO of Twitter just prior to the Block, Inc.

renaming.[23] Before he stepped down as CEO of Twitter, Mr. Dorsey provided testimony

in 2018 before the United States Senate Judiciary Committee with Facebook COO Sheryl

Sandberg regarding meddling into the 2016 Presidential Election and also with respect to

the banning of former President Trump from the Twitter platform in 2021.[24] In a series

of tweets accumulating hundreds of thousands of "likes" and tens of thousands of re-

tweets, Mr. Dorsey explained that he did not "celebrate or feel pride" in banning Mr.

Trump because it represented a "failure of ours to promote healthy conversation."[25] His

comments reflect the challenges that many technology companies face that drive public

interest in those companies, such as issues of free speech, as well as user data privacy and

security. Companies that make paper towels and other consumer packaged goods do not

draw similar public attention for such issues.

15. One can look to other companies within the technology sector as

demonstrative of the public interest in these companies and their founders. Some of these

---

[22]  Reibstein Declaration, ¶ 89.

[23]  Exhibit 1, Conger, Kate and Lauren Hirsch, "Twitter's Jack Dorsey Steps Down From CEO Role," *The New York Times,* November 29, 2021.

[24]  Exhibit 2-1, Conger, Kate and Mike Isaac, "Inside Twitter's Decision to Cut off Trump," *The New York Times,* January 16, 2021; Exhibit 2-2, Salinas, Sarah, "Watch Facebook COO Sheryl Sandberg and Twitter CEO Jack Dorsey testify at the Senate Intelligence Committee," *CNBC,* September 5, 2018.

[25]  Exhibit 3, Dorsey, Jack [@jack], Twitter, January 13, 2021, <https://twitter.com/jack/status/1349510769268850690>.

founders, like Jack Dorsey, have built notoriety and great wealth along with their brands, including Apple's Steve Jobs, Facebook's Mark Zuckerberg, and Amazon's Jeff Bezos. Their status has attracted attention from media and society, and as with Mr. Dorsey, has even resulted in calls from Congress to provide public testimony.



16.    As I further explained in the Reibstein Declaration, Block, Inc. has displayed a particular interest in Bitcoin.[26]  For example, Block, Inc. has received attention for partnering with professional athletes like Aaron Rodgers of the Green Bay

---

[26]    Reibstein Declaration, ¶ 89.

Packers and Klay Thompson and Andre Iguodola of the Golden State Warriors such that those athletes could receive part of their salaries in Bitcoin.[27]

17.    As I explained in the Reibstein Declaration, "[g]iven Mr. Dorsey's status as a billionaire and head of a technology company that is showing particular interest in Bitcoin, it is likely that media will continue to provide coverage of Block, Inc. on an ongoing basis… ."[28]  This opinion was informed by consideration of the specific context of this case, critical context that Prof. Wind and Prof. Dhar fail to appreciate or meaningfully address, as evidenced by their attempts to compare companies that make paper towels and other consumer packaged goods to Block, Inc.  It is surprising that Prof. Wind and Prof. Dhar make these comparisons given that I observed in the Reibstein Declaration the "varying extents" to which the media associated corporate/product brand pairs across different companies using a "House of Brands" architecture[29] and concluded that given this variation in linkage across brand pairs, it is particularly important to focus on the specific context of the Defendant in this matter.[30]

18.    Even assuming that it is relevant to consider companies other than Block, Inc., it is clear that Prof. Dhar and Prof. Wind cherry-picked their examples.  There are plentiful examples of companies that employ a "House of Brands" strategy that media

---

[27]    Reibstein Declaration, ¶ 88.

[28]    Reibstein Declaration, ¶ 89.

[29]    Reibstein Declaration, ¶ 40.

[30]    Reibstein Declaration, ¶ 43.

ultimately identify linkages within, including Anheuser Busch and Bud Light[31], General Motors and Chevy[32], Amazon and Whole Foods[33], and Alphabet and Google (an example that Prof. Dhar raised in his initial declaration but did not discuss in his sur-reply[34]). Another example is Facebook and Meta. Over the roughly three-month period since Facebook rebranded as Meta in October 2021, and as shown in **Table 1** of the Reibstein Declaration, there have been over *eight-thousand* articles that discuss Facebook and Meta together. While this represents about four percent of all articles discussing Facebook during this period, I show in the Reibstein Declaration that this represents nearly 60 percent of all articles discussing Meta.

### III. PROF. DHAR'S AND PROF. WIND'S CRITIQUES OF MY EMPIRICAL MEDIA ANALYSIS ARE UNFOUNDED

19.    Prof. Wind asserts that the Reibstein Declaration's analysis of media coverage "suffers from serious flaws,"[35] and Prof. Dhar agrees that this analysis is flawed.[36]  The critiques offered by both Prof. Dhar and Prof. Wind are unfounded and are inconsequential.

---

[31]    Exhibit 4-1.

[32]    Exhibit 4-2.

[33]    Exhibit 4-3.

[34]    Dhar Declaration, ¶87.

[35]    Wind Sur-Reply, ¶ 82.

[36]    Dhar Sur-Reply, ¶ 2.

**A. My Empirical Media Analysis Is Based on a Sound Methodology, Relies on Data from a Widely-Used Media Database, and I Confirmed Its Findings via Manual Review**

20.     As I explained in the Reibstein Declaration, I conducted an empirical analysis that demonstrates that for many companies that employ a "House of Brands" architecture, the media nevertheless expose consumers to substantial linkages between the corporate brand and product brands within that architecture.[37]   Prof. Dhar's and Prof. Wind's criticisms of this analysis do not lead me to change any of the opinions regarding this analysis that I outlined in my prior declaration.

