## UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## WESTERN DIVISION

H&R BLOCK, INC. AND HRB
INNOVATIONS, INC.,

        Plaintiffs,

      v.

BLOCK, INC.,

        Defendant.

Case No. 21-cv-0913-NKL

## <u>ORDER</u>

    Pending before the Court is a Motion for Preliminary Injunction filed by Plaintiffs, H&R

Block, Inc. and HRB Innovations, Inc. (together, H&R Block or Plaintiffs) against Defendant

Block, Inc. (hereinafter Block, Inc. or Defendant). *See* Doc. 16. After extensive briefing, a full

day of testimony, and multiple opportunities to hear the arguments of the parties, the Court

GRANTS Plaintiffs' Motion for Preliminary Injunction in part.

## I.  BACKGROUND

    Plaintiffs provide tax and other financial services to consumers and small businesses

using the name "H&R Block" and various trademarks in which the word "Block" is prominently

displayed. H&R Block also uses a green square logo (  ) to identify itself and the financial

services it offers.

Defendant Block, Inc. is a technology company made up of several business units, mostly focused on financial services. Prior to December 2021, Block, Inc. was named Square, Inc. Not long before it changed its name, Square, Inc. bought Credit Karma Tax. The acquisition added tax services to Square, Inc.'s offerings for the first time. For a time after the acquisition, Credit Karma Tax did business under its original name and logo (ck) and on its own platform. J-1 ¶ 31, Ex. K.

On December 1, 2021, Square, Inc. publicly announced its new name. Around the same time, Credit Karma Tax was integrated into Cash App, one of Square, Inc.'s preexisting internet-based products, best known for money transfer services. Credit Karma Tax was renamed Cash App Taxes and rebranded with Cash App's green square logo ($). After its name change, Block, Inc. launched a website and social media accounts containing the name "Block," and used those accounts, along with press releases, to discuss the name change. Defendant also filed an application with the United States Patent and Trademark Office ("USPTO") to register "Block" as a trademark, along with its new twisted cube logo ( ). *See* D-1, at 49–62 (Exhibit E to Plaintiffs' Complaint, Block, Inc.'s trademark applications). In its application to the USPTO, Block, Inc. indicated that it planned to use the "Block" mark and logo for "[h]olding company services," including "business management, business administration, business promotion, and business consulting services for subsidiaries." *Id.*

On December 16, 2021, six days after Defendant's name change took effect, H&R Block filed a complaint against Block, Inc. for trademark infringement under the Lanham Act and Missouri law. On December 21, 2021, H&R Block filed a motion for a preliminary injunction.[1]

---

[1] H&R Block's state law and Lanham Act claims rest on the same and factual and legal framework. *Cmty. of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church*, 634 F.3d 1005, 1010 (8th Cir. 2011) ("Missouri law is well settled that the same facts which support a

H&R Block claims that Defendant's use of "Block" and a green square logo in connection with its tax service is likely to cause confusion because H&R Block and Block, Inc. both offer overlapping services, including tax preparation and filing, other related financial services, and charitable services. H&R Block claims it will be irreparably harmed by Block, Inc.'s use of "Block" and a green square logo in connection with these overlapping products and services, as it will undermine H&R Block's ability to control its public image and perception; consumers will incorrectly believe that Block, Inc.'s tax service comes from H&R Block, or that H&R Block is one of the "building blocks" in the Block, Inc. family of brands. H&R Block claims that consumers, the media and investors are already confused, and, as Block, Inc. completes the rebranding process, confusion will only increase. H&R Block seeks a preliminary injunction to restore and preserve the *status quo*, i.e., the way things were before Defendant's name change. Doc. 17 (Sugg. in Supp. of Pls.' Mot. for Prelim. Inj.), 13–24; Doc. 1 (Compl.) ¶¶ 6, 43-45, 47, 51-52; Doc. 68 (Sugg. in Further Supp. of Pls.' Mot. for Prelim. Inj.), 16–21.[2]

Defendant claims that it does not use "Block" as part of the branding for Cash App or any of its consumer-facing brands; that it does not use its green square Cash App logo for tax services without the name "Cash App;" that there are several third parties that use "Block" or green square logos for financial services without confusion; and that there is no likelihood of confusion between

---

suit for trademark infringement support a suit for unfair competition and common law infringement."); *Fischer & Frichtel Custom Homes, LLC*, 2021 WL 1750174, at *2 (E.D. Mo. May 4, 2021) ("The elements of claims for trademark infringement and unfair competition under Missouri law 'substantially overlap' with those of federal trademark law under the Lanham Act."). The parties do not treat them separately, and the Court sees no reason to at this stage.

[2] Specifically, H&R Block claims (1) infringement of a registered trademark under Section 32 of the Lanham Act; (2) unfair competition under Section 43(a) of the Lanham Act; (3) trademark infringement under Missouri common law; (4) unfair competition under Missouri common law; and (5) injunctive relief under Missouri Rev. Stat., Section 417.061. Each of Plaintiff's claims requires proof of a likelihood of consumer confusion.

H&R Block and Block, Inc.  Defendant claims that an injunction barring it from using its corporate name or requiring a change of the Cash App logo would be disruptive to its business.  It further claims that it has spent over a year developing and implementing its "new corporate identity" and "[i]t cannot just flip a switch and go back to its former name".  Doc. 38 (Def.'s Sugg. in Opp. to Pls.' Mot. for Prelim. Inj.), pp. 1-2, 6-8, 14–26.

At the preliminary injunction hearing, Plaintiffs offered testimony from Jeffrey J. Jones II (H&R Block, Inc.'s CEO), and Defendant offered testimony from Chrysty Esperanza (Block, Inc.'s General Counsel) and Owen Jennings (Head of Business and Product for Cash App and President of Cash App Taxes).  The parties also submitted declarations of several expert witnesses: for Plaintiffs, E. Deborah Jay, Sarah Butler, and David Reibstein, and for Defendant, Ravi Dhar and Yoram (Jerry) Wind.  Block, Inc. also submitted a survey report from Professor David Franklyn (which was attached to Prof. Wind's sur-rebuttal declaration) and a fact declaration from Claudia Ng (Senior Production Designer at Block, Inc.). The parties submitted additional documents through various attorney declarations.  The Court also permitted each party to submit proposed orders.  On March 1, 2022, the Court held a supplemental hearing to address various questions raised by those proposed orders.

## II.  FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A.  Plaintiff, H&R Block

H&R Block was founded in 1955 by brothers Henry and Richard Bloch.  Originally founded as a bookkeeping business, H&R Block now specializes in income tax preparation, along with a range of other tax and financial services.  Today, H&R Block is known not only as "H&R Block," but also as simply "Block." J-1 (Jones Decl). ¶¶ 8–16; J-4 (Jones Rebuttal Decl.) ¶¶ 10–21.  As Mr. Jones explained, this is a "contemporary way" that H&R Block, the media, and

consumers refer to the brand. Tr. at 59:12-59:25 (Jones Direct). H&R Block uses both its name H&R Block and the name "Block" in its business and marketing. It has developed a range of trademarks that incorporate both iterations of its name, several of which H&R Block has registered as trademarks with the United States Patent and Trademark Office. *See, e.g.,* J-1 ¶ 5.

H&R Block has a broad market presence, both online and in person. H&R Block currently has over 9,000 "H&R Block" locations in the United States, with an additional 1,500 international offices, and more than 300 "Block Advisor" locations, where it offers a variety of tax and other related financial services and products. J-1 ¶¶ 3–4, 13; Tr. at 52:21–53:7, 57:15–57:19 (Jones Direct). H&R Block also offers its products and services through its websites, www.hrblock.com and www.blockadvisors.com, and on its mobile application, MyBlock. Through these platforms, customers can prepare and file their taxes and get virtual access to H&R Block's tax professionals for assistance. Customers also can prepare and file their taxes through H&R Block's do-it-yourself ("DIY") software, which is available online and through retail stores nationwide. J-4 (Jones Rebuttal Decl.) ¶ 20.

In addition to tax preparation and filing, H&R Block offers a variety of related financial services in association with "H&R Block" and under "Block" based branding (such as "MyBlock" and "Block Advisors"), including pre-paid debit cards, lines of credit, loans, access to credit scores, money management, payment processing and mobile banking platforms. J-1 ¶¶ 4, 5, 9,14; J-4 ¶¶ 22–30.

Under its "Block Advisors" brand, H&R Block offers a variety of tax, financial, accounting, bookkeeping and payroll services to small businesses. In 2021 alone, H&R Block served more than two million small businesses under the "Block Advisors" brand. J-1 ¶ 13; J-4 ¶ 16; Tr. at 54:4–54:14, 57:15–57:19, 58:10-58:11 (Jones Direct).

H&R Block also offers charitable, philanthropic, volunteer, community service, and humanitarian services in the many communities in which it operates, including through a community impact program called "Make Every Block Better." J-1 ¶ 15; Tr. at 61:14–61:16, 65:14–65:25 (Jones Direct); 112:21–112:22 (Jones Cross).

H&R Block pervasively markets itself using its trademarks and has invested billions of dollars on national advertising campaigns on television, in print, on the radio, on the Internet and on social media, including on Twitter, Instagram, Facebook, Tik Tok, and LinkedIn. Over the last three years, H&R Block has spent nearly half a billion dollars advertising its products and services. J-1 ¶ 7; J-4 ¶¶ 4, 6, 15, 20; Tr. at 61:3–62:8, 63:9–64:25, 66:1-67:11 (Jones Direct). H&R Block's advertising makes varied uses of "Block" without "H&R," including through taglines like "Block Has Your Back," in which H&R Block has invested over $100 million, and "It's Better with Block," in which H&R Block invested over $50 million during 2020. H&R Block also uses "Block" on its social media accounts, including a recent advertising campaign on Tik Tok with the hashtag "#DIYwithBlock," which generated billions of views; in connection with its "Block Advisors" brand for small businesses; in signage in its H&R Block retail offices; in its diversity and inclusion initiatives, including through its "Belonging@Block" program; in recruiting employees at "Block Days;" and in its growth and transformation strategy called "Block Horizons 2025." J-1 ¶¶ 11, 14, 16; J-4 ¶¶ 11, 13; Tr. at 58:22; 61:14–61:20; 62:2–62:6; 63:19–63:22, 66:7–67:11 (Jones Direct). Several examples, all included in the declaration of H&R Block's CEO Jeffrey Jones II, are reproduced below. *See* Doc. 16-1, at 5.



Often, but not always, when H&R Block uses "Block" alone, it also includes its full "H&R Block" name. Tr. at 101:13–103:13 (Jones Cross). As Mr. Jones explained, using "H&R Block" and "Block" together helps reinforce the connection between "Block" and H&R Block so that people will understand that, when "Block" is used in the context of taxes and adjacent financial services, it means H&R Block. Tr. at 61:6–61:13 (Jones Direct); *see also* P-88 (Reibstein Reply Decl.) ¶ 35. The evidence shows that people make this connection.

H&R Block also uses green square logos in connection with its products and services and owns several federal trademark registrations for those logos. H&R Block's green square marks are a significant element of H&R Block's branding. The marks are included on many of H&R Block's consumer-facing materials, including national television commercials and as part of the "Block Advisors" branding and advertising. H&R Block has used many of its green square marks both with and without its full H&R Block name. As Mr. Jones explained, H&R Block uses the word "Block," its logos—which are in the form of a "block"— and the color green to help reinforce

the connection between the logo and the H&R Block brand. J-1¶ 20; J-4 ¶¶ 7, 31-32; Tr. at 59:9–25; 70:18–73:11 (Jones Direct).

H&R Block owns the following relevant trademarks:[3]

| Mark | Reg. No. | Reg. Date. | Services/Goods |
|---|---|---|---|
| H&R BLOCK | 3,338,962 | Nov. 20, 2007 | Preparation of tax returns for others; financial planning services; conducting classes and courses in preparation of tax returns. |
| H&R BLOCK EMERALD CARD | 3,392,368 | Mar. 4, 2008 | Debit card and credit card services. |
| H&R BLOCK EMERALD SAVINGS | 3,525,361 | Oct. 28, 2008 | Savings account services. |
| H&R BLOCK EMERALD ADVANCE | 3,532,084 | Nov. 11, 2008 | Financial services, namely, debit and credit card services, loan financing and financing lines of credit. |
| BLOCKWORKS | 4,769,331 | Jul. 7, 2015 | Computer software for tax return preparation, tax planning, tax calculation, and tax return filing and associated instructional manuals and other printed instructional materials sold as a unit therewith. |
| BLOCK ADVISORS | 5,055,458 | Oct. 4, 2016 | Tax return preparation for others; tax planning services; business management and consulting services; accounting services; bookkeeping; and payroll services for others, namely, payroll preparation and payroll processing. |
|  | 5,179,142 | Apr. 11, 2017 | Tax return preparation for others; tax planning services; business management and consulting services; accounting services; budgeting services; bill paying services; and payroll services for others, namely, |

---

[3] Because there is no dispute about the trademarks H&R Block has registered, the Court takes the charts that follow from Doc. 16-1, at 2–3, 12–13.

| | | | |
|---|---|---|---|
| | | | payroll preparation and payroll processing services. |
| BLOCK HAS YOUR BACK | 6,003,605 | Mar. 3, 2020 | Preparation of tax returns for others. |
| **H&R BLOCK** [The trademark consists in part of a green square] | 2,533,014 | Jan. 22, 2002 | Preparation of tax returns for others. |
| | 3,656,593 | July 21, 2009 | Computer programs for use in the preparation of tax returns; tax advice and planning services; tax consultation; tax filing services; accounting consultation and accounting services; Financial planning services; banking services; and mortgage services, namely, mortgage banking, mortgage lending, mortgage brokering and mortgage servicing; Educational services, namely, conducting classes and courses in the field of tax preparation and distribution of course materials in connection therewith; Providing online non-downloadable software for use in the preparation of tax returns. |
| **Advisors BLOCK** | 5,179,142 | Apr. 11, 2017 | Tax return preparation for others; tax planning services; business management and consulting services; accounting services; budgeting services; bill paying services; and payroll services for others, namely, payroll preparation and payroll processing services. |

### B. Square Inc./Block, Inc.

Square, Inc. (renamed as Block, Inc. in December 2021) was founded by Jack Dorsey and

Jim McKelvey in 2009 in order "to create tools that help expand access to the economy." J-2

(Esperanza Decl.) ¶ 4–5. The company began with one product, called Square, a square-shaped

payment card reader and point-of-sale software that allowed businesses and individual sellers to accept customer payments. *Id.*

Over time, Square, Inc. acquired or developed additional businesses. Cash App is one such business, which was started in 2013 as Square Cash.[4] *Id.* ¶ 12; J-3 (Jennings Decl.) ¶ 4. Cash App is a peer-to-peer money transfer service that allows people to send money to friends, family, and others through their phones without needing a bank account or credit card. J-3 ¶¶ 3–4. Cash App also allows users to store money on the app, use those funds in-person or online through a virtual Visa Cash App debit card, invest in stocks and Bitcoin, and take out small loans. Cash App permits users to directly deposit their paychecks into their Cash App account, as if it were a traditional bank account. Tr. at 190:8–18. More than 100 million people have downloaded Cash App and more than 40 million are active monthly users. J-3 ¶ 7.

Cash App's logo is a green square with a dollar sign (  ). *Id.* ¶ 6; D-18a (Cash App website). Defendant owns registered trademarks on the name "CASH APP" (alone) as well as the combination of the Cash App name and logo. J-3 ¶ 6. (  ). Because Credit Karma Tax was integrated into the Cash App platform for the 2022 tax season and rebranded as Cash App Taxes, Defendant's tax service is also branded with a green square logo and a dollar sign.

---

[4] Block, Inc.'s other businesses include TIDAL, a music streaming service, Spiral, a business to promote the adoption of Bitcoin, a blockchain-based currency, and TBD, a decentralized finance platform in development, which is also based on blockchain technology. J-2 (Esperanza Decl.) ¶¶ 14–16; *see also* Tr. at 142:17–19.



J-3 Ex. B, at 16–24 (screenshot showing Cash App's tax feature and branding).

Defendant claims that it selected the name "Block" because of its association with "building blocks, neighborhood blocks and their local businesses, communities coming together at block parties full of music, a blockchain, a section of code, and obstacles to overcome." J-2 ¶ 21; Doc. 1 (Compl.) ¶ 32, Ex. A; P-29.[5] It also claims that the name change was made in connection with the adoption of a "House of Brands"[6] marketing architecture, which, in theory, involves separating the corporate identity from the names of the businesses or products the business owns.

---

[5] For purposes of this order only, the Court will assume that this is at least part of the reason that Square, Inc. chose the name "Block" to brand its business.

[6] A company adopts a House of Brands model when it offers "a collection of differentiated product brands, some or all of which may involve no inherent connection to the corporate brand." J-7 (Reibstein Decl.) ¶ 29. This is different from a Branded House model, through which a company relies on its corporate brand "as an umbrella brand across their entire range of products." *Id.* For example, compare Apple, Inc. (Branded House Model) with Alphabet, Inc. (House of Brands Model).

The name change from Square to Block was immediately publicized by Mr. Dorsey, Block, Inc.'s well-known CEO, on his Twitter account, which has over six million followers. J-2 ¶ 20; P-29; P-52; Tr. at 199:22–199:24, 206:20–208:14 (Jennings Cross). Block, Inc.'s business units— Cash App, Square, Tidal, etc.—were included in the publicity surrounding the name change.

Prior to announcing its name change, Defendant filed an application with the USPTO indicating an intent to use "Block" as a trademark for use in connection with the following services:

> Holding company services, namely, providing business management, business administration services for subsidiaries and affiliates which provide tools and resources for economic empowerment;

> holding company services, namely, providing business management, business administration, business promotion, and business consulting services for subsidiaries; . . .

> charitable services, namely, promoting public awareness about charitable, philanthropic, volunteer, public and community service and humanitarian activities; . . . [and]

> providing investors with financial information. . . .

P-73 (Defendant's Application to register "Block" with the USPTO); Tr. At 159:24–163:3 (Esperanza Cross). In its application, Block, Inc. declared, under oath, that it intended to use "Block" in commerce. P-73, at 4–5.

Block, Inc. states that it does not currently use its "Block" mark as a brand for any of its customer facing products or businesses.[7] Even so, Block, Inc. markets itself and links itself to its "building blocks" publicly. Block, Inc. has its own website, available at block.xyz, and social media presence on platforms such as LinkedIn, Twitter ("@blocks" and "@blockir"), and Instagram ("@blocks"). P-31; P-33; D-34. Tr. at 155:55–156:8 (Esperanza Cross); Tr. 198:18–198:25 (Jennings Cross). Block, Inc. concedes that it uses these platforms to publicize the "Block"

---

[7] Block, Inc. was originally referenced in the copyright notice on the Cash App Taxes and Cash App webpages. The references were removed after Block, Inc. received H&R Block's complaint and preliminary injunction papers. *See* J-3 (Jennings Decl.) ¶¶ 22–23.

name, as well as to link Block, Inc. to its "building blocks" Cash App, Square, TIDAL, Spiral, and TBD54566975. Tr. 155–159 (Esperanza Cross). For example, Block, Inc. has posted that "Block is @Square, @CashApp, @spiralbtc, @TIDAL, @TBD54566975, and our foundational teams who support them." P-58. Block, Inc. also tags Cash App on social media from its "Block" accounts in order to publicly connect Cash App with "Block" and notify Cash App's followers of that connection. Tr. 157–158 (Esperanza Cross); P-58.

References to Block, Inc. also appear on the Cash App website and in connection with its mobile application. Tr. at 192:24-193:4 (Jennings Direct); *see also* J-1 ¶ 28. In addition, these references are found in the Cash App Taxes Terms of Service, the Cash App Taxes Consent to Disclosure of Tax Return Information, the Cash App Taxes Privacy Notice, and in the rules for a recent Cash App sweepstakes. Tr. at 192:24–193:4 (Jennings Direct); J-4 ¶ 60, Ex. 2; P-72. These references to Block, Inc. must exist because Block, Inc. chose not to separately incorporate or otherwise legally distinguish its business units; instead, they are each part of the same legal entity, which Square, Inc. chose to name Block, Inc. Tr. at 219:10–16 (Jennings Cross).

In addition, Block, Inc. uses the "Block" name when responding to online consumer complaints about Cash App's new tax offering and for "regulatory issues." Tr. at 216:3-218:5 (Jennings Cross); P-88. Block, Inc. also uses "Block" as a contact for press and investor relations for its "building blocks." A number of Cash App employees, indicate on their LinkedIn profiles that they work for "Cash App at Block" or "Cash App (Block)." P-35.

### C. Public Reaction to Name Change

Following the announcement of Defendant's name change, social media users have drawn a connection between H&R Block and Block, Inc., including in the following examples:

- "The square rebrand is surely going to piss off @HRBlock who do a lot of financial service stuff under the Block name. Very surprised it got through their trademark

checks."

- "This seems dumb. They already are an established brand with lots of users and hardware out there. (I use it, for example.) Also, doesn't this seem close to H&R Block with their simple green square logo? They should just stick with Square."

- "[I]sn't that name already taken by HRBlock, which is already in the financial and ba[n]king sectors?"

- "Are you talking about H&R block?"

- "Have you ever heard of H&R Block? They are in the financial business as well. Did you know they refer to their businesses as Block?"

- "Too bad. [H&R Block] is colloquially called Block."

- "What about H&R Block? That's what I think of when I hear 'Block.'"

J-1 ¶ 35, Ex. M. Others on social media have expressed the opposite view.

- "I believe people know the difference between H&R Block vs Block . . . ."

- "No one is going to confuse them. No one."

- "If someone asked what company you think of when you hear 'block' the last thing you'd hear is H&R Block."

- "H&R Block doesn't do remotely the same thing. So frivolous."

D-3 (Dhar Decl.) ¶ 84.

  In addition to these social media posts, individuals and news outlets alike have linked Cash App and its new tax services to "Block." Some of these posts and articles even include references to "$HRB," H&R Block's stock ticker symbol. P-25; Tr. at 79:19–81:5; J-4 ¶ 58. Various news articles have also linked Cash App to "Block," including several recent articles that were published shortly after the IRS began to accept electronic returns on January 24, 2022. For example, in a February 2, 2022, review of Cash App Taxes, a *PC Magazine* article explained that Credit Karma Tax is "[n]ow called Cash App Taxes—reflecting its tight integration with Block's Cash App." P-39. Another article in *Android Headlines* described different free tax filing services, including

H&R Block, and then discussed Cash App Taxes as being offered through "Block's Cash App." P-48. These articles link Cash App and its new tax preparation and filing services to "Block."

Similar articles have continued since the preliminary injunction hearing.[8] For example, *The Wall Street Journal* published an article on February 25, 2022, which again links Cash App and its tax services to "Block."

> Block's Cash App is money again for investors in the fintech giant. . . . Now investors may find reasons for a renewal of optimism in results for Block's Cash App, the neobank-like service that enables payments, deposits and more. . . . Perhaps most enticingly, ***Block attributed some of that growth to expansion of what Cash App does: newer services such as tax preparation***, merchant services and accounts for teens. . . .

Telis Demos, *Cash App is King for Block Stock*, Wall Street J. (Feb. 25, 2022)[9] (emphasis added); *see also* P-47 (referring to the new lightning network on "Block's Cash App"); P-45 (explaining that "Block has developed a new Cash App feature" and now "Block Users Can Gift Stock, Bitcoin on Cash App").

Some of those articles can be read to reflect confusion about whether the Cash App services are being offered by H&R Block because they list stories about Cash App under profiles about H&R Block. For example:

- A January 14, 2022 MarketScreener article (the "MarketScreener Article") entitled "Block's CashApp Launching Free Tax Filing Service Called 'Cash App Taxes'" was posted on a profile page about H&R Block. P-50.

- A Reuters company profile (the "Reuters Profile") for H&R Block includes articles under the "Latest News" about Block, Inc., including an article entitled "Jack Dorsey's Block to build an open bitcoin mining system," and "Afterpay's $29 billion

---

[8] The court may consider these articles because the "Court[] may properly take judicial notice of newspapers and other publications as evidence of what was in the public realm at the time, but not as evidence that the contents in the publication were accurate." *Klossner v. IADU Table Mound MHP, LLC*, No. 20-CV-1037, 2021 WL 4739311, at *2 (N.D. Iowa Oct. 5, 2021).

[9] available at https://www.wsj.com/articles/cash-app-is-king-for-block-stock-11645807732?st=i9zxetuy8ghhjh2&reflink=desktopwebshare_permalink

buyout by Block set to close after Spain nod."  P-46.

### D.  Standard for Preliminary Injunction

Pursuant to Federal Rule of Civil Procedure 65, this Court may grant preliminary injunctive relief to a plaintiff who shows (1) a probability of success on the merits, (2) a threat of irreparable harm, (3) that the balance between this harm and the injury that an injunction would inflict on other parties weighs in favor of an injunction, and/or (4) that the public interest weighs in favor of an injunction.  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981).  "At base, the question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined."  *Dataphase Sys., Inc.*, 640 F.2d at 114.  Accordingly, a plaintiff need not prove that every factor applies, or applies with the same force to obtain a preliminary injunction.  *Id.*; *see also Calvin Klein Cosms. Corp. v. Lenox Labs., Inc.*, 815 F.2d 500, 503 (8th Cir. 1987) ("No single factor in itself is dispositive; in each case all the factors must be considered to determine whether on balance they weigh towards granting the injunction.").  "While no single factor is determinative, the probability of success factor is the most significant."  *Carson v. Simon*, 978 F.3d 1051, 1059 (8th Cir. 2020).

The party seeking a preliminary injunction has the burden of proof, T*urtle Island Foods, SPC v. Thompson*, 992 F.3d 694, 699 (8th Cir. 2021), and "[a] preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter*, 555 U.S. at 24.

"[The Eighth Circuit] described the primary function of a preliminary injunction as preserving the status quo until the district court has an opportunity to grant full effective relief.  *Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 490 (8th Cir. 1993).  'Requiring [the defendant] to take affirmative action . . . before th[e] issue has been decided on the merits goes beyond the purpose of a *preliminary* injunction.'" *Tumey v. Mycroft AI, Inc.*, 27 F.4th

657, 664 (8th Cir. 2022).

In a trademark case, the status quo to be preserved by a preliminary injunction is "the situation prior to the time the junior user began use of its allegedly infringing mark: that is the last peaceable, non-contested status of the case." § 30:50 Preserving the status quo, 5 McCarthy on Trademarks and Unfair Competition § 30:50 (5th ed.). "The status quo ante litem refers not simply to any situation before the filing of a lawsuit, but instead to 'the last uncontested status which preceded the pending controversy,' *Tanner Motor Livery, Ltd. v. Avis, Inc.,* 316 F.2d 804, 809 (9th Cir.1963) (quoting *Westinghouse Elec. Corp. v. Free Sewing Mach. Co.,* 256 F.2d 806, 808 (7th Cir.1958)); *see also GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) ("In this case, the status quo ante litem existed before Disney began using its allegedly infringing logo. The interpretation of this concept that Disney advocates would lead to absurd situations, in which plaintiffs could never bring suit once infringing conduct had begun.").

### E. *Dataphase* Factors

#### 1. Probability of Success on the Merits

##### a. Elements of Trademark Infringement

Use of a protected mark is prohibited by the Lanham Act when a competing use is "likely to cause confusion, or to cause mistake, or to deceive." *See* 15 U.S.C. § 1114; *see also* 15 U.S.C. § 1125(a)(1)(a) (similarly requiring a showing of likely confusion, mistake, or deception by use of a certain name). Accordingly, to succeed in a trademark infringement claim, a plaintiff must prove (1) ownership of a valid trademark; (2) a defendant is using an infringing mark in commerce; and (3) a likelihood that the allegedly infringing mark would be confused with the registered mark. *Aveda Corp. v. Evita Mktg., Inc.*, 706 F. Supp. 1419, 1426 (D. Minn. 1989) (citing *A.J. Canfield Co. v. Vess Beverages, Inc.*, 796 F.2d 903, 230 U.S.P.Q. 441, 442–43 (7th Cir. 1986)). The

ultimate inquiry is always whether, considering all the circumstances, the allegedly infringing mark "creates a likelihood of confusion, deception, or mistake among an appreciable number of ordinary buyers." *Duluth News-Tribune v. Mesabi Publ'g Co.*, 84 F.3d 1093, 1096 (8th Cir. 1996).

The protection provided by the Lanham Act extends to any use of plaintiff's mark on any product or service which would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner.'" *Anheuser- Busch, Inc. v. Balducci Publ'ns.*, 28 F.3d 769, 774 (8th Cir. 1994) (citation omitted). That said, the law is not only concerned with confusion to the "buying public;" confusion by other stakeholders, including investors, the media, vendors, and potential and current employees is also an important consideration. *First Nat'l Bank in Sioux Falls v. First Nat'l Bank S. Dakota*, 679 F.3d 763, 770 (8th Cir. 2012).

### b. Whether H&R Block Owns a Valid Trademark

H&R Block has registered the following relevant trademarks in the United States, including: "H&R Block" (Reg.No. 3,338,962); "H&R Block Emerald Card" (Reg. No. 3,392,368); "H&R Block Emerald Savings" (Reg. No. 3,525,361); "H&R Block Emerald Advance" (Reg. No. 3,532,084); "Blockworks" (Reg. No. 4,769,331); "Block Advisors" (Reg. No. 5,055,458); "Block Advisors" (stylized) (Reg. No. 5,179,142); and "Block Has Your Back" (Reg. No. 6,003,605). H&R Block's registrations constitute *prima facie* evidence that those marks are valid, that H&R Block owns those marks, and that H&R Block has the exclusive right to use those marks in commerce. *See S&M Nutec, L.L.C. v. T.F.H. Publ'ns, Inc.*, No. 03-1033-NKL, 2005 WL 1224607, at *10 (W.D. Mo. May 23, 2005) (citing 15 U.S.C. § 1115(a)). Additionally, several of these registered marks are incontestable pursuant to 15 U.S.C. § 1065, which "is conclusive evidence of the registrant's exclusive right to use the mark, as well as the registrant's ownership of the

trademark." *Dakota Indus., Inc. v. Ever Best Ltd.*, 28 F.3d 910, 912 (8th Cir. 1994) (internal citation omitted)

While H&R Block does not have a registered trademark for the word "Block" itself, the Court finds that it has acquired common law rights in the stand alone "Block" mark. To establish a valid common law trademark, the plaintiff must show "prior appropriation and use of the mark in connection with a particular business." *Bass Buster, Inc. v. Gapen Mfg. Co.*, 420 F. Supp. 144, 157 (W.D. Mo. 1976). H&R Block has presented evidence of its use of the term "Block" in commerce in connection with its products and services. This use has taken hold with the public, as consumers and the media use "Block" alone to refer to the brand. H&R Block submitted survey evidence showing that 45% of the general consuming public recognizes "Block" as a brand name used in connection with a tax product or service. J-5 (Jay Rebuttal Decl.) ¶ 6;[10] *see also* J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 7:18 (5th ed. 2021) ("If the public has come to shorten a trademark into a nickname, then the nickname is entitled to legal protection as a mark."); *Brooks Bros. v. Brooks Clothing of Cal.*, 60 F. Supp. 442, 454, 462 (S.D. Cal. 1945) ("Brooks" is an abbreviation for "Brooks Brothers;" defendant enjoined from using "Brooks" for clothing stores). H&R Block, thus, has established common law rights in the trademark "Block."

H&R Block has also established that it owns a family of "Block" trademarks. "A family of marks exists when one common family characteristic appears as part of all the marks used, and the owner has sufficiently advertised or promoted the marks to establish, in the minds of the public or the trade, a recognition that he possesses a 'family of marks' identified by the common

---

[10] Block, Inc. criticizes the methodology of the Jay Survey. But, for the purposes of analyzing whether H&R Block has acquired any common law or family of marks protection over the word "Block," the Court credits Dr. Jay's findings. While Block, Inc. faults Dr. Jay for "priming" survey respondents with the relevant market—here tax services—that critique has no relevance at this step, where customer recognition in the relevant market is the appropriate consideration.

characteristic." *Scott v. Mego Int'l, Inc.*, 519 F. Supp. 1118, 1128 n.6 (D. Minn. 1981) (citing Callmann, Unfair Competition, Trademarks, and Monopolies § 82.1(f)); *Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 395 (7th Cir. 1992) ("A number of cases have explained that possession of several marks with a common suffix, prefix or syllable can give rise to a protected 'family' of marks; the common element is the family 'surname.'"). Here, that common characteristic is "Block."[11]

Block, Inc. argues that, because H&R Block frequently uses "H&R Block" near "Block," H&R Block does not own rights in "Block" alone. D-2 (Wind Decl.) ¶¶ 7, 51–56, 64, 73; D-3 (Dhar Decl.) ¶¶ 54–64. That H&R Block may frequently use its full name or logo together with "Block" does not undermine or negate its rights to use "Block." H&R Block's use of "Block" (regardless of its proximity to the full "H&R Block") gives rise to H&R Block's common law rights. *See MMG Enters., Inc. v. Walter Pye's Mens Shops, Inc.*, Civ. A. No. 94-3750, 1995 WL 16771 (E.D. La. Jan. 17, 1995) (plaintiff owned trademark rights in its abbreviated name "NCL" even though plaintiff often used its full name, "National Clothing Liquidators," in conjunction with its abbreviated name in advertisements); *see also Martahus v. Video Duplication Servs.*, 3 F.3d 417, 424 (Fed. Cir. 1993) (plaintiff's use of its abbreviated name on invoices was a trademark

---

[11] Even if H&R Block had not established protection over "Block" as either a common law trademark or under a family of marks theory, "Block" is a distinguishing feature of H&R Block's many registered trademarks and is therefore entitled to protection. *Northwest Airlines, Inc.*, 467 F. Supp. 2d 957 ("Northwest" worthy of protection even though plaintiff Northwest Airlines did not own a registration for "Northwest" alone, because plaintiff owned numerous trademark registrations that included the word "Northwest"; had continuously used "Northwest" in connection with its services; had sold billions of dollars of services under "Northwest;" had expended many millions of dollars in advertising its services; and had presented evidence of media coverage using "Northwest" to refer to plaintiff); *Lane Bryant, Inc. v Glassman*, 95 F. Supp. 320, 323 (E.D. Mo 1951) (enjoining defendant from using "Maternalane" where plaintiff owned trademark rights in "Lane Bryant," but not "Lane" alone, and sold maternity clothing). *See infra.* Section II(E)(1)(d).

use, even though the invoices also included plaintiff's full name). The Court finds that H&R Block has established that it owns trademark rights in its family of "Block" marks, including both its registered trademarks and its common law "Block" trademark, and that such marks are valid and entitled to protection.

In addition to the "Block" family of marks, H&R Block owns federal trademark registrations for its green square logo, including Registration Nos. 2,533,014, 3,656,593 and 5,179,142. J-1 ¶ 20; J-4. These registrations constitute *prima facie* evidence that the marks are valid, that H&R Block owns those marks, and that H&R Block has the exclusive right to use its green square marks in commerce. 15 U.S.C. § 1115(a). H&R Block has used its green square marks across all of its branding, including office signage, advertisements, its website, and social media, both in combination with the words "H&R Block" and by itself, for decades. J-4 ¶¶ 10–17. Although Block, Inc. disputes the strength of H&R Block's green square logo and argues that it is frequently used near the "H&R Block" word mark, Block, Inc. does not challenge the validity of H&R Block's federal trademark registrations for the green square logo or H&R Block's ownership of those trademarks. Like the meaningful connection between "Block" and H&R Block, the use of the green square logo in conjunction with the "H&R Block" name and the "Block" trademark strengthens the association with the tax and other financial services that H&R Block offers.

### c. Whether Block, Inc. uses "Block" In Commerce

Block, Inc. argues that its use of "Block" is not trademark infringement because "Block, Inc." is only a corporate name and Defendant does not use "Block" as the name of one of its consumer-facing "brands." Doc. 38 at 19. But the Lanham Act prohibits any use by a defendant of any "word, term, [or] name" used "in commerce" that "is likely to cause confusion, or to cause

mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a)(1) (emphasis added). The question is not whether Defendant is using "Block" as a brand or as the name of its consumer-facing apps; rather, the question is whether Defendant is using the "word, term, [or] name" "Block" in commerce.

Block, Inc. clearly uses "Block" in commerce. Examples include:

- A December 1, 2021, press release announcing that it was changing its name to Block, Inc., and that Cash App is one of its "building blocks." Mr. Jennings agreed that "there was a linkage in the very first press release on December 1st between Block, Inc., the newly christened company, and Cash App." P-29; Tr. at 199:22–200:9 (Jennings Cross).

- Block, Inc.'s founder, Mr. Dorsey, tweeted to his six million followers that Square was changing its name to Block. This Tweet was liked over 12,000 times. P-52; Tr. at 208:2–208:14 (Jennings Cross). Mr. Dorsey also tweeted to his six million followers an announcement regarding the launch of Cash App Taxes. This Tweet was liked over 6,900 times. P-59; P-53; Tr. 206:20–207:22; 208:2–209:11 (Jennings Cross).

- Block, Inc. maintains a website at www.block.xyz that states that "Block, Inc. is Square, Cash App, Spiral, TIDAL, TBD54566975," and that "[t]hese are [its] building blocks." P-28; Tr. at 155:2–155:10; 157:8–157:12 (Esperanza Cross). Block, Inc.'s website is intended to be viewed by employees, candidates for employment, investors, regulators, and the media. Tr. at 144:12–145:6 (Esperanza Direct).

- Block, Inc. maintains an Instagram page with the handle @block.xyz which includes a post that Mr. Jennings agreed "is showing the building blocks of Block, including the green square logo of Cash App." P-33; Tr. 202:11–24 (Jennings Cross).

- Block, Inc. maintains a Twitter account with the handle @blocks. P-31; Tr. at 155:25–156:2 (Esperanza Cross). On December 1, 2021, when Defendant announced it was changing its name from Square, Inc. to Block, Inc., it tweeted that "Block is @Square, @CashApp, @spiralbtc, @TIDAL, @TBD54566975" in order "to announce the rebrand[12] from Square to Block and that these are the companies

---

[12] Block, Inc. pinned this post to the top of its account so that it will remain the first thing visitors see when they visit the Block, Inc. Twitter page. Block, Inc. also tagged @CashApp and its other

that are part of Block." This post was liked by more than 6,300 Twitter accounts and shared by more than 2,000 users. P-58; Tr. at 158:5–158:9 (Esperanza Cross).

- Block, Inc. has promoted Cash App on its Twitter account. P-32; Tr. at 201:5–202:4 (Jennings Cross).

- On December 31, 2021, Block, Inc. tweeted a promotional video with the tag line "When the Block strike midnight." P-60.

- In connection with complaints about Cash App's tax services that are filed by consumers with the Better Business Bureau ("BBB"), Block, Inc. signs its responses as coming from "Block." These complaints and responses are posted on the BBB website for the public's review. P-88, Ex. 6; Tr. at 216:3–218:5 (Jennings Cross).

- Block, Inc. uses the name "Block" in its privacy policy, which Mr. Jennings agreed was "important to consumers these days." Tr. at 197:25–198:2, 199:3–199:5 (Jennings Cross).

- Block, Inc. indicates that Cash App sweepstakes are "sponsored by Block, Inc." P-72; Tr. at 210:5–211:16 (Jennings Cross). One such sweepstakes garnered approximately seven million views and 78,600 likes on Twitter as well as over 567,000 views on Instagram. D-3 ¶¶ 48-49.

- Block, Inc.'s website features a playlist titled "Block Vibes," which features a link to Block, Inc.'s TIDAL website with a playlist of songs curated by Jay-Z. Including these songs on the www.block.xyz website can only have been done to attract public attention to the website. Tr. at 94:3–94:18; 119:23–119:25 (Jones Cross).

These uses are all uses in commerce and fall squarely within the scope of use against which the Lanham Act protects.

As further proof of its intention to use "Block" in commerce, Defendant has filed an application with the USPTO to register "Block" as a trademark for a variety of services. Tr. at 159:24–162:25 (Esperanza Cross). In that application, Block, Inc. told the USPTO under penalty of perjury that it plans to use "Block" in commerce and in connection with its business promotion and management services for its subsidiaries (like Cash App); these uses will—and already do—

_____

brands' social media accounts to connect those accounts and their followers to Block, Inc.'s @blocks Twitter page. Tr. 157–158 (Esperanza Cross).

constitute use of an allegedly infringing mark in commerce. P-73.

What's more, even if Block, Inc. is correct that it is only using "Block" as a corporate name or as the name of its "corporate parent," Tr. at 274:14–274:25 (Def.'s Closing), such use is still actionable under the Lanham Act. *See* J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 9:3 (5th ed. 2021) ("defendant's use of plaintiff's trademark as part of defendant's corporate title and name, can be viewed as trademark infringement"). Corporate names can be infringing, and courts have enjoined use of a defendant's corporate name that includes a plaintiff's trademark. *Safeway Stores, Inc. v. Safeway Props., Inc.*, 307 F.2d 495, 499–500 (2d Cir. 1962) (affirming preliminary injunction against defendant's use of plaintiff's "Safeway" trademark in its corporate name, Safeway Properties, Inc.); *Nat'l Customer Eng'g Inc. v. Lockheed Martin Corp.*, No. 96–8938, 1997 WL 363970, at *6 (C.D. Cal. Feb. 14, 1997) (enjoining defendants' use of corporate name, MountainGate Systems, Inc.).[13]

The green square Cash App and Cash App Taxes logo is also used in commerce. It is undisputed that the green square logo appears in connection with the Cash App and Cash App Taxes products. It appears on every Cash App user's phone or tablet and is displayed prominently on the Cash App website. It is also featured in connection with the Cash App Taxes section of both the Cash App website and application.

---

[13] Block, Inc.'s reliance on *Armstrong Cork Co. v. World Carpets, Inc.*, 597 F.2d 496 (5th Cir. 1979) to argue that it does not use "Block" as a source identifier is misplaced. In *Armstrong*, the court was clear that the defendant "[sought] merely to change its corporate name" and there was "no showing that [the defendant was] seeking to feature either its new name in its entirety or, more significantly, the term WORLD to denominate or advertise its carpets." *Id.* at 505. That is not the case here. Defendant is using the name "Block" and a green square logo to promote its brands, including Cash App and its new tax services. Block, Inc.'s argument is, however, relevant to the scope of relief that is appropriate. At this stage of the proceedings, H&R Block is seeking only an order prohibiting Block, Inc. from using "Block" in any public-facing way in connection with the services that both Block, Inc. and H&R Block provide. This relief is consistent with both the *Safeway* and *Armstrong* decisions.

### d. Whether Block, Inc.'s Name and the Green Square Logos are Likely to Cause Confusion

Because H&R Block has valid trademarks and because Block, Inc. is using the allegedly infringing "marks" in commerce, success on the merits turns on whether H&R Block can prove that Block, Inc.'s new name and the Cash App logos create "a likelihood of confusion, deception, or mistake on the part of an appreciable number of ordinary purchasers as to an association between [H&R Block] and [Block] due to their common use of the trademarks." *Gen. Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 626 (8th Cir. 1987). While purchaser confusion is the Court's "primary focus," *Elec. Design & Sales, Inc. v. Elec. Data Sys. Corp.*, 954 F.2d 713, 716 (Fed. Cir. 1992), the Court may also consider the likelihood of confusion for other stakeholders, including investors, the media, vendors, and potential and current employees. *First Nat'l Bank in Sioux Falls v. First Nat'l Bank S. Dakota*, 679 F.3d 763, 770 (8th Cir. 2012); *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 298 n.24 (3d Cir. 2001) ("[E]vidence of any confusion at all, by investors, purchasers, or the media, may still affect this Court's determination of whether there is a likelihood of confusion by purchasers, for if there is evidence that, for example, the media, whose words purchasers read, is confused about the names of these companies, then it is more likely that purchaser will be confused as well"); *U.S. v. Hon*, 904 F.2d 803, 806, 08 (2d Cir. 1990) ("Courts outside our circuit have also extended Lanham Act confusion to the public at large") (collecting cases).

To determine the likelihood of confusion in the Eighth Circuit, the Court "employs a list of nonexclusive factors [to address] a core inquiry: whether the relevant average consumers for a product or service are likely to be confused as to the source of a product or service or as to an affiliation between sources based on a defendant's use." *Select Comfort Corp. v. Baxter*, 996 F.3d 925, 933 (8th Cir. 2021) (citing *Anheuser–Busch, Inc. v. Balducci Publ'ns*, 28 F.3d 769, 774 (8th

Cir. 1994). Those factors are: "(1) the strength of the trademark; (2) the similarity between the plaintiff's and defendant's marks; (3) the competitive proximity of the parties' products; (4) the alleged infringer's intent to confuse the public; (5) evidence of any actual confusion; and (6) the degree of care reasonably expected of the plaintiff's potential customers." *Anheuser-Busch, Inc.*, 28 F.3d at 774 (citing *SquirtCo. v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980)). Courts must interpret the likelihood of confusion expansively and protect against any use of a plaintiff's mark "which would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner." *Id.* (citations omitted). Accordingly, no single *SquirtCo.* factor is dispositive, nor is the list exclusive; numerous factors must be weighed and considered by the Court to determine whether a likelihood of confusion exists "in light of what occurs in the marketplace, taking into account the circumstances surrounding the purchase of the goods." *Vitek Sys., Inc.*, 675 F.2d at 192. Indeed "different factors will carry more weight in different settings," *Select Comfort Corp.*, 996 F.3d at 933 (citations omitted), and are not entirely separable. *Kemp v. Bumble Bee Seafoods, Inc.*, 398 F.3d 1049, 1054 (8th Cir. 2005) ("[T]he factors are not entirely separable. For example, it is inappropriate to conduct a side-by-side comparison of the elements of two products' trade dress . . . without reference to the senior mark's strength or the market conditions under which likely consumers would see the marks.").

"This flexible, context-specific, and relative-rather-than-mechanical approach makes sense because the general function of the likelihood-of-confusion factors is to guide the finder of fact towards considerations generally thought to be material to the consuming public's understanding of product source or affiliation. Common sense is inherent in the factors, and the factors, properly applied, should try to capture a holistic view of the normal experiences for any given industry,

product, or service.  The consumer experience differs by products (buying a toothbrush vs. buying a car vs. professional buyers obtaining input goods for a factory), and the relative importance of any given factor is influenced greatly by how the other factors might apply." *Select Comfort Corp.*, 996 F.3d at 934.

Also relevant in considering the *SquirtCo.* factors is the potential likelihood of reverse confusion or initial interest confusion. "Reverse confusion occurs when a large junior user saturates the market with a trademark similar or identical to that of a smaller, senior user.  In such a case, the junior user does not seek to profit from the good will associated with the senior user's mark.  Nonetheless, the senior user is injured. . . ." *Minn. Pet Breeders, Inc. v. Schellv. Kampeter, Inc.*, 41 F.3d 1242, 1246 (8th Cir. 1994) (quoting *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 957 (7th Cir.1992)).  Initial interest confusion is "confusion that creates initial customer interest, even though no actual sale is finally completed as a result of the confusion. . . . In general, the theory of initial-interest confusion recognizes that a senior user's goodwill holds value at all times, not merely at the moment of purchase. The theory protects against the threat of a competitor receiving a free ride on the goodwill of an established mark." *Select Comfort Corp.*, 996 F.3d at 932 (citations and quotation marks omitted).

### (1) Strength of the Marks

"A strong and distinctive trademark is entitled to greater protection than a weak or commonplace one." *Frosty Treats v. Sony Computer Ent. Am. Inc.*, 426 F.3d 1001, 1008 (8th Cir. 2005); *SquirtCo.*, 628 F.2d at 1091.  A mark's overall strength is measured both conceptually and commercially.  *Lovely Skin, Inc. v. Ishtar Skin Care Prod.*, LLC, 745 F.3d 877, 888 (8th Cir. 2014).

**Conceptual Strength**.  The conceptual strength of a trademark measures whether the mark itself is distinct or strong enough to merit protection.  To measure the conceptual strength of a

27

trademark, courts must classify it into one of four categories: generic, descriptive, suggestive, or arbitrary or fanciful. *Insty\*Bit, Inc. v. Poly-Tech Industries, Inc.*, 95 F.3d 663, 672 (8th Cir. 1996); *Cellular Sales, Inc. v. Mackay*, 942 F.2d 483, 486 (8th Cir. 1991) (citation omitted). A generic mark is one that is used by the public to identify a category of goods or the nature of an article, or "refer[s] to the genus of which the particular product is a species[,]" and is not protected. *Insty\*Bit*, 95 F.3d at 672 n. 13; *Duluth News-Tribune*, 84 F.3d at 1096. An arbitrary mark is one that uses a common word to describe a product in an unfamiliar way, while a fanciful mark is one invented solely for use as a trademark; both are entitled to the highest level of protection. *Insty\*Bit*, 95 F.3d at 672 n. 10; *Duluth News–Tribune,*, 84 F.3d at 1096. Suggestive and descriptive marks "fall somewhere in between." *Id.* A suggestive mark requires "imagination, thought, and perception to reach a conclusion as to the nature of the goods[,]" and, like arbitrary or fanciful marks, "are entitled to protection regardless of whether they have acquired secondary meaning." *Frosty Treats*, 426 F.3d at 1005. A descriptive mark, on the other hand, conveys the "immediate idea of the ingredients, [or] qualities or characteristics of the goods," and is only protectable if it has acquired a secondary meaning. *Id.*

H&R Block contends that its marks are arbitrary, because they do not "suggest nor describe any ingredient, quality, or characteristic of those goods or services." *See* Doc. 17, at 17 (citing *Select Comfort Corp. v. Baxter*, 156 F. 3d 971, 984 (D. Minn. 2016)). Block, Inc. counters that H&R Block was named for its founders—the Bloch brothers—and therefore, its "Block" marks are descriptive. *Fischer & Frichtel Custom Homes, LLC v. Fischer Mgmt.*, No. 4:21-cv-00470, 2021 WL 1750174, at *3 (E.D. Mo. May 4, 2021) (stating that surnames are classified as "descriptive marks requiring secondary meaning for protection under trademark law.") (citations omitted).

All H&R Block's registered textual trademarks—H&R BLOCK, H&R BLOCK EMERALD CARD, H&R BLOCK EMERALD SAVINGS, H&R BLOCK EMERALD ADVANCE, BLOCKWORKS, BLOCK ADVISORS, or BLOCK HAS YOUR BACK—and the unregistered stand alone "Block" trademark are arbitrary. The H&R Block marks, including "Block," "do[] not immediately convey an idea of the qualities and characteristics" of the goods and services H&R Block provides, namely, tax, financial and charitable goods and services. *See Zerorez Franchising Sys., Inc. v. Distinctive Cleaning, Inc.*, 103 F. Supp. 3d 1032, 1042 (D. Minn. 2015).

Block, Inc. is correct that when a mark is "primarily merely a surname" it is generally considered descriptive. *Schlafly v. Saint Louis Brewery, LLC*, 909 F.3d 420, 425 (Fed. Cir. 2018). But that is not the case here. H&R Block was named *for* its founders, but the company name is not the names *of* its founders. *Cf. Fischer & Frichtel Custom Homes, LLC*, 2021 WL 1750174, at *3 (finding dispute between companies named "Fischer" and "Fischer & Fritchtel" to involve descriptive marks because they were nothing more than the surnames of the respective parties). Moreover, even if the mark was the same as the name of the Bloch founders (which it is not), the mark still would be conceptually strong given the decades of use, billions of dollars in advertising of the "Block" marks, and the fact that "block" is not a term that has any dictionary meaning in association with taxes and related financial services. *General Motors, LLC v. Rapp Chevrolet, Inc.*, No. CIV 12-4209, 2013 WL 2245472, at *5 (D.S.D. May 21, 2013) (finding the mark "Chevrolet," named from Louis Chevrolet, in use for decades, promoted nationally, and highly recognizable to the public, to be "somewhat 'arbitrary or fanciful' in nature" and "entitled to a high level of protection"); *see also Moon Seed LLC v. Weidner*, No. 3:20-cv-00104, 2021 WL 2627455, at *4 (S.D. Iowa Apr. 22, 2021) (finding "Moon," the last name of the company's

founder, "arbitrary and inherently distinctive" because "Moon" is "not typically associated with agricultural seed").

Further, H&R Block's green square logo is arbitrary because it is not suggestive or descriptive of tax services or financial services. Its green square marks are also distinctive for tax and financial services, having been used by H&R Block for decades to brand its products. Therefore, the H&R Block marks are arbitrary, distinctive, and conceptually strong when connected to tax services and the name "Block."

**Commercial Strength**.  A mark's commercial strength reflects the mark's "public recognition and renown[,]" as evidenced by "the extent of advertising, sales volume, features and reviews in publications, and survey evidence." *Roederer v. J. Garcia Carrion, S.A.*, 732 F. Supp. 2d 836, 867 (D. Minn. 2010) (citations omitted).  Commercial strength is measured in "the class of customers and potential customers of a product or service, and not the general public[,]" *Palm Bay Imports v. Veuve Clicquot Ponsardin Maison Fondee en 1772*, 396 F.3d 1369, 1375 (Fed. Cir. 2005) (assessing fame or strength of a mark), and is measured "at the time the mark is asserted in litigation." *Roederer*, 732 F. Supp. 2d at 867 (citations and quotations omitted).  H&R Block's registered marks are commercially very strong.  Its common law mark, "Block" is also relatively strong, given the length of H&R Block's use of the mark and its extensive advertising efforts that include the stand-alone mark.

H&R Block's CEO testified that H&R Block has invested billions of dollars advertising and promoting the "Block" brand. Tr. 245:14–245:20 (Pls.' Closing); Tr. 58:12–58:21 (Jones Direct); *see also* J-4 ¶ 4.  H&R Block has over 10,000 store fronts worldwide.  H&R Block's Block Advisors has over 300 additional physical locations and, last year alone, served about two million small business owners.  Tr. 57:15–58:11 (Jones Direct).  Meanwhile, online, H&R Block's

MyBlock application, where customers and tax professionals connect under the "Block" mark, has had over 50 million logins. Tr. 56:2–56:14 (Jones Direct). It is undisputed that H&R Block is one of the largest and most well-known tax services companies in the country and it helps millions of customers with their taxes every year.

The commercial strength of H&R Block's marks is reinforced by H&R Block's successful enforcement efforts against infringers—including against the confusingly similar marks "Tax Block," "Think Outside the Block," "Thinking Outside the Block," and "T&R Block." Tr. 60:14– 61:2 (Jones Direct); J-1 ¶¶ 18-19; *see also Roederer*, 732 F. Supp. 2d at 868 (finding a plaintiff's successful enforcement of its trademark rights "enhances the commercial strength" of its mark); *Bd. of Trustees of Univ. of Ark. v. Prof. Therapy Servs.*, 873 F. Supp. 1280, 1288 (W.D. Ark. 1995) (finding "owner's actions to protect its marks through the use of cease and desist letters and litigation" is an additional "indicia of strength").

Block, Inc. does not contest these measures of commercial strength. However, it does argue that the commercial strength of the stand-alone "Block" mark is diminished for three reasons. First, Block, Inc. argues that H&R Block's actual usage of "Block" shows it is not meant to be a source identifier. For example, Block, Inc. points out that when H&R Block uses a stand-alone "Block" reference, it almost always includes the full H&R Block name and logo close by. *See* Tr. at 101:5–114:20; D-3 (Dhar Decl.) ¶¶ 55–63; D-31 (H&R Block's social media accounts); Tr. at 115:9–23 (Pls.' CEO agreeing that all cited news articles also refer to "H&R Block"); Tr. at 113:14–17 (CEO's baseball jersey worn to internal employee events bears full "H&R Block" logo on the sleeve, *see* P-15 (selected images of "Block" jersey)). Block, Inc. also argues that H&R Block does not use Search Engine Optimization to promote the stand-alone "Block" name; to Block, Inc., this shows that H&R Block does not believe that customers will look for H&R Block

using just "Block." *See* D-2 (Wind Decl.) ¶¶ 58–60 & Ex. M.

Next, Block, Inc. argues that its recognition surveys show that customers do not associate "Block" with H&R Block outside of the tax market. In surveys conducted by Block, Inc.'s experts, when respondents were not told to focus on the tax market, only approximately 6% associated "Block" with H&R Block. Meanwhile, H&R Block's expert Dr. Jay showed that, when asked in the context of tax services, 45% of the general consuming public in the United States recognizes "Block" as a brand name for H&R Block. J-5 (Jay Rebuttal Decl.) ¶ 6. The parties fiercely dispute whether the survey respondents should have been "primed," or told that the "Block" brand about which they were asked existed in the tax market.

Block, Inc. also argues that, under the Crowded Field Doctrine, H&R Block cannot claim commercially strong marks in the financial services industry more broadly because over 60 other "Block" marks have been registered and are associated with financial services. *See* D-3 (Dhar Decl.) ¶¶ 65, 68 & Ex. M (listing more than 60 third-party trademarks using "BLOCK," relating to financial goods and services); J-2 (Esperanza Decl.) ¶ 26 (citing a social media post that references six blockchain-related companies with "BLOCK" in their names); P-7 (MacAneney Decl.) ¶ 3 & Ex. A (listing over 200 trademarks using "BLOCK," including 12 related to blockchain technology).

The Court finds none of these challenges persuasive.

First, H&R Block does market itself using the stand alone "Block" brand. J-1 ¶¶ 11, 14, 16; J-4 ¶¶ 11, 13; Tr. at 58:22; 61:14–61:20; 62:2–62:6; 63:19–63:22, 66:7–67:11 (Jones Direct). While Block, Inc. is correct that, in many instances, the full H&R Block branding is close by, Block, Inc. has cited no case holding that *commercial strength* of a stand-alone mark is diminished simply because a company's full name and logo are located nearby, and the Court sees no reason

that the use of one trademark near another would decrease the commercial strength of either mark, as long as both are used and recognized by consumers. The record is clear that H&R Block widely promotes itself as "Block" and that customers and media outlets alike use the shorthand "Block" to refer to H&R Block. While H&R Block does not use Search Engine Optimization to direct internet traffic using "Block," a fact largely unknown to the public and easily changeable, that does not change the many ways in which H&R Block does market itself and engage with the public using the stand alone "Block" branding.

Second, while the parties strongly dispute the propriety of the Jay survey, the law is clear that the Court must weigh a mark's commercial strength in the relevant marketplace—here, tax services. *Palm Bay Imports*, 396 F.3d at 1375. As such, that Dr. Jay primed survey respondents to think of brands in the tax industry does not lead the Court to discount her survey results for the purposes of the commercial strength analysis.[14] Dr. Jay concluded that 45% of the public recognize "Block" as H&R Block when it comes to tax services. J-5 (Jay Rebuttal Decl.) ¶ 6. This supports the conclusion that "Block" is commercially strong.

Third, even though many similar third-party registrations exist, it seems that few, if any, offer services similar to H&R Block. *See* D-3 (Dhar Decl.) ¶¶ 65, 68 & Ex. M (listing more than 60 third-party trademarks using "BLOCK," relating to financial goods and services); J-2 (Esperanza Decl.) ¶ 26 (citing a social media post that references six blockchain-related companies

---

[14] Nor is the Court persuaded to discount Dr. Jay's results by Block, Inc's criticism that Dr. Jay used an improper design or by using an implausible control stimulus. Similar questions have been credited in other cases as appropriate questions to test brand recognition. *See Visa Int'l Serv. Ass'n v. JSL Corp.*, 590 F Supp. 2d 1306, 1315 (D. Nev. 2008); *Combe Inc., v. Dr. August Wolff GmBH and Co. KG Arzneimittel*, 382 F. Supp. 3d 429, 438–39 (E.D. Va. 2019). Additionally, the design of the Jay Survey has been endorsed by scholars as an appropriate design to test brand recognition. *See* Shari Seidman Diamond, Surveys in Dilution Cases II, Trademark and Descriptive Advertising Surveys: Law Science and Design, 155, 156–57 (ABA, S. Diamond & J. Swann eds. 2012).

Case 4:21-cv-00913-NKL   Document 105   Filed 04/28/22   Page 33 of 67

with "BLOCK" in their names); P-7 (MacAneney Decl.) ¶ 3 & Ex. A (listing over 200 trademarks using "BLOCK," including 12 related to blockchain technology). Because the third-party registrations are not used in H&R Block's core market, the Court finds them to be less relevant to commercial strength. *Scarves by Vera, Inc. v. Todo Imports Ltd.*, 544 F.2d 1167, 1173 (2nd Cir. 1976) ("The significance of third-party trademarks depends wholly upon their usage."); *J &B Wholesale Distrib., Inc. v. Redux Beverages, LLC*, 621 F. Supp. 2d 678, 685 (D. Minn. 2007) (giving little weight to third-party uses of mark on unrelated products). What's more, even if the Court did consider the third-party registrations relevant, it is not clear from the record how—and whether—any of the marks are used and how customers interact with them; the Court cannot fully assess their probative value without that information. *Advantus Cap. Mgmt.*, 2006 WL 2916840, at *2 (citing *Palm Bay Imports, Inc.*, 396 F.3d at 1373.

Finally, it is not surprising that 45% of the Jay Survey participants recognized "Block" as a brand name for H&R Block in the context of tax services. H&R Block has been active in the tax preparation sector for over six decades and has spent half a billion dollars on advertising to promote its products and services in the last three years alone.

Especially when combined with the green square logo, the Block trademarks are very strong. Accordingly, this factor weighs heavily in favor of H&R Block.

### (2) Similarity of Marks

When considering whether marks are similar, courts analyze "similarities of sight, sound, and meaning." *Gen. Mills, Inc.*, 824 F.2d at 627. "[S]imilarity in any one of the elements of sound, appearance or meaning is sufficient to support a determination of likelihood of confusion." *Eveready Battery Co. v. Green Planet, Inc.*, 91 U.S.P.Q.2d 1511, at *9 (T.T.A.B. 2009). In making the comparison, the Court must not simply do a side-by-side comparison; instead, it "must evaluate

the impression that each mark in its entirety is likely to have on a purchaser exercising the attention usually given by purchasers of such products." *Duluth News-Tribune*, 84 F.3d at 1097 (citing *Gen. Mills*, 824 F.2d at 627).

"Block" is the distinguishing feature in H&R Block's family of "Block" marks—both registered and H&R Block's common law "Block" trademark. Block, Inc. is also using "Block" as its distinguishing feature and has applied to register "Block" as a trademark. Where, as here, "the distinguishing word or feature of a trademark is copied and used with similar goods or services, the consuming public is likely to be confused." *Ford Motor Co. v. Ford Fin. Sols., Inc.*, 103 F. Supp. 2d 1126, 1128 (N.D. Iowa 2000); *see also Kemp*, 398 F.3d at 1055 (finding confusion where parties' marks shared dominant feature, "Louis Kemp"); *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1291–92 (9th Cir. 1992) ("shared dominant element of GALLO" in "Joseph Gallo" for cheese and "E. & J. Gallo" for wine is "sufficient evidence to support a finding of similarity"). Because the marks share a defining feature, "[s]imilarity will deceive almost as much as precise identity. Nice and careful discrimination between the names cannot be expected from a busy public." *Gilbert/Robinson, Inc. v. Carrie Beverage-Missouri, Inc.*, 758 F. Supp. 512, 523 (E.D. Mo. 1991), *aff'd*, 989 F.2d 985 (8th Cir. 1993). Indeed, here, the dominant feature of the competing trademarks is identical: "Block."

To defeat the similarities between Block, Inc. and H&R Block's marks, the Defendant points to market conditions and the way consumers interact with the products. Block, Inc. argues that it only offers tax services under Cash App's branding, not Block, Inc.'s branding. To get to Cash App Taxes, Block, Inc. argues, customers must download the Cash App application on either the Google Play Store or the Apple App Store, navigate through the Cash App application, and arrive at the Cash App Taxes feature. *See* J-9 (Jennings Sur-Rebuttal Decl.) ¶ 6. During that

journey, Block, Inc. argues that consumers only encounter its corporate name in "fine print," such as in the Cash App Terms of Service, the Cash App Consent to Disclosure, and other necessary legal disclosures that must reference the official corporate entity. J-4 ¶ 60 & Ex. 2; Tr. at 192:21–193:4, 209:14–210:4; J-1 (Jones Decl.) ¶ 28; P-88 (Reibstein Reply Decl.) Ex. 6. Block, Inc. argues that these incidental references to "Block" are inconsequential, both legally and to consumers. *Nelson-Ricks Cheese Co. v. Lakeview Cheese Co.*, 331 F. Supp. 3d 1131, 1149 (D. Idaho 2018) (finding that unauthorized use of a mark "in very small print" at the bottom of a package is unlikely to cause confusion among sophisticated consumers), *aff'd*, 775 F. App'x 350 (9th Cir. 2019); *Armstrong Cork Co. v. World Carpets, Inc.*, 597 F.2d 496, 504 (5th Cir. 1979) (concluding that minor infringing reference in the fine print was insufficient to show infringement as a matter of law); *Land O'Lakes Creameries, Inc. v. Oconomowoc Canning Co.*, 221 F. Supp. 576, 581 (E.D. Wis. 1963) (noting that "the purchasing public generally tends to look only to the prominent print of the label"). If this case turned on only incidental references in the fine print, these cases might be persuasive. But it does not.

First, the "fine print" in this case is not incidental, it is required,[15] and some of it legally binds the consumer. The Court will not assume that purchasers as a group ignore legal agreements to which they are committing themselves, even if those terms are in fine print on a website and even if the purchasers are generally unsophisticated. At a minimum, an "appreciable" number of consumers are likely to read agreements to which they are committing themselves and the likelihood of confusion requirement is satisfied when an "appreciable" number of consumers are likely to be confused. Further, Cash App itself has several references to Block, Inc. Therefore,

---

[15] Indeed, Defense counsel argued that Block, Inc. would be irreparably harmed if it had to change its name because that name was inextricably intertwined with Cash App and legally required. *See* Tr. of March, 1, 2022, hearing (Oral Argument Tr.), at 16:14–18:1.

the Court rejects Defendant's argument that accessing Cash App Taxes through the Cash App application breaks the connection between Block, Inc. and Cash App Taxes. This is especially so because the Cash App logo is close in color and style to H&R Block's green square logo which increases the likelihood of confusion.

Second, to assess similarity, the Court must, to the best of its ability, stand in the shoes of an average consumer and simulate actual marketplace context. *Calvin Klein*, 815 F.2d at 503–04. In the actual marketplace, consumers are faced with more than just "fine print" references connecting Block, Inc. to Cash App Taxes. There have been numerous articles not only reporting on Block, Inc., but also on Block, Inc.'s tax service, Cash App Taxes. J-4 (Jones Rebuttal Decl.) ¶ 45 (news articles); Tr. 131:3–22 (comparisons of tax services that refer to "Block's Cash App Taxes"). Block, Inc. argues that the Court should ignore that reality. Instead, it argues that since Block, Inc. is not itself linking Cash App or Cash App Taxes with Block, Inc.'s brand, it is irrelevant that various news outlets have, and continue to do so. P-39; P-48; Telis Demos, Cash App is King for Block Stock, Wall Street J. (Feb. 25, 2022) (referencing "Block's Cash App" and its expansion into tax preparation services).[16]

To support its position, Block, Inc. cites various cases that reiterate that infringement requires proof that "Defendants' use of the marks" or "actual practice" will likely cause confusion. *See e.g.*, *KP Permanent Make-Up, Inc.*, 543 U.S. at 117 (infringement requires showing "the defendant's actual practice is likely to cause confusion" in the minds of consumers "about the origin of the goods or services in question"); *Everest Capital Ltd.*, 393 F.3d at 759 (infringement claims require plaintiff to prove "Defendants' use of their marks was 'likely to cause confusion'

---

[16] Available at https://www.wsj.com/articles/cash-app-is-king-for-block-stock-11645807732?st=i9zxetuy8ghhjh2&reflink=desktopwebshare_permalink (emphasis added).

as to the origin of their products and services").  To the Defendant, these cases say that the Court can *only* consider the alleged infringer's actions when evaluating the likelihood of confusion. Nothing in these cases so hold, or so suggest.  These authorities do not foreclose consideration of the marketplace context in which consumers encounter products, even if that context is informed by third-party reporting.  Courts have used the media as a tool in evaluating the likelihood of confusion before.  *Museum of Modern Art v. MOMACHA IP LLC*, 339 F. Supp. 3d 361, 377–78 (S.D.N.Y. 2018) (using social media and news articles to inform analysis of competitive proximity and actual confusion); *Roederer*, 732 F. Supp. 2d at 870 n.9 (using "media mentions" and "internet postings" to "demonstrate similarity and linguistic association between the marks.").  And this Court will do so here.

At core, the cases cited by Block, Inc., and those like them, say only that the defendant's deployment of an infringing mark must lead to confusion.  This case turns on Defendant's actions. Here, Defendant changed its name to Block, Inc. and started offering tax services, like those offered by H&R Block, almost contemporaneously.  Block, Inc. decided to integrate these tax services into its Cash App product, which operates under a green square logo, just like H&R Block. Block, Inc. also publicly links itself to its Cash App product; it identifies Cash App as one of its "building blocks," and Cash App frequently shows up on various social media accounts affiliated with Block, Inc., including in Tweets by Block, Inc. founder Jack Dorsey.  Tr. at 198:18–198:25 (Jennings Cross); P-31; P-33; Tr. at 155:22–156:8 (Esperanza Cross); Tr. 155-159; J-3 (Jennings Decl.) ¶ 7; P-52 (@jack Tweet of name change, reflecting 6 million+ followers); P-58 (Block, Inc. Tweeting about its name change).  Many Block, Inc. employees indicate on their LinkedIn profiles that they work for "Cash App at Block" or "Cash App (Block)," and, because Cash App is not its own legal entity, Block, Inc. responds to consumer complaints made to the Better Business Bureau

about Cash App Taxes, signing off with "Block." Tr. 157-158 (Esperanza Cross); P-35; P-58. It is this "actual practice" that H&R Block claims will cause confusion, and it is in this marketplace context that consumers interact with Block, Inc.'s alleged infringement. The use of green square logos by Cash App and Cash App Taxes and H&R Block further increases the likelihood of confusion.

Moreover, nothing requires—or allows—the Court to ignore elements of this marketplace context, such as public links between Block, Inc. and Cash App and Cash App Taxes, just because the alleged infringer did not itself directly make them. While paid company advertising is one source of marketing, so too is media reporting, especially when the media is reporting as a direct result of actions taken by the owner of a product. A savvy businessperson knows that the media can be, and often is, an effective—and free—source of marketing. Here, because the media is reporting on Block, Inc.'s own actions, and the consumer will undoubtedly be exposed to that reporting, the Court should consider how the media will exacerbate confusion caused by the Defendant's usage of "Block." *Calvin Klein Cosms. Corp.*, 815 F.2d at 504 ("A realistic evaluation of consumer confusion must attempt to recreate the conditions in which buying decisions are made[.]"); *Vitek Sys., Inc.*, 675 F.2d at 192 (holding that courts must analyze confusion "in light of what occurs in the marketplace, taking into account the circumstances surrounding the purchase of the goods."). As such, the Court finds it very likely that H&R Block will succeed in convincing a factfinder that a customer in live market conditions, and exposed to the stimuli that those conditions bring, would be likely to associate Block, Inc.'s products or services with H&R Block. *Mutual of Omaha Ins. Co.*, 836 F.2d at 399 n.4. To hold otherwise would ignore the Eighth Circuit's instruction to apply the likelihood of confusion factors in a way that captures "considerations generally thought to be material to the consuming public's understanding of

product source or affiliation." *Select Comfort Corp.*, 996 F.3d at 934. After all, "[c]ommon sense is inherent in the [*SquirtCo.*] factors, and the factors, properly applied, should try to capture a holistic view of the normal experiences for any given industry, product, or service." *Id.*

Block, Inc. also argues that, because H&R Block frequently—if not always—displays its full name and logo near any use of the short form "Block[,]" the similarities between H&R Block's and Block, Inc.'s marks are diminished. *See ZW USA, Inc.*, 889 F.3d at 447 (finding that because a manufacturer's trade name appeared prominently on the website on which its allegedly infringing products were being sold, the marks involved were not similar); *Duluth News-Tribune*, 84 F.3d at 1097 ("[O]therwise similar marks are not likely to be confused when used in conjunction with [the] clearly displayed name of [the] manufacturer." (citation omitted)); *Luigino's*, 170 F.3d at 831 (finding that prominent display of house marks conveyed "perceptible distinctions" between products). But even if H&R Block does use its full name and logo any time it markets itself as "Block," this does not substantially reduce the similarity of the marks. H&R Block's concern, in part, is that consumers will be confused into believing that H&R Block is associated with Block, Inc. By displaying its full name, H&R Block does not reduce that risk because it does not dispel any possible connection between the two companies. In cases like *Duluth News-Tribune* and *ZW USA*, the manufacturer names that were displayed ("Publication of the Mesabi Daily News, Virginia and Daily Tribune, Hibbing" and "BagSpot," respectively) clearly differentiated the mark holder from the alleged infringer. In those cases, it makes sense that the presence of the manufacturer's name would reduce confusion. Here, however, given the similarity between the names "H&R Block" and "Block, Inc.," the presence of the full H&R Block name does little to dispel confusion, especially because the dominant impression of both is "Block." *See, e.g., Guthrie Healthcare Sys. v. ContextMedia, Inc.*, 826 F.3d 27, 39 (2d Cir. 2016) ("Nor is likelihood

of confusion dispelled by the fact that Defendant often uses its name, ContextMedia, alongside the logo."). Further, H&R Block's green logo, "Block," and the full company name all form a part of H&R Block's branding. They each are meant to reinforce one another, and H&R Block has worked to solidify that connection in the minds of consumers. An effort that has succeeded, as evidenced by consumer recognition of "Block's" association with tax preparation.

The Court next turns to similarities between its standalone green square mark (  ) and the Cash App logo (  ). H&R Block and Block, Inc. both use similar green square logos to promote their products and services. While there are minor differences, perhaps distinguishable through a side-by-side comparison, in live market conditions it is unlikely that the average consumer would appreciate them. Mr. Jones on cross examination did say that he was not previously concerned about the green square logos of Cash App and Credit Karma prior to Block, Inc.'s name change and its acquisition and integration of Credit Karma Tax. However, it is clear from the totality of the record that he and H&R Block are concerned about Defendant's use of the green square logo now that Block, Inc.'s services include tax preparation and related financial services that are accessible on a platform which links the product to Block, Inc.

This factor weighs strongly in favor of H&R Block.

### (3) Degree of Competition

Analysis of the degree of competition factor, the third *SquirtCo.* factor, requires a broad examination of the "products' relationship in the market." *Kemp*, 398 F.3d at 1056. "Products are in competitive proximity when there is similarity or overlap in their sales outlets, trade channel, and customers." *Roederer*, 732 F. Supp. 2d at 868. A showing of direct competition is not required." *Kemp*, 398 F.3d at 1056 (citing 15 U.S.C. §1125(a)(1)(A)); *see also Mut. of Omaha Ins. Co.*, 836 F.2d at 399. The "proper application of this factor requires exploration of the

likelihood that consumers would draw a connection between the two [services or products] and be confused as to the identities of their respective sources." *Kemp*, 398 F.3d at 1056. If consumers are likely to associate the two product lines, this factor weighs in favor of confusion. *Id.*

H&R Block and Block, Inc. both offer tax, small business, payroll, and invoicing services, as well as debit cards, mobile banking platforms, direct deposit, spending rewards programs, small dollar lending programs, and business banking accounts. Block, Inc.'s tax and other financial services are similar to, and in direct competition with, H&R Block's, which weighs in favor of a likelihood of confusion. *See Ford Motor Co.*, 103 F. Supp. 2d at 1128 (enjoining "Ford Financial Services" where defendant's services were "similar to" and "compete with the financial services that Ford [Motor Co.] provides"); *see also 3M Co. v. Mohan*, No. 09-1413, 2010 WL 5095676 (D. Minn. Nov. 24, 2010) (finding trademark infringement and granting injunction where plaintiff sold some of its products online, and defendant used the Internet as its sole channel of trade); *Emerson Elec. Co. v. Emerson Quiet Kool Corp.*, 577 F. Supp. 668, 677 (E.D. Mo. 1983) (finding products in close competitive proximity where products were used for same purpose, sold during same time of year, and sold through similar channels). What's more, both H&R Block and Block, Inc. target the same customers for these services: the "underbanked." J-1, ¶¶ 14, 29–30. Block, Inc. also has indicated in its trademark application that it intends to offer charitable services under its "Block" mark, which will compete directly with H&R Block's charitable community impact programs, including its "Make Every Block Better" program. While Block, Inc. also offers services that H&R Block does not, "[w]here products are related … it is reasonable for consumers to think that the products come from the same source, and confusion, therefore, is more likely." *Kemp*, 398 F.3d at 1056.

Block, Inc. argues that the parties are not in competition because Block, Inc. does not offer

tax services under the "Block" name; instead, Defendant uses Block, Inc. as a parent company and for corporate services. According to the Defendant, because it does not market Cash App and Cash App Taxes to customers using Block, Inc. branding, it does not offer those services under the "Block" mark. Def.'s Proposed Order, at 31 (citing *Davis v. Walt Disney Co*. 430 F.3d 901, 904 (8th Cir. 2005)). The Court disagrees.

First, Block, Inc. may refer to itself as a parent company, but that is not, in the traditional sense, true. None of Block, Inc.'s "building blocks" are legal entities; they are not subsidiaries owned by Block, Inc. The only legal entity is Block, Inc. Block, Inc. offers tax services, and the fact that it does so through its separately branded Cash App platform does not change this conclusion. Second, as discussed above, Block Inc. is directly, and publicly, linked to Cash App and its tax filing services through both its own advertising, public reporting, and the express references to Block, Inc. within the Cash App and Cash App Taxes interfaces. Accordingly, the Court will consider the competition between each of Block, Inc.'s "building blocks" and H&R Block.

As Block, Inc. concedes,[17] because Cash App offers the Cash App Taxes feature using its green square logo, the competitive proximity of the services offered under the parties' green square logos also weighs in Plaintiff's favor. While Block, Inc. is correct that Cash App Taxes and H&R Block's tax services are accessible through somewhat different channels—Cash App Taxes requiring the Cash App application and H&R Block's services being accessible in person, through freestanding software, and, in part, on an app—there is enough overlap to find this factor weighs in favor of H&R Block. Indeed, given the ubiquitous and evolving reach of the internet today, a

---

[17] *See* Def.'s Proposed Order, at 31.

consumer would assume that a brick-and-mortar service provider would also be functioning on the internet, increasing the risk that consumers will be confused about the origin of Block, Inc.'s "building blocks" that are related to tax and financial services.  Further, Defendant and Plaintiffs are competing for the same customers (underbanked tax filers) during the same timeframe (tax season).  *3M Co.* 2010 WL 5095676 (finding trademark infringement and granting injunction where plaintiff sold some of its products online, and defendant used the Internet as its sole channel of trade); *Emerson Elec. Co.*, 577 F. Supp. at 677 (finding products in close competitive proximity where products were used for same purpose, sold during same time of year, and sold through similar channels); *see also* Tr. at 175:4–176:5; J-9 (Jennings Sur-Rebuttal Decl.) ¶ 8; Doc. 16-1, at ¶ 4 (explaining H&R Block's storefront business and app); Doc. 53, at ¶ 20 (explaining H&R Block's software is available for purchase from many retailers).  The differences between Cash App Taxes and H&R Block's products and services do not make it such that "customers would [not] stumble across the alleged infringing [product] on accident while seeking the protected product[,]"  *Cf. Eyebobs, LLC v. Snap, Inc.*, 259 F. Supp. 3d 965, 976 (D. Minn. 2017),  especially given the close similarity between the company names at issue.  The similarities between the logos of Cash App and H&R Block —including the distinctive green color scheme—only further reinforces the similarities.

Part of the fundamental infringement analysis here turns on whether H&R Block will be perceived to be affiliated with Block, Inc.  At bottom, it is "reasonable for consumers to believe the products [here] c[a]me from the same source," and therefore this factor weighs in favor of H&R Block.  *See Davis*, 430 F.3d at 904

### (4) Intent to Confuse the Public

"Intent on the part of the alleged infringer to pass off its goods as the product of another

raises an inference of likelihood of confusion, but intent is not an element of a claim for trademark infringement." *SquirtCo.*, 628 F.2d at 1091; *see also* J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 23:106 (5th ed. 2021) ("The good faith intentions of an infringer are no defense to a finding of liability."). Courts have been "reluctant to place undue weight on the 'intent' digit of confusion, particularly in the context of a preliminary injunction proceeding where, as here, the plaintiff is handcuffed by an expedited timeline and [no] discovery." *Bd. of Regents of the Univ. of Houston Sys. v. Houston Coll. of L., Inc.*, 214 F.3d 573, 602 (S.D. Tex. 2016).

Block, Inc. is presumed to have constructive knowledge of the registered "H&R Block" marks. 15 U.S.C. § 1072 ("Registration of a mark on the principal register . . . shall be constructive notice of the registrant's claim of ownership thereof."). Additionally, Block, Inc.'s general counsel, Ms. Esperanza, testified that Block, Inc. conducted a trademark search before adopting the "Block" mark. Tr. at 149:3–149:16. While Ms. Esperanza was unsure if that search identified H&R Block, she testified that she had "heard of H&R Block," knew H&R Block offered tax products and services, and knew that Block, Inc. was choosing the name "Block" even though it was also going to start providing tax services in connection with the Cash App green square logo. Tr. at 152:12–153:5 (Esperanza Cross). There is no doubt that Block, Inc. had knowledge of H&R Block's tax preparation services and its green logos at the time Defendant chose its new name.

H&R Block asks this Court to find this knowledge enough to tip the intent factor in its favor. *See* Doc. 17, at 20 (citing *Cmty. of Christ Copyright Corp. v. Devon Park Restoration*, 683 F. Supp. 2d 1006, 1015 (W.D. Mo. 2010)). While certain district courts have found knowledge to be enough, it appears the Eighth Circuit itself has foreclosed the option. *ZW USA, Inc*., 889 F.3d at 447 ("We have explained that '[k]nowledge of another's product and an intent to compete with

that product is not . . . equivalent to an intent . . . to mislead and to cause consumer confusion.'" (citing *Sensient Techs. Corp. v. SensoryEffects Flavor Co.*, 613 F.3d 754, 766 (8th Cir. 2010)).

Even so, in this case, there is more than just knowledge and an intent to compete. There is also the temporal proximity between Square's acquisition of a tax business and its decision to change its name to Block, Inc., with full knowledge that H&R Block was a competitor in the tax field with a similar green logo. This evidence suggests an intent to trade on H&R Block's reputation. Nonetheless, the Court believes this issue is best addressed after both sides have an opportunity to fully develop the record. At this point, the Court treats intent as a neutral factor.

### (5) Evidence of Actual Confusion

"The test for infringement lies in the likelihood of confusion, not actual confusion; therefore, plaintiffs are not required to prove any instances of actual confusion." *Advantus Cap. Mgmt., Inc. v. Aetna, Inc.*, No. 06-CV-2855, 2006 WL 2916840, at *5 (D. Minn. Oct. 11, 2006) (citing *David Sherman Corp. v. Heublein, Inc.*, 340 F.2d 377, 379 (8th Cir. 1965)). This is particularly true at the preliminary injunction stage, where "plaintiff has prudently attempted to forestall" confusion, *id.*, and "parties rarely have amassed significant evidence of actual confusion." *Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, 758 F.3d 1069, 1072–73 (9th Cir. 2014).

At this early stage, there is some evidence of confusion.

First, H&R Block produced articles that appear to associate Block, Inc.'s Cash App with H&R Block. *See* P-46 (Reuters H&R Block Profile); P-50 (MarketScreener Article). "[T]he fact that media . . . has exhibited confusion indicates that at least some consumers will be confused as well." *Heaven Hill Distilleries, Inc. v. Log Still Distilling*, No. 3:21-cv-190, 2021 WL 5985253, at *25 (W.D. Ky. Dec. 16, 2021); *see also Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.*, 652

F. Supp. 1105, 1113 (S.D.N.Y. 1987), *aff'd*, 830 F.2d 1217 (2d Cir. 1987) (finding that two newspaper articles are evidence of actual confusion); *Acad. of Motion Picture Arts and Sci. v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1456 (9th Cir. 1991) (finding error where the district court did not consider newspaper articles and telephone calls as evidence of actual confusion); *SunAmerica Corp. v. Sun Life Assur. Co. of Can.*, 890 F. Supp. 1559, 1576 (N.D. Ga. 1994) ("[C]onfusion exists when . . . newspapers confuse the names of the parties in reporting financial events"). This is especially true "since the media will often have more resources and expertise regarding the topics they cover than an average consumer would . . . . If even the reporters are confused, some portion of their audience likely would be too." *Heaven Hill*, 2021 WL 5985253, at *25.[18]

Block, Inc. argues that the Reuters Profile and the MarketScreener Article do not represent any confusion; rather, these references were merely reporting on news in the tax industry that was relevant to H&R Block and its stock.[19] But if Block, Inc. were correct, one also would expect to

---

[18] H&R Block has also identified posts on social media that it claims show customer confusion. *See generally* P-25; *see also Nike, Inc. v. Lotas*, No. 220-CV-09431, 2020 WL 7264552, at *3 (C.D. Cal. Nov. 18, 2020) (public comments made on defendant's Instagram page are evidence of actual confusion that support finding a likelihood of confusion). It is true that certain posts could demonstrate confusion between the two companies. Doc. 16-1, at ¶ 34 ("Are you talking about H&R Block?"), ¶ 36 ("Is Block [H&R Block] merging with Square?"). This evidence is certainly probative. That said, there are many other posts that do not reflect confusion, but rather suggest that customers recognize H&R Block and Block, Inc. as different companies. These posts, standing alone, have little probative value, in large part because Block, Inc. produced its own social media evidence, with posters suggesting that confusion between H&R Block and Block, Inc. would be unlikely. The Court considered all of the posts, understanding that they "should be viewed in conjunction with other evidence of actual confusion," but ultimately only found those posts that reflected actual confusion, to be persuasive. *Dream Team Collectibles*, 958 F. Supp. at 1415 (inquiries about relationship between plaintiff and defendant inform confusion).

[19] Block, Inc. makes a similar argument with respect to social media posts identified by H&R Block as indicating customer confusion. It argues that there is no guarantee that customers will interpret the posts by the allegedly confused poster as referencing H&R Block. *See* Def.'s

find articles discussing other competitors in the tax industry, such as TurboTax, yet only H&R Block was mentioned. Thus, the Court does not find Defendant's argument persuasive. At a minimum, these articles are likely to confuse readers into believing that H&R Block and Block, Inc. are affiliated. *See Checkpoint Sys., Inc.*, 269 F.3d at 298 ("[I]f there is evidence that, for example, the media, whose words purchasers read, is confused about the names of these companies, then it is more likely that purchaser will be confused as well") (citation omitted).

Articles like this also can lead to reverse confusion. Readers are likely to believe erroneously that H&R Block is now part of Block, Inc. (which has a market capitalization that is 17 larger than that of H&R Block, Doc. 38 at p. 24 n.9) or is one of its "building blocks." *Dream Team Collectibles, Inc. v. NBA Properties, Inc*., 958 F. Supp. 1401, 1408 (E.D. Mo. 1997) ("In 'reverse confusion,' customers purchase the senior user's goods under the mistaken impression that they are getting the goods of the junior user. That is, reverse confusion occurs when the junior user's advertising and promotion so swamps the senior user's reputation in the market that customers are likely to be confused into thinking that the senior user's goods are those of the junior user: the reverse of traditional confusion.").

Block, Inc. argues that these articles cannot be used to support the actual confusion factor because the actual confusion factor requires incidents of confusion or survey evidence. *See* Def.'s Proposed Order, at 24. But the Eighth Circuit has made clear that consideration of evidence "from which actual or likely consumer confusion could be inferred" is appropriate at the preliminary injunction stage. *Calvin Klein Cosms. Corp.*, 815 F.2d at 504. The lone case cited by Defendant

---

Proposed Order at 27 (citing P-25 at 6, 7, 9, 11). While the specific post identified could be read as Block, Inc. suggests, that is that the poster did not confuse H&R Block and Block, Inc, but rather reflected that H&R Block's stock price decreased *because* of Block, Inc. (then, Square), it is enough at this juncture to say that the ambiguity only contributes to the likelihood of confusion. Some customers are likely to interpret the posts as H&R Block suggests.

involving early injunctive relief, *Fischer & Frichtel*, 2021 WL 1750174 at *6, does not suggest this evidence should not be considered by the Court here. There, the plaintiff presented third-party opinions that the defendant's entry into the market could cause confusion, and limited examples of certain individuals confusing which party had purchased a business. *Id.* The court discounted the third-party opinions and found the instances of actual confusion to be too few and too isolated to support a finding on this factor. *Id.* Unlike that court, this Court gives these early indicators of confusion weight in the context of the facts here and finds that the confusion will only worsen as Block, Inc. is further linked publicly to Cash App and its new tax features.[20]

Block, Inc. also argues that H&R Block's theory that third-party writings—such as posts on social media and media coverage—will cause confusion, even if the posters themselves are not confused, should not be considered. To Block, Inc., only confusion resulting from its own actions is relevant to the likelihood of confusion analysis. As the Court has already explained, the confusion at issue in this case *does* result in part from Block, Inc.'s actions, and nothing in the cases cited by the Defendant prohibit the Court from considering the role third-party media coverage will have on confusion. *See e.g.*, *KP Permanent Make-Up, Inc.*, 543 U.S. at 117; *Everest Capital Ltd.*, 393 F.3d at 759; *Roederer*, 732 F. Supp. 2d at 864; *Rainbow Play Sys., Inc. v. GroundScape Techs., LLC*, 364 F. Supp. 2d 1026, 1034 (D. Minn. 2005). By using "Block," the Defendant's "actual practice" is creating a likelihood of confusion, including by generating

---

[20] Block, Inc. argues that this likely confusion is overstated because, among other reasons, Block, Inc. employs a "house of brands" model, which allows a corporate entity to develop its own identity distinct from its portfolio of brands and vice versa. D-3 ¶ 87. Although a "house of brands" can and often does offer some distance between the product brands and the corporate brand, that is not always the case in practice, P-88 ¶¶ 8–12, and the Court finds that is not the case on the evidence presented here, particularly given the links that are already being made between Block, Inc. and Cash App and the attention paid by the media and consumers alike to technology companies like Block, Inc. P-88 ¶¶ 13–18; 42–47.

coverage by the media that directly links Block, Inc. to its Cash App business unit and its new tax offerings.[21]  *Museum of Modern Art*, 339 F. Supp. 3d at 377–78 (looking to posts on social media and articles to inform the competitive proximity and actual confusion analysis).  Moreover, Block, Inc. cannot claim it had no role in publicizing the information these third parties discuss in their reporting.

Finally, both parties submitted extensive expert evidence—including surveys—to address actual confusion.  For example, Block, Inc. first introduced a survey designed by Wharton Professor Yoram Wind, purporting to show that no confusion with H&R Block is likely from Defendant's Cash App Taxes website, the Cash App name and logo, or the Block, Inc. website. D-2 (Wind Decl.) ¶¶ 41–46.  In response, H&R Block submitted a survey by Sarah Butler, which tested consumer reactions to an article announcing "Block" had acquired Credit Karma Taxes. After consumers identified the "Block" in the article to be H&R Block, Ms. Butler concluded that confusion was likely.  J-6 ¶¶ 34–38, 41–42.  Both parties have additionally launched massive assaults on the methodologies of their opponent's surveys.  "The treatment of survey evidence is simplified once it is recognized that such evidence is circumstantial rather than direct evidence of confusion.  The issue becomes how strong an inference of confusion can be drawn from the particular survey."  § 32:178. Author's Comment: being realistic about surveys, 6 McCarthy on Trademarks and Unfair Competition § 32:178 (5th ed.) (internal quotation and citation omitted).

---

[21] Block, Inc. also cites *Fortres Grand Corp. v. Warner Bros. Entm't Inc.*, 763 F.3d 696, 705 (7th Cir. 2014) to suggest the Court should not consider third-party postings in the actual confusion analysis.  There, the Seventh Circuit rejected online evidence because it *did not* show confusion because the "internet chatter" at issue addressed whether a fictional hacking tool, called "Clean Slate" in a Batman movie could exist, and in no way implicated the plaintiff's "Clean Slate" product.  The Seventh Circuit never said that such evidence *could not* be utilized.  Accordingly, *Fortres* is not persuasive.

At core, "surveys are clarifying evidence, not proof." *Id.* Taken together, the Parties' expert survey evidence does little to move the needle on the actual confusion analysis. Put simply, after considering the surveys, the conclusions drawn from them, and the Parties' criticisms, the experts effectively cancel each other out at this stage, and the Court finds itself in no better position to measure actual confusion from the expert's surveys. The Court is not excluding the expert survey evidence and this evidence has been fully considered, but without cross examination or a hearing devoted to the experts' surveys, the Court is unpersuaded at this time by this evidence.

This conclusion, however, does nothing to alter the Court's decision that there is some evidence of actual confusion based on non-expert evidence. Accordingly, this factor slightly favors H&R Block.

### (6) Customer Sophistication

The sixth and final factor requires courts to look at "the kind of product, its cost and the conditions of purchase" to determine "whether the degree of care exercised by the purchaser can eliminate the likelihood of confusion which would otherwise exist." *ZW USA, Inc.*, 889 F.3d at 447. The Court must stand "in the shoes of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such [consumers] would usually give in buying that class of goods." *Gen. Mills, Inc.*, 824 F.2d at 627 (quotation omitted).

Block, Inc. argues that customers who are using the tax services of H&R Block or Block, Inc. are likely to exercise a higher degree of care because tax preparation "require[s] inquiries into one's financial and personal life." *JTH Tax, Inc. v. Freedom Tax, Inc.*, No. 3:19-CV-00085, 2019 WL 2062519, at *8 (W.D. Ky. May 9, 2019) (finding consumer care weighed against confusion); *see also First Nat. Bank in Sioux Falls*, 153 F.3d at 889–90. The Court generally agrees that customers selecting banks and financial services companies are likely to exercise a relatively

Case 4:21-cv-00913-NKL   Document 105   Filed 04/28/22   Page 51 of 67

higher degree of care.  But, in this case, both parties have highlighted that they market to the un-or-underbanked; that is, individuals "who do not have a relationship with a traditional bank because they do not trust such banks, find them inconvenient to use, or cannot afford the fees and minimums."  J-1, ¶ 14, 29.  The Court finds that this type of customer is less likely to exercise a high level of care when choosing tax software.  Indeed, the primary concern for these consumers would likely be to find the product that can get their tax return filed quickly and easily, and with little or no cost to the consumer.

What's more, it is less likely that customers selecting the products at issue have any experience with or understanding of a "house of brands" model or corporate affiliations more generally.  *See Carling Brewing Co. v. Philip Morris Inc.*, 297 F. Supp. 1330, 1337 (N.D. Ga. 1968) ("[T]he public is generally unaware of the specific corporate structure of those whose products it buys, but is aware that corporate diversification, mergers, acquisitions and operation through subsidiaries is a fact of life" so "it is reasonable to believe" that defendant's use of plaintiff's mark "could lead to some confusion as to the sponsorship of" defendant's products and services); *see also R. J. Reynolds Tobacco Co. v. R. Seeling & Hille*, 201 U.S.P.Q. 856, 1978 WL 21295, at *4 (T.T.A.B. 1978) (recognizing "the common practice which is so prevalent today for large corporations, not only to expand their present line of products, but also to diversify their business to include new fields of endeavor[.]").  In this context, even careful consumers could be confused about whether H&R Block is affiliated with Block, Inc., especially in the context of DIY tax preparation.

In any event, consumer "[s]ophistication does not preclude a likelihood of confusion." *Charles Schwab & Co. v. Hibernia Bank*, 665 F. Supp. 800, 811 (N.D. Cal. 1987) (consumers were likely to be confused "as to association, affiliation and sponsorship of the product, regardless and

perhaps because of the sophistication of the consumers" in the context of the financial services industry, where consumers are "more likely to be aware of…deregulation and diversification"). This is particularly true when the marks at issue—here, both the names and the logos— are nearly identical and the goods and services are similar. *See McGregor-Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1137 (2d Cir. 1979); *Banff, Ltd. v. Federated Dep't Stores, Inc.*, 841 F.2d 486, 492 (2d Cir. 1988) ("Hence, because both parties produce lines of quality apparel under strongly similar marks, this factor does not mitigate against the likelihood of confusion.").

Conditions of purchase provide some opportunity to differentiate the Parties' products; Cash App is accessible only by downloading an app and H&R Block's services are widely available in person, through a stand-alone software sold at many retailers, and on an app. That said, the conditions of purchase are not so different that it dispels the risk of confusion. *3M Co. v. Mohan*, 2010 WL 5095676 (finding trademark infringement and granting injunction where plaintiff sold some of its products online, and defendant used the Internet as its sole channel of trade). Moreover, initial interest confusion is also actionable and relevant. *Select Comfort Corp.*, 996 F.3d 925 (recognizing that a theory of initial interest confusion may apply in a trademark infringement case). Given that Block, Inc. promotes its various brands as "building blocks" of "Block," including on social media, consumers may be confused, even if only initially, into thinking that "Block's Cash App" is affiliated with H&R Block. This is especially so because Cash App and Cash App Taxes are branded with a green square logo—like H&R Block—and contain references to Block, Inc.

This *SquirtCo.* factor tips in H&R Block's favor, or at a minimum, is neutral

### (7) Sum of Factors

"The ultimate inquiry [under the *SquirtCo.* factors] always is whether, considering all the

circumstances, a likelihood exists that consumers will be confused about the source of the allegedly infringing product." *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 602 (8th Cir. 1999) (citations omitted).

Three of the six *SquirtCo.* factors—strength of the plaintiff's marks, similarity of the marks, and competitive proximity—strongly favor H&R Block. The intent factor and the sophistication factor will be treated as neutral, at this stage. The actual confusion factor tips in H&R Block's favor, but not strongly. None of the *SquirtCo.* factors favor Defendant. Accordingly, the *SquirtCo.* factors, taken together, lead to the conclusion that H&R Block has proven that there is a likelihood of confusion, or mistake on the part of an appreciable number of ordinary purchasers about the source of Cash App and Cash App Taxes. This finding is also consistent with common sense, which, as the Eighth Circuit has made clear, should not be lost in the analysis of the *SquirtCo.* factors.

The *SquirtCo.* factors are not the exclusive factors that the Court should consider when assessing a likelihood of confusion. *See Select Comfort Corp.*, 996 F.3d at 933. In this case, additional considerations also weigh in favor of a likelihood of confusion. As discussed above, Block, Inc. has publicly disclosed that "Block, Inc. is . . . Cash App" and has used "Block" social media to promote Cash App's tax offerings. The media has picked up on this link and has reinforced it by referring to "Block's Cash App" when discussing Cash App, and by describing Cash App's tax offerings as coming from "Block." Consumers, journalists, and others have similarly posted on social media about Block and Cash App. All these comments and articles reinforce the link between Cash App and its tax offerings and "Block," which causes confusion with H&R Block. Courts have recognized, linkages such as these on social media and in the press "further strengthens the relatedness of [the parties'] services in consumers' minds" and can have

a "confusing effect." *Museum of Modern Art*, 339 F. Supp. 3d at 377–78.

This confusion is likely to be amplified given that Block, Inc. is an innovative technology company with a founder and CEO who garners extensive attention and has millions of followers on social media. Mr. Dorsey's announcements about Block, Inc.'s various businesses have already been widely reported. The media will likely continue to provide coverage of Block, Inc. on an ongoing basis as Defendant completes its re-branding, thereby multiplying consumer exposure to linkages between Cash App and "Block."[22]

* * *

In sum, H&R Block has demonstrated that it has valid and protectable marks, and that Block, Inc.'s use of "Block" in commerce in the context of the relevant market is likely to cause confusion. Accordingly, the Court concludes that H&R Block is likely to succeed on the merits of its trademark infringement claim.

### 2. Threat of Irreparable Harm

Having concluded that Plaintiff has shown that it is likely to succeed on the merits of its infringement claim, the Court turns to the second *Dataphase* factor - the threat of irreparable harm.

At this preliminary stage, "A plaintiff seeking an[]… injunction shall be entitled to a

---

[22] Defendant argues that the Court should find that there is no likelihood of confusion because the USPTO has given Defendant's mark "Block" preliminary approval. The Court rejects this argument for multiple reasons. First, because the application for the "Block" mark was limited to "holding company services," a trademark examiner would be looking only for conflicting marks used in connection with holding company services, not tax services. Second, only now, after this preliminary finding was rendered, can Block, Inc.'s mark be published in the Gazette, providing affected parties notice and an opportunity to challenge the application. Thus, the adversarial process in the USPTO has just begun. Finally, any approval by the USPTO is subject to additional judicial review. *See generally* 37 C.F.R. §§ 2.61, 2.80, 2.145; *see also* Michael J. Schwab, Acquiring Trademark Rights and Registrations (2022), Practical Law Practice Note 2-505-1700, accessed April 22, 2022.

rebuttable presumption of irreparable harm . . . upon a finding of likelihood of success on the merits[.]" 15 U.S.C. § 1116(a). "If a plaintiff can demonstrate a likelihood that it will succeed on the merits of its infringement claim . . . it is not a big leap to conclude that [a plaintiff] would be injured by that action." *See* H.R. REP. No. 116-645, pt. 3 (2020) (citation omitted). Because H&R Block has established a likelihood of success on the merits, the Court presumes that it has suffered irreparable harm. *See* 15 U.S.C. § 1116(a); *see also Coca-Cola Co. v. Purdy*, 382 F.3d 774, 789 (8th Cir. 2004) ("showing that confusion is likely supports a strong presumption of irreparable harm"); *Calvin Klein Cosmetics Corp. v. Lenox Lab'ys., Inc.*, 815 F.2d 500, 505 (8th Cir. 1987) ("The court correctly noted that it could presume irreparable injury from a finding of probable success in proving likelihood of confusion."); *Gen. Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 625 (8th Cir. 1987) ("Since a trademark represents intangible assets such as reputation and goodwill, a showing of irreparable injury can be satisfied if it appears that [a plaintiff] can demonstrate a likelihood of consumer confusion.").[23]

In addition to this presumption, H&R Block has demonstrated through the evidence of record that it is likely to suffer irreparable harm if a preliminary injunction is not issued. "[I]rreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Grasso Enters., LLC v. Express Scripts, Inc.*, 809 F.3d 1033, 1040 (8th Cir. 2016) (quoting *Gen Motors Corp. v. Harry*

---

[23] Contrary to Defendant's suggestions that this Court may only consider injury the plaintiff "has suffered" and that H&R Block has offered "only speculation" of harm, Doc. 38, at 24, a plaintiff need not wait for actual confusion or harm before it is entitled to preliminary relief in this context. *Advantus*, 2006 WL 2916840, at *4 ("The Court declines [defendant's] offer to penalize plaintiffs for their ardor and expedition in seeking to protect their name and their effort to preclude—rather than suffer—marketplace confusion."). Further, it is "simply not the law" that a plaintiff must prove "actual damage or injury" at this juncture—a likelihood of irreparable harm is sufficient. *Mut. of Omaha Ins. Co.*, 836 F.2d at 403 n.11.

*Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009)). "Loss of intangible assets such as reputation and goodwill can constitute irreparable injury." *United Healthcare Ins. Co. v. Advance PCS*, 316 F.3d 737, 741 (8th Cir. 2002) (citing *Gen. Mills, Inc.*, 824 F.2d at 625); *WWP, Inc. v. Wounded Warriors, Inc.*, 566 F. Supp. 2d 970, 978 (D. Neb. 2008).

H&R Block's CEO, Mr. Jones, testified about "the decades and the hundreds of millions of dollars that [H&R Block has] spent to make [its] brand known for what it is," and how consumer confusion will damage the H&R Block brand. Tr. at 82:17-84:1 (Jones Direct). Mr. Jones explained that, in the tax space, H&R Block has already seen combinations of "Block" and "Cash App," which is likely to cause consumer confusion and harm the H&R Block brand. *Id.* at 83:3–83:11. Mr. Jones also expressed concern about potential media reports about Block, Inc., explaining that "a headline, a data breach, a perspective on business and the future of business in bitcoin or anything that really isn't [H&R Block's] perspective that gets connected to our name Block has the potential . . . to quickly put [H&R Block] in crisis mode and on the defensive." *Id.* at 83:15-84:1. Given that H&R Block holds sensitive financial and personal data, any negative publicity about Block, Inc.'s tax-related offerings that is attributed to H&R Block would lead to incalculable and non-compensable harm. *See, e.g.*, *HealthNow N.Y. Inc. v. Romano*, 17-cv-310, 2018 WL 4908107, at *5 (W.D.N.Y. Oct. 10, 2018) (finding plaintiff sufficiently "alleged likelihood of confusion and thus also established irreparable injury" by showing consumers may misattribute fault to plaintiff for defendant's data breach) (citation omitted). While Block, Inc. attempts to characterize H&R Block's risk of irreparable harm to be nothing more than a "possibility of a remote future injury," the Court concludes that it is not. *See* Def.'s Proposed Order, at 35 (quoting *Riley v. Crawford*, No. 06-4211-CV-C-NKL, 2007 WL 2002344, at *1 (W.D. Mo. July 5, 2007)).

H&R Block has no means of controlling the quality of Block, Inc.'s tax and financial services. There is a substantial risk that consumers who are confused about the source of those services and dissatisfied with their quality may incorrectly form a negative view of H&R Block.[24] Such harm is particularly likely given that Block, Inc. occupies (and is expanding into) the same markets that H&R Block currently occupies, using a corporate name that includes the defining portion of H&R Block's marks and similar green logos. Because "H&R Block" and "Block, Inc." are so similar, and because customers are exposed to Block, Inc. in connection with its Cash App services including Cash App Taxes, the risk is not merely speculative, and, by its nature, such harm is irreparable. *See Sturgis Area Chamber of Commerce v. Sturgis Rally & Races, Inc.*, 99 F. Supp. 2d 1090, 1101 (D.S.D. 2000) ("In evaluating the threat of irreparable harm, the court may . . . consider the potential loss of control over the quality of plaintiff[s'] services, [and] the risk of damage to . . . plaintiff[s'] reputation and service mark from continuing use of an infringing mark. When a likelihood of confusion exists, plaintiffs' lack of control over the quality of defendants' services constitutes an immediate and irreparable injury, regardless of the actual quality of those services.") (citation omitted); *see also Hillerich & Bradsby Co. v. Christian Bros., Inc.*, 943 F. Supp. 1136, 1141–42 (D. Minn. 1996) (when evaluating irreparable harm, it is appropriate for court to consider the "loss of control over the quality of plaintiff's product and the risk of damage to a plaintiff's reputation and trademark from the continued use of an infringing mark") (citation omitted).

Harm also is likely in the context of recruiting for employees, informing investors, responding to the media, reporting to regulators, and charitable activities. As Mr. Jennings

_____

[24] This is particularly true with respect to the consumer complaints submitted to the Better Business Bureau about Cash App's tax services where Defendant has responded under the name "Block." P-88.

acknowledged, the audience for the "Block" name includes "employees and candidates from a recruiting and retention perspective," as well as investors, regulators, and the media, plus "[a]nyone that was looking at the overall corporate brand." Tr. at 144:4–144:11 (Jennings Direct). What's more, H&R Block offers charitable, philanthropic, volunteer, community service and humanitarian services in the many communities in which it operates, including through a community impact program called "Make Every Block Better." J-1 ¶ 15; Tr. at 61:14–61:16, 65:14–65:25 (Jones Direct); 112:21–112:22 (Jones Cross). Block, Inc. intends to use "Block" to offer "charitable services, namely, promoting public awareness about charitable, philanthropic, volunteer, public and community service and humanitarian activities." P-73; Tr. at 159:24–163:3 (Esperanza Cross). That both Block, Inc. and H&R Block intend to use the "Block" mark to garner public attention and consumer goodwill from charitable and philanthropic activities only further compounds the risk that confusion poses to H&R Block.

Employee, investor, regulator, charity, and media confusion would irreparably harm H&R Block. *See Aura Commc'ns, Inc. v. Aura Networks, Inc.*, 148 F. Supp. 2d 91, 95 (D. Mass. 2001) (considering "confusion by prospective employees" and finding that damage to a company's ability to attract employees constitutes irreparable harm); *see also Perini Corp. v. Perini Constr., Inc.,* 915 F.2d 121, 128 (4th Cir.1990) ("public confusion" among non-purchasers is relevant if it "adversely affect[s] the plaintiff's ability to control his reputation among its laborers, lenders, investors, or other group with whom the plaintiff interacts"); *Mid–State Aftermarket Body Parts, Inc.*, 466 F.3d at 634. Recognizing that confusion in this area could be quite harmful, Mr. Jennings conceded that he "definitely" did not want potential employees "to be confused into thinking that maybe [Block, Inc. is] associated with H&R Block." Tr. at 205:5–205:12 (Jennings Cross).

While Block, Inc. argues that there is no evidence that H&R Block will be irreparably

harmed if Block is not enjoined from using a green square logo, the Court disagrees. It is true that Credit Karma and Cash App used green square logos before H&R Block filed this lawsuit, but, neither had: (1) a name primarily consisting of "Block," (2) connected to its tax services, and (3) connected to a green square logo. Under these circumstances the use of the green square logo with the word "Block," substantially increases the risk of consumer confusion.

Because H&R Block has demonstrated a likelihood of success on the merits, the Court finds it is entitled to a statutory presumption of irreparable harm, and in any event, H&R Block has also demonstrated independently that it will be irreparably harmed in the absence of an injunction.

### 3. Balance of Harm

The Court must next consider the balance of the harm to H&R Block if no injunction is granted versus the injury that would befall Block, Inc. if an injunction is granted. *Dataphase*, 640 F.2d at 113. A relevant question is whether the "harm to the moving party outweighs the financial loss and damage to the reputation of the nonmoving party." *National Board of YMCA v. Flint YMCA*, 764 F.2d 199, 226 U.S.P.Q. 324, 325 (6th Cir. 1985). Where the moving party has made a substantial investment developing its trademark relative to the nonmoving party's investment in the allegedly infringing mark, the courts generally find that the moving party's hardship outweighs that of the nonmoving party. *See, e.g., McNeil Laboratories, Inc. v. American Home Products Corp.*, 416 F.Supp. 804, 193 U.S.P.Q. 486, 491 (D.N.J. 1976); *Humble Oil & Refining Co. v. Humble Leasing Co.*, 146 U.S.P.Q. 717, 721 (E.D. Pa. 1965).

H&R Block has been using the "Block" and green square families of marks for decades, and over that time, has carefully nurtured a reputation for high-quality service and reliability with respect to consumers' most sensitive financial information. Tr. at 82:17–83:11 (Jones Direct).

Block, Inc., on the other hand, formally changed its name only recently and invested in that rebrand a small fraction of the "hundreds and hundreds of millions of dollars" Cash App spends annually on marketing. Tr. at 213:6–17 (Jennings Cross). Under these circumstances, the balance of hardships tips in H&R Block's favor. *See, e.g.*, *MSP Corp. v. Westech Instruments, Inc.*, 500 F. Supp. 2d 1198, 1217–18 (D. Minn. Aug. 6, 2007) ("[Plaintiff] has advertised and sold its [products] for seven years[;] . . . it has invested time, resources, and reputation to develop a product and should be protected from newcomers using shortcuts to capitalize on that hard work and good will."); *Woodroast Sys. v. Rests. Unlimited, Inc.*, 793 F. Supp. 906, 919 (D. Minn. 1992) (granting injunctive relief where plaintiff "made a substantial investment of time and money to develop and register its… mark," whereas defendant "began to use the phrase…recently and did not enter the present market until [months prior]," and noting that "other, non-infringing alternatives are available for [defendant's use").

This is especially so given the intangible assets at issue in this case. H&R Block is seeking preliminary injunctive relief in order to preserve its reputation and goodwill. While Block, Inc. argues that H&R Block's concerns are both overstated and speculative, the Court disagrees. *Aveda Corp. v. Evita Marketing, Inc.*, 706 F.Supp. 1419, 1431 (D. Minn. 1980) (holding that damages cannot adequately compensate a loss of trade, reputation, and goodwill); *Jayair Corp. v. Muka Indus., Inc.*, No. CIV.A.94-5447, 1994 WL 744642, at *5 (C.D. Cal. Oct. 3, 1994) ("The potential harm to plaintiff includes the loss of reputation and goodwill established over the course of more than two years of doing business under the JayAIR mark. Because these assets are intangible, damages are extremely hard to calculate. Therefore, any losses caused by a failure to issue an injunction at this time would be difficult to fully compensate.").

Defendant argues that an injunction forcing it to change its name would "inflict far more

harm on Block[, Inc.] than H&R Block would face without one." Doc. 38 at pp. 24–25. Defendant claims that, if such an injunction issues, Block, Inc. would "incur substantial financial hardship, requiring extensive time and money to develop and implement a new rebranding, including securing domain name and social media rights, modifying computer and IT systems, and the like— a process that would again take more than one year and negatively affect employee morale and recruiting." *See id.* at 25. Block, Inc. also points to substantial hardships resulting from regulatory requirements.

Block, Inc.'s concerns are overstated. In part, this is because H&R Block is no longer seeking a preliminary injunction that would require Block, Inc. to change its name at this time. Rather, it seeks a more narrowly tailored injunction. In addition, the Court has crafted an injunction to minimize the burden on Defendant, by focusing only on the most immediate risk of consumer confusion - the connection between Block, Inc., its tax services business, and the green square logo under which those services are offered. The Court has not addressed several other channels of Plaintiff's business on which the Defendant is also likely to be infringing. Those issues must await the final resolution of the case on its merits.

Defendant is a sophisticated technology company with a multitude of competent and sophisticated lawyers and engineers at its disposal. Given those resources, the Court is convinced that Defendant can expeditiously separate a recently acquired tax preparation service from the Block, Inc. corporate structure so that the word "Block" or a close variant of Block is no longer legally required to be connected with Cash App Taxes. While limiting its public communications that link Defendant to Cash App and Cash App Taxes is somewhat burdensome, that limitation is also consistent with Defendant's stated desire to embrace the House of Brands model, which generally distances the individual components of a business from the "parent" company.

There are of course other options available to Block, Inc. to comply with the Court's injunction, but it is not the role of the Court to tell Block, Inc. which avenue of compliance will be the least disruptive to its operations. That is the responsibility of Block, Inc., which it assumed when it chose to use a well-known mark already closely connected to a well-known competitor.

Therefore, the relative balance of harms is decidedly in H &R Block's favor.

### 4. The Public Interest

"The final factor considered in determining whether a preliminary injunction should issue is the public interest. In the context of trademark infringement, this factor involves balancing of the interest in protecting the public from confusion or deception with the interest in a competitive market." *Aveda Corp.*, 706 F. Supp. at 1431–32 (citing 2 McCarthy, *Trademarks and Unfair Competition* 2d § 30:21). "The public has an interest in the enforcement of validly registered trademarks," and "the right not to be deceived or confused as a result of the infringement of established trademarks." *Cmty. of Christ Copyright Corp. v. Miller*, No. 07–0543, 2007 WL 4333192, at *3 (W.D. Mo. Dec. 7, 2007). Enforcement of trademark laws also serves the public by "protect[ing] the ability of consumers to distinguish among competing producers," and incentivizing businesses to procure consumer goodwill by serving their customers' interests. *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 198 (1985). Here, an injunction serves both the interest in avoiding confusion and in maintaining healthy market competition.

Block, Inc. also argues that deleting Cash App Taxes from the larger Cash App interface would be even more disruptive because "millions of Credit Karma Tax customers who now rely on Cash App for their previous year's tax returns, needed to complete this year's tax returns, would be frustrated or worse, likely increasing the chances of missed or incorrect tax filings for these customers." *See* Def.'s Proposed Order at 41. But this year's tax season is largely over, especially

for the consumers targeted by Cash App Taxes and H&R Block's online DIY services. And the Court's injunction does not require Defendant to delete any data or prevent prior customers from accessing their data. Indeed, Defendant only recently migrated the data from Credit Karama Tax into the Cash App product; it reported no problems from doing so.

Block, Inc. next argues that the Department of Justice's review of the sale of Credit Karma Tax to Block, Inc. suggests the public interest weighs against an injunction. Block, Inc. emphasizes that the DOJ required Credit Karma, Inc. to divest itself from Credit Karma Tax before it could be acquired by Intuit (another company that offers tax services) to avoid "reduc[ing] existing and future competition, resulting in higher prices, lower quality, and reduced choice for [digital do-it-yourself] tax preparation products upon which millions of Americans rely." 86 Fed. Reg. at 22,706. It found that Defendant's plans to integrate Credit Karma's tax business into Cash App, which already had tens of millions of users, would create a viable, ongoing business that could "compete effectively" in the tax preparation market. *Id*. at 22,708. While the Defendant's plan to integrate Credit Karma Tax into its larger Cash App interface was a viable *option*, there is no evidence it was a *condition* of the sale. It appears that the DOJ was concerned with promoting competition and ensuring that the transactions at issue would not remove a strong DIY tax service from the market. And, in fact, when Defendant acquired Credit Karma Tax, it offered its tax services in a standalone app, separate from Cash App, until about the time that it changed its name to Block, Inc.

The public interest clearly favors an injunction, and this factor weighs in favor of H&R Block.

### 5. Sum of *Dataphase* Factors

For all the reasons discussed above, Plaintiffs have established that the Defendant's public

use of "Block" and a green square logo in connection with the brands that offer services like those offered by H&R Block is likely to cause confusion. That confusion is likely to occur through Block, Inc.'s use of its name in Cash App and Cash App Taxes and other financial services that compete with H&R Block's tax and other financial services. That confusion has been amplified by Block's public communications and worsened by third parties who have, and will likely continue, to link Block, Inc. to its "building blocks" (*e.g.*, Cash App and Square) and to its new Cash App Taxes service, all of which compete to some degree with services offered by H&R Block. Some of that confusion is likely to be initial interest confusion that causes consumers to be interested in Cash App's tax or related services because they believe it is associated with H&R Block; some of that confusion is likely to be point-of-purchase confusion for those consumers who use Cash App Taxes because they are confused into thinking it comes from H&R Block; and some of that confusion is likely to be reverse confusion, as consumers and investors are deceived into believing that H&R Block is now affiliated with Block, Inc.'s family of brands.

Accordingly, all the *Dataphase* factors weigh in favor of granting an injunction.

### III. BOND

Under Federal Rule of Civil Procedure 65(c), "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." While H&R Block initially acknowledged that it would be required to post a bond, it now argues that the Court can and should waive the bond requirement.

"Courts in this circuit have almost always required a bond before issuing a preliminary injunction[.]" *Richland/Wilkin Joint Powers Auth. v. U. S. Army Corps of Eng'rs*, 826 F.3d 1030, 1043 (8th Cir. 2016) (citations omitted). District courts are given "much discretion in setting

bond," but it must make findings to support its determination that the bond it requires is adequate considering the costs and damages that would result from a wrongfully issued injunction. *Hill v. Xyquad, Inc.*, 939 F.2d 627, 632 (8th Cir. 1991). While limited "[e]xceptions have been made [to the bond requirement] where the defendant has not objected to the failure to require a bond[,]" where public policy favors encouraging private enforcement, "or where the damages resulting from a wrongful issuance of an injunction have not been shown[,]" *Richland/Wilkin Joint Powers Auth.*, 826 F.3d at 1043, H&R Block has not shown that these circumstances exist here. While certain district courts have held that bond is unnecessary and that other exceptions exist, "[i]n view of the express language of Rule 65(c), the purposes for the bond requirement, and the weight of [Eighth Circuit decisions], this [C]ourt believes requiring a bond in some amount before issuing a preliminary injunction is far the better course." *Curtis 1000, Inc. v. Youngblade*, 878 F. Supp. 1224, 1279 (N.D. Iowa 1995) (collecting cases).

The amount of the bond, however, does squarely fall within the district court's discretion. *Hill*, 939 F.2d at 632. Because the Court has significantly narrowed its injunction, and because it is clear H&R Block is a large company capable of paying any actual damages that might be recoverable by Defendant as a result of this preliminary injunction, the Court sets the Bond at $250,000.

## IV. CONCLUSION

For the reasons discussed above, Plaintiffs' Motion for Preliminary Injunction, Doc. 16, is GRANTED in part. The Plaintiffs have successfully shown, under each of the *Dataphase* factors, that injunctive relief is appropriate. Therefore, Block, Inc. is hereby preliminarily enjoined:

1.      from using "Block, Inc.," or "Block," or a close variant, such as "Blocks," in connection with or in close proximity to Cash App Taxes or the green square Cash

App Taxes logo.  This means that Defendant cannot operate Cash App Taxes as a feature of Cash App or be linked to Cash App through a separate application so long as Cash App also refers to Block, Inc.  It also means that Cash App Taxes cannot be owned by a legal entity with the word "Block" in it.

2.     from publicly communicating through advertising, press releases, social media, on its websites, or other public tools, that it is associated with Cash App Taxes or any platform or internet function that contains or embeds Cash App Taxes or other brands or products associated with taxes or tax services. This preliminary injunction does not prevent Block, Inc. from communicating information to government regulators if required by law to do so.

3.     The Court has determined that H&R Block must post a bond of $250,000, pursuant to Rule 65(c) of the Federal Rules of Civil Procedure.

4.     This preliminary injunction shall continue until final resolution of this case or until modified by the Court.



                                         s/ Nanette K. Laughrey
                                        NANETTE K. LAUGHREY
                                        United States District Judge

Dated:  April 28, 2022
Jefferson City, Missouri