**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MISSOURI**

| | |
|---|---|
| H&R BLOCK, INC. and HRB INNOVATIONS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> BLOCK, INC., <br><br> Defendant. | Case No. 4:21-cv-00913-NKL |

## SUGGESTIONS OF DEFENDANT BLOCK, INC.

## IN SUPPORT OF ITS MOTION FOR STAY PENDING APPEAL

# TABLE OF CONTENTS

**Page**

FACTUAL BACKGROUND ................................................................................................3

    A.    Defendant And Its Name Change. .........................................................3

    B.    Plaintiffs' Lawsuit And The Preliminary Injunction Order. ...................5

    C.    Compliance With The Preliminary Injunction Order. ............................6

ARGUMENT ...................................................................................................................7

II.    DEFENDANT AND MILLIONS OF CASH APP'S CUSTOMERS WILL BE
IRREPARABLY HARMED ABSENT A STAY ............................................7

    A.    The Order May Require Immediate Costly And Disruptive Changes ....7

        1.    Removing Cash App Taxes From Cash App Would Be Highly
Burdensome And Require Time The Order Does Not Permit....................8

        2.    Prohibiting Defendant's Speech About Cash App And Cash App
Taxes Is Disruptive And Impractical ...................................9

        3.    An Immediate Name Change Is Impractical And Would Cause
Irreversible Harm ...............................................9

    B.    The Order Interferes With Defendant's Free Speech Rights. ................10

III.    DEFENDANT IS LIKELY TO PREVAIL ON APPEAL ................................10

    A.    The Order Legally Errs In Analyzing The Evidence Of Supposed
Consumer Confusion. ..............................................11

    B.    The Order Compares The Wrong Marks. ..............................14

    C.    The Order Is Unconstitutionally Overbroad. .........................15

IV.    THE HARM TO DEFENDANT AND CASH APP'S CUSTOMERS
OUTWEIGHS ANY POTENTIAL FUTURE INJURY TO PLAINTIFFS....................16

V.    A STAY FURTHERS THE PUBLIC INTEREST ..........................................17

CONCLUSION ................................................................................................................19

Case 4:21-cv-00913-NKL   Document 114   Filed 05/06/22   Page 2 of 24

# TABLE OF AUTHORITIES

**Page**

## CASES

*Am. Footwear Corp. v. Gen. Footwear Co.*,
   609 F.2d 655 (2d Cir. 1979) ................................................................................ 12

*Anheuser-Busch, Inc. v. Balducci Publ'ns*,
   28 F.3d 769 (8th Cir. 1994) ................................................................................ 16

*Blue Moon Ent., LLC v. City of Bates City, Mo.*,
   441 F.3d 561 (8th Cir. 2006) .............................................................................. 10

*Brady v. Nat'l Football League*,
   640 F.3d 785 (8th Cir. 2011) ......................................................................... 7, 17

*Calvin Klein Cosmetics Corp. v. Lenox Lab'y, Inc.*,
   815 F.2d 500 (8th Cir. 1987) .............................................................. 11, 17, 18

*Carroll v. President & Comm'rs of Princess Anne*,
   393 U.S. 175 (1968) ........................................................................................... 15

*Cellular Sales, Inc. v. Mackay*,
   942 F.2d 483 (8th Cir. 1991) .............................................................................. 16

*Coca-Cola Co. v. Purdy*,
   382 F.3d 774 (8th Cir. 2004) .............................................................................. 15

*Conopco, Inc. v. May Dep't Stores Co.*,
   46 F.3d 1556 (Fed. Cir. 1994) ........................................................................... 14

*Dakota Indus., Inc. v. Ever Best Ltd.*,
   944 F.2d 438 (8th Cir. 1991) .............................................................................. 10

*E.W. Bliss Co. v. Struthers-Dunn, Inc.*,
   408 F.2d 1108 (8th Cir. 1969) .............................................................................. 9

*First Sav. Bank, F.S.B. v. First Bank Sys., Inc.*,
   163 F.R.D. 612 (D. Kan. 1995) ............................................................................ 9

*Fischer & Frichtel Custom Homes, LLC, v. Fischer Mgmt., LLC*,
   2021 WL 1750174 (E.D. Mo. May 4, 2021) ..................................................... 13

*GTE Corp. v. Williams*,
   731 F.2d 676 (10th Cir. 1984) ........................................................................... 10

*Heaven Hill Distilleries, Inc. v. Log Still Distilling, LLC*,
   2021 WL 5985253 (W.D. Ky. Dec. 16, 2021) ............................................ 13, 14

ii

*Hoggard v. Rhodes*,
    141 S. Ct. 2421 (2021) ............................................................................................ 15

*James River Flood Control Ass'n v. Watt*,
    680 F.2d 543 (8th Cir. 1982) ................................................................................. 17

*Kargo Glob., Inc. v. Advance Mag. Pub., Inc.*,
    2007 WL 2258688 (S.D.N.Y. Aug. 6, 2007) ......................................................... 13

*Kemp v. Bumble Bee Seafoods, Inc*.,
    398 F.3d 1049 (8th Cir. 2005) ............................................................................... 16

*Kibler v. Hall*,
    843 F.3d 1068 (6th Cir. 2016) ............................................................................... 13

*Limited v. Macy's Merch. Group Inc.*,
    2016 WL 4094913 (S.D.N.Y. Aug. 2, 2016) ......................................................... 13

*Luigino's, Inc. v. Stouffer Corp.*,
    170 F.3d 827 (8th Cir. 1999) ................................................................................. 14

*Masters Software, Inc. v. Discovery Commc'ns, Inc*.,
    2010 WL 11692803 (W.D. Wash. Aug. 13, 2020) ............................................... 11

*Museum of Modern Art v. MOMACHA IP LLC*,
    339 F. Supp. 3d 361 (S.D.N.Y. 2018) ............................................................. 13, 14

*Neb. Press Ass'n. v. Stuart*,
    427 U.S. 539 (1976) ............................................................................................... 15

*Org. for Black Struggle v. Ashcroft*,
    978 F.3d 603 (8th Cir. 2020) ................................................................................... 7

*Playtex Prods., Inc. v. Georgia-Pacific Corp*.,
    390 F.3d 158 (2d Cir. 2004) ................................................................................. 12

*Roederer v. J. Garcia Carrion, S.A.*,
    732 F. Supp. 2d 836 (D. Minn. 2010) ................................................................... 13

*Rogers v. Scurr*,
    676 F.2d 1211 (8th Cir. 1982) ............................................................................... 15

*Rosen v. Port of Portland*,
    641 F.2d 1243 (9th Cir. 1981) ............................................................................... 15

*SI03, Inc. v. Musclegen Research, Inc.*,
    2021 WL 765293 (E.D. Mo. Feb. 26, 2021) ......................................................... 17

*Sindi v. El-Moslimany*,
    896 F.3d 1 (1st Cir. 2018) ..................................................................................... 15

*Starbucks Corp., v. Wolfe's Borough Coffee, Inc.*,
    588 F.3d 97 (2009) ................................................................................................. 12

*Stone Strong, LLC v. Stone Strong of Texas, LLC*,
    2021 WL 4710449 (D. Neb. Oct. 8, 2021) ................................................................ 17

*Tumey v. Mycroft AI, Inc.*,
    27 F.4th 657 (8th Cir. 2022) ................................................................................ 7

*Turning Point USA at Ark. State Univ. v. Rhodes*,
    973 F.3d 868 (8th Cir. 2020) ............................................................................... 15

*Two Hands IP LLC v. Two Hands Am., Inc.*,
    2021 WL 4437975 (S.D.N.Y. Sept. 28, 2021) ............................................................ 13

*United Indus. Corp. v. Clorox Co.*,
    140 F.3d 1175 (8th Cir. 1998) ............................................................................. 10

*United States v. White*,
    769 F.2d 511 (8th Cir. 1985) ............................................................................... 16

*Univ. of Tex. v. Camenisch*,
    451 U.S. 390 (1981) ......................................................................................... 11

*Woodsmith Pub. Co. v. Meredith Corp.*,
    904 F.2d 1244 (8th Cir. 1990) ............................................................................. 11

iv

# INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 62(d) and Federal Rule of Appellate Procedure 8(a)(1), Defendant Block, Inc. respectfully moves for a stay pending appeal of this Court's April 28 preliminary injunction Order. Dkt. 105 (the "Order"). Defendant is concurrently filing a motion for an administrative stay to take immediate effect until the Court rules on this motion (and if necessary, the Eighth Circuit rules on any renewed motion pursuant to Federal Rule of Appellate Procedure 8(a)(2)).

At the close of the March 1 hearing, the Court observed: "Everybody wants to know how this matter is going to get resolved so that they can file in the Eighth Circuit, regardless of who wins, and have another look at it. So I'm fully aware of where we're headed here." Dkt. 99 (Mar. 1, 2022 Tr.) at 44:22–25. Defendant respectfully intends to exercise that right.[1]

Although Defendant appreciates the Court's effort to enter an order more "narrow" than the broad one Plaintiffs originally sought, the Order could be read to require Defendant to make costly and substantial changes to its Cash App services and to do so "expeditiously" (Dkt. 105 at 62). Such changes would be difficult to reverse if the injunction is later vacated or dissolved.

Defendant takes its obligations under the Order seriously and thus must identify all plausible interpretations of the Order, even those that Defendant disagrees with and believes are unreasonable, in order to show the irreparable harm that it would potentially suffer absent a stay. To avoid that harm and ensure Defendant's appeal is not rendered moot by the time the Eighth Circuit decides it, the Court should stay the Order pending appeal.

Under the four governing factors, Defendant is entitled to that relief.

---

[1] To enable the Court to consider its stay motions before appellate proceedings commence, Defendant has not yet filed a Notice of Appeal.

1

***The Injunction Imposes Immediate and Substantial Hardships***:  The injunction's key provisions are contained in Paragraphs 1 and 2.  Dkt. 105 at 66–67.  The second sentence of Paragraph 1 states that "Defendant cannot operate Cash App Taxes as a feature of Cash App or be linked to Cash App through a separate application so long as Cash App also refers to Block, Inc." *Id.* at 67.  Although the phrase "refer[] to Block, Inc." is open to interpretation, it could be read to require Defendant to extract the tax service from Cash App—a technological change that would take time and expense and harm customers.  Further, the Order may require a change in the ownership of Cash App Taxes so that it is not "owned by a legal entity with the word 'Block' in it." *Id.* at 67.  Yet any such change must protect the millions of Cash App Taxes filers who need to monitor the status of their returns and any refunds.

Selling Cash App Taxes would not be a simple option.  It is a free tax service whose customers pay nothing to use it.  To ensure that such genuinely free tax services remain available across the country, Defendant is barred by an "Assurance" with the New York State Attorney General ("NYAG") from divesting itself of the service until at least the end of 2024.

Paragraph 2 is additionally burdensome and raises serious First Amendment questions, particularly if read to preclude Defendant from speaking with investors, analysts, and others about Cash App Taxes, or, even more expansively, about the much larger Cash App business.

***Defendant Is Likely To Succeed On Appeal***:  The linchpin of any trademark claim is likelihood of consumer confusion.  Defendant will raise substantial questions on appeal as to whether the Order correctly applied settled law on that issue.  Defendant's *Eveready* survey showed no likelihood of consumer confusion, and Plaintiffs offered no evidence that any *consumer* thought "H&R Block" is the source of Cash App or Cash App Taxes.  Yet the Order adopted Plaintiffs' novel theory that it is enough that some *media* articles mentioned "Block's

2

Cash App Taxes" or news services included stories about Defendant in Plaintiffs' profile. Dkt. 105 at 46–50. That theory places a defendant's liability for trademark infringement in the hands of unknown third parties. The Order relied on a comparison of Plaintiffs' marks to "Block" rather than to "Cash App" and "Cash App Taxes"—the proper focus of the confusion inquiry. *Id.* at 34–41. Moreover, *third*, Defendant will raise a substantial issue on appeal whether the injunction's restriction on Defendant's speech is unconstitutionally overbroad and vague.

*The Harm to Defendant and Cash App's Customers Outweighs any Harm to Plaintiffs*: The tax season has come and gone, and no harm to Plaintiffs has materialized. By contrast, the harm to Defendant's $50 million investment in Cash App Taxes and the disruptions to the Cash App threatened by an expansive reading of the Order are specific, imminent, and far greater than what can be redressed with a $250,000 bond.

*The Public Interest Favors a Stay*: A stay will benefit millions of consumers by preserving Cash App Taxes and ensuring their access to that free tax service—especially now, while they await their refunds. If Defendant is forced to revise the Cash App app and website to remove Cash App Taxes, millions of customers who use it to file a tax return just weeks ago would discover, when they open Cash App to check the status of refunds, that the functionality has changed. They could have a hard time locating their tax filing records and refund status.

## FACTUAL BACKGROUND

### A.   Defendant And Its Name Change.

Before December 1, 2021, Defendant was known as Square, Inc., reflecting the name of its initial product, the "Square" point-of-sale credit card readers and software. J-2 (Esperanza Decl.) ¶¶ 6–8. Defendant's businesses included also the Spiral blockchain business, the TIDAL music streaming business, the TBD blockchain business, and Cash App. J-2 ¶¶ 4, 12–15.

3

Cash App offers customers the ability to move money between people, buy and sell stocks and bitcoin, get a debit card, obtain a short term loan, and file taxes for free. J-3 (Jennings Decl.) ¶ 4. Cash App is a well-established app with a large user base. It has been downloaded more than 100 million times, making it the most-downloaded finance app in the Apple App Store. More than 40 million active customers use Cash App's services every month. J-3 ¶¶ 7, 9.

In November 2020, Defendant paid $50 million to buy Credit Karma Taxes, Inc., a free income tax service. In 2021, Defendant integrated it into the Cash App mobile app and rebranded it as "Cash App Taxes." *See* J-3 ¶ 13. The integration required syncing all risk systems, privacy systems, data infrastructure, client-server interactions, and other flows—a process that took over 14 months. Dkt. 93 (Feb. 10, 2022 Tr.) at 226:13–18.

Defendant's acquisition of Credit Karma Tax was prompted by the Department of Justice's opposition to the purchase of Credit Karma by Intuit, owner of TurboTax. Credit Karma Tax used a unique indirect monetization model, which allowed it to remain free to all users. Jermann Decl. Ex. 1 ¶ 6.[2] The DOJ was concerned that Intuit's dominance in the tax services market would substantially lessen competition for digital do-it-yourself (DDIY) tax preparation services. *See* Dkt. 38 at 26. Government agencies around the country were troubled by the efforts of Intuit—and of Plaintiff—to obstruct access to free tax filing services and coerce filers to use unnecessary paid products instead. *See*, *e.g.*, Jermann Decl. Ex. 2. The DOJ insisted that Intuit agree to divest Credit Karma Tax. *See* Dkt. 38 at 26. It found Defendant to be an appropriate buyer because Defendant "was capable, willing, and incentivized to compete effectively and w[ould] preserve competition in the market for DDIY tax preparation products"

---

[2] Defendant submits this Assurance of Discontinuance given the language of the Order that, read expansively, is different in nature and scope than the one Plaintiffs initially sought.

and because Defendant would continue to offer the service for free. 86 Fed. Reg. 22,708 (Apr. 29, 2021); *see also* Ex. 1 ¶¶ 16–17.

In 2021, Defendant decided that its identity should evolve to reflect the diversity of its businesses. After an extensive process, in December Defendant announced the name "Block, Inc." (evoking "blockchain") and a new logo—a spinning, iridescent cube. J-2 ¶ 22.

## B. <u>Plaintiffs' Lawsuit And The Preliminary Injunction Order.</u>

Shortly thereafter, Plaintiffs filed this lawsuit and moved for a preliminary injunction. Dkts. 1, 16. Plaintiffs alleged that Defendant's Block name and Cash App logo are likely to cause confusion with H&R Block's name and green square logo. Dkt. 16 at 2; Dkt. 17 at 29–30.

Although Plaintiffs initially demanded, among other things, that Defendant change its name, Plaintiffs ultimately conceded that "requir[ing] Defendant to change its legal name" would not be an appropriate remedy on a preliminary injunction. Jermann Decl. Ex. 3 at 48 (Pls.' Feb. 25, 2022 Proposed Order).

For the next two months after submission of the motion, the income tax season came and went. On April 28, the Court issued the Order and enjoined Defendant:

1. from using "Block, Inc.," or "Block" … in connection with or in close proximity to Cash App Taxes or the green square Cash App Taxes logo. This means that Defendant cannot operate Cash App Taxes as a feature of Cash App or be linked to Cash App through a separate application so long as Cash App also refers to Block, Inc. It also means that Cash App Taxes cannot be owned by a legal entity with the word "Block" in it.

2. from publicly communicating through advertising, press releases, social media, on its websites, or other public tools, that it is associated with Cash App Taxes or any platform or internet function that contains or embeds Cash App Taxes or other brands or products associated with taxes or tax services. This preliminary injunction does not prevent Block, Inc. from communicating information to government regulators if required by law to do so.

Dkt. 105 at 66–67. The next day, Defendant moved for a 30-day stay in aid of the May 10 Court-ordered mediation. Dkt. 108. The Court denied the motion on May 3. Dkt. 112.

## C.    Compliance With The Preliminary Injunction Order.

Compliance with the Order raises profound practical challenges.  Defendant cannot simply shut down a $50 million service that millions of customers rely on.  If read expansively, the second and third sentences of Paragraph 1 may require Defendant to cut Cash App Taxes out of Cash App.  The third sentence suggests Defendant cannot own Cash App Taxes.  Dkt. 105 at 66.  But Defendant cannot quickly or easily redesign the app to cleave off the tax service from the other functions.  *See* Dkt. 93 at 226:7–18.  It would take months to rewrite millions of lines of code, beta-test it to ensure that the features currently integrated with Cash App Taxes work independently, submit it for Apple's and Google's technical review and approval, and finalize the app.  Moreover, this would harm the millions of people who used Cash App Taxes to file their returns and expect to use the app to check status and receive refunds.

Nor could Defendant easily sell the free Cash App Taxes service.  Assuming for the sake of argument that Defendant could find a suitable buyer, doing so would subject Defendant to sustaining a loss on what it paid for the service and then invested to integrate it with Cash App— amounts far in excess of the $250,000 bond.  Moreover, a sale would violate the Assurance Defendant entered into with the NYAG as part of the approval of the purchase of the Credit Karma tax service.  That Assurance protects millions of Americans' ability to access truly free income tax services and, therefore, barred Defendant from selling the service for four years.  Given the Assurance, the injunction leaves Defendant unable to *sell* Cash App Taxes, while one interpretation of the last sentence of Paragraph 1 seemingly leaves Defendant unable to *own* it.

Paragraph 2 constrains Defendant's right to communicate publicly about its business.  Because Cash App Taxes is "embed[ded]" in Cash App (Dkt. 105 at 67), an expansive reading of the Order may restrain Defendant from telling its shareholders, stock analysts, and others that it

owns Cash App Taxes or Cash App. Plaintiffs never sought such a broad injunction on Defendant's protected speech.

## ARGUMENT

Four factors are relevant in determining whether to stay an injunction pending appeal: "(1) whether the party seeking the stay has demonstrated a strong likelihood of success on the merits; (2) whether the party seeking the stay will be irreparably injured without a stay; (3) whether a stay would substantially injure other parties; and (4) the public's interest." *Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 607 (8th Cir. 2020) (citations omitted). This Court must "consider the relative strength of the four factors, balancing them all." *Brady v. Nat'l Football League*, 640 F.3d 785, 789 (8th Cir. 2011) (citation, internal quotation marks omitted).

Here, all four factors weigh in favor of a stay.

## I. DEFENDANT AND MILLIONS OF CASH APP'S CUSTOMERS WILL BE IRREPARABLY HARMED ABSENT A STAY

### A. The Order May Require Immediate Costly And Disruptive Changes

The Court said it was not requiring Defendant to change its name or strip Cash App Taxes from Cash App. Dkt. 105 at 62. As noted above, however, because "Cash App Taxes cannot be owned by a legal entity with the word 'Block' in it" and Defendant is enjoined from "publicly communicating … that it is associated with Cash App Taxes or any platform or internet function that contains or embeds Cash App Taxes," it is difficult to conceive how Defendant could comply with an expansive reading of the Order without doing one of these things—or both. Without a stay, Defendant would have to act now. Yet as the Order states: "Requiring [the defendant] to take affirmative action . . . before th[e] issue has been decided on the merits goes beyond the purpose of a *preliminary* injunction." Order at 16 (quoting *Tumey v. Mycroft AI, Inc*., 27 F.4th 657, 664 (8th Cir. 2022)).

7

### 1. Removing Cash App Taxes From Cash App Would Be Highly Burdensome And Require Time The Order Does Not Permit

It took Defendant over one year to integrate the Credit Karma Tax service into the Cash App app and website. J-3 ¶¶ 13, 15. Undoing that work would be no simple task. Cash App's Head of Product and Business testified that separating the apps and services would be "harmful and disruptive" to Cash App's tens of millions of customers and would make it harder for them to access free tax services. J-3 ¶ 25. The taxes feature is designed to integrate fully with Cash App's other free services. Divorcing the tax feature would risk disrupting the service for millions of users who rely on it. J-3 ¶ 15.

The Order stated that Defendant could easily solve these problems because it "is a sophisticated technology company with a multitude of competent and sophisticated lawyers and engineers." Dkt 105 at 62. But unrebutted testimony from Cash App's Owen Jennings explained that it would be "impossible for Cash App Taxes to be a separate application" because:

> You have to go through the Cash App account sign-up and provision your account with Cash App credentials to use Cash App Taxes, so all of our risk systems, our privacy systems, our data infrastructure, the flows, the client-server interactions, all of that is Cash App. And that's what we've spent the past roughly 14 months working on was taking the functionality from Credit Karma Tax and hooking it up to Cash App.

Dkt. 93 at 226:7–18.

If the last sentence of Paragraph 1 of the Order were read to require Defendant to sell Cash App Taxes, that could not be accomplished easily or quickly, or without substantial disruption to customers, and may violate the communication prohibitions in Paragraph 2. And that could not be undone if Defendant prevails on appeal or at trial. Further, any purchaser would have to be willing to buy a business that does not charge its customers. A forced divestiture could saddle Defendant with a loss on the $50 million investment it made to buy the

service plus the millions more it spent to rewrite the code to integrate it with Cash App. *See* 86 Fed. Reg. 22,711 fn.1 (Apr. 29, 2021).

Even if those issues could be solved, there is a bigger problem. Under the terms of the Assurance that Defendant gave to the NYAG when it bought Credit Karma Tax, Defendant is prohibited from selling Cash App Taxes through the end of 2024. Ex. 1 ¶ 22.

### 2. Prohibiting Defendant's Speech About Cash App And Cash App Taxes Is Disruptive And Impractical

Because Cash App Taxes is embedded in Cash App, and Cash App is one of Block Inc.'s businesses, Defendant risks possible noncompliance with an expansive interpretation of the Order every time it makes any public statements about Cash App or Cash App Taxes. As a public company, Defendant is required to share information about its businesses to shareholders and prospective investors. Read expansively, the Order may prevent Defendant from even blandly stating, "we have a business called Cash App." Such an interpretation would require the costly and time-consuming step of lawyers vetting Defendant's statements to its investors, prospective employees, and the media to ensure compliance. *Cf. E.W. Bliss Co. v. Struthers-Dunn, Inc.*, 408 F.2d 1108, 1116 (8th Cir. 1969) (vacating injunction "so broad that it effectively prevents" defendant from conducting parts of its business).

### 3. An Immediate Name Change Is Impractical And Would Cause Irreversible Harm

A corporate name change is not realistic or equitable. Indeed, doing so just six months after Defendant underwent a rebranding campaign and prior to adjudication of the issues in this lawsuit is so plainly impractical and inequitable that even Plaintiffs abandoned that request. Ex. 3 at 48. *See First Sav. Bank, F.S.B. v. First Bank Sys., Inc.*, 163 F.R.D. 612, 615–16 (D. Kan. 1995) (defendants would "face substantial harm if forced for the second time to revert back to its former name after publicizing a name change").

9

If Defendant were forced to spend millions of dollars to change its name now and promote that change, it would be irreversible, even if Defendant prevails on interlocutory appeal or on the merits at trial. *See GTE Corp. v. Williams*, 731 F.2d 676, 679 (10th Cir. 1984) (vacating injunction; "If [defendant] must change his trade name now, it is probably unrealistic to expect he would change the name back … if he won on the merits").

### B. The Order Interferes With Defendant's Free Speech Rights.

For the reasons explained below (*see infra*, at 15-16), the Order raises serious First Amendment questions by not expressly permitting Defendant to speak about Cash App Taxes and the much larger Cash App business. The harm resulting from an interpretation of the Order that would so restrict public communication with Defendant's corporate audience, prospective employees, customers, and the media would be immediately irreparable under settled law. *See Blue Moon Ent., LLC v. City of Bates City, Mo*., 441 F.3d 561, 565 (8th Cir. 2006) ("The loss of First Amendment freedoms, even for [a] short period …, may constitute an irreparable injury.") (citation omitted). Moreover, it would irreparably hamstring Defendant's ability to operate as a public company. The Order does not enjoin a specific marketing campaign or product package. Rather, if read expansively, it would significantly disrupt Defendant's public communication about its businesses, threatening disruption of Defendant's relationships with stakeholders.

## II. DEFENDANT IS LIKELY TO PREVAIL ON APPEAL

Unless stayed, the Order, if expansively construed, would effectively give Plaintiffs all the equitable relief they sought from this lawsuit before trial and just as discovery is getting underway. In such cases, the moving party's burden is a heavy one. *Dakota Indus., Inc. v. Ever Best Ltd.*, 944 F.2d 438, 440 (8th Cir. 1991). Courts are required to exercise "[c]aution" in deciding whether the balance of factors "tips decidedly toward the movant" in such circumstances. *United Indus. Corp. v. Clorox Co*., 140 F.3d 1175, 1179 (8th Cir. 1998); *see*

10

*Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("[I]t is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits."). Plaintiffs did not satisfy this burden.

### A. The Order Legally Errs In Analyzing The Evidence Of Supposed Consumer Confusion.

A stay is warranted so that before Defendant undertakes the burden of complying with the Order, the Eighth Circuit can address the serious legal questions raised by the adoption of Plaintiffs' unprecedented theory, which rests not on evidence of consumer confusion but rather speculation of future media reports that might cause it. *E.g., Masters Software, Inc. v. Discov. Commc'ns, Inc.*, 2010 WL 11692803, *3 (W.D. Wash. Aug. 13, 2020) (staying injunction where movant showed plaintiff's infringement theory was "rarely successful").

Plaintiffs failed to present any evidence of consumer confusion. Their CEO admitted that Plaintiffs "ha[ve]n't identified a single customer" who was confused by Defendant's marketing. Dkt. 93 at 90:18–91:3. In lieu of such evidence, consumer surveys are "probably the most accurate evidence of actual confusion." *Woodsmith Pub. Co. v. Meredith Corp.*, 904 F.2d 1244, 1249 (8th Cir. 1990). Failure to properly weigh surveys is grounds for reversal because it means the court's decision may not have properly "recreate[d] the conditions in which buying decisions are made." *Calvin Klein Cosmetics Corp. v. Lenox Lab'y, Inc.*, 815 F.2d 500, 504 (8th Cir. 1987) (vacating preliminary injunction for failure to adequately consider survey evidence).

Plaintiffs did not submit *any* survey evidence testing Defendant's actual presentation of its branding, even though Plaintiffs had the time and resources to do so. By contrast, Defendant did. Defendant's surveys were designed by Professor Wind and followed the *Eveready* format. D-2 (Wind Decl.) ¶ 24. They showed that consumers do not confuse "H&R Block" with Defendant's Cash App Taxes website, the Cash App name and logo, or the Block website. D-2

11

¶¶ 41–46.  He found that only a miniscule number of survey respondents—between 0% and 1%—were confused.  D-2 ¶¶ 41–46.  He described this as "among the most clear-cut survey results of 'no confusion' that I have seen in over forty years of designing, conducting, and evaluating thousands of consumer surveys."  D-2 ¶¶ 6, 46.  Even Plaintiffs conceded that Dr. Wind's survey was entitled to "some weight."  Ex. 3 at 34.  Yet the Order gave it none, even though it found no errors in Dr. Wind's work.  Dkt. 105 at 51.

Instead, the Order adopted a likelihood-of-confusion standard that conflicts with the purpose of the Lanham Act and trademark precedent.  Because trademark law seeks to prevent infringers from misleading consumers as to the source of goods and services, it focuses on the *defendant's* conduct in *marketing* its goods and services to those *consumers*.  15 U.S.C. § 1125(a)(1); *KP Perm. Make-Up, Inc. v. Lasting Impression, Inc*., 543 U.S. 111, 117 (2004) (plaintiff must show the alleged infringer's "*actual practice* is likely to produce confusion in the minds of consumers") (emphasis added).  The Court adopted Plaintiffs' different theory, focusing not on Defendant's conduct but rather on media  stories that supposedly might generate possible consumer confusion between Plaintiffs' tax services and services offered by Cash App Taxes.  *E.g.*, Dkt. 1 (Compl.) ¶¶ 43–44; Dkt. 105 at 46-50.

Lanham Act liability must rest on how a defendant uses its brand on packaging and marketing; it may not be based on use a name removed from the actual context.  *E.g., Playtex Prods., Inc. v. Georgia-Pacific Corp*., 390 F.3d 158, 168 (2d Cir. 2004) (affirming irrelevance of consumer reaction to defendant's name alone without defendant's actual packaging), *superseded on other grounds by statute as recognized in Starbucks Corp., v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97 (2009); *Am. Footwear Corp. v. Gen. Footwear Co.*, 609 F.2d 655 n.4 (2d Cir. 1979) (affirming irrelevance of consumer reaction to cropped section of defendant's marketing);

12

*Limited v. Macy's Merch. Group Inc.,* 2016 WL 4094913, at *9 (S.D.N.Y. Aug. 2, 2016)

(consumer reaction to marketing material that excluded defendant's logo was of little value),

*Kargo Glob., Inc. v. Advance Mag. Pub., Inc.*, 2007 WL 2258688, at *11 (S.D.N.Y. Aug. 6,

2007) (consumer reaction to unrepresentative snippets of marketing material inadmissible).

Because it is improper to consider consumer reaction to defendant's branding without the

context in which the defendant actually uses it, *a fortiori,* consumer reaction to third-party

articles or social media posts are *not* sufficient to establish confusion. *See Fischer & Frichtel*

*Custom Homes, LLC, v. Fischer Mgmt., LLC*, 2021 WL 1750174 at *6 (E.D. Mo. May 4, 2021)

("observations of third parties" about potential confusion is not "evidence of actual confusion"

but "merely point out the *possibility* of future confusion") (emphasis in original); *Roederer v. J.*

*Garcia Carrion, S.A.*, 732 F. Supp. 2d 836, 870 n.9 (D. Minn. 2010) ("Such calling to mind [in

media mentions and postings] does not equate to confusion for trademark purposes").

Courts in other circuits have likewise rejected reliance on "anecdotal" media evidence.

*See, e.g.*, *Kibler v. Hall*, 843 F.3d 1068, 1078–79 (6th Cir. 2016) (no reasonable jury could find

likelihood of confusion based solely on confusion on social media); *Two Hands IP LLC v. Two*

*Hands Am., Inc.*, 2021 WL 4437975, *10 (S.D.N.Y. Sept. 28, 2021) (rejecting social media

evidence because there was no evidence the confusion had "any potential or actual effect on

consumers' purchasing decisions") (citation omitted).

The Order principally relied on two inapposite cases, *Heaven Hill Distilleries, Inc. v. Log*

*Still Distilling, LLC*, 2021 WL 5985253 (W.D. Ky. Dec. 16, 2021) (Dkt. 105 at 46), and *Museum*

*of Modern Art v. MOMACHA IP LLC*, 339 F. Supp. 3d 361 (S.D.N.Y. 2018) (Dkt. 105 at 50).

Neither holds that a defendant is responsible for how the media discusses its services.

13

In *Heaven Hill*—unlike this case—the defendants intentionally sowed public confusion that their product was associated with one created by their family ancestor. 2021 WL 5985253, at *27. Their own marketing department was concerned that the company's public statements were creating confusion. *Id.* The court considered a news story that reflected the writer's confusion. This is just a corollary to the rule that, where a defendant intends to create confusion, the court can assume the defendant succeeded. *Id.* at *24. But the court did not rule that such third-party statements could be the *cause* of consumer confusion, as the Order held here.

*Museum of Modern Art* concerned third-party social media posts *expressing* confusion as to an association with the plaintiff, not whether third-party social media was likely to *cause* confusion. 339 F. Supp. 3d at 378–79. Thus, it too provides no support for the Order's theory that future media coverage can confuse consumers.

**B.    The Order Compares The Wrong Marks.**

On the "similarity of the marks" factor for likelihood of confusion, the Order concluded that, "here, the dominant feature of the competing trademarks is identical: 'Block.'" Dkt 105 at 35. This too raises a serious appellate question as it was not the right comparison. Consumers do not see "Block" or its three-dimensional logo alone (or in combination with any other mark) when purchasing or using Cash App or Cash App Taxes. The consumer sees the Cash App brand and logo, which have strong brand recognition. *See* J-3 ¶¶ 8–9; D-3 (Dhar Decl.) ¶¶ 45–53. That makes a difference, as a matter of law. *See Luigino's, Inc. v. Stouffer Corp.*, 170 F.3d 827, 831 (8th Cir. 1999) (affirming summary judgment of no infringement because, even though the marks shared an identical word, "[t]he use of different colors and typefaces, as well as the prominent display of the house marks convey perceptible distinctions between the products."); *Conopco, Inc. v. May Dep't Stores Co.*, 46 F.3d 1556, 1566–68 (Fed. Cir. 1994) (applying

14

Eighth Circuit law and finding no likelihood of confusion, in part because of the prominent placement of logos on the front of the products).

The Order "reject[ed] Defendant's argument that accessing Cash App Taxes through the Cash App application breaks the connection between Block, Inc. and Cash App Taxes." Dkt. 105 at 37. But "break[ing] the connection" is not the correct legal standard. The Order should have considered the marks together to assess whether "similarities of sight, sound, and meaning" exist. Here the dominant house brand—Cash App—does not look or sound like "H&R Block."

## C.  The Order Is Unconstitutionally Overbroad.

Portions of a trademark injunction "may be set aside if they are broader than necessary," *Coca-Cola Co. v. Purdy*, 382 F.3d 774, 790 (8th Cir. 2004), particularly where, as here, First Amendment interests are involved, *see Sindi v. El-Moslimany*, 896 F.3d 1, 32 (1st Cir. 2018) (*citing Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175, 183–84 (1968)).

The Order is overbroad and covers lawful activities not "tailored to … [the] specific harm shown," *Rogers v. Scurr*, 676 F.2d 1211, 1214 (8th Cir. 1982), including Defendant's constitutionally protected speech about its business that the Court did not find infringing.

The Order's restrictions on Defendant's speech, particularly if they apply to speech to investors and the media, are a classic example of a presumptively unconstitutional prior restraint. *Turning Point USA at Ark. State Univ. v. Rhodes*, 973 F.3d 868, 878 (8th Cir. 2020) (noting that prior restraint on speech in public forums is presumptively unconstitutional), *cert. denied sub nom. Hoggard v. Rhodes*, 141 S. Ct. 2421 (2021). Because the harm resulting from a prior restraint is presumed "immediate and irreversible," *Neb. Press Ass'n. v. Stuart*, 427 U.S. 539, 559 (1976), courts must apply "the most exacting scrutiny," *Rosen v. Port of Portland*, 641 F.2d 1243, 1246 (9th Cir. 1981) (citation omitted). Courts in trademark cases thus "should tread

15

cautiously when considering injunctive relief against future [speech]." *Anheuser-Busch, Inc. v. Balducci Publ'ns*, 28 F.3d 769, 778 (8th Cir. 1994).

The Order did not address these issues or apply the requisite level of scrutiny to them. As a result, the Order prohibits speech that the Court did not find confusing or actionable, such as Defendant's communications with its corporate audience or prospective employees.[3] These audiences are sophisticated and familiar with Defendant, so there is no basis under the Lanham Act for restricting Defendant's communications with them. *Cf. Kemp v. Bumble Bee Seafoods, Inc.*, 398 F.3d 1049, 1055 (8th Cir. 2005) ("Purchaser … sophistication is important and often dispositive because sophisticated consumers may be expected to exercise greater care.") (internal citation and quotation marks omitted).

## III. THE HARM TO DEFENDANT AND CASH APP'S CUSTOMERS OUTWEIGHS ANY POTENTIAL FUTURE INJURY TO PLAINTIFFS

In contrast to Defendant's showing that it will be irreparably harmed absent a stay, *supra* Part I, Plaintiffs did not provide any evidence of actual harm, such as evidence of actionable confusion or lost sales, that is required for a preliminary injunction. The lack of tangible evidence of harm is telling because, by the time the Court issued the Order, "tax season [was] largely over." Dkt. 105 at 62. There is thus no reason to believe that Plaintiffs would be unduly harmed by a brief stay pending appeal. *See Cellular Sales, Inc. v. Mackay*, 942 F.2d 483, 487 (8th Cir. 1991) (reversing preliminary injunction where plaintiff failed to present evidence that defendant "had caused any loss of sales to plaintiff's business").

---

[3] Although "commercial speech" receives only limited First Amendment protection, most of the speech the Order prohibits does not fall into that category. A business's communications about itself to the media and to its owners (here, its shareholders), which the Order appears to constrain, are fully protected speech, not commercial speech. *Cf. United States v. White*, 769 F.2d 511, 516 (8th Cir. 1985) (describing commercial speech as "representations [] made in connection with [defendant's] efforts to promote and sell for profit" its product).

16

In contrast, as noted above, immediate implementation of the injunction would harm Defendant's First Amendment rights, and under an expansive interpretation, its business and millions of Cash App's customers. *See James River Flood Control Ass'n v. Watt*, 680 F.2d 543, 544 (8th Cir. 1982) (per curiam) (granting stay pending appeal where appellant might suffer irreparable injury). These harms would be immediate, immense, and would disrupt the lives of many consumers who rely on Cash App and Cash App Taxes for their basic financial needs. These outweigh speculative future harms to Plaintiffs that, based on the recent tax season, may never occur. *See Brady*, 640 F.3d at 793; *Stone Strong, LLC v. Stone Strong of Texas, LLC*, 2021 WL 4710449, *7 (D. Neb. Oct. 8, 2021) (considering that defendant had "outstanding obligations to customers that would be disrupted by an injunction").

The Order relied on the statutory presumption of irreparable harm. Dkt. 105 at 60. However, as the Order acknowledged, this presumption is rebuttable. *Id.* at 55–56. It has been rebutted here, where Defendant cited particularized evidence showing that it and Cash App's customers would be irreparably harmed absent a brief stay, and Plaintiffs submitted no evidence showing the need for an immediate injunction. *See SI03, Inc. v. Musclegen Research, Inc.*, 2021 WL 765293, *5 (E.D. Mo. Feb. 26, 2021) (no presumption of irreparable harm where plaintiff "does little more than assert it is being irreparably harmed").

IV.    **A STAY FURTHERS THE PUBLIC INTEREST**

Although the Court found that the public has an interest in not being confused, Dkt. 105 at 63, the Order gave insufficient weight to the greater financial harms that millions of Cash App customers would face if an expansive interpretation of the injunction were implemented immediately. *See Calvin Klein*, 815 F.2d at 505 (reversing injunction where "the district court did not appear to consider the broader economic implications of its grant of the preliminary injunction, as is required").

17

The Order minimized another public interest: "avoiding monopolies and [] encouraging, not stifling, competition." *Id.* (citation omitted). The Order states that this can be addressed by operating Cash App Taxes "in a standalone app, separate from Cash App." Dkt. 105 at 64. But the history of Defendant's acquisition of Credit Karma and integration with Cash App show that Cash App Taxes may be commercially infeasible as a "standalone app."

As noted, Cash App Taxes became a Cash App feature in 2021 after the DOJ required the then-owner Credit Karma Inc. to divest itself of the tax service if it wanted to be acquired by Intuit. Feb. 10, 2022 Tr. 152:22–23; 86 Fed. Reg. 22,706 (Apr. 29, 2021). The NYAG similarly investigated the potential anticompetitive effects of the proposed merger, noting that no other company had successfully entered the market "in over a decade." Ex. 1 ¶ 8.

Credit Karma proposed a sale of its tax business to Defendant that would be integrated into Cash App. 86 Fed. Reg. at 22,706; Ex. 1 ¶11. Both the DOJ and NYAG concluded that Defendant's plans to integrate Credit Karma Taxes into Cash App, which had tens of millions of users, would promote competition for tax services. Fed. Reg. 22,708; Ex. 1. ¶¶ 18, 20. The DOJ and NYAG's concerns show that operating Cash App Taxes *as part of Cash App*, with its large customer base, bolsters competition, lowers prices, and enhances consumer choice. Removing the feature from the platform would destroy these benefits.

Further, it would take significant time and resources to strip out Cash App Taxes from the Cash App platform, and it would be commercially infeasible to operate it as a standalone product because, unlike Plaintiffs' products, it is a free service to customers and does not generate revenue on its own. *See* Dkt. 93 at 226:7–18; Dkt. 99 at 20:15–21:8; J-3 ¶ 16. And under the NYAG Assurance, Defendant is prohibited until 2024 from selling Cash App Taxes to another company that could operate it and offer it to the public. Ex. 1 ¶ 22. Thus, the likely effect of the

injection, unless stayed, would be to eliminate the only new entrant into the DDIY tax-preparation market in over a decade. *See id.* ¶ 8. That would contravene the public interest. *See Dakota Indus*, 944 F.2d at 441 ("the public's interest in being offered the widest range of merchandise in all price brackets would best be served by denying the injunction").

## **CONCLUSION**

The Court should grant a stay pending appeal.

Dated: May 6, 2022

Respectfully submitted,

By: _____*/s/ David Jermann*_____
　　　　David Jermann

Margret Caruso (*pro hac vice*)
Rachel Herrick Kassabian (*pro hac vice*)
**QUINN EMANUEL URQUHART &**
**SULLIVAN LLP**
555 Twin Dolphin Dr., 5th Floor
Redwood Shores, California 94065
margretcaruso@quinnemanuel.com
rachelkassabian@quinnemanuel.com

Robert M. Schwartz (*pro hac vice*)
**QUINN EMANUEL URQUHART &**
**SULLIVAN LLP**
865 S. Figueroa Street, 10th Floor
Los Angeles, California 90017
robertschwartz@quinnemanuel.com

David A. Jermann, II (MO Bar #51389)
**ARMSTRONG TEASDALE LLP**
2435 Grand Blvd., Suite 1500
Kansas City, Missouri 64108
djermann@atllp.com

19