# EXHIBIT 1

ATTORNEY GENERAL OF THE STATE OF NEW YORK
ANTITRUST BUREAU

---

In the Matter of

**Investigation by LETITIA JAMES,**
**Attorney General of the State of New York,** of

**Intuit Inc., and Credit Karma, Inc.,**

Respondents.

Assurance
No. 20-079

---

## ASSURANCE OF DISCONTINUANCE

The Office of the Attorney General of the State of New York ("OAG") commenced an investigation pursuant to Section 343 of the New York General Business Law, Section 63(12) of the New York Executive Law, the Donnelly Act, Section 2 of the Sherman Act, and Section 7 of the Clayton Act concerning the potential harm to competition caused by the proposed acquisition of Credit Karma, Inc. ("Credit Karma"[1]) by Intuit Inc. ("Intuit"[2]) ("the Acquisition"). During the OAG's investigation, Credit Karma proposed to divest its digital do-it-yourself ("DDIY") tax preparation product, Credit Karma Tax, Inc. ("CKT"), to Square, Inc. ("Square"), as a means of addressing the OAG's concerns ("the Divestiture"). The OAG investigation focused on the potential anticompetitive effects of the Acquisition, and the competitive impact of the proposed Divestiture. As part of its investigation, the OAG, among other things, obtained testimony from

---

[1] "Credit Karma" includes Credit Karma, Inc., its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees.

[2] "Intuit" includes Intuit Inc., its successors and assigns, and its subsidiaries, divisions, groups, affiliates, partnerships, and joint ventures, and their directors, officers, managers, agents, and employees. Following the date of the Acquisition, "Intuit" shall also include Credit Karma.

numerous market participants, gathered and analyzed relevant market data, and reviewed documents and information produced by Intuit, Credit Karma, and Square.

This Assurance of Discontinuance ("Assurance") contains the findings of the OAG's investigation and the relief agreed to by Intuit, Credit Karma, Square (collectively "Parties," and each, a "Party"), and the OAG.

## OAG's FINDINGS

1. The development, provision, operation, and support of DDIY tax preparation products that help individuals file U.S. federal and state tax returns ("DDIY tax preparation") is a relevant product market. The relevant geographic market is worldwide.

2. Other methods of preparing personal U.S. income tax returns are not close substitutes for DDIY tax preparation products, because those methods of tax preparation do not offer comparable functionality or are less convenient, more cumbersome, or more expensive. For example, hiring an accountant—*i.e.*, "assisted tax preparation"—is substantially more expensive and less convenient than using DDIY tax preparation products. Similarly, completing federal and state tax returns manually using the "pen-and-paper" method is a substantially more tedious and error-prone process and thus less efficient than using DDIY tax preparation products.

3. Intuit is based in California and was founded in 1983. It is a financial software company that provides tax preparation, accounting, and financial products and services to individuals, small businesses, and accountants. In 2019, Intuit earned over $6.5 billion in total revenue. Intuit's DDIY tax preparation business, TurboTax Online ("TurboTax"), has long been the DDIY tax preparation market leader, with an estimated market share of approximately 66%. Intuit's revenue from TurboTax in 2019 was approximately $2.25 billion. Intuit's closest DDIY tax preparation competitor has a market share of less than 15%.

4. TurboTax generates revenue through a "freemium" model, in which some taxpayers receive free basic tax preparation and e-filing services. However, all customers may pay for add-ons such as additional tax forms, itemized deductions, and live support.

5. Credit Karma is based in California and was founded in 2007. It is a leading personal finance company in the United States, offering free credit scores, credit reports, and financial insights to consumers. In 2016, Credit Karma announced the launch of CKT, its free DDIY tax preparation product. In 2020, over 2 million tax filers prepared and electronically filed their federal and state tax returns using CKT. Credit Karma currently has over 100 million users, and its revenue in 2019 was approximately $1 billion. In any given month, over 35 million users are actively engaged on the Credit Karma platform.

6. CKT is completely free for all users. Credit Karma's indirect monetization business model, unique in the DDIY tax preparation industry, is what allows it to offer CKT free of charge. Instead of fees charged to CKT customers, Credit Karma makes money from third parties when those third parties transact with Credit Karma's users through its platform.

7. Intuit has viewed CKT, and its unique business model, as a major competitive threat to TurboTax since CKT's launch in 2016. Upon the announcement of CKT's launch, Intuit recognized the disruptive potential of a completely free product and developed a comprehensive response plan. In the years since, Intuit has viewed CKT as one of its primary competitors and engaged in aggressive competition to defend its position in the DDIY tax preparation market. In response to competition from Credit Karma, Intuit has strategically lowered prices on some of its DDIY tax preparation products, such as by extending promotions for free state tax filing with TurboTax (up to a $50 value). In addition, to compete with Credit Karma, Intuit has expanded the scope and quality of services it offers to TurboTax users at no

additional cost to consumers, including by granting customers free access to their prior years' tax returns.

8. New entry and expansion by competitors are unlikely to be timely and sufficient in scope to prevent the Acquisition's likely anticompetitive effects. Apart from Credit Karma, no other companies have successfully entered the DDIY tax preparation market in over a decade. As Intuit's and Credit Karma's executives have recognized, barriers to entry are high. Barriers to entry and expansion include (i) large sunk costs and significant other expenditures to compete with TurboTax; and (ii) significant time and marketing expense to build and promote a trusted brand.

9. The Acquisition is unlikely to generate verifiable, merger-specific efficiencies sufficient to reverse or outweigh the anticompetitive effects that are likely to occur.

10. Given Intuit's entrenched position in the DDIY tax preparation market, the unique nature of Credit Karma's business model, and the absence of countervailing factors, the OAG finds that the Acquisition, as initially proposed, is likely to result in increased prices, lower quality, and less innovation in the DDIY tax preparation market.

11. To address the OAG's concerns, Credit Karma proposed to divest CKT to Square.

12. Square is based in California and was founded in 2009. It is a financial services and mobile payment company that offers point of sale software and hardware to merchants. In 2013, Square launched Cash App, initially a mobile peer-to-peer payments app that has since grown to offer an ecosystem of financial services for sending, spending, and investing money to consumers ("Cash App").

13. Square is interested in adding a DDIY tax preparation product to the Cash App ecosystem, but, as discussed above, *de novo* entry into the DDIY tax preparation market is time

consuming and expensive. Square would like to enter the DDIY tax preparation market as soon as possible.

14. Cash App is a leading online financial brand with significant financial resources and personnel with expertise in the online consumer financial products space.

15. Cash App's revenue in 2019 was approximately $1.1 billion. It currently has approximately 100 million cumulative accounts and had over 30 million unique monthly active transacting customers in June 2020.

16. Cash App is largely free to consumers. It primarily relies on an indirect monetization model, focusing on increasing deposits into the system and monetizing the flow of funds throughout the ecosystem, by, for example, interchange fees from debit card usage or fees for accelerated transfer of funds.

17. Intuit, Credit Karma, and Square neither admit nor deny the OAG's Findings above.

18. Square represents:

   a. Square's current intent is to adopt a business model where CKT will remain free to consumers, and Square will make money through usage of Cash App; and

   b. Square's current intent is to (a) invest to improve CKT's design and user interface; (b) work to expand CKT's coverage so that more Americans can file their taxes for free; and (c) continue to innovate, including working to decrease the time it takes for customers to file their taxes.

19. The OAG finds that without the Divesture and other relief contained in this Assurance, the Acquisition may substantially lessen competition in the DDIY tax preparation

market in violation of the Donnelly Act, Gen. Bus. Law § 340 et. seq., the Sherman Act, § 2 (15 U.S.C. § 2), the Clayton Act § 7 (15 U.S.C. § 18), and Executive Law § 63(12).

20. Based on its findings and on Square's representations, the OAG finds the relief and agreements contained in this Assurance appropriate and in the public interest. The OAG is also aware that the merging parties have consented to a Proposed Final Judgment in which the United States Department of Justice has required the parties to take certain additional actions consistent with this Assurance as a condition of the Department of Justice's approval of the merger. THEREFORE, the OAG is willing to accept this Assurance pursuant to Executive Law § 63(15), in lieu of commencing a statutory proceeding for potential violations of Executive Law § 63(12), the Donnelly Act, Gen. Bus. Law § 340 et. seq., the Sherman Act, § 2 (15 U.S.C. § 2), and the Clayton Act § 7 (15 U.S.C. § 18).

IT IS HEREBY UNDERSTOOD AND AGREED, by and between the Parties:

**RELIEF**

21. The Parties will comply with the following provisions:

    a. The Parties will complete the Divestiture within fifteen (15) days of executing this Assurance (the "Divestiture Date"). No agreement memorializing the Divestiture, or describing the divested assets ("Divested Assets"), may be finalized between the Parties without the OAG's written approval. The agreement must, at minimum, include, or satisfy, the following conditions:

        i. Intuit and Credit Karma will cooperate with and assist Square to identify and hire all personnel that, in the OAG's discretion, are essential to Square's ability to compete effectively ("Relevant

Personnel"). Intuit and Credit Karma will not interfere with any effort by Square to employ any Relevant Personnel.

b. The Parties will execute a TSA within fifteen (15) days of executing this Assurance. The TSA is subject to the approval of the OAG and must, at minimum, include, or satisfy, the following conditions:

   i. Intuit and Credit Karma will offer support for engineering, product support, data migration, information security, information technology, technology infrastructure, customer support, marketing, finance, accounting, and knowledge-transfer related to the tax industry, for a period of up to twenty-four (24) months from the Divestiture Date;

   ii. Intuit and Credit Karma will continue to make the CKT mobile application available through the same distribution channels used during the twelve (12) months prior to the Divestiture Date;

   iii. Intuit and Credit Karma will continue to make CKT available to customers at all times with at least the same level of quality, functionality, availability, access, and customer support as was provided by Credit Karma during the twelve (12) months prior to the Divestiture Date;

   iv. Intuit and Credit Karma will not have the ability to raise Square's costs, lower Square's efficiency, or otherwise interfere in the ability of Square to compete effectively.

22. Square will not sell or otherwise convey, directly or indirectly, the Divested Assets (other than in the event of a sale of Square or Cash App as a whole, provided that in the event of a sale of Cash App, Square will provide notice to the OAG simultaneous with any federal authority). Square will comply with this provision for a period of four (4) years after the Divestiture Date.

23. Intuit and Credit Karma will not take any action that could jeopardize, delay, or impede in any way the Divestiture or process for completing the Divestiture.

24. Intuit and Credit Karma will not reacquire any part of or any interest in the Divested Assets during the term of this Assurance. In addition, Intuit and Credit Karma will not, without the prior consent of the OAG, enter into a new joint venture, partnership, or collaboration, including any marketing or sales agreement, or expand the scope of an existing joint venture, partnership, or collaboration with Square involving DDIY tax preparation during the term of this Assurance. The decision whether to consent to any joint venture, partnership, or collaboration is within the sole discretion of the OAG.

25. This Assurance will terminate, without any further action by the Parties, ten (10) years from the last date signed by the Parties, unless terminated earlier by the mutual agreement of the Parties and OAG.

26. Intuit will provide the OAG with a certification affirming its compliance with the requirements set forth in this Assurance, to be submitted to the OAG by December 31, 2020. This certification will be in writing and be signed by Intuit. Thereafter, a certification of compliance will be submitted to the OAG on an annual basis. In any case where the circumstances warrant, the OAG may require Intuit to file an interim certification of compliance upon thirty (30) days' notice.

27. If any monitor or trustee is appointed pursuant to the Department of Justice's approval of the Acquisition, any reports Intuit receives from that monitor or trustee must be submitted to the OAG within ten (10) days of receipt by Intuit.

## MISCELLANEOUS

Subsequent Proceedings:

28. The Parties expressly agree and acknowledge that the OAG may initiate a subsequent investigation, civil action, or proceeding to enforce this Assurance, for violations of the Assurance, or if the Assurance is voided pursuant to Paragraph 34, and agree and acknowledge that in such event:

    a. any statute of limitations or other time-related defenses are tolled from and after the effective date of this Assurance;

    b. the OAG may use statements, documents, or other materials produced or provided by the Parties prior to or after the effective date of this Assurance;

    c. any civil action or proceeding must be adjudicated by the courts of the State of New York, and that the Parties irrevocably and unconditionally waive any objection based upon personal jurisdiction, inconvenient forum, or venue;

    d. evidence of a violation of this Assurance shall constitute prima facie proof of a violation of the applicable law pursuant to Executive Law § 63(15).

29. If a court of competent jurisdiction determines that any Party has violated the Assurance, the Party shall pay to the OAG the reasonable cost, if any, of obtaining such determination and of enforcing this Assurance, including, without limitation, legal fees, expenses, and court costs.

Effects of Assurance:

30. All terms and conditions of this Assurance shall continue in full force and effect on any successor, assignee, or transferee of the Parties. The Parties shall include in any such successor, assignment or transfer agreement a provision that binds the successor, assignee or transferee to the terms of the Assurance. No Party may assign, delegate, or otherwise transfer any of its rights or obligations under this Assurance without the prior written consent of the OAG.

31. Nothing contained herein shall be construed as to deprive any person of any private right under the law.

32. Any failure by the OAG to insist upon the strict performance by the Parties of any of the provisions of this Assurance shall not be deemed a waiver of any of the provisions hereof, and the OAG, notwithstanding that failure, shall have the right thereafter to insist upon the strict performance of any and all of the provisions of this Assurance to be performed by the Parties.

Communications:

33. All notices, reports, requests, and other communications pursuant to this Assurance must reference Assurance No. 20-079 and shall be in writing and shall, unless expressly provided otherwise herein, be given by hand delivery; express courier; or electronic mail at an address designated in writing by the recipient, followed by postage prepaid mail, and shall be addressed as follows: If to Intuit, to: Kerry McLean, Executive Vice President & General Counsel, 2700 Coast Ave, Mountain View, CA 94043. If to Credit Karma, to: Susannah Wright, Chief Legal Officer and Corporate Secretary at Credit Karma, Inc., 1100 Broadway, Suite 1800, Oakland, CA 94607. If to Square, to Sivan Whiteley, General Counsel, Square, 1455 Market Street, Suite 600, San Francisco, CA 94103, USA. If to the OAG, to the person holding the title of Bureau Chief, Antitrust Bureau.

Representations and Warranties:

34. The OAG has agreed to the terms of this Assurance based on, among other things, the representations made to the OAG by the Parties and their counsel and the OAG's own factual investigation as set forth in the Findings. Each party represents and warrants that neither it nor its counsel has made any material representations to the OAG that are inaccurate or misleading. If any material representations by the Parties or their counsel are later found to be inaccurate or misleading, this Assurance is voidable by the OAG in its sole discretion.

35. No representations, inducement, promise, understanding, condition, or warranty not set forth in this Assurance has been made to or relied upon by the Parties in agreeing to this Assurance.

36. The Parties represent and warrant, through the signatures below, that the terms and conditions of this Assurance are duly approved. The Parties further represent and warrant that Kerry McLean, Susannah Wright, and Sivan Whiteley, as the signatories to this Assurance, are duly authorized officers acting on behalf of Intuit, Credit Karma, and Square.

General Principles:

37. Unless a term limit for compliance is otherwise specified within this Assurance, the Parties' obligations under this Assurance are enduring. Nothing in this Assurance shall relieve the Parties of other obligations imposed by any applicable state or federal law or regulation or other applicable law.

38. The Parties shall not in any manner discriminate or retaliate against any of their employees, including but not limited to employees who cooperated or are perceived to have cooperated with the investigation of this matter or any future investigation related to enforcing this Assurance.

39. The Parties agree not to take any action or to make or permit to be made any public statement denying, directly or indirectly, any finding in this Assurance or creating the impression that this Assurance is without legal or factual basis.

40. Nothing contained herein shall be construed to limit the remedies available to the OAG in the event that the Parties violate this Assurance after its effective date.

41. This Assurance may not be amended except by an instrument in writing signed on behalf of the OAG and Parties to this Assurance.

42. In the event that any one or more of the provisions contained in this Assurance shall for any reason be held by a court of competent jurisdiction to be invalid, illegal, or unenforceable in any respect, in the sole discretion of the OAG, such invalidity, illegality, or unenforceability shall not affect any other provision of this Assurance.

43. The Parties acknowledge that they have entered this Assurance freely and voluntarily and upon due deliberation with the advice of counsel.

44. This Assurance shall be governed by the laws of the State of New York without regard to any conflict of laws principles.

45. The Assurance and all its terms shall be construed as if mutually drafted with no presumption of any type against any party that may be found to have been the drafter.

46. This Assurance may be executed in multiple counterparts by the OAG and Parties. All counterparts so executed shall constitute one agreement binding upon the OAG and Parties, notwithstanding that the OAG and Parties are not signatories to the original or the same counterpart. Each counterpart shall be deemed an original to this Assurance, all of which shall constitute one agreement to be valid as of the effective date of this Assurance. For purposes of this Assurance, copies of signatures shall be treated the same as originals. Documents executed,

scanned and transmitted electronically and electronic signatures shall be deemed original signatures for purposes of this Assurance and all matters related thereto, with such scanned and electronic signatures having the same legal effect as original signatures.

47. The effective date of this Assurance shall be November 25, 2020.

>LETITIA JAMES
>Attorney General of the State of New York
>28 Liberty Street
>New York, NY 10005
>
>By: /s/ Bryan Bloom
>    Bryan L. Bloom, Esq.
>    Assistant Attorney General, Antitrust Bureau
>
>    Morgan J. Feder, Esq.
>    Assistant Attorney General, Antitrust Bureau
>
>    Elinor R. Hoffmann, Esq.
>    Chief, Antitrust Bureau
>
>    Christopher D'Angelo, Esq.
>    Executive Deputy Attorney General for Economic Justice

Intuit Inc.

By: /s/ Kerry McLean

Kerry McLean
Executive Vice President & General Counsel

Credit Karma, Inc.

By: /s/ Susannah Wright

Susannah S. Wright
Chief Legal Officer and Corporate Secretary

Square, Inc.

By: /s/ Sivan Whiteley

Sivan Whiteley
General Counsel