21.     To conduct this analysis, I relied on articles from the widely-used Dow Jones Factiva database, a global news archive that provides access to articles from tens of thousands of sources going back more than 40 years.[38]  To confirm the conclusions that could be reached using these data, I conducted manual review exercises described in the Reibstein Declaration.[39]

22.     In this analysis, I looked at various third-party companies with a "House of Brands" structure to determine whether there were connections made by the media between the corporate brand and the underlying brands over approximately the last five years.  As shown in **Table 1** of my initial declaration, this proved to be the case for many companies, including several companies in tech. My results also show that the media establish linkages between product brands and corporate owners even when the owner is

---

[37]     Reibstein Declaration, ¶ 41.

[38]     Reibstein Declaration, ¶ 39.

[39]     Reibstein Declaration, ¶ 43.

*not* a consumer-facing brand. Waymo, the self-driving car venture, is discussed in connection with its corporate owner Alphabet over 40 percent of the time, while media coverage of Vaseline also mentions owner Unilever about 13 percent of the time, suggesting that a non-consumer facing corporate owner may be even more likely to be associated with its product brand if it operates in the tech space.

**Table 1: Media Articles Referencing Associations of Corporations and Product Brands 2017-2021**

| Product Brand and Corporation | Articles Mentioning Both the Product Brand and Corporation ("Joint Articles") [A] | Articles Mentioning the Product Brand [B] | Joint Articles as Share of Articles Mentioning Product Brand [C] = [A]/[B] |
|---|---|---|---|
| *Technology Examples* | | | |
| Beats Fit Pro AND Apple | 380 | 417 | 91% |
| Facebook AND Meta | 8,039 | 189,035 | 4% |
| Motorola AND Lenovo | 1,220 | 23,162 | 5% |
| Waymo AND Alphabet | 6,160 | 14,779 | 42% |
| Waymo AND Google | 8,600 | 14,779 | 58% |
| Xbox AND Microsoft | 12,116 | 45,825 | 26% |
| YouTube AND Google | 73,832 | 694,712 | 11% |
| *Other Examples* | | | |
| Bisquick AND General Mills | 72 | 1,169 | 6% |
| Lexus AND Toyota | 10,840 | 39,109 | 28% |
| Roper AND Whirlpool | 102 | 43,990 | <1% |
| Vaseline AND Unilever | 480 | 3,702 | 13% |
| Dove AND Unilever AND (Soap OR Skin OR Lotion) | 1,168 | 5,326 | 22% |

23.     Using the same analytical approach, I observe substantial linkage between Cash App and Square, Inc.—Block, Inc.'s former corporate name—during this same time period. **Figure 21**[40] from my initial declaration not only shows media linkages between Cash App and Square, Inc., but also reveals that joint mentions of Cash App and Square,

---

[40]     Emphasis added.

Inc. increased dramatically over time. Given the public interest in Block, Inc. as I discussed above, it is highly likely that the media will continue this pattern of increasing linkage between Cash App and its owner, now named Block, Inc.

**Figure 21: Historical Linkage of "Cash App" to "Square" in Media Articles**

|  | *2017* | *2018* | *2019* | *2020* | *2021* |
|---|---|---|---|---|---|
| **Cash App AND Square** | 81 | 248 | 326 | 620 | 1,428 |
| **Cash App** | 100 | 388 | 730 | 2,043 | 3,563 |
| **Ratio** | 81% | 64% | 45% | 30% | 40% |
| **Ratio (Adjusted)** | 81% | 61% | 41% | 27% | 32% |

24.     As you can see more readily when illustrated graphically, as I have done below, the number of articles mentioning both "Cash App" and "Square" increased nearly <u>eighteen-fold</u> between 2017 and 2021.



25.     As I noted in my initial declaration, Cash App was called "Square Cash"
until 2017. Prof. Dhar uses this fact to imply that many of the media articles I identified
merely capture discussion of Cash App using its previous name, and do not reflect
genuine linkages between Square, Inc. and Cash App.[41] Prof. Dhar's claim is unsupported
and is also undermined by the graph I present above. Because Square Cash was renamed
as Cash App in 2017, one would expect discussion of "Square Cash" in the media to
decline following the name change. In other words, if Prof. Dhar's critique were valid,
one would expect to see a downward trend in the graph above. Instead, what we see is a

---

[41]     Dhar Sur-Reply, ¶30.

steep increase in the number of articles discussing Cash App and Square, Inc. over time, revealing that Prof. Dhar's claim is baseless.

26.     Prof. Wind attempts to argue that the sample I used for my manual review "was not random or representative of all news articles regarding Cash App."[42] He asserts that "[i]nstead, the sample significantly overrepresents articles published in earlier years and underrepresents articles published in later years."[43] Prof. Wind fundamentally misunderstands the purpose of my analysis. My focus was not to make an inference about all news articles regarding Cash App. Rather, as I clearly expressed in the Reibstein Declaration, I was interested in understanding the trend of articles that connected "Cash App" with "Square" over time.[44] In such an analysis, every individual year is equally important to assessing trend, and I divided the articles that I reviewed approximately equally across years. I am confident that this approach provided the necessary insight into each individual year to support my overall conclusions about trends across years. Notably, Prof. Wind provides no guidance as to how my manual review should have been otherwise divided across individual years, and he provides no explanation of why an alternative approach would be expected to result in different conclusions. Indeed, I am confident that this would not be the case.

27.     Further, Prof. Wind provides no alternative analysis to contradict my evidence that the number of articles linking "Cash App" and "Square" grew substantially

---

[42]     Wind Sur-Reply, ¶ 84.

[43]     Wind Sur-Reply, ¶ 84.

[44]     Reibstein Declaration, ¶¶ 73-74.

over 2017 to 2021. Rather, he focuses attention on the "Ratio" rows of my Figure 21 decreasing over time. This critique makes no sense. Further, it is a cherry-picked interpretation of the data. To see this, suppose that the count of articles jointly linking "Cash App" and "Square" had gone from 1 to 1,000,000 in consecutive years, and that the "Ratio" for the first year was 100% while the "Ratio" for the second year was 50%. Ignoring a 1,000,000x increase in the count of joint linkage articles and instead focusing on the drop in the "Ratio" is not a reliable method of inference. Both series of data should be considered, and indeed, I considered both in the Reibstein Declaration, concluding: "[t]he number of articles referencing Cash App has been growing over time, as has the number of articles referencing Cash App and Square jointly," a pattern "consistent with the notion that Cash App's linkage to its owner has become stronger and more prevalent over time"[45]; "across individual calendar years from 2017 to 2021, the resulting percentages of media linkage between 'Cash App' and 'Square' range from 27 percent to 81 percent"[46]; and "[t]hese findings indicate a substantial degree of media linkage between 'Cash App' and 'Square' over this time period… ."[47]

---

[45]     Reibstein Declaration, ¶ 73.

[46]     Reibstein Declaration, ¶ 74.

[47]     Reibstein Declaration, ¶ 74.

### B. My Empirical Media Analysis is Replicable

28.     Regarding the critiques put forth by Profs. Dhar and Wind, I was particularly surprised that Prof. Wind argued that my analysis could not be replicated.[48] That is not the case.  Anyone with a subscription to Factiva can replicate my approach and reach the same overall conclusion using the information provided in my reliance materials and in my backup production materials.[49]  Furthermore, I provided Defendants with all articles that I manually reviewed as part of my quality control measures, quality control measures that were undertaken to identify any false positives and ensure that my results were accurate. Further, my backup production materials explain, for every article that I manually reviewed, the results of my assessment as to whether the linkage in the article was a "false positive" or a genuine linkage between product brand and corporate brand.

### C. My Empirical Media Analysis Is Based on a Wide-Ranging Sample of Media Sources Reflective of the Broad Base of Taxpayers

29.     Perhaps most unconvincingly, Prof. Dhar also contends that many of the news articles I analyzed in the Factiva database appear to be from publications "aimed at investors, not consumers", [50] which he claims "reduces the likelihood that *consumers*

---

[48]    Wind Sur-Reply, Exhibit R, p. 22.

[49]    Exhibit 2 of the Reibstein Declaration, summarizing my reliance materials, clearly communicates that I relied upon "Dow Jones Factiva (Corporate Version)" as a data source, and my backup production clearly communicates the search parameters that I used.

[50]    Dhar Sur-Reply, ¶31.

would have viewed these articles." [51] In addition to the obvious fact that investors are also consumers and taxpayers, Prof. Dhar "cherry picks" these examples. He fails to note that the articles included in the sample of Dow Jones Factiva articles that I reviewed come from a variety of different sources, including many popular news outlets with a wide range of readers:

- The New York Times
- Los Angeles Times
- The Wall Street Journal
- USA Today
- CNN
- ABC News
- San Francisco Chronicle
- Providence Journal
- New York Post
- Forbes
- Daily Herald
- Business Insider
- Investment News
- The Deal
- SNL Financial
- M&A Navigator
- Computer Weekly
- U.S. Fed News
- Nasdaq
- San Francisco Business Times

- St. Louis Post-Dispatch
- Silicon Valley Business Journal
- Sun Sentinel
- BusinessWire
- NewsRx
- Uwire
- The Atlanta Journal Constitution
- New York Business Journal
- Grand Forks Herald
- Payments Source
- PRNewswire
- CFO Magazine
- Engadget
- Independent Banker
- International Business Times
- InvestorPlace
- Kiplinger

- Nightly Business Report
- Proactive
- Public
- Smarter Analyst
- Telegraph Herald
- The Hill
- The Waukesha Freeman
- The Winchester Star
- TechCrunch
- Waterloo-Cedar Falls Courier
- Fast Company
- MarketResearch
- NewsPress
- Blockchain Tech News
- Mobile Payments Today
- Worldwide Computer Products News
- The Spokesman-Review
- St. Louis Business Journal

- The Daily News
- RTT News
- The Ledger
- The Times-Tribune
- The Citizen's Voice & Sunday Voice
- Digiday
- CQ FD Disclosure
- VIQ FD Disclosure
- *MarketWatch*
- *Investor's Business Daily*
- *Benzinga*
- *American Banker*
- *Barron's*

30.     To the extent that the sources listed above include publications with a financial focus, Prof. Dhar's criticisms are still unconvincing and poorly reasoned. For example, Prof. Dhar highlights *Investor's Business Daily, Benzinga, MarketWatch, Barron's* and *American Banker* as examples of sources targeted solely at "investors," implying that their media reach is limited. [52] Investors are of course also consumers and

---

[51]    Dhar Sur-Reply, ¶31.
[52]    Dhar Sur-Reply, ¶31.

taxpayers, but moreover, these are not little-known sources unlikely to be seen by tax-paying members of the general public.  For instance, and as shown below, MarketWatch had 4.2 million followers on Twitter as of February 2022, while Investor's Business Daily had nearly 300 thousand. Even if these are financial news outlets, their audiences are not small, as Prof. Dhar erroneously suggests. [53]

31.    Prof. Dhar also alleges that my media analysis should not have included press releases, as those are "intended for a media audience, and not for consumers."[54] Even if we accept the premise of Prof. Dhar's critique that press releases are consumed only by the media, Prof. Dhar fails to recognize that press releases inform the media and therefore articles that are disseminated to the general public, so the information included therein is relevant. In any event, the omission of such sources would not alter my opinions.

32.    In total, Prof. Dhar's and Prof. Wind's criticisms neither undermine the reliability of my analysis nor lead to different conclusions based on my results.

---

[53]    Exhibit 5, Compilation of Tweets.

[54]    Dhar Sur-Reply, ¶31.

**MarketWatch (4.2M followers):**          **Investor's Business Daily (267.9K followers):**




## IV. PROF. WIND AND PROF. DHAR INAPPROPRIATELY DISMISS CLEAR EVIDENCE THAT CONSUMERS RECOGNIZE "BLOCK" AS AN IDENTIFIER FOR H&R BLOCK, A RESULT THAT IS ENTIRELY CONSISTENT WITH H&R BLOCK'S INVESTMENTS IN PROMOTING ASSOCIATIONS BETWEEN "BLOCK" AND H&R BLOCK

33.     Prof. Dhar acknowledges that "the word 'Block' when used in connection with the H&R Block name, can be used as a source identifier for H&R Block," but continues to argue that none of the evidence offered by H&R Block "is sufficient to demonstrate that 'Block' standing alone, is a source identifier for 'H&R Block.'"[55] Similarly, Prof. Wind asserts that "H&R Block is not known by 'Block' alone" and claims that "H&R Block's marketing shows that H&R Block 'overwhelmingly markets

---

[55]     Dhar Sur-Reply, ¶41.

itself and its services as 'H&R Block' rather than just as 'Block'".[56]  These opinions are flawed, as I explain below.

### A. Joint Promotion of "Block" in Conjunction with "H&R Block" Reflects H&R Block's Successful Efforts to Build Associations Between the Two

34.     First, I note my agreement with Prof. Wind and Prof. Dhar that H&R Block has used the term "Block" alone without the "H&R," but often in close connection to "H&R Block."  Our disagreement is driven by the fact that Prof. Wind and Prof. Dhar fail to recognize that, as expressed in the Reibstein Declaration, "joint occurrence of 'H&R Block' and 'Block' in marketing communications is a way to build associations between the two in the minds of consumers, to a degree that 'Block' may in fact serve to identify H&R Block" and that "consumer-based evidence … indicates that H&R Block has indeed been successful in cultivating 'Block' as a source identifier."[57]

### B. Consumers Recognize that "Block" is a Source Identifier for H&R Block, Even If "H&R Block" May Be a More Popular Source Identifier

35.     Professor Dhar argues that "if a high percentage of these marketing and advertising expenditures" that use 'Block' alone also "promote the H&R Block brand, then it is more likely that the effect is to reinforce H&R Block as a brand, not its use of Block."[58]   Prof. Wind asserts that H&R Block has an "overwhelming marketing focus on

---

[56]    Wind Sur-Reply, ¶100.

[57]    Reibstein Declaration, ¶ 64.

[58]    Dhar Sur-Reply, ¶42.

the full H&R Block brand"[59] and concludes that "Dr. Reibstein cannot prove that consumers know or refer to H&R Block as 'Block' alone."[60] He infers that since H&R Block is the dominant name usage, to which I agree, that there cannot be a secondary designation that also communicates the brand. This logic is flawed—it suggests that one source identifier being more popular than another in terms of promotion or usage means that the less popular source identifier cannot actually be a source identifier. But this is contradicted by several real-world examples.

- Take, for instance, KFC. For 39 years, it was known as Kentucky Fried Chicken, but often used its name side-by-side with KFC. In 1990, to avoid some licensing issues, it officially changed its name to KFC.[61] Because the name had been used in close proximity to Kentucky Fried Chicken for years, consumers were able to see KFC alone as a source identifier. Being prior to that formal name change did not mean that consumers did not identify "KFC" as Kentucky Fried Chicken.

- The same is the case with Dunkin Donuts, or "Dunkin." Dunkin Donuts became such a well-known brand that it was able to change its name simply to "Dunkin," but consumers still know that it serves donuts. Prof. Dhar points out that Dunkin, unlike H&R Block, officially rebranded to "Dunkin,"[62] but that entirely misses the point. Dunkin Donuts rebranded to "Dunkin" only after acquiring brand

---

[59] Wind Sur-Reply, ¶ 89.

[60] Wind Sur-Reply, Section IV.B.

[61] Morse, Gardiner, "The Hazards and Rewards of Rebranding by Abbreviation, from BP to Y," *Harvard Business Review*, July 14, 2010.

[62] Dhar Sur-Reply, ¶51.

recognition and goodwill in both and consumers recognized that "Dunkin" was referring to Dunkin Donuts.

- As another example, McDonald's is also known as both "Mickey D's" and "Golden Arches," and has used these "nicknames" in its marketing efforts. While the full-form of the brand name (that is, "McDonald's") may be used more frequently, that does not mean that these other marks do not serve as source identifiers.

- Similarly, The Charles Schwab Corporation is a banking and financial services firm that goes most commonly by Charles Schwab or, for short, "Schwab." Charles Schwab's own marketing and advertising use the "Schwab" short-hand, and commercials also advertise to "Talk to Chuck." Even if "Charles Schwab" is used most frequently, these other marks are nonetheless source identifiers. This is contrary to the claims made by Professors Wind and Dhar.

- Last, the University of Missouri is also known as "Mizzou." The University uses both "University of Missouri" and "Mizzou" in its marketing efforts (*e.g.,* on its website). It does not matter whether "University of Missouri" or "Mizzou" is used more frequently, or whether they are used together or not. Consumers know that both terms refer to the same institution.

36. Prof. Wind asserts, wrongly, that "Dr. Reibstein extrapolates from six Amazon reviews that H&R Block is known just as 'block.'" This is ironic because, as I explained in the Reibstein Declaration, the initial declarations offered by Prof. Wind and Prof. Dhar "fail[ed] to recognize *any* evidence of consumer associations between H&R

30

Block and 'Block', though … such evidence clearly exists."[63]  In any event, my opinion that "H&R Block has been successful at cultivating consumer associations between H&R Block and 'Block'"[64] was based on the totality of the evidence I considered, including survey evidence, not on six Amazon reviews as Prof. Wind suggests.  Prof. Wind further suggests that I "cherry-picked a few examples without scientific analysis of all the relevant data,"[65] but again, this is an error.  Indeed, I did not conduct a survey to see what consumers thought they might associate with a term, alternatively I looked at actual behavior which reveals how they are using the name "Block."  My interest was not in calculating precise percentages from the totality of Amazon reviews, in part because unlike what could be done in a survey, these consumers are not being asked directly about the source identifiers they use.  They are offering these source identifiers in a naturally occurring context, and in that context, may generally prefer one source identifier (e.g., "H&R Block") to a greater degree than another (e.g., "Block").  But this is no different from "Charles Schwab" and "Schwab" or "McDonald's" and "Mickey D's".  Some usage of the less popular source identifier is relevant for consideration, in conjunction with the rest of the available evidence.  In any event, Prof. Wind's analysis of the Amazon reviews indicates that consumer use of "Block" to identify H&R Block was much *more* prevalent than what I initially identified in the Reibstein Declaration.  His results show that out of all reviews that reference the company in some manner (a

---

[63]    Reibstein Declaration, ¶ 63.

[64]    Reibstein Declaration, ¶ 3.

[65]    Wind Sur-Reply, ¶ 96.

sample size of 431), 9.7% use "Block" to do so, either in isolation (5.8%) or in conjunction with a separate instance of "H&R Block" (3.9%).[66] In absolute terms he identified a much greater number of isolated use of "Block" in reference to H&R Block than I did. While the above percentage figures are provided in his Exhibit R, for his report body Prof. Wind chooses to provide percentages out of *all* the available Amazon reviews (a sample size of 1,007), not just the 431 reviews which "mention H&R Block or some variation of it."[67] Therefore, his Figure 13 statistic that 96.1% of the 1,007 reviews do not use "Block" alone is obtained by including more than 500 reviews that do not mention H&R Block or some variation of it. Regardless, Prof. Wind's calculations only serve to confirm my opinions that "Block" is being used as a source identifier for H&R Block.

37.     Prof. Wind correctly points out an issue of interpretation in my discussion of the Google Trends data presented in the Reibstein Declaration, which I agree with and clarify here. Because the search term "block tax" is contained within the search term "h&r block tax", it is relevant to ask not *whether* the Google Trends line for "block tax" is higher than for "h&r block tax", but rather the *extent* to which it is higher. The gap between the two lines represents searches that contained "block tax" but did not contain "h&r block tax". As Prof. Wind shows in his sur-reply, this gap is not and could not be eliminated by adjusting for various forms of "h&r" such as "hr", "h and r", or "h r". This is because Prof. Wind demonstrates that consumers do indeed search for the precise term

---

66     See Wind Sur-Reply, Exhibit R, p. 16.

67     Wind Sur-Reply, Exhibit R, p. 16.

"block tax" with no additional modifiers.[68]  This is precisely my point.  While Prof. Wind

attempts to dismiss this evidence as minimal relative to searches for "H&R Block"

(without "tax"),[69] again, one cannot reject that a term serves as a source identifier on the

basis that a different source identifier is more popular.  Further, while Prof. Wind's

appendix asserts that it is not clear that such users were intending to search for H&R

Block, it is relevant to note that H&R Block's competitor TurboTax, from Intuit, has

purchased paid search advertising on searches for both "h&r block taxes" as well as

"block taxes", as evidenced in the below images.  This is consistent with the proposition

that TurboTax is interested in advertising to consumers who are seeking out H&R Block

using either of the identifiers "h&r block" or "block" in conjunction with "taxes".[70]

---

[68]    Wind Sur-Reply, ¶¶ 94-95.

[69]    Wind Sur-Reply, ¶ 92.

[70]    These searches were conducted on February 9, 2022 using incognito mode in the Chrome browser.

 

h&r block taxes                                    ✕

🔍 All    📰 News    🏷 Shopping    📍 Maps    📖 Books    ⋮ More

About 9,320,000 results (1.45 seconds)

Ad · https://www.hrblock.com/ ▾

### H&R Block® Official Site - Start Filing 2022 Taxes Today
Complete Your **Tax** Return With **H&R Block**® To Get The Max Refund, Guaranteed. Start Today!
**H&R Block**® Offers A Wide Range Of **Tax** Prep Services To Help You Get Your Maximum Refund.
Stimulus Reconciliation. Match With A **Tax** Pro.

📍 Palo Alto · 12 locations nearby

**$0 Federal. $0 State.**                     **Download Tax Software**
File Your Simple Tax Returns For          Find The H&R Block Tax Software to
Free with H&R Block® Free Online.         Suit Your Needs. Explore Products!

**Free Tax Calculator**                       **Looking For A Tax Pro?**
Get A Quick Refund Estimate With          Virtual Or In-Person Help w/ Filing
H&R Block®'s Free Tax Calculator!         Schedule A Tax Appointment Today!

Ad · https://turbotax.intuit.com/tax-leader ▾

### File Your Taxes Confidently - TurboTax® Has Your Back
TurboTax® Supports Any Unique **Tax** Situation, From Simple To Complex. See How Easy It Is!
Free Tax Refund Estimate · Advance Child Tax Credit · TurboTax® Full Service

Ad · https://www.taxslayer.com/ ▾

### Start Filing for Free - File Your Taxes for Free
Every **Tax** Situation, Every Form - No Matter How Complicated, We Have You Covered.

https://www.hrblock.com › online-tax-filing          ⋮

### Online Tax Filing Services & E-File Tax Prep | H&R Block®
The newly designed **H&R Block Tax** Prep app lets you do your own taxes on any device, with on-
demand help from our tax experts if needed.
★★★★☆ Rating: 4.4 · 367,057 reviews · $39.99 to $144.99 · In stock
Self-Employed · Accurate Calculations Guarantee · Online Assist



## V. PROF. WIND'S AND PROF. DHAR'S REJECTION OF THE IMPORTANCE OF MEDIA IS NOT CREDIBLE

38. Both Prof. Wind and Prof. Dhar apparently believe that media will not impact consumers in this dispute. This is remarkable given Prof. Wind's prior writings on the role of media, which I discuss above, as well as Prof. Dhar's recognition in his sur-

reply that "it is not uncommon for third-party media and social media coverage to link a corporate parent to a consumer-facing brand."[71]

39.     Despite ignoring the importance of media linkages between corporate and product brands in their initial declarations, Prof. Dhar and Prof. Wind now pivot to rejecting the idea that consumers encounter and pay attention to media.  Prof. Dhar states that "despite the existence of the articles that Dr. Reibstein cites, it is far from assured that consumers will actually encounter them"[72] and "Dr. Reibstein focuses his analysis on third-party media mentions, without establishing that consumers actually viewed or attended to these mentions."[73]  Prof. Wind states that "[o]ne cannot assume what consumers see and how they will react."[74]

40.     At the outset, it is worth noting that the fundamental purpose of media is to communicate to the public, and accordingly, influence their perceptions.  It is also worth noting how widespread the relevant consumer population in this matter is.  Prof. Wind and Prof. Dhar surely cannot be suggesting that all taxpayers who might consider the products at issue in this case would ignore any media that they encounter, particularly in light of Prof. Wind's claim this is a high-involvement purchase, which would imply quite the opposite.  Hence, it is unclear precisely what Prof. Dhar and Prof. Wind believe on this front.

---

[71]     Dhar Sur-Reply, ¶ 16.

[72]     Dhar Sur-Reply, ¶ 12.

[73]     Dhar Sur-Reply, ¶ 2.

[74]     Wind Sur-Reply, ¶80.

41.     Prof. Dhar attempts to impose a false standard that I should have employed "well-established practices for measuring brand associations in the minds of consumers" to provide "any empirical evidence that Block is associated with the Cash App brand in the minds of consumers."[75]  But as I explained in the Reibstein Declaration, "[m]y focus is not on current confusion, as it has had limited time in which to materialize, but rather on the future likelihood of confusion."[76] As I explained, a key condition for confusion in this matter is the overlap between the two companies' offered products and services, and Cash App Taxes has yet to experience its first full tax season under that branding.[77]

A.  **There is Ample Evidence that Media with Widespread Reach Will Continue to Expose Consumers to Linkages Between Cash App And "Block"**

42.     In addition to the above critiques, Prof. Wind states that "it does not make sense to infer from *past* linkages between 'Square, Inc.' and 'Cash App' that consumers or the media will link 'Block, Inc.' with Cash App or Cash App Taxes going forward."[78] Though I disagree with his view, I note that the Reibstein Declaration combined evidence of such past linkages with ample evidence that media are already starting to link Cash App with "Block."[79]  Prof. Dhar states that, "[d]espite purporting to analyze the existence of linkage between the Cash App brand and Block in his Report, Dr. Reibstein does not

---

[75]     Dhar Sur-Reply, ¶ 8.

[76]     Reibstein Declaration, ¶ 70.

[77]     Reibstein Declaration, ¶¶ 68, 70.

[78]     Wind Sur-Reply, ¶ 102.

[79]     Reibstein Declaration, Section VI.D.

conduct any empirical analysis on this point,"[80] but this too ignores the ample evidence referenced above and presented in the Reibstein Declaration. And this body of evidence has only continued to grow, as I discuss below.

43.     Contrary to Prof. Wind's claims, there is good reason to believe that Block, Inc. will be of particular continued interest to media and consumers, even beyond historical interest in Square, Inc. As I explained in the Reibstein Declaration, "there has been particular recent media attention stemming from Block, Inc. CEO Jack Dorsey's decision to step down as CEO of Twitter."[81] Media have opined that Block, Inc. is Mr. Dorsey's chance to build a tech conglomerate in the mold of Alphabet, Meta, and Amazon.[82] And the media have covered Block, Inc.'s post-rename activities, including its interest in Bitcoin, accordingly. Just last month, *Fortune* reported that "Jack Dorsey's Block" allows users to buy and sell Bitcoin through Cash App, while *The Washington Post* reported that "Block CEO Jack Dorsey" expects that bitcoin, bought and sold on the company's Cash App, will become the world's "'single currency'" within the decade.[83] Also in January 2022, *Business Insider* described Cash App as being "owned by crypto-

---

[80]     Dhar Sur-Reply, ¶

[81]     Reibstein Declaration, ¶ 89.

[82]     Rivero, Nicolás, "Block is Jack Dorsey's chance to build a tech conglomerate," *Quartz,* December 9, 2021. *See also,* Sanders, Patrick, "If Jack Dorsey Focuses, Block Stock Is a Buy," *Nasdaq*, December 20, 2021.

[83]     Wagner, Kurt, et al., "Jack Dorsey's Block wants to make Bitcoin mining 'more distributed and efficient in every way," *Fortune,* January 13, 2022; Newmyer, Tory, "Cryptocurrency is suddenly everywhere – except in the cash register," *The Washington Post,* January 31, 2022.

bull Dorsey's financial services company Block."[84] I expect that media associations

between Mr. Dorsey, Block, Inc., and its product brands will become only more prevalent

over time.



**Media Demonstrate Ongoing Interest in Technology Companies, Owners, Executives**

### Jack Dorsey: Block is 'officially building an open bitcoin mining system'

Published Thu, Jan 13 2022·6:11 PM EST

Taylor Locke
@ITSTAYLORLOCKE

SHARE

Jack Dorsey creator, co-founder, and Chairman of Twitter and co-founder & CEO of Square speaks on stage at the Bitcoin 2021 Convention, a crypto-currency conference held at the Mana Convention Center in Wynwood on June 04, 2021 in Miami, Florida. Joe Raedle | Getty Images

Exhibit 7-6

44.    I note as well an incident in which a media website mistakenly presented a

linkage between Cash App, "Block", and H&R Block.  Exhibit 7-7.

---

84    Rosen, Phil, "Two NBA All-Stars to accept salary in bitcoin in partnership with Jack Dorsey's Cash App," *BusinessInsider,* January 11, 2022.



45.     Mr. Dorsey himself promotes the linkage between Cash App and "Block" using his Twitter account @Jack—which has over 6 million followers.  Exhibit 8-1. This includes promoting "Block" as the owner of its various "building block" product brands, including Cash App, Exhibit 8-2, and includes promoting Cash App Taxes on the platform in tweets that thousands of social media accounts "liked" and hundreds then re-shared to their own networks, Exhibit 8-3.



**jack** ⚡ ✔
@jack

#bitcoin ₿

◎ 🌙 Joined March 2006

**4,536** Following  **6.1M** Followers

---

 **jack** ⚡ ✔                                    •••
@jack

## UpdateTip:

> ⬛ **Square** ✔ @Square · Dec 1, 2021
>
> We're changing our company name so we can give the full @Square brand to our Seller business. So now we need a name to tie @Square, @CashApp, @TIDAL, and @TBD54566975 together into one. That name is "Block." Why? twitter.com/blocks/status/…
>
> Show this thread

4:37 PM · Dec 1, 2021 · Twitter Web App

---

**1,277** Retweets   **164** Quote Tweets   **12.4K** Likes





847 Retweets    185 Quote Tweets    6,947 Likes

**B. Media Linkages of Cash App and Cash App Taxes to "Block" Will Continue to Grow, Both During the Coming Tax Season and More Generally with the Passage of Time**

46.    Developments related to the current tax season further reject the critiques

offered by Prof. Dhar and Prof. Wind as to linkages between Cash App Taxes and

"Block."  For example, the following discuss linkages between Cash App Taxes and "Block":

a. A PC Mag article discusses that Block, Inc.'s tax preparation service is called "Cash App Taxes because of its tight integration with Block's Cash App."[85]

b. An Android Headlines article discusses that Block, Inc's tax preparation service is "now being done through Block's Cash App."[86]  The tax preparation offering from H&R Block is discussed in the same article.[87]

47. In addition to the recently started tax season, the mechanism of "virality" is another reason why media linkages of Cash App and Cash App Taxes to "Block" will continue to grow and proliferate throughout the consumer population.  Virality reflects the tendency of information to be circulated rapidly and widely among internet users.  In the modern digital world, reacting to and further facilitating the spread of media messages can be as simple as using a "Share" button to send a news article to colleagues

---

[85] Yakal, Kathy, "Cash App Taxes 2022 (Tax Year 2021) Previous," *PC Mag,* January 26, 2022. I note that as of February 2022, the Twitter account associated with PC Mag had 389.9K followers.

[86] Maxham, Alexander, "How to File Your 2021 Tax Return For Free," *Android Headlines*, January 27, 2022.

[87] I have also identified numerous media sources linking Block, Inc. and Cash App. *See, e.g.,* Perez, Sarah, "Block's Cash App Adopts Lightning Network for Free Bitcoin Payments," Tech Crunch, January 18, 2022; Davis, Griffin, "Block Cash App's Lightning Network Feature Allows Free BTC Transactions!  Here are Other Benefits," Tech Times, January 18, 2022; Orr, Andrew, "Update to Cash App Lets People Gift Stocks and Bitcoin," The Mac Observer, December 14, 2021; Orr, Andrew, "'Cash App' From Block Now Supports Bitcoin Lightning Network", The Mac Observer, January 19, 2022; "Block Users Can Gift Stock, Bitcoin on Cash App," PYMNTS.com, December 14, 2021; Cohen, Michael, "Venmo, Cash App and Zelle Now Required to Report Transactions Over $600 to IRS and Users are Upset," Benzinga, January 12, 2022. *See also,* Wikipedia, "Cash App," https://en.wikipedia.org/wiki/Cash_App (accessed February 9, 2022).

or pushing a button on Twitter to retweet or quote an existing Tweet. As I have discussed above and evidenced in the examples provided, media and consumers have an interest in technology companies and an interest in tech billionaire founders like Mr. Dorsey. Indeed, as exemplified above, it is common for Twitter followers to "like," retweet, or quote tweets from Mr. Dorsey.

## VI.    PROF. WIND AND PROF. DHAR IGNORE THE LIKELY MECHANISMS OF CONFUSION IN THIS CASE

48.    In the Reibstein Declaration, I explained that "Prof. Wind and Prof. Dhar suggest that the potential for confusion should be evaluated in a particularly narrow context."[88] The arguments that Prof. Wind and Prof. Dhar present in their sur-replies further reinforces that they have ignored the likely mechanism of consumer confusion in this case, as explained below.

49.    Prof. Wind asserts that his survey "accurately tests for possible future confusion."[89] He should have said that his survey test for possible *forward* confusion—at the present time, not in the future. Forward confusion is when a potential consumer encounters the mark of the junior user—here Block, Inc., the provider of Cash App Taxes—and mistakenly believes that it is associated with the senior user, here H&R Block. And it is true that, as Prof. Wind himself describes, his survey "respondents were exposed to Cash App Taxes when they saw the stimulus."[90] But this does not mean that

---

[88]    Reibstein Declaration, ¶ 70.

[89]    Wind Sur-Reply, Section IV.A.3.

[90]    Wind Sur-Reply, ¶ 88.

respondents brought to his survey, in early January 2022, the same brand associations that they will bring to the Cash App Taxes website in the future. Indeed, these brand associations are likely to be different in the future, as I discussed in the Reibstein Declaration,[91] owing to the likelihood of continued and growing media linkages between Cash App Taxes and "Block" including those introduced by the current tax season, which occurs after Prof. Wind's survey. Prof. Wind's survey simply cannot speak to this factor, which invalidates his assertion that he accurately tests for possible future confusion.

50.     Prof. Dhar's opinions are subject to the same critique. Even after I explained in the Reibstein Declaration that his assessment of the relevant marketplace context was too narrow given his focus on how "how current or prospective users of Cash App and Cash App Taxes use the app,"[92] he asserts in his sur-reply that anything outside of his definition of the "user journey" is irrelevant to an assessment of confusion. First of all, Prof. Wind argues that paying taxes is a high-involvement purchase process. To the extent this is true for some consumers,[93] the consumer journey is likely longer than the narrow window Prof. Dhar alleges is relevant. Further, Prof. Dhar explains his argument by saying that "while it is possible, though inherently speculative, that some consumers might see media mentions of a brand name and the corporate owner at a distance from the user journey, all consumers that encounter a product in the marketplace must encounter

---

[91]     *See, e.g.,* Reibstein Declaration, ¶ 70.

[92]     Reibstein Declaration, ¶ 70.

[93]     See my discussion in the Reibstein Declaration, ¶ 51.

its name, logo, and branding in the process of becoming a user"[94] and re-emphasizing that "[i]n order to use Cash App, a user must download the Cash App mobile application."[95] Like Prof. Wind, Prof. Dhar's reasoning speaks only to *forward* confusion—a situation where the potential consumer encounters the junior user. Prof. Dhar emphasizes that there is "no Block branding used anywhere within the [Cash App] mobile application environment,"[96] but as with Prof. Wind's survey, this does not address the brand associations that potential consumers are likely to bring to the purchase environment in the future, owing to the likelihood of continued and growing media linkages between Cash App Taxes and "Block." For this reason, neither Prof. Wind nor Prof. Dhar provide a valid critique of my opinion that "a proper assessment of the likelihood of confusion in this matter should not be limited to a narrow marketplace context or a narrow window of time subsequent to Block, Inc.'s name change."[97]

51.     Moreover, Prof. Dhar's and Prof. Wind's dogged focus on *forward* confusion is critically problematic. As I explained in the Reibstein Declaration, "it is important to consider the harm that could befall a brand that becomes less trusted due to an incident of consumer confusion."[98] Further, I provided an example of "the event of a serious deficiency in the 'Cash App Taxes' product, such as a data breach, that results in

---

[94]    Dhar Sur-Reply, ¶ 33.

[95]    Dhar Sur-Reply, ¶ 34.

[96]    Dhar Sur-Reply, ¶ 37.

[97]    Reibstein Declaration, ¶ 71.

[98]    Reibstein Declaration, ¶ 52.

46

widespread and negative media coverage" that links "Cash App Taxes" with "Block."[99] Contrary to Prof. Dhar's claims that consumer engagement with media is "inherently speculative," it is clear that media coverage of such a serious deficiency would receive attention from significant numbers of consumers. Prospective consumers that encounter such negative media mentions and confuse "Block" with H&R Block are likely to downgrade their assessment of H&R Block as a trusted brand, and this downgrade may well harm the brand associations for all services provided by H&R Block. Critically, this mechanism of confusion *does not require any engagement* with the Cash App Taxes website, or even the Cash App logo (as media headlines and articles do not typically or necessarily incorporate logos, nor does the word of mouth that results from such media). As a result, the opinions offered by Prof. Dhar and Prof. Wind do not speak to this mechanism of likely confusion.

52.     There is yet another mechanism of likely confusion that Prof. Dhar and Prof. Wind ignore. As I explained in the Reibstein Declaration, "a new brand that is confused for a trusted brand has the ability to benefit from this confusion, by entering the consumer's consideration set and potentially being selected when it otherwise would not have been considered by the consumer."[100] The opinions offered by Prof. Wind and Prof. Dhar do not respond to this likely mechanism of confusion in any way. For example, prospective consumers that encounter media references to "Block's free tax service, Cash App Taxes" or similar linkages and confuse "Block" with H&R Block may well decide to

---

[99]    Reibstein Declaration, ¶ 94.
[100]   Reibstein Declaration, ¶ 52.

seek out the Cash App Taxes website, *even if they had never heard of Cash App or Cash App Taxes before*.  This confusion is made all the more likely by the fact that H&R Block has long been a trusted brand in tax preparation services.

53.     The scenarios contemplated above lay bare the inadequacies of Prof. Wind's and Prof. Dhar's arguments with respect to the consumer/user journey.[101]  Prof. Wind and Prof. Dhar ignore that consumers have meaningful interactions with media in the course of their journey, and that these interactions have the potential to alter consumer brand associations, via confusion, with respect to both H&R Block and Cash App Taxes.  To the extent that Prof. Wind is correct that tax preparation services are indeed a high-involvement product, consumers may well seek out such media.

54.     Further, Prof. Wind and Prof. Dhar ignore the potential for confusion even in situations where prospective consumers encounter the Cash App logo or Cash App Taxes website.  As I explained in the Reibstein Declaration, "based on my expertise with branding and brand elements, the Cash App logo is a far better visual fit with the H&R Block family of logos than with the logo of Block, Inc," which "facilitates the likelihood of consumer confusion that Cash App is associated with H&R Block, rather than diminishing it as suggested by Prof. Wind and Prof. Dhar."[102]  While Prof. Wind did a conduct a survey with the Cash App logo and Cash App Taxes website as stimuli, again, this did not incorporate the brand associations that consumers are likely to develop over

---

[101]     Dhar Declaration, ¶ 20; Wind Declaration, ¶¶ 9, 68, 81.
[102]     Reibstein Declaration, ¶ 96.

time within the tax context based on exposure to media linkages between "Cash App Taxes" and "Block."

## VII. PROF. DHAR AND PROF. WIND FAIL TO RECOGNIZE THE PERMANENT AND IRREPARABLE HARM THAT WILL LIKELY RESULT FROM THE H&R BLOCK BRAND BEING AT THE MERCY OF BLOCK, INC.'S ACTIONS

55.     Because Prof. Wind and Prof. Dhar ignore the likely mechanisms of consumer confusion in this case, they fail to respond to my opinion that the confusion will likely "harm the brand associations that H&R Block has cultivated over its more than 65 years of offering tax preparation and other personal financial services to the marketplace."[103] I maintain this opinion.

56.     Further, Prof. Wind and Prof. Dhar ignore my opinion that "the potential for harm to H&R Block's brand associations is also not necessarily likely to be gradual or steady over time."[104]  Indeed, it is possible that a substantial, rapid, and irreparable harm to H&R Block's brand could result based on the actions of Block, Inc.  In my opinion, a court injunction issued subsequent to such an event would be too late to preclude such irreparable harm from occurring.

---

[103]    Reibstein Declaration, ¶ 93.

[104]    Reibstein Declaration, ¶ 94.

Signed on the 9th Day of February, 2022

_Dave Reibstein_

_____

Professor David Reibstein