# EXHIBIT 3

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MISSOURI

H&R BLOCK, INC. and HRB INNOVATIONS, INC.

        Plaintiffs,

  v.

BLOCK, INC.,

        Defendant.

Case No. 4:21-cv-00913-NKL

**Plaintiffs' Proposed Order**

Pending before the Court is Plaintiffs H&R Block, Inc.'s and HRB Innovations, Inc.'s (together, "H&R Block" or "Plaintiffs") Motion for Preliminary Injunction, Doc. 16 (Pls.' Mot. for Preliminary Injunction) against Defendant Block, Inc. After a review of the Complaint, the Motion, the suggestions in support and opposition, the evidence presented at the Preliminary Injunction Hearing held on February 10, 2022, argument of counsel, the hearing held on March 1, 2022, the parties' proposed orders, and applicable law, the Motion is hereby GRANTED.

## Background

Plaintiffs provide tax and other financial services to consumers and small businesses under the name "H&R Block" and various other marks including "Block." Plaintiffs also use various forms of a green square logo to identify themselves and the services they offer. Plaintiffs own many trademarks containing "Block" and green squares.

Defendant is a technology company with a focus on financial services that, until December 2021, operated under the name Square, Inc. In late 2020, Defendant bought Credit Karma Tax, adding tax services to its offerings and initially provided those services using the "Credit Karma Tax" name and branding. On December 1, 2021, Square, Inc. announced that it was changing its name to Block, Inc. As part of its name change, Defendant launched a website

1007698397

and social media accounts using the name "Block." It also filed an application to register "Block" as a trademark with the United States Patent and Trademark Office (USPTO). Around the same time, Defendant began offering its tax services to consumers through its Cash App mobile application, which uses a green square logo with a white dollar sign ().

On December 16, 2021, Plaintiffs filed a complaint for trademark infringement, alleging that Block, Inc.'s use of "Block" in connection with tax, financial and small business services is likely to cause confusion with H&R Block's "Block" family of trademarks. H&R Block also challenged Block, Inc.'s use of a green square logo to brand its tax and related services because it would likely cause confusion with H&R Block's green square trademark ().

After the parties were unable to resolve their dispute, Plaintiffs filed the present Motion for Preliminary Injunction to limit Defendant's use of the name "Block" and its green square logo to avoid confusion and injury to H&R Block during the pendency of this suit. That motion has been fully briefed and the Court held an evidentiary hearing on February 10, 2022.

At the hearing, Plaintiffs offered testimony from Jeffrey J. Jones II (H&R Block, Inc.'s CEO), and Defendant offered testimony from Chrysty Esperanza (Block, Inc.'s General Counsel) and Owen Jennings (Head of Business and Product for Cash App and President of Cash App Taxes). The parties also submitted declarations of several expert witnesses: for Plaintiffs, E. Deborah Jay, Sarah Butler, and David Reibstein, and for Defendant, Ravi Dhar and Yoram (Jerry) Wind; Block, Inc. also submitted a survey report from Professor David Franklyn (which was attached to Prof. Wind's sur-rebuttal declaration) and a fact declaration from Claudia Ng (Senior Production Designer at Block, Inc.). The parties submitted additional documents through various attorney declarations.

## Findings of Fact

### A. H&R Block

H&R Block was founded in 1955 by brothers Henry and Richard Bloch. Originally founded as a bookkeeping business, H&R Block now specializes in income tax preparation, along with a range of additional tax and financial services. Today, H&R Block is known not only as "H&R Block," but also as simply "Block." J-1 (Jones Decl). ¶¶ 8-16; J-4 (Jones Rebuttal Decl.) ¶¶ 10-21. As Mr. Jones explained, this is a "contemporary way" that H&R Block, the media and consumers refer to the brand. Tr. at 59:12-59:25 (Jones Direct). H&R Block uses both its original "H&R Block" trademark and the shortened name "Block" in its business and marketing. It has developed a range of trademarks that incorporate both iterations of its name, several of which H&R Block has registered as trademarks with the United States Patent and Trademark Office. *See, e.g.,* J-1 ¶ 5.

H&R Block currently has over 9,000 "H&R Block" locations in the United States and more than 300 "Block Advisor" locations, where it offers a variety of tax and other related financial services and products. J-1 ¶¶ 3-4, 13; Tr. at 52:21–53:7, 57:15–57:19 (Jones Direct).

H&R Block also offers its products and services online, including through its www.hrblock.com and www.blockadvisors.com websites and its mobile application, MyBlock. Through these platforms, customers can prepare and file their taxes or get virtual access to H&R Block's tax professionals for assistance. Customers also can prepare and file their taxes through H&R Block's do-it-yourself (DIY) software, which is available online and through retail stores nationwide. J-4 (Jones Rebuttal Decl.) ¶ 20.

In addition to tax preparation and filing, H&R Block offers a variety of related financial services in association with "H&R Block" and other "Block"-based branding (such as

3

"MyBlock" and "H&R Block Emerald Card"), including pre-paid debit cards, lines of credit, loans, access to credit scores, money management, payment processing and mobile banking platforms. J-1 ¶¶ 4, 5, 9 14; J-4 ¶¶ 22-30.

Under its "Block Advisors" brand, H&R Block offers a variety of tax, financial, accounting, bookkeeping and payroll services to small businesses. In 2021 alone, H&R Block served more than two million small businesses under the "Block Advisors" brand. J-1 ¶ 13; J-4 ¶ 16; Tr. at 54:4–54:14, 57:15–57:19, 58:10-58:11 (Jones Direct).

H&R Block also offers charitable, philanthropic, volunteer, community service and humanitarian services in the many communities where it operates, including through a community impact program called "Make Every Block Better." J-1 ¶ 15; Tr. at 61:14–61:16, 65:14–65:25 (Jones Direct); 112:21–112:22 (Jones Cross).

H&R Block uses its trademarks throughout its marketing and has invested billions of dollars on national advertising campaigns on television, in print, on the radio, on the Internet and on social media, including on Twitter, Instagram, Facebook, Tik Tok and LinkedIn. Over the last three years, H&R Block has spent nearly half a billion dollars advertising its products and services. J-1 ¶ 7; J-4 ¶¶ 4, 6, 15, 20; Tr. at 61:3–62:8, 63:9–64:25, 66:1-67:11 (Jones Direct).

H&R Block's advertising makes varied uses of "Block" without "H&R," including through taglines like "Block Has Your Back," in which H&R Block has invested over $100 million, and "It's Better with Block," in which H&R Block invested over $50 million during 2020. H&R Block also uses "Block" on its social media accounts, including a recent advertising campaign on Tik Tok with the hashtag "#DIYwithBlock," which generated billions of views; in connection with its "Block Advisors" brand for small businesses; in signage in its H&R Block retail offices; in its diversity and inclusion initiatives, including through its "Belonging@Block"

program; in recruiting employees at "Block Days"; and in its growth and transformation strategy called "Block Horizons 2025." J-1 ¶¶ 11, 14, 16; J-4 ¶¶ 11, 13; Tr. at 58:22; 61:14–61:20; 62:2–62:6; 63:19–63:22, 66:7–67:11 (Jones Direct).

In many of the circumstances in which H&R Block uses "Block" alone, it also includes its "H&R Block" name nearby. Tr. at 101:13–103:13 (Jones Cross). As Mr. Jones explained, using "H&R Block" and "Block" together helps reinforce the connection between "Block" and H&R Block so that people will understand that, when "Block" is used in the context of taxes and adjacent financial services, it means H&R Block. Tr. at 61:6–61:13 (Jones Direct). *See also* P-88 (Reibstein Reply Decl.) ¶ 35. H&R Block has presented evidence that people make this connection. For example, consumers refer to H&R Block as "Block" in reviews of H&R Block's software products; similarly, media outlets have referred to H&R Block as "Block" in the headlines of articles spanning decades. J-4 ¶¶ 20-21; Tr. at 68:10–68:20 (Jones Direct); 114:21–114:25 (Jones Cross).

H&R Block also uses green square logos in connection with its products and services, and owns several federal trademark registrations for those logos. H&R Block's green square marks are a significant element of H&R Block's branding. The marks are included on many of H&R Block's consumer-facing materials, including national television commercials and as part of the "Block Advisors" branding and advertising. H&R Block has used its green square marks both with and without its full name H&R Block. As Mr. Jones explained, H&R Block uses the logos—which are in the form of a block—to help reinforce the connection between the logo and the H&R Block brand name. J-1¶ 20; J-4 ¶¶ 7, 31-32; Tr. at 70:18–73:11 (Jones Direct).

**B. Block, Inc.**

Defendant was founded in 2009 as "Square, Inc." by Jack Dorsey and Jim McKelvey in

order "to create tools that help expand access to the economy." J-2 (Esperanza Decl.) ¶ 4-5.

Defendant provides a variety of financial goods and services, such as a square-shaped payment

card reader and point-of sale software, debit cards, payroll services, loans and peer-to-peer

money transfers. J-2 ¶¶ 5-8, 16; J-3 (Jennings Decl.) ¶¶ 2-4. Some of these offerings overlap with

Plaintiffs' goods and services, but, until recently, Defendant did not offer tax preparation or

filing services. *Compare, e.g.*, *id.* with J-1 ¶ 5; and see J-3 ¶ 13.

In November 2020, Defendant, as Square, Inc., acquired Credit Karma Tax. J-3 ¶ 13. In

2021, Defendant offered these tax services under the "Credit Karma Tax" name through its pre-

existing Credit Karma platform. J-1 ¶ 31, Ex. K.

On December 1, 2021, Square, Inc. announced that it was changing its name to "Block,

Inc."[1] The name change was immediately publicized by Mr. Dorsey, Block, Inc.'s well-known

CEO, on his Twitter account, which has over six million followers. J-2 ¶ 20; P-29; P-52; Tr. at

199:22–199:24, 206:20–208:14 (Jennings Cross).

Defendant selected the name "Block" because of its association with "building blocks,

neighborhood blocks and their local businesses, communities coming together at block parties

full of music, a blockchain, a section of code, and obstacles to overcome." J-2 ¶ 21; Doc. 1

(Compl.) ¶ 32, Ex. A; P-29. Defendant's "building blocks" are its businesses offered under the

names "Square," "Cash App," "Spiral," "TIDAL" and "TBD54566975." P-28; Tr. at 157:8-

157:13 (Esperanza Cross). Block, Inc. has stated that "Block is @Square, @CashApp,

@spiralbtc, @TIDAL, @TBD54566975, and our foundational teams who support them." P-58.

One of Defendant's "building blocks" is Square. Square offers small businesses and other

sellers an "integrated ecosystem of commerce solutions, business software, and banking

---

[1]    Although Block, Inc. changed its name from Square to Block, its stock ticker symbol is still
       SQ. It indicated that it does not plan to change its ticker symbol at this time. J-2 ¶ 20; P-29.

services." Square also offers its small business customers checking accounts with a linked debit card and other financial services. J-1 ¶ 26; J-2 ¶¶ 5-8, 16.

Another of Defendant's "building blocks" is Cash App, which is a mobile payment service that offers users peer-to-peer money transfer services, direct deposit and a Visa debit card connected to the user's balance. Cash App's logo, which also is the icon used for its mobile app, is a green square logo with a dollar sign in the center. J-3 ¶¶ 2-4, 6, 10. Shortly after changing its name to Block, Inc., Defendant began offering tax preparation and filing services through Cash App under the Cash App green square logo. Previously, it had offered these tax services only through a separate application that was branded as "Credit Karma Tax." J-1 (Jones Decl). ¶¶ 31, 39. J-3 ¶ 13.

On December 1, 2021, Defendant filed an application with the USPTO to register "Block" as a trademark for use in connection with a variety of services, including:

> Holding company services, namely, providing business management, business administration services for subsidiaries and affiliates which provide tools and resources for economic empowerment;
>
> holding company services, namely, providing business management, business administration, business promotion, and business consulting services for subsidiaries; . . .
>
> charitable services, namely, promoting public awareness about charitable, philanthropic, volunteer, public and community service and humanitarian activities; . . . [and]
>
> providing investors with financial information. . . .

P-73; Tr. at 159:24–163:3 (Esperanza Cross).

Block, Inc. states that it "uses its Block brand for parent company purposes, for instance with the investor community and with employees." Tr. at 40:6–40:13 (Block, Inc. Opening). It states that it "doesn't use [the Block] mark as a brand for any of its customer-facing products and business lines." Tr. at 40:14–40:15 (Block, Inc. Opening); J-2 ¶ 18. Defendant does, though,

refer to "Block" throughout its public-facing www.block.xyz website, as well as in that website's "Block" copyright and trademark policy and as its "Block" contact for press and investor relations. Tr. at 198:18–198:25 (Jennings Cross). Block, Inc. also operates several "Block" social media accounts through which it communicates information to the public, including Twitter accounts with the handles "@blocks" and "@blockir" and an Instagram account with the handle "@blocks." P-31; P-33; Tr. at 155:22–156:8 (Esperanza Cross). Block concedes that it uses its online "Block" platforms to publicize its new "Block" name, as well as the message that Cash App, Square and its other "building blocks" are part of "Block." Tr. 155-159 (Esperanza Cross).

Block, Inc. also uses "Block" directly in connection with Cash App. Since rebranding from Square to Block, Block, Inc. has started including "many, many" references to "Block, Inc." on its Cash App website and mobile application. Tr. at 192:24-193:4 (Jennings Direct); *see also* J-1 ¶ 28. These references are found in the Cash App Taxes Terms of Service, the Cash App Taxes Consent to Disclosure of Tax Return Information, the Cash App Taxes Privacy Notice, and in the rules for a recent Cash App sweepstakes. Tr. at 192:24–193:4 (Jennings Direct); J-4 ¶ 60, Ex. 2; P-72. Block, Inc. also tags Cash App on social media from its "Block" accounts in order to publicly connect Cash App with "Block" and notify Cash App's followers of that connection. Tr. 157-158 (Esperanza Cross); P-58. In addition, Block, Inc. uses the "Block" name when responding to online consumer complaints about Cash App's new tax offering. Tr. at 216:3-218:5 (Jennings Cross); P-88. A number of Block, Inc. employees indicate on their LinkedIn profiles that they work for "Cash App at Block" or "Cash App (Block)." P-35.

### C. The Public's Reaction to Defendant's Name Change

Following the announcement of Defendant's name change, people on social media have drawn a connection between H&R Block and Block, Inc., including in the following examples:

- "The square rebrand is surely going to piss off @HRBlock who do a lot of financial service stuff under the Block name. Very surprised it got through their trademark checks."

- "This seems dumb. They already are an established brand with lots of users and hardware out there. (I use them for example.) Also, doesn't this seem close to H&R Block with their simple green square logo? They should just stick with Square."

- "[I]sn't that name already taken by HRBlock, which is already in the financial and ba[n]king sectors?"

- "Are you talking about H&R block?"

- "Have you ever heard of H&R Block? They are in the financial business as well. Did you know they refer to their businesses as Block?"

- "Too bad. HRB is colloquially called Block."

- "What about H&R Block? That's what I think of when I hear 'Block.'"

J-1 ¶ 35, Ex. M.

Since then, individuals and news outlets have posted comments on social media that link Cash App and its new tax services to "Block." Some of these tag the post with "$HRB," a reference to H&R Block's stock ticker symbol. P-25; Tr. at 79:19–81:5; J-4 ¶ 58. Others are media articles that make a connection between Cash App and "Block," including several recent articles that were published shortly after the IRS began to accept electronic returns on January 24, 2022. For example, in a February 2, 2022 review of Cash App Taxes, a *PC Magazine* article explained that Credit Karma Tax is "[n]ow called Cash App Taxes—reflecting its tight integration with Block's Cash App." P-39. Another article in *Android Headlines* described different free tax filing services, including H&R Block, and then discussed Cash App Taxes as being offered through "Block's Cash App." P-48. These articles link Cash App and its new tax preparation and filing services to "Block."

Articles such as this have continued since the preliminary injunction hearing. For

example, *The Wall Street Journal* published an article on February 25, 2022 that makes frequent linkages between "Block" and "Cash App," including its new tax services:

> Block's Cash App is money again for investors in the fintech giant. . . . Now investors may find reasons for a renewal of optimism in results for Block's Cash App, the neobank-like service that enables payments, deposits and more. . . . Perhaps most enticingly, ***Block attributed some of that growth to expansion of what Cash App does: newer services such as tax preparation***, merchant services and accounts for teens. . . .

Telis Demos, *Cash App is King for Block Stock*, WALL STREET J. (Feb. 25 2022), available at https://www.wsj.com/articles/cash-app-is-king-for-block-stock-11645807732?st=i9zxetuy8ghhjh2&reflink=desktopwebshare_permalink (emphasis added).[2]

Media outlets also have published articles about Cash App's services and have identified them as coming from "Block." *See* P-47 (referring to the new lightning network on "Block's Cash App"); P-45 (explaining that "Block has developed a new Cash App feature" and now "Block Users Can Gift Stock, Bitcoin on Cash App"). Some of those articles appear to reflect confusion about whether the Cash App services are being offered by H&R Block because they list stories about Cash App under profiles about H&R Block. For example:

- A January 14, 2022 MarketScreener article (the "MarketScreener Article") entitled "Block's CashApp Launching Free Tax Filing Service Called 'Cash App Taxes'" was posted on a profile page about H&R Block. P-50.

- A Reuters company profile (the "Reuters Profile") for H&R Block includes articles under the "Latest News" about Block, Inc., including an article entitled "Jack Dorsey's Block to build an open bitcoin mining system," and "Afterpay's $29 billion buyout by Block set to close after Spain nod." P-46.

---

[2] Although this article was published after the preliminary injunction hearing, the "Court[] may properly take judicial notice of newspapers and other publications as evidence of what was in the public realm at the time, but not as evidence that the contents in the publication were accurate." *Klossner v. IADU Table Mound MHP, LLC*, No. 20-CV-1037-CJW-KEM, 2021 WL 4739311, at *2 (N.D. Iowa Oct. 5, 2021).

As Professor Dhar acknowledged, it is "not uncommon for third-party media and social media coverage to link a corporate parent to a consumer-facing brand." D-5 (Dhar Sur-Reply Decl.) ¶ 16.

### The Parties' Claims and Defenses

On December 16, 2021, six days after Defendant's name change took effect, H&R Block filed a complaint against Block, Inc. for trademark infringement under the Lanham Act and Missouri law. On December 21, 2021, H&R Block filed a motion for a preliminary injunction.

H&R Block claims that Defendant's use of "Block" and attendant use of a green square logo for its tax services is likely to cause confusion because H&R Block and Block, Inc. offer many of the same services, including tax preparation and filing, other related financial services, and charitable services. H&R Block claims it will be irreparably harmed by Block, Inc.'s use of "Block" and a green square logo, as it will undermine H&R Block's ability to control its public image and perception; consumers will incorrectly believe that Block, Inc.'s tax preparation and filing service comes from H&R Block, or that H&R Block is one of the "building blocks" in the Block, Inc. family of brands. H&R Block claims that consumers, the media and investors are already confused, and, as Block, Inc. completes its rebrand, confusion will only increase. H&R Block seeks a preliminary injunction to restore and preserve the *status quo*, the way things were before Defendant's name change. Doc. 17 (Sugg. in Supp. of Pls.' Mot. for Prelim. Inj.), pp. 13–24; Doc. 1 (Compl.) ¶¶ 6, 43-45, 47, 51-52; Doc. 68 (Sugg. in Further Supp. of Pls.' Mot. for Prelim. Inj.), pp. 16–21.

Defendant claims that it does not use "Block" as part of the branding for Cash App or any of its consumer-facing brands; that it does not use its green square Cash App logo for tax services without the name "Cash App"; that there are several third parties that use both "Block"

and green squares for financial services without confusion; and that there is no likelihood of confusion between H&R Block and Block, Inc. Defendant claims that an injunction barring it from using its corporate name or requiring a change of the Cash App logo would be disruptive to its business. It further claims that it has spent over a year developing and implementing its "new corporate identity" and "[i]t cannot just flip a switch and go back to its former name," Square, Inc. Doc. 38 (Def.'s Sugg. in Opp. to Pls.' Mot. for Prelim. Inj.), pp. 1-2, 6-8, 14–26.

<u>Discussion</u>

The Eighth Circuit has instructed courts to consider the following factors when assessing a plaintiff's motion for preliminary injunction: (1) whether the plaintiff is likely to succeed on the merits, (2) whether the plaintiff is likely to suffer irreparable harm in the absence of preliminary relief, (3) whether the balance of equities tips in the plaintiff's favor, and (4) whether an injunction is in the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir.1981). "[T]he purpose of issuing a preliminary injunction in a lawsuit is to preserve the status quo and to prevent irreparable harm until the court has an opportunity to rule on the lawsuit's merits." *Curtis 1000 v. Youngblade*, 878 F. Supp. 1224, 1244–45 (N.D. Iowa 1995). "In trademark cases, the status quo 'refers not simply to any situation before the filing of a lawsuit, but instead to the last uncontested status which preceded the pending controversy.'" *Cmty. of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church*, 613 F. Supp. 2d 1140, 1145 (W.D. Mo. 2009) (citation omitted). "The status quo . . . is the period before [the defendant] began using the infringing marks." *Id.* For purposes of this case, H&R Block seeks to preserve the status quo that existed before Defendant's rebranding to Block, Inc.

### A. Plaintiffs Are Likely to Succeed on the Merits

To prevail on a trademark infringement claim under the Lanham Act, the plaintiff "must

prove ownership of a valid trademark and a likelihood that the allegedly infringing mark would be confused with the registered mark." *Aveda Corp. v. Evita Mktg., Inc.*, 706 F. Supp. 1419, 1426 (D. Minn. 1989). The Eighth Circuit has adopted "an expansive interpretation of likelihood of confusion, extending 'protection against use of plaintiff's mark on any product or service which would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with, connected with, or sponsored by, the trademark owner.'" *Anheuser-Busch, Inc. v. Balducci Publ'ns.*, 28 F.3d 769, 774 (8th Cir. 1994) (citation omitted). The law is not only concerned with confusion to the "buying public." The law also considers confusion by other stakeholders, including investors, the media, vendors, and potential and current employees. *First Nat'l Bank in Sioux Falls v. First Nat'l Bank S. Dakota*, 679 F.3d 763, 770 (8th Cir. 2012).[3]

     *1. H&R Block's Trademarks are Valid.*

     H&R Block has established that it owns a family of "Block" trademarks. "A family of marks exists when one common family characteristic appears as part of all the marks used, and the owner has sufficiently advertised or promoted the marks to establish, in the minds of the public or the trade, a recognition that he possesses a 'family of marks' identified by the common characteristic." *Scott v. Mego Int'l, Inc.*, 519 F. Supp. 1118, 1128 n.6 (D. Minn. 1981) (citing CALLMANN, UNFAIR COMPETITION, TRADEMARKS, AND MONOPOLIES § 82.1(f)); *see also Northwest Airlines, Inc. v. Bauer*, 467 F. Supp. 2d 957 (D.N.D. 2006).

     H&R Block owns the following United States trademark registrations which include the

---

[3]    The elements of claims for trademark infringement and unfair competition under Missouri law "substantially overlap" with those of federal trademark law under the Lanham Act. *See Steak n Shake Co. v. Burger King Corp.*, 323 F. Supp. 2d 983, 991 (E.D. Mo. 2004); *Cmty. of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church*, 634 F.3d 1005, 1010 (8th Cir. 2011) (under Missouri law, it "is well settled that the same facts which support a suit for trademark infringement support a suit for unfair competition" and common law infringement), *aff'g*, 683 F.Supp.2d 1006 (W.D. Mo. 2010).

common word "Block": "H&R Block" (Reg. No. 3,338,962); "H&R Block Emerald Card" (Reg. No. 3,392,368); "H&R Block Emerald Savings" (Reg. No. 3,525,361); "H&R Block Emerald Advance" (Reg. No. 3,532,084); "Blockworks" (Reg. No. 4,769,331); "Block Advisors" (Reg. No. 5,055,458); "Block Advisors" (stylized) (Reg. No. 5,179,142); and "Block Has Your Back" (Reg. No. 6,003,605). H&R Block's registrations constitute *prima facie* evidence that those marks are valid, that H&R Block owns those marks, and that H&R Block has the exclusive right to use those marks in commerce. *See S&M Nutec, L.L.C. v. T.F.H. Publ'ns, Inc.*, No. 03-1033-CV-W-NKL, 2005 WL 1224607, at *10 (W.D. Mo. May 23, 2005) (citing 15 U.S.C. § 1115(a)). Additionally, several of these registered marks are incontestable pursuant to 15 U.S.C. § 1065, which "is conclusive evidence of the registrant's exclusive right to use the mark, as well as the registrant's ownership of the trademark." *Dakota Indus., Inc. v. Ever Best Ltd.*, 28 F.3d 910, 912 (8th Cir. 1994) (citing *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 196 (1985)).

H&R Block also has provided evidence that it owns common law rights in the mark "Block" by itself. To establish a valid common law trademark, the plaintiff must show "prior appropriation and use of the mark in connection with a particular business." *Bass Buster, Inc. v. Gapen Mfg. Co.*, 420 F. Supp. 144, 157 (W.D. Mo. 1976); *accord Gilbert/Robinson, Inc. v. Carrie Beverage-Missouri, Inc.*, 758 F. Supp. 512, 522 (E.D. Mo. 1991) ("The exclusive right to use the mark belongs to the first person who appropriates it and uses it in connection with a particular business. Any doubts as to confusion are to be decided against the newcomer."), *aff'd*, 989 F.2d 985 (8th Cir. 1993). H&R Block has presented evidence of its use of the term "Block" in commerce in connection with its products and services. This use has taken hold with the public, as consumers and the media sometimes use "Block" alone to refer to the brand. *See* J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 7:18 (5th ed.

2021) ("If the public has come to shorten a trademark into a nickname, then the nickname is entitled to legal protection as a mark."); *see also Brooks Bros. v. Brooks Clothing of Cal.*, 60 F. Supp. 442, 454, 462 (S.D. Cal. 1945) ("Brooks" is an abbreviation for "Brooks Brothers"; defendant enjoined from using "Brooks" for clothing stores). H&R Block, thus, has established common law rights in the trademark "Block."

Block, Inc. argues that, because H&R Block frequently uses "H&R Block" in close proximity to "Block," H&R Block does not own rights in "Block" alone. D-2 (Wind Decl.) ¶¶ 7, 51–56, 64, 73; D-3 (Dhar Decl.) ¶¶ 54-64. That argument misunderstands trademark law. The use of "Block" in commerce in connection with the sale of H&R Block's goods and services gives rise to H&R Block's common law rights in "Block." That H&R Block may frequently use its full name or logo together with "Block" does not undermine or negate those rights. That use of "Block" (regardless of its proximity to "H&R Block") gives rise to H&R Block's common law rights in "Block." *See MMG Enters., Inc. v. Walter Pye's Mens Shops, Inc.*, Civ. A. No. 94-3750, 1995 WL 16771 (E.D. La. Jan. 17, 1995) (plaintiff owned trademark rights in its abbreviated name "NCL" even though plaintiff often used its full name, "National Clothing Liquidators," in conjunction with its abbreviated name in advertisements); *see also Martahus v. Video Duplication Servs.*, 3 F.3d 417, 424 (Fed. Cir. 1993) (plaintiff's use of its abbreviated name on invoices was a trademark use, even though the invoices also included plaintiff's full name). The Court finds that H&R Block has established that it owns trademark rights in its family of "Block" marks, including both its registered trademarks and its common law "Block" trademark, and that such marks are valid and entitled to protection.[4]

---

[4] Even if H&R Block had not established common law rights through use of "Block" alone, "Block" is a distinguishing feature of H&R Block's many registered trademarks and is therefore entitled to protection. *Northwest Airlines, Inc.*, 467 F. Supp. 2d 957 ("Northwest"

In addition to the BLOCK family of marks, H&R Block owns federal trademark registrations for its green square logo, including Registration Nos. 2,533,014, 3,656,593 and 5,179,142. J-1 ¶ 20; J-4. These registrations constitute *prima facie* evidence that the marks are valid, that H&R Block owns those marks, and that H&R Block has the exclusive right to use its green square marks in commerce. 15 U.S.C. § 1115(a). H&R Block has used its green square marks across all of its branding, including office signage, advertisements, its website, and social media, both in combination with the words "H&R Block" and by itself, for decades. J-4 ¶¶ 10-17. Although Block, Inc. disputes the strength of H&R Block's green square logo and argues that it is frequently used in close proximity to the "H&R Block" word mark, Block, Inc. does not challenge the validity of H&R Block's federal trademark registrations for the green square logo or H&R Block's ownership of those trademarks. Similar to the meaningful connection between "Block" and H&R Block, the use of the green square logo in conjunction with the "H&R Block" name strengthens the connection between H&R Block and the green square logo, especially when used in connection with the tax and other financial services that H&R Block offers.

2. *Block, Inc. Uses "Block" in Commerce.*

Defendant argues that its use of "Block" is not trademark infringement because "Block, Inc." is only a corporate name and Defendant does not use "Block" as the name of one of its consumer-facing "brands." Doc. 38 at p. 19. That argument misconstrues trademark law because a name does not have to be used as a "brand" in order to infringe another's trademark rights. The

worthy of protection even though plaintiff Northwest Airlines did not own a registration for "Northwest" alone, because plaintiff owned numerous trademark registrations that included the word "Northwest"; had continuously used "Northwest" in connection with its services; had sold billions of dollars of services under "Northwest"; had expended many millions of dollars in advertising its services; and had presented evidence of media coverage using "Northwest" to refer to plaintiff); *Lane Bryant, Inc. v Glassman*, 95 F. Supp. 320, 323 (E.D. Mo 1951) (enjoining defendant from using "Maternalane" where plaintiff owned trademark rights in "Lane Bryant," but not "Lane" alone, and sold maternity clothing).

Lanham Act prohibits use by a defendant of any "word, term, name" that is used "in commerce" and that "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person." 15 U.S.C. § 1125(a)(1) (emphasis added). The question is not whether Defendant is using "Block" as a brand or as the name of its consumer-facing apps; rather, the question is whether Defendant is using the "word, term, [or] name" "Block" in commerce in a way that is likely to cause confusion.

The evidence from the hearing (examples of which are cited below) shows that Block, Inc. frequently uses the word "Block" in a manner that "is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection or association . . . or as to the origin, sponsorship, or approval" of Block, Inc.'s products and services. Some of those uses are in consumer-facing ways that themselves are likely to cause confusion; others are uses that link Block, Inc. and its "building blocks" in ways that facilitate confusion by third parties, making the confusion worse in the marketplace. For example:

- Defendant issued a press release on December 1, 2021 announcing that it was changing its name to Block, Inc., and that Cash App is one of its "building blocks." Mr. Jennings agreed that "there was a linkage in the very first press release on December 1st between Block, Inc., the newly christened company, and Cash App." P-29; Tr. at 199:22–200:9 (Jennings Cross).

- Block, Inc.'s founder, Mr. Dorsey, tweeted to his six million followers that Square was changing its name to Block. This Tweet was liked over 12,000 times. P-52; Tr. at 208:2–208:14 (Jennings Cross). Mr. Dorsey also tweeted to his six million followers an announcement regarding the launch of Cash App Taxes. This Tweet was liked over 6,900 times. P-59; P-53; Tr. 206:20–207:22; 208:2–209:11 (Jennings Cross).

- Block, Inc. maintains a website at www.block.xyz that states that "Block, Inc. is Square, Cash App, Spiral, TIDAL, TBD54566975," and that "[t]hese are [its] building blocks." P-28; Tr. at 155:2–155:10; 157:8–157:12 (Esperanza Cross). Block, Inc.'s website is intended to be viewed by employees, candidates for employment, investors, regulators, and the media. Tr. at 144:12–145:6 (Esperanza Direct).

- Block, Inc. maintains an Instagram page with the handle @block.xyz which includes

a post that Mr. Jennings agreed "is showing the building blocks of Block, including the green square logo of Cash App." P-33; Tr. 202:11–24 (Jennings Cross).

- Block, Inc. maintains a Twitter account with the handle @blocks. P-31; Tr. at 155:25–156:2 (Esperanza Cross). On December 1, 2021 when Defendant announced it was changing its name from Square, Inc. to Block, Inc., it tweeted that "Block is @Square, @CashApp, @spiralbtc, @TIDAL, @TBD54566975" in order "to announce the rebrand[5] from Square to Block and that these are the companies that are part of Block." This post was liked by more than 6,300 Twitter accounts and shared by more than 2,000 users. P-58; Tr. at 158:5–158:9 (Esperanza Cross).

- Block, Inc. has promoted Cash App on its Twitter account. P-32; Tr. at 201:5–202:4 (Jennings Cross).

- On December 31, 2021, Block, Inc. tweeted a promotional video with the tag line "When the Block strike midnight." P-60.

- In connection with complaints about Cash App's tax services that are filed by consumers with the Better Business Bureau (BBB), Block, Inc. signs its responses as coming from "Block." These complaints and responses are posted on the BBB website for the public's review. P-88, Ex. 6; Tr. at 216:3–218:5 (Jennings Cross).

- Block, Inc. uses the name "Block" in its privacy policy, which Mr. Jennings agreed was "important to consumers these days." Tr. at 197:25–198:2, 199:3–199:5 (Jennings Cross).

- Block, Inc. indicates that Cash App sweepstakes are "sponsored by Block, Inc." P-72; Tr. at 210:5–211:16 (Jennings Cross). One such sweepstakes garnered approximately seven million views and 78,600 likes on Twitter as well as over 567,000 views on Instagram. D-3 ¶¶ 48-49.

- Block, Inc.'s website features a playlist titled "Block Vibes," which features a link to Block, Inc.'s TIDAL website with a playlist of songs curated by Jay-Z. Including these songs on the www.block.xyz website can only have been done to attract public attention to the website. Tr. at 94:3–94:18; 119:23–119:25 (Jones Cross).

These uses are all uses in commerce and fall squarely within the scope of use against which the Lanham Act protects. As further proof of its intention to use "Block" in public-facing ways, Defendant has filed an application with the USPTO to register "Block" as a trademark for a

---

[5]    Block, Inc. pinned this post to the top of its account so that it will remain the first thing visitors see when they visit the Block, Inc. Twitter page. Block, Inc. also tagged @CashApp and its other brands' social media accounts to connect those accounts and their followers to Block, Inc.'s @blocks Twitter page. Tr. 157–158 (Esperanza Cross).

variety of services. Tr. at 159:24–162:25 (Esperanza Cross). In that application, Defendant told the USPTO under penalty of perjury that it intends to use "Block" in commerce. P-73.

Even if Block, Inc. is correct that it is only using "Block" as a corporate name or as the name of its "corporate parent," Tr. at 274:14–274:25 (Def.'s Closing), such use is still actionable under the Lanham Act. J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 9:3 (5th ed. 2021) ("defendant's use of plaintiff's trademark as part of defendant's corporate title and name, can be viewed as trademark infringement"). Corporate names can be infringing, and courts have enjoined use of a defendant's corporate name that includes a plaintiff's trademark. *Safeway Stores, Inc. v. Safeway Props., Inc.*, 307 F.2d 495, 499–500 (2d Cir. 1962) (affirming preliminary injunction against defendant's use of plaintiff's "Safeway" trademark in its corporate name, Safeway Properties, Inc.); *Nat'l Customer Eng'g Inc. v. Lockheed Martin Corp.,* No. 96–8938 DDP ANX, 1997 WL 363970, at *6 (C.D. Cal. Feb. 14, 1997) (enjoining defendants' use of corporate name, MountainGate Systems, Inc.).

Block, Inc.'s reliance on *Armstrong Cork Co. v. World Carpets, Inc.*, 597 F.2d 496 (5th Cir. 1979) to argue that it does not use "Block" as a source identifier is misplaced. In *Armstrong*, the court was clear that the defendant "[sought] merely to change its corporate name" and there was "no showing that [the defendant was] seeking to feature either its new name in its entirety or, more significantly, the term WORLD to denominate or advertise its carpets." *Id.* at 505. That is not the case here. Defendant is using the name "Block" to promote its other brands, including Cash App and its new tax services.

Block, Inc.'s argument is, however, relevant to the scope of relief that is appropriate. At this stage of the proceedings, H&R Block is seeking only an order prohibiting Block, Inc. from using "Block" in any public-facing way in connection with the services that both Block, Inc. and

H&R Block provide. This relief is consistent with both the *Safeway* and *Armstrong* decisions.

   3.   *Defendant's Use of "Block" Is Likely to Cause Confusion.*

In assessing likelihood of confusion, the Eighth Circuit has enumerated six factors for the Court to consider: (1) the strength of the trademark; (2) the similarity between the plaintiff's and defendant's marks; (3) the competitive proximity of the parties' products; (4) the alleged infringer's intent to confuse the public; (5) evidence of any actual confusion; and (6) the degree of care reasonably expected of the plaintiff's potential customers. *SquirtCo. v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980) (the "*SquirtCo* factors"). No *SquirtCo* factor is dispositive; numerous factors must be weighed and considered by the Court to determine whether a likelihood of confusion exists. *Id.*

In considering these factors, the Court should consider confusion among consumers as well as among non-consumers. As the Eighth Circuit has held, the likelihood of confusion that is actionable under the Lanham Act 'include[s] confusion of nonpurchasers as well as direct purchasers'"; evidence of confusion by "vendors, delivery people, or other non-customers, and occasionally careless (rather than confused) customers" may be relevant. *First Nat. Bank in Sioux Falls*, 679 F.3d at 770 (quoting *Insty\*Bit, Inc. v. Poly–Tech Indus., Inc.*, 95 F.3d 663, 672 (8th Cir.1996)); *see also Mid–State Aftermarket Body Parts, Inc. v. MQVP, Inc.*, 466 F.3d 630, 634 (8th Cir. 2006); *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 298 n.24 (3d Cir. 2001) ("evidence of any confusion at all, by investors, purchasers, or the media, may still affect this Court's determination of whether there is a likelihood of confusion by purchasers, for if there is evidence that, for example, the media, whose words purchasers read, is confused about the names of these companies, then it is more likely that purchaser will be confused as well"); *U.S. v. Hon*, 904 F.2d 803, 806, 08 (2d Cir. 1990) ("Courts outside our

circuit have also extended Lanham Act confusion to the public at large") (collecting cases).

Also relevant in considering the *SquirtCo* factors is the potential likelihood of reverse confusion or initial interest confusion. "Reverse confusion occurs when a large junior user saturates the market with a trademark similar or identical to that of a smaller, senior user. In such a case, the junior user does not seek to profit from the good will associated with the senior user's mark. Nonetheless, the senior user is injured. . . ." *Minn. Pet Breeders, Inc. v. Schell v. Kampeter, Inc.*, 41 F.3d 1242, 1246 (8th Cir. 1994) (quoting *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 957 (7th Cir.1992)). Initial interest confusion is "confusion that creates initial customer interest, even though no actual sale is final completed as a result of the confusion. . . . In general, the theory of initial-interest confusion recognizes that a senior user's goodwill holds value at all times, not merely at the moment of purchase. The theory protects against the threat of a competitor receiving a free ride on the goodwill of an established mark." *Select Comfort Corp. v. Baxter*, 996 F.3d 925, 932 (8th Cir. 2021) (citations and quotation marks omitted).

### i) H&R Block's Trademarks Are Strong

"A strong and distinctive trademark is entitled to greater protection than a weak or commonplace one." *SquirtCo*, 628 F.2d at 1091. A trademark's overall strength is measured by both its conceptual and commercial strength. *See 3M Co. v. Nationwide Source, Inc.*, No. 20-CV-2694, 2021 WL 141539, at *4 (D. Minn. Jan. 15, 2021).

### ***Conceptual Strength***

The conceptual strength of a mark depends on whether the mark is classified, from least protectable to most protectable, as (1) generic; (2) descriptive; (3) suggestive; or (4) arbitrary or fanciful. *See USA Visionary Concepts, LLC v. MR Int'l*, LLC, No. 4:09-CV-00874-DGK, 2009 WL 10672094, at *3 (W.D. Mo. Nov. 17, 2009).

The H&R Block marks, including "Block," "do[] not immediately convey an idea of the qualities and characteristics" of the goods and services H&R Block provides, namely, tax, financial and charitable goods and services. *See Zerorez Franchising Sys., Inc. v. Distinctive Cleaning, Inc.*, 103 F. Supp. 3d 1032, 1042 (D. Minn. 2015). Instead, "Block" is arbitrary, as it is not the same spelling as its founders' name and has no association with the services and products H&R Block offers. Moreover, even if the mark was the same as the name of the Bloch founders, the mark still would be conceptually strong given the decades of use, billions of dollars in advertising of the "Block" marks, and the fact that "block" is not a term that has any dictionary meaning in association with taxes and related financial services. *General Motors, LLC v. Rapp Chevrolet, Inc.*, No. CIV 12-4209-RAL, 2013 WL 2245472, at *5 (D.S.D. May 21, 2013) (finding the mark "Chevrolet," named from Louis Chevrolet, in use for decades, promoted nationally, and highly recognizable to the public, to be "somewhat 'arbitrary or fanciful' in nature" and "entitled to a high level of protection"); *see also Moon Seed LLC v. Weidner*, No. 3:20-cv-00104-RGE-SBJ, 2021 WL 2627455, at *4 (S.D. Iowa Apr. 22, 2021) (finding "Moon," the last name of the company's founder, "arbitrary and inherently distinctive" because "Moon" is "not typically associated with agricultural seed"). H&R Block's green square marks are also distinctive for tax and financial services and have been used by H&R Block for many years. Therefore, the H&R Block marks are arbitrary, distinctive, and conceptually strong.

### ***Commercial Strength***

"In the likelihood of confusion context, commercial strength is based on the 'public recognition and renown' of the mark as shown by the amount of advertising, sales volume, features and reviews in publications, and survey evidence." *Roederer v. J. Garcia Carrion, S.A.*, 732 F. Supp. 2d 836, 867 (D. Minn. 2010) (citation omitted). H&R Block's CEO testified that

H&R Block has invested billions of dollars advertising and promoting the "Block" brands. Tr. 245:14–245:20 (Pls.' Closing); Tr. 58:12–58:21 (Jones Direct); see also J-4 ¶ 4. H&R Block's Block Advisors has over 300 physical locations and branded storefronts and, last year alone, served about two million small business owners. Tr. 57:15–58:11 (Jones Direct). Meanwhile, online, H&R Block's MyBlock application has had over 50 million logins to the portal, where customers and tax professionals connect under the "Block" mark. Tr. 56:2–56:14 (Jones Direct).

The commercial strength of H&R Block's marks is reinforced by H&R Block's successful enforcement efforts against infringers—including against the confusingly similar marks "Tax Block," "Think Outside the Block," "Thinking Outside the Block," and "T&R Block." Tr. 60:14–61:2 (Jones Direct); J-1 ¶¶ 18-19. *See Roederer*, 732 F. Supp. 2d at 868 (finding a plaintiff's successful enforcement of its trademark rights "enhances the commercial strength" of its mark); *Bd. of Trustees of Univ. of Ark. v. Prof. Therapy Servs.*, 873 F. Supp. 1280, 1288 (W.D. Ark. 1995) (finding "owner's actions to protect its marks through the use of cease and desist letters and litigation" is an additional "indicia of strength").

In addition, H&R Block has submitted a survey conducted by Dr. Deborah Jay (the "Jay Survey"), which asked 500 respondents whether they had seen or heard of "BLOCK" and five other names, including 1040.COM, JACKSON HEWITT, LIBERTY TAX, OLT, and TURBOTAX, used in connection with a tax product or service. Respondents were also asked about a fictitious name, DYO RETURNS, to determine the amount of "noise" in the survey. After accounting for noise, the Jay Survey found that a significant segment (45%) of the general consuming public in the United States recognizes BLOCK as a brand name used in connection with a tax product or service. J-5 (Jay Rebuttal Decl.) ¶ 6. The Court finds that the Jay Survey

provides evidence of the strength of H&R Block's "Block" mark.[6] Even if the Court were to

disregard the Jay Survey (which it declines to do), the other evidence submitted by H&R Block

establishes that H&R Block's family of "Block" marks is strong.[7]

---

[6]  Block, Inc. criticizes the Jay Survey for purportedly using an improper design for assessing consumer recognition as a brand; improperly priming respondents by suggesting and limiting responses to brands that offer a "tax product or service," and using an implausible control. The Court does not agree with these criticisms. Similar questions have been credited in other cases as appropriate questions to test brand recognition. *See Visa Int'l Serv. Ass'n v. JSL Corp.,* 590 F Supp. 2d 1306, 1315 (D. Nev. 2008); *Combe Inc., v. Dr. August Wolff GmBH and Co. KG Arzneimittel,* 382 F. Supp. 3d 429, 438–39 (E.D. Va. 2019). Additionally, the design of the Jay Survey has been endorsed by scholars as an appropriate design to test brand recognition. *See* SHARI SEIDMAN DIAMOND, SURVEYS IN DILUTION CASES II, TRADEMARK AND DECEPTIVE ADVERTISING SURVEYS: LAW SCIENCE AND DESIGN, 155, 156–57 (ABA, S. Diamond & J. Swann eds. 2012).

Block, Inc. relied on a survey conducted by Prof. Franklyn (introduced through Prof. Wind's declaration) to try to show that there is *de minimis* consumer recognition of BLOCK as a brand name for H&R Block. D-4 (Wind Sur-Reply Decl.) ¶¶ 63, 70. The Franklyn Survey "did not introduce the tax category to respondents, showed each respondent only one name and adjusted the question phrasing so as not to suggest that the name was necessarily a brand, and used a credible control name for a tax brand." *Id.* ¶ 65. The Franklyn Survey found that 5.4% of respondents recognized BLOCK as a brand and specifically identified BLOCK as "H&R Block" or as a brand offering tax products or tax or financial services. *Id.* ¶ 67. The Franklyn Survey does not undermine the strength of the Jay Survey because, by asking about the word "block" divorced of any context, it is hardly surprising that respondents did not associate that dictionary word with a brand name. As Dr. Jay explained, except for coined names (such as "Mizzou"), most words or names, absent a context, do not function as a brand. For example, JACK, absent a context, likely does not function as a brand. If one were to ask consumers about "Jack," some people might think of a person's name (like the Defendant's CEO, Jack Dorsey); others might think of a playing card. But in the context of whiskey, respondents might think of the "Jack Daniels" brand (which people know as "Jack"). P-90 (Jay Decl.) ¶ 22. That is why providing the context, as the Jay Survey did, is so important for assessing the level of recognition of a mark.

[7]  In arguing that the "Block" and green square marks are weak, Defendant also relies on the opinions of Prof. Dhar. Prof. Dhar submitted lists of third-party trademarks that include the word "Block," "Blok," "Blox," or some variation thereof, as well as a list of registered marks that feature a green square. D-3 ¶ 65. Defendant is correct that evidence of third-party usage of similar marks can diminish the strength of the plaintiff's trademark. *Sensient Tech. Corp. v. SensoryEffects Flavor Co.,* 636 F. Supp. 2d 891, 903 (E.D. Mo. 2009) ("A mark may be classified as weak where there has been extensive third party use of similar marks on similar goods.") (citation and quotation marks omitted). The Court, however, gives little weight to the evidence of third-party marks submitted by Prof. Dhar for three reasons.

The Court finds that H&R Block's marks are both conceptually and commercially strong.

### ii) The Similarity of H&R Block's and Block's Inc.'s Marks

When considering whether marks are similar, courts analyze "similarities of sight, sound, and meaning." *Gen. Mills, Inc. v. Kellogg Co.,* 824 F.2d 622, 627 (8th Cir. 1987). "[S]imilarity in any one of the elements of sound, appearance or meaning is sufficient to support a determination of likelihood of confusion." *Eveready Battery Co. v. Green Planet, Inc.*, 91 U.S.P.Q.2d 1511, at *9 (T.T.A.B. 2009).

"Block" is the distinguishing feature of the marks in the family of "Block" marks, and H&R Block is regularly referred to as "Block" alone. Block, Inc. is using "Block" and has

---

First, Prof. Dhar's lists have little probative value because Block, Inc. did not submit the actual trademark registrations into evidence. *See FocusVision Worldwide, Inc. v. Info. Builders, Inc.*, 859 F. App'x 573, 578 (Fed. Cir. 2021) (declining to take judicial notice of third-party trademark registrations because merely listing the registration numbers and reciting goods and services are insufficient to make the third-party registrations of record).

Second, Prof. Dhar did not identify the goods and services for which the marks are registered. When the actual goods and services are reviewed, it is clear that most have no relation to the tax-related goods and services H&R Block offers. *See Advantus Cap. Mgmt.*, 2006 WL 2916840, at *2 ("Third party marks which are used to promote entirely unrelated products are of minimal relevance."); *J&B Wholesale Distrib., Inc. v. Redux Beverages, LLC*, 621 F. Supp. 2d 678, 685 (D. Minn. 2007) (giving little weight to third-party uses of mark on unrelated products).

Third, "[t]he probative value of third-party trademarks depends entirely on their usage," not mere registration. Defendant offers no evidence of how, or whether, the third-party marks are actually used in the marketplace. *Advantus Cap. Mgmt.*, 2006 WL 2916840, at *2 (citing *Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772,* 396 F.3d 1369, 1373 (Fed. Cir. 2005)). The mere listing of third-party trademark registrations, without any indication of the extent to which they are used in connection with the same services offered by H&R Block, does nothing to diminish the strength of the "Block" marks.

Prof. Dhar also argues that H&R Block's green square trademark is weak because there are other marks in the financial services industry that pair the color green with a geometric shape. D-3 ¶ 66. However, none of the marks Prof. Dhar identifies use a plain green square in connection with the same goods and services H&R Block offers. This list of other green marks thus does nothing to undermine the strength of H&R Block's green square trademark.

applied to register "Block" as a trademark. Where, as here, "the distinguishing word or feature of a trademark is copied and used with similar goods or services, the consuming public is likely to be confused." *Ford Motor Co. v. Ford Fin. Sols., Inc.*, 103 F. Supp. 2d 1126, 1128 (N.D. Iowa 2000); *see also Kemp v. Bumble Bee Seafood, Inc.*, 398 F.3d 1049, 1055 (8th Cir. 2005) (finding confusion where parties' marks shared dominant feature "Louis Kemp"); *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1291–92 (9th Cir. 1992) ("shared dominant element of GALLO" in "Joseph Gallo" for cheese and "E. & J. Gallo" for wine is "sufficient evidence to support a finding of similarity").

With respect to the logos, H&R Block and Block, Inc. both use similar green square logos to promote their financial services and products. Although the Cash App logo includes a white dollar sign, that is a generic reference for an app related to money. It therefore is quite different from the CK initials that were used on the Credit Karma Tax green square logo (which also was never used by Defendant in connection with "Block"), which more clearly distinguished that logo. Doc. 38 at p. 7; Doc. 68 at p. 5. Contrary to Block, Inc.'s argument that the commercial strength of H&R Block's green square "marks lies in their nature as composite marks" because it often is used with "H&R Block," Doc. 38 at p. 15, the fact that the parties' logos are used alongside their respective names does not minimize the likelihood of confusion. *See, e.g.*, *Guthrie Healthcare Sys. v. ContextMedia, Inc.*, 826 F.3d 27, 39 (2d Cir. 2016) ("Nor is likelihood of confusion dispelled by the fact that Defendant often uses its name, ContextMedia, alongside the logo.").[8]

### iii) The Competitive Proximity of H&R Block and Block, Inc.'s Goods and Services

---

[8] Block, Inc. argues that "H&R Block" and "Cash App" are dissimilar, and thus this factor favors Block, Inc. Although "H&R Block" clearly is not similar to "Cash App," those are not the marks at issue in this case. The relevant inquiry for this factor is a comparison between "Block" (or "H&R Block") and "Block, Inc." (or "Block").

"Products are in competitive proximity when there is similarity or overlap in their sales outlets, trade channel, and customers." *Roederer*, 732 F. Supp. 2d at 868. This *SquirtCo* factor looks to the "degree of competition" between the services. A showing of direct competition is not required; rather, the Court conducts a "broader examination of the [services' and] products' relationship in the market." *Kemp v. Bumble Bee Seafoods, Inc.*, 398 F.3d 1049, 1056 (8th Cir. 2005) (citing 15 U.S.C. §1125(a)(1)(A)); *see also Mut. of Omaha Ins. Co. v. Novak*, 836 F.2d 397, 399 (8th Cir. 1987) ("it is error to assume that trademark law protects against use of a mark only on directly competitive products"; where "there was little or no direct competition[,] . . . infringement still could be found)[,] . . . for confusion, not competition, is the touchstone of trademark infringement"). The "proper application of this factor requires exploration of the likelihood that consumers would draw a connection between the two [services or products] and be confused as to the identities of their respective sources." *Kemp*, 398 F.3d at 1056.

H&R Block and Block, Inc. both offer tax, small business, payroll, and invoicing services, as well as debit cards, mobile banking platforms, direct deposit, spending rewards programs, small dollar lending programs, and business banking accounts. Block, Inc. also has indicated in its trademark application that it intends to offer charitable services under the "Block" mark, which will compete directly with H&R Block's charitable community impact programs, including its "Make Every Block Better" program.

Block, Inc.'s tax and other financial services are similar to and in direct competition with H&R Block's, which weighs in favor of a likelihood of confusion. *See Ford Motor Co.*, 103 F. Supp. 2d at 1128 (enjoining "Ford Financial Services" where defendant's services were "similar to" and "compete with the financial services that Ford [Motor Co.] provides"); *see also 3M Co. v. Mohan*, No. 09-1413 ADM/FLN, 2010 WL 5095676 (D. Minn. Nov. 24, 2010) (finding

27

trademark infringement and granting injunction where plaintiff sold some of its products online, and defendant used the Internet as its sole channel of trade); *Emerson Elec. Co. v. Emerson Quiet Kool Corp.*, 577 F. Supp. 668, 677 (E.D. Mo. 1983) (finding products in close competitive proximity where products were used for same purpose, sold during same time of year, and sold through similar channels). At a minimum, the parties offer related goods and services. "Where products are related…it is reasonable for consumers to think that the products come from the same source, and confusion, therefore, is more likely." *Kemp*, 398 F.3d at 1056.

### iv) The Alleged Infringer's Intent to Confuse the Public

"Intent on the part of the alleged infringer to pass off its goods as the product of another raises an inference of likelihood of confusion, but intent is not an element of a claim for trademark infringement." *SquirtCo.*, 628 F.2d at 1091; *see also* J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:106 (5th ed. 2021) ("The good faith intentions of an infringer are no defense to a finding of liability."). Courts have been "reluctant to place undue weight on the 'intent' digit of confusion, particularly in the context of a preliminary injunction proceeding where, as here, the plaintiff is handcuffed by an expedited timeline and [no] discovery." *Bd. of Regents of the Univ. of Houston Sys. v. Houston Coll. of L., Inc.*, 214 F. Supp. 3d 573, 602 (S.D. Tex. 2016). Moreover, "[i]ntent is an issue whose resolution may benefit only the cause of the senior user, not of an alleged infringer." *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410, 424 (6th Cir. 2012) (alteration in original) (citation and quotation marks omitted).

Under the law, Block, Inc. is presumed to have constructive knowledge of the registered "H&R Block" marks. 15 U.S.C. § 1072 ("Registration of a mark on the principal register . . . shall be constructive notice of the registrant's claim of ownership thereof."). Additionally, Block,

Inc.'s general counsel, Ms. Esperanza, testified that Block, Inc. conducted a trademark search before adopting the "Block" mark, which no doubt would have disclosed the existence of H&R Block's registered trademarks. Tr. at 149:3–149:16. Ms. Esperanza also testified that she had "heard of H&R Block," knew H&R Block offered tax products and services, and knew Block, Inc. was choosing the name "Block" even though it was also going to start providing tax services with the Cash App green square logo. Tr. at 152:12–153:5 (Esperanza Cross).

This *SquirtCo* factor is at least neutral and tips slightly in H&R Block's favor given Block, Inc.'s prior knowledge of H&R Block. *See Cmty. of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church*, 683 F. Supp. 2d 1006, 1015 (W.D. Mo. 2010) ("An inference of an intent to trade upon the plaintiff's good will arises if the defendants, with knowledge of plaintiff's mark, chose a mark similar to that mark from the infinite number of possible marks.") (citation omitted).

### v) Actual Confusion

"The test for infringement lies in the likelihood of confusion, not actual confusion; therefore, plaintiffs are not required to prove any instances of actual confusion." *Advantus Cap. Mgmt., Inc. v. Aetna, Inc.*, No. 06-CV-2855(JMR/FLN), 2006 WL 2916840, at *5 (D. Minn. Oct. 11, 2006) (citing *David Sherman Corp. v. Heublein, Inc.*, 340 F.2d 377, 379 (8th Cir. 1965)). This is particularly true at the preliminary injunction stage, where "plaintiff has prudently attempted to forestall" confusion, *id.*, and "parties rarely have amassed significant evidence of actual confusion." *Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, 758 F.3d 1069, 1072–73 (9th Cir. 2014).

Although H&R Block is not required to produce evidence of actual confusion for a preliminary injunction—or even to ultimately succeed on its trademark infringement claim—it

has provided evidence that is indicative of actual confusion. Several of these examples involve the media reporting on Block, Inc. and its Cash App and associating those reports with H&R Block, such as the Reuters Profile (P-46) and the MarketScreener Article (P-50). "[T]he fact that media . . . has exhibited confusion indicates that at least some consumers will be confused as well." *Heaven Hill Distilleries, Inc. v. Log Still Distilling*, No. 3:21-cv-190-BJB-CHL, 2021 WL 5985253, at *25 (W.D. Ky. Dec. 16, 2021); *see also Centaur Commc'ns, Ltd. v. A/S/M Commc'ns, Inc.*, 652 F. Supp. 1105, 1113 (S.D.N.Y. 1987), *aff'd*, 830 F.2d 1217 (2d Cir. 1987) (finding that two newspaper articles are evidence of actual confusion); *Acad. of Motion Picture Arts and Sci. v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1456 (9th Cir. 1991) (finding error where the district court did not consider newspaper articles and telephone calls as evidence of actual confusion); *Am. Emp. Ins. v. Acadia Ins. Co.*, 39 F. Supp.2d 64, 69 (D.Me.1999) (finding actual confusion due to misidentification of parties in "many newspapers across the United States"); *SunAmerica Corp. v. Sun Life Assur. Co. of Can.*, 890 F. Supp. 1559, 1576 (N.D. Ga.1994) ("[c]onfusion exists when . . . newspapers confuse the names of the parties in reporting financial events"). This is especially true "since the media will often have more resources and expertise regarding the topics they cover than an average consumer would. . . . If even the reporters are confused, some portion of their audience likely would be too." *Heaven Hill*, 2021 WL 5985253, at *25.

Block, Inc. argues that the Reuters Profile and the MarketScreener Article do not represent actual confusion; rather, these references were merely reporting on news in the tax industry that was relevant to H&R Block and its stock. Although the reporters' state of mind is not clear from the face of the articles, the Court finds that this evidence has some probative value on the question of actual confusion. If Block, Inc. were correct that the articles were included

under H&R Block's company profile because they were merely reporting on news in the tax industry, one also would expect to find articles discussing H&R Block's and Defendant's other competitors, such as TurboTax. But that is not the case—no articles about other competitors are included in these profiles. In any event, regardless of the journalists' intent, articles such as the Reuters Profile and the MarketScreener Article are likely to confuse readers into believing that the news about "Block's Cash App," listed on a page about H&R Block, is a reference to an H&R Block product or service. *See Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 298 (3d Cir. 2001) ("if there is evidence that, for example, the media, whose words purchasers read, is confused about the names of these companies, then it is more likely that purchaser will be confused as well") (citation omitted).

Articles like this also can lead to reverse confusion. Readers are likely to believe erroneously that H&R Block is now part of Block, Inc. (which has a market capitalization that is 17 larger than that of H&R Block, Doc. 38 at p. 24 n.9)  or is one of its "building blocks." *Dream Team Collectibles, Inc. v. NBA Properties, Inc*., 958 F. Supp. 1401, 1408 (E.D. Mo. 1997) ("In 'reverse confusion,' customers purchase the senior user's goods under the mistaken impression that they are getting the goods of the junior user. That is, reverse confusion occurs when the junior user's advertising and promotion so swamps the senior user's reputation in the market that customers are likely to be confused into thinking that the senior user's goods are those of the junior user: the reverse of traditional confusion.").

H&R Block also has identified several social media posts (discussed above) reflecting consumer confusion, or at a minimum, suggesting that confusion is likely. Although Defendant has used its new name for only a short time, online posts such as these, which "create[ ] such early confusion represent[] meaningful evidence of actual confusion." *Heaven Hills*, 2021 WL

31

5985253, at *25; *see also Nike, Inc. v. Lotas*, No. 220-CV-09431-MCSPVC, 2020 WL 7264552, at *3 (C.D. Cal. Nov. 18, 2020) (public comments made on defendant's Instagram page are evidence of actual confusion that support finding a likelihood of confusion); *Align Tech., Inc. v. Strauss Diamond Instruments, Inc.*, No. 18-CV-06663-TSH, 2019 WL 1586776, at *10 (N.D. Cal. Apr. 12, 2019). Notably, Defendant's expert, Prof. Wind, argued in another case that communications in the form of social media posts "provide a rich source of data" that can provide evidence of confusion. *Get Kaisered, Inc. v. AKT Franchise, LLC*, 2020 WL 9422892 (D. Del.) (Doc. 70, Expert Report of Yoram Wind, PhD.); *see also* P-88 ¶¶ 13-17; 43-47.

Even if the Court agrees with Block, Inc. that these posts do not represent actual confusion, at the minimum, they "are relevant, admissible and should be viewed in conjunction with other evidence of actual confusion." *Dream Team Collectibles,* 958 F. Supp. at 1415 (inquiries about relationship between plaintiff and defendant inform confusion).

The Court also has considered survey evidence, which can be used to show actual confusion, and which "should be given substantial weight unless seriously flawed." *First Nat'l Bank in Sioux Falls v. First Nat'l Bank S.D., SPC, Inc.*, 655 F. Supp. 2d 979, 999 (D.S.D. 2009). H&R Block has submitted a survey designed by Sarah Butler. Ms. Butler surveyed 399 consumers who were in the market for prepaid debit card, tax preparation services or software, or bookkeeping/payroll services for small businesses (all services offered by H&R Block). Ms. Butler showed the respondents a news article that discussed Defendant's acquisition of Credit Karma's tax preparation service. The control stimulus was the original article with the headline "Square Will Buy Credit Karma's Free Tax Prep Service. What Does That Mean for Consumers?"; the test stimulus replaced "Square" with "Block," in light of Block, Inc.'s recent name change. J-6 (Butler Decl.) ¶ 40; Tr. at 251:17–252:19.

More than 36% of respondents, when shown the survey's test stimulus, believed that the "Block" referenced in the article was H&R Block or believed that H&R Block was affiliated with Block, Inc. *See* J-6 ¶ 43. The Eighth Circuit has recognized confusion at this level to be evidence of actual confusion. *Mut. of Omaha Ins. Co. v. Novak*, 836 F.2d at 400 (finding actual confusion when survey evidence showed 10% confusion); *see also First Nat'l Bank in Sioux Falls*, 655 F. Supp. 2d at 999, 1000 (surveys showing 13–19% confusion "supports a finding of actual confusion and the likelihood of confusion"); *A.T. Cross Co. v. TPM Distrib. Inc.*, 226 U.S.P.Q. 521, 1985 WL 72660, at *3 (D. Minn. 1985) ("the plaintiff's survey demonstrates the existence of actual confusion in the marketplace [with 33.7% confusion], and, by implication, that there was a strong likelihood of confusion").[9] The Court credits Ms. Butler's survey as probative of likely confusion.

To attempt to show that confusion is unlikely, Block, Inc. submitted its own surveys from Prof. Wind, in which respondents were shown different stimuli associated with "Cash App," "Cash App Taxes," or "Block," and asked questions to determine whether respondents were

---

[9]   Block, Inc. argues that Ms. Butler's survey is flawed for a number of reasons, including because it tests the consumer perception of a media article, rather than Block Inc.'s own marketing materials, and because the article Ms. Butler tested was about a past event (*i.e.*, Defendant's acquisition of Credit Karma Tax) which will not occur again. D-4; Doc. 80 at 3 (Sur-Reply). The Court does not find those criticisms persuasive. *See Sterling Drug Inc. v. Bayer AG*, 792 F. Supp. 1357, 1373 n.15 (S.D.N.Y. 1992), *aff'd in part, remanded in part*, 14 F.3d 733 (2d Cir. 1994) (considering surveys "measuring reactions to a newspaper article and an advertisement"). The article Ms. Butler tested was a reasonable and appropriate proxy for the types of articles that consumers are likely to see in the coming months about the tax services offered by Block, Inc. through Cash App (and indeed of the articles that have come out since Ms. Butler's survey was conducted, P-39; P-40; P-43; P-48), and is indicative of how consumers will react to such articles. P-89 (Butler Reply Decl.) ¶¶ 2, 9.

Block Inc. also criticizes Ms. Butler's survey on the ground that the following question was unduly leading: "By what other name(s), if any, is Block known by?" D-4 ¶¶ 8-47; Doc. 80 at 3. But that question is very similar to one that Prof. Wind himself used in his survey, namely: "Does this business or company have a business connection or association with another company?" D-2 ¶ 37.

confused. In all three cases, Prof. Wind found virtually no confusion, from which he concluded that "consumers are unlikely to confuse the brand name 'H&R Block' and/or its green square logo with the company 'Block' and/or the green logo used by some of its brands." D-2 ¶ 84 (Wind Decl.).[10] The Court gives some weight to Prof. Wind's surveys, though it finds the surveys to be limited in value. Although Prof. Wind's surveys demonstrate that certain stimuli may not lead to consumer confusion, the surveys do not demonstrate that confusion is unlikely in many of the circumstances under which consumers are likely to encounter Block, Inc.'s use of "Block" and therefore do not disprove a likelihood of confusion.

Ultimately, H&R Block is not required to provide evidence of actual confusion to obtain a preliminary injunction. Even if the Court disregards H&R Block's survey, the Court finds that H&R Block has submitted at least some evidence that is probative of actual confusion. Accordingly, this factor favors H&R Block.

**vi) The Degree of Care Reasonably Expected of the Plaintiff's Potential Customers**

When determining the degree of care consumers exercise, the Court "must stand in the shoes of the ordinary [customer], buying under the normally prevalent conditions of the market," and giving the attention such a customer would usually give in buying the type of goods or services at issue. *Gen. Motors, LLC v. Rapp Chevrolet, Inc.*, No. CIV 12-4209-RAL, 2013 WL 2245472, at *6 (D.S.D. May 21, 2013) (citation omitted).

Block, Inc. argues that customers who are using the tax services of H&R Block or Block, Inc. are likely to exercise a higher degree of care because tax preparation "require[s] inquiries

---

[10]   H&R Block has advanced several criticisms of Prof. Wind's surveys, including that they did not provide respondents with appropriate materials to gauge opinions; they did not provide relevant marketplace context that would have shown Block, Inc.'s tax offerings through Cash App; and they did not question an appropriate demographic. J-6 ¶ 2. The Court agrees that these surveys tested only a narrow set of materials that consumers, investors, potential employees, and other relevant audiences are likely to see in the marketplace.

into one's financial and personal life." *JTH Tax, Inc. v. Freedom Tax, Inc.*, No. 3:19-CV-00085-RGJ, 2019 WL 2062519, at *8 (W.D. Ky. May 9, 2019) (finding consumer care weighed against confusion); *see also First Nat. Bank in Sioux Falls*, 153 F.3d at 889–90. Although consumers may exercise heightened care when it comes to filing their taxes, consumers are not necessarily well versed about corporate affiliations. Even careful consumers could be confused about whether H&R Block is affiliated with the "Block" or "Block, Inc." that also provides tax preparation and filing services. *See Carling Brewing Co. v. Philip Morris Inc.*, 297 F. Supp. 1330, 1337 (N.D. Ga. 1968) ("[T]he public is generally unaware of the specific corporate structure of those whose products it buys, but is aware that corporate diversification, mergers, acquisitions and operation through subsidiaries is a fact of life" so "it is reasonable to believe" that defendant's use of plaintiff's mark "could lead to some confusion as to the sponsorship of" defendant's products and services); *see also R. J. Reynolds Tobacco Co. v. R. Seeling & Hille*, 201 U.S.P.Q. 856, 1978 WL 21295, at *4 (TTAB 1978) (recognizing "the common practice which is so prevalent today for large corporations, not only to expand their present line of products, but also to diversify their business to include new fields of endeavor").

Moreover, even if confusion is reduced by the time consumers make a purchasing decision, initial interest confusion is also actionable and relevant. *Select Comfort Corp.*, 996 F.3d 925 (recognizing that a theory of initial interest confusion may apply in a trademark infringement case). Given that Block, Inc. promotes its various brands as "building blocks" of "Block," including on social media, consumers may be confused, even if only initially, into thinking that "Block's Cash App" is affiliated with H&R Block.

In any event, consumer "[s]ophistication does not preclude a likelihood of confusion." *Charles Schwab & Co. v. Hibernia Bank*, 665 F. Supp. 800, 811 (N.D. Cal. 1987) (consumers

were likely to be confused "as to association, affiliation and sponsorship of the product, regardless and perhaps because of the sophistication of the consumers" in the context of the financial services industry, where consumers are "more likely to be aware of…deregulation and diversification"). This is particularly true where the marks at issue are identical, and the goods and services are similar, as they are here. *See McGregor-Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1137 (2d Cir. 1979); *Banff, Ltd. v. Federated Dep't Stores, Inc*., 841 F.2d 486, 492 (2d Cir. 1988) ("Hence, because both parties produce lines of quality apparel under strongly similar marks, this factor does not mitigate against the likelihood of confusion.").

This *SquirtCo* factor tips in H&R Block's favor, or at a minimum, is neutral.

### vii) Balancing The *SquirtCo* Factors

Four of the six *SquirtCo* factors—strength of the plaintiff's mark, similarity of the marks, competitive proximity, and actual confusion—decidedly favor H&R Block. The remaining two factors—intent of the defendant and degree of care—tip in H&R Block's favor, or, at a minimum, are neutral. None of the *SquirtCo* factors favor Defendant. Accordingly, the *SquirtCo* factors, taken together, weigh in favor of a finding of a likelihood of confusion.

The *SquirtCo* factors are not the exclusive factors that the Court should consider when assessing a likelihood of confusion. *See Select Comfort Corp.*, 996 F.3d at 933. In this case, additional considerations also weigh in favor of a likelihood of confusion. As discussed above, Block, Inc. has publicly disclosed that "Block, Inc. is . . . Cash App" and has used "Block" social media to promote Cash App's tax offerings. The media has picked up on this linkage and has reinforced it by referring to "Block's Cash App" when discussing Cash App,[11] and by describing

---

[11] The fact that Cash App is a descriptive name, as Mr. Jennings acknowledged, Tr. at 214:19–215:1 (Jennings Cross), helps explain why the media, consumers, and others will likely continue to refer to it as "***Block's*** Cash App." That is because the reference to "Block" helps

Cash App's tax offerings as coming from "Block." Consumers, journalists and others have similarly posted on social media about Block and Cash App. All of these comments and articles reinforce the link between Cash App and its tax offerings and "Block," which causes confusion with H&R Block. As Professor Reibstein has explained, P-88 Section V, and courts have recognized, linkages such as these on social media and in the press "further strengthens the relatedness of [the parties'] services in consumers' minds" and can have a "confusing effect." *Museum of Modern Art v. MOMACHA IP LLC*, 339 F. Supp. 3d 361, 377–78 (S.D.N.Y. 2018).

This confusion is likely to be amplified given that Block, Inc. is an innovative technology company with a founder and CEO who garners extensive attention and has millions of followers on social media. Mr. Dorsey's announcements about Block, Inc.'s various businesses have already been widely reported. The media will likely continue to provide coverage of Block, Inc. on an ongoing basis as Defendant completes its re-branding, thereby multiplying consumer exposure to linkages between Cash App and "Block." J-7 (Reibstein Decl.) ¶ 89.[12]

* * *

In sum, H&R Block has demonstrated that it has valid and protectable marks, and that Block, Inc.'s use of "Block" is likely to cause confusion. Accordingly, H&R Block is likely to succeed on the merits of its trademark infringement claim.

---

consumers understand which cash app is being referenced. In contrast, other apps used to manage cash, such as Zelle and Venmo, have distinctive names, so they do not need an explanation of the source of the app (such as PayPal's Venmo).

[12] Block, Inc. argues that this likely confusion is overstated because, among other reasons, Block, Inc. employs a "house of brands" model, which allows a corporate entity to develop its own identity distinct from its portfolio of brands and vice versa. D-3 ¶ 87. Although a "house of brands" can and often does offer some distance between the product brands and the corporate brand, that is not always the case in practice, P-88 ¶¶ 8-12, and the Court finds that is not the case on the evidence presented here, particularly given the media linkages that are already occurring and the media's and consumers' particular interest in technology companies. P-88 ¶¶ 13-18; 42-47.

## B. Plaintiffs Are Likely to Suffer Irreparable Harm in the Absence of Preliminary Relief

"A plaintiff seeking an[]… injunction shall be entitled to a rebuttable presumption of irreparable harm . . . upon a finding of likelihood of success on the merits . . . in the case of a motion for a preliminary injunction. . . ." 15 U.S.C. § 1116(a). The reason for the presumption is due to the unique harm that trademark infringement causes. H.R. REP. No. 116-645, pt. 6, at 37–42 (2020) ("the damages occasioned by trademark infringement are by their very nature irreparable and not susceptible of adequate measurement for remedy at law"). "If a plaintiff can demonstrate a likelihood that it will succeed on the merits of its infringement claim . . . it is not a big leap to conclude that [a plaintiff] would be injured by that action." H.R. REP. No. 116-645, pt. 3 (2020) (citation omitted). Indeed, "it is unclear what additional evidence could or should be provided to establish irreparable harm given the evidence of record already demonstrating consumer confusion or loss of control over the brand." *Id.* at 53.

Contrary to Defendant's suggestions that this Court may only consider injury the plaintiff "has suffered" and that H&R Block has offered "only speculation" of harm, Doc. 38 at p. 24, a plaintiff need not wait for actual confusion or harm before it is entitled to preliminary relief. *See Advantus*, 2006 WL 2916840, at *4 ("The Court declines [defendant's] offer to penalize plaintiffs for their ardor and expedition in seeking to protect their name and their effort to preclude—rather than suffer—marketplace confusion."). Further, it is "simply not the law" that a plaintiff must prove "actual damage or injury" in a case of trademark infringement—a likelihood of irreparable harm is sufficient. *Mut. of Omaha Ins. Co. v. Novak*, 836 F.2d at 403 n.11.

Because H&R Block has demonstrated that it is likely to succeed on the merits of its trademark infringement claim, H&R Block is entitled to the statutory presumption of irreparable harm. *See* 15 U.S.C. § 1116(a); *see also Coca-Cola Co. v. Purdy*, 382 F.3d 774, 789 (8th Cir.

2004) ("showing that confusion is likely supports a strong presumption of irreparable harm");
*Calvin Klein Cosmetics Corp. v. Lenox Lab'ys., Inc.*, 815 F.2d 500, 505 (8th Cir. 1987) ("The
court correctly noted that it could presume irreparable injury from a finding of probable success
in proving likelihood of confusion."); *Gen. Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 625 (8th Cir.
1987) ("Since a trademark represents intangible assets such as reputation and goodwill, a
showing of irreparable injury can be satisfied if it appears that [a plaintiff] can demonstrate a
likelihood of consumer confusion.").

In addition to the presumption, H&R Block has demonstrated that irreparable harm is
likely. "[I]rreparable harm occurs when a party has no adequate remedy at law, typically because
its injuries cannot be fully compensated through an award of damages." *Grasso Enters., LLC v.
Express Scripts, Inc.*, 809 F.3d 1033, 1040 (8th Cir. 2016) (quoting *Gen Motors Corp. v. Harry
Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009)). "Loss of intangible assets such as reputation
and goodwill can constitute irreparable injury." *United Healthcare Ins. Co. v. Advance PCS*, 316
F.3d 737, 741 (8th Cir. 2002) (citing *Gen. Mills, Inc.*, 824 F.2d at 625); *WWP, Inc. v. Wounded
Warriors, Inc.*, 566 F. Supp. 2d 970, 978 (D. Neb. 2008).

H&R Block's CEO, Mr. Jones, testified about "the decades and the hundreds of millions
of dollars that [H&R Block has] spent to make [its] brand known for what it is," and how
consumer confusion will damage the H&R Block brand. Tr. at 82:17-84:1 (Jones Direct). Mr.
Jones explained that, in the tax space, H&R Block has already seen combinations of "Block" and
"Cash App," which is likely to cause consumer confusion and harm the H&R Block brand. *Id.* at
83:3–83:11. Mr. Jones also expressed concern about potential media reports about Block, Inc.,
explaining that "a headline, a data breach, a perspective on business and the future of business in
bitcoin or anything that really isn't [H&R Block's] perspective that gets connected to our name

Block has the potential . . . to quickly put [H&R Block] in crisis mode and on the defensive." *Id.* at 83:15-84:1. Given that H&R Block is entrusted with customers' most sensitive financial and personal data, any negative publicity about Block, Inc.'s tax-related offerings that is attributed to H&R Block would lead to incalculable and non-compensable harm. *See, e.g.*, *HealthNow N.Y. Inc. v. Romano*, 17-cv-310, 2018 WL 4908107, at *5 (W.D.N.Y. Oct. 10, 2018) (plaintiff sufficiently "alleged likelihood of confusion and thus also established irreparable injury" by showing consumers may misattribute fault to plaintiff for defendant's data breach) (citation omitted).

Harm also is likely in the context of recruiting for employees, informing investors, responding to the media, and reporting to regulators. As Mr. Jennings acknowledged, the audience for the "Block" name includes "employees and candidates from a recruiting and retention perspective," as well as investors, regulators, and the media, plus "[a]nyone that was looking at the overall corporate brand." Tr. at 144:4–144:11 (Jennings Direct). Employee, investor, regulator and media confusion would irreparably harm H&R Block. *See Aura Commc'ns, Inc. v. Aura Networks, Inc.*, 148 F. Supp. 2d 91, 95 (D. Mass. 2001) (considering "confusion by prospective employees" and finding that damage to a company's ability to attract employees constitutes irreparable harm); *see also Perini Corp. v. Perini Constr., Inc.,* 915 F.2d 121, 128 (4th Cir.1990) ("public confusion" among non-purchasers is relevant if it "adversely affect[s] the plaintiff's ability to control his reputation among its laborers, lenders, investors, or other group with whom the plaintiff interacts"); *Mid–State Aftermarket Body Parts, Inc.*, 466 F.3d at 634. Recognizing that confusion in this area could be quite harmful, Mr. Jennings conceded that he "definitely" did not want potential employees "to be confused into thinking that maybe [Block, Inc. is] associated with H&R Block." Tr. at 205:5–205:12 (Jennings Cross).

40

H&R Block has no means of controlling the quality of Block, Inc.'s advertised offerings under the "Block" name. If the services or products Defendant offers that are linked to the "Block" name are not consistent with the quality of H&R Block's services and products, there is a substantial risk that consumers who are confused about the source of those services and dissatisfied with their quality may incorrectly form a negative view of H&R Block.[13] Such harm is particularly likely given that Block, Inc. occupies (and is expanding into) the same markets that H&R Block currently occupies. By its nature, such harm is irreparable. *See Sturgis Area Chamber of Commerce v. Sturgis Rally & Races, Inc.*, 99 F. Supp. 2d 1090, 1101 (D.S.D. 2000) ("In evaluating the threat of irreparable harm, the court may . . . consider the potential loss of control over the quality of plaintiff[s'] services, [and] the risk of damage to . . . plaintiff[s'] reputation and service mark from continuing use of an infringing mark. When a likelihood of confusion exists, plaintiffs' lack of control over the quality of defendants' services constitutes an immediate and irreparable injury, regardless of the actual quality of those services.") (citation omitted); *see also Hillerich & Bradsby Co. v. Christian Bros., Inc.*, 943 F. Supp. 1136, 1141–42 (D. Minn. 1996) (when evaluating irreparable harm, it is appropriate for court to consider the "loss of control over the quality of plaintiff's product and the risk of damage to a plaintiff's reputation and trademark from the continued use of an infringing mark") (citation omitted).

Having demonstrated a likelihood of success on the merits, the Court finds that H&R Block is entitled to a statutory presumption of irreparable harm, and in any event, H&R Block also has demonstrated that it will be irreparably harmed in the absence of an injunction.

---

[13]   This is particularly true with respect to the consumer complaints submitted to the Better Business Bureau about Cash App's tax services where Defendant has responded under the name "Block." P-88.

## C. The Balance of Equities Tips in Plaintiffs' Favor

The Court must next consider the balance of the harm to H&R Block if no injunction is granted versus the injury that would befall Block, Inc. if an injunction is granted. *Dataphase*, 640 F.2d at 113. The Court's decision will likely result in hardship for one of the parties; it is the Court's task is to balance the harms. *See Storage Concepts, Inc. v. Incontro Holdings, L.L.C.*, 820-cv-447, 2021 U.S. Dist. LEXIS 86284, at *11–12 (D. Neb. May 5, 2021).

H&R Block has been using the "Block" and green square families of marks for decades, and over that time, has carefully nurtured a reputation for high-quality service and reliability with respect to consumers' most sensitive financial information. Tr. at 82:17–83:11 (Jones Direct). Block, Inc., on the other hand, formally changed its name just weeks ago and invested in that rebrand a small fraction of the "hundreds and hundreds of millions of dollars" Cash App spends annually on marketing. Tr. at 213:17-213:17 (Jennings Cross). Under these circumstances, the balance of hardships tips in H&R Block's favor. *See, e.g.*, *MSP Corp. v. Westech Instruments, Inc.*, 500 F. Supp. 2d 1198, 1217–18 (D. Minn. Aug. 6, 2007) ("[Plaintiff] has advertised and sold its [products] for seven years[;] . . . it has invested time, resources, and reputation to develop a product and should be protected from newcomers using shortcuts to capitalize on that hard work and good will."); *Woodroast Sys. v. Rests. Unlimited, Inc.*, 793 F. Supp. 906, 919 (D. Minn. 1992) (granting injunctive relief where plaintiff "made a substantial investment of time and money to develop and register its… mark," whereas defendant "began to use the phrase…recently and did not enter the present market until [months prior]," and noting that "other, non-infringing alternatives are available for [defendant's] use").

Defendant argues that an injunction forcing it to change its name would "inflict far more harm on Block[, Inc.] than H&R Block would face without one." Doc. 38 at pp. 24–25.

Defendant claims that, if such an injunction issues, it would "incur substantial financial hardship, requiring extensive time and money to develop and implement a new rebranding, including securing domain name and social media rights, modifying computer and IT systems, and the like—a process that would again take more than one year and negatively affect employee morale and recruiting." *See id.* at 25.

The Court finds these arguments to be exaggerated, at odds with Block, Inc.'s other arguments, and ultimately irrelevant. On one hand, Block, Inc. argues that it does not use "Block" in consumer-facing materials or in connection with its brands; on the other hand, it claims that it would experience significant hardship if it were required to change its corporate name because it would need to replace its many "Block" branded outlets with its new name. If Block, Inc. truly were not using "Block" in a consumer-facing way or in connection with its brands, it would not be difficult for it to remove public facing "Block" branding. If that were the case, Block, Inc.'s concerns would be overblown.

But that is not the case. The evidence demonstrates that Block, Inc. is using "Block" in a consumer-facing way. But Block, Inc.'s concerns are still overstated. That is because H&R Block is no longer seeking a preliminary injunction that would require Block, Inc. to change its name. Rather, it seeks a more narrowly-tailored injunction, designed to address the likely confusion and harm that was demonstrated at the preliminary injunction hearing.[14]

---

[14] Block, Inc. also argues that "an immediate name change would run afoul of state and federal money transmission and virtual currency laws." Doc. 38 at p. 25. In support of this, Defendant claimed that "Block, Inc. is a licensed money transmitter, BitLicense holder, broker-dealer, and provider of prepaid accounts under state and federal law." J-2 ¶ 29. Block, Inc. has since conceded that this is incorrect: Block, Inc. is neither a broker-dealer nor a licensed provider of prepaid accounts, and Square, Inc. is still currently the name on its BitLicense. Tr. 166 (Esperanza cross); *see also* P-6 (Durone Decl.) ¶¶ 8-13; P-6uu–6xx (Durone Decl. Ex. 47–50). Furthermore, the process to change Block, Inc.'s legal name on a money transmission or virtual currency license is not onerous, and at least 20 states have no

Consistent with this request for a tailored injunction, the Court will enjoin Defendant from using "Block" in certain public ways, but it will not be required to change its name at this time. The scope of this injunction will likely afford H&R Block the relief to which it is entitled while reducing the burden an injunction would cause to Block, Inc.

Block, Inc. also argues that an injunction barring use of its Cash App logo would be disruptive to its business and result in "immense harm." Doc. 38 at pp. 25–26. However, H&R Block has not requested that the Court enjoin Block, Inc.'s use of the Cash App logo in connection with its non-tax-related services offered through Cash App. Instead, H&R Block has requested only that the Court enjoin Block, Inc.'s use of a green square logo in connection with its recent tax-related products and services. Such an injunction would mean that Cash App could continue to use its green square logo for all of the services it provided before December 1, 2021; it only would be prohibited from using the green square logo on or in connection with the new tax-related services offered by Cash App, and from linking or promoting the financial services it historically offered through Cash App to its new tax-related services. As Mr. Jennings testified at the hearing, it would be possible for Block, Inc. to change the green logo used for Cash App's tax-related services to another color. Tr. at 220:23–221:2 (Jennings Cross).

The Court acknowledges that there could be some financial hardship and inconvenience for Block, Inc. associated with an injunction, "but nothing in the injunction sought would prevent [Block, Inc.] from continuing to operate its business; it must merely stop operating under a mark owned by another entity." *Storage Concepts, Inc.,* 2021 U.S. Dist. LEXIS 86284, at *12. In

advance notice or approval requirement. P-6 ¶¶ 3-5; P-6a–6u (Durone Decl. Ex. 1-21). For the states that may require some advance notice or approval, the notice periods are short, and Block, Inc. would simply need to submit an electronic form. P-6 ¶¶ 6-7; P-6u-6rr (Durone Decl. Ex. 21–44). Moreover, Block, Inc. has been using its new name without completing that process. Tr. 166-167 (Esperanza cross). In any event, these concerns are not implicated by the narrowly-tailored injunction the Court is entering.

contrast, if "the preliminary injunction is not granted [H&R Block] will suffer a loss of trade, reputation and good will that 'no final decree of a court can adequately compensate.'" *Aveda Corp. v. Evita Mktg.*, 706 F. Supp. 1419, 1431 (D. Minn. 1989) (citation omitted). Further, "[a]ny hardship caused by the preliminary injunction may justly fall on the parties which consciously decided to dress their goods for the market in a manner so near to [a] successful rival that the public may fail to distinguish between them." *Id.* (citation omitted).

The Court finds the balance of the equities weighs in favor of an injunction.

### D. An Injunction Is In The Public Interest

"The final factor considered in determining whether a preliminary injunction should issue is the public interest. In the context of trademark infringement, this factor involves balancing of the interest in protecting the public from confusion or deception with the interest in a competitive market." *Aveda Corp.*, 706 F. Supp. at 1431–32 (citing 2 MCCARTHY, *Trademarks and Unfair Competition* 2d § 30:21). "The public has an interest in the enforcement of validly registered trademarks," and "the right not to be deceived or confused as a result of the infringement of established trademarks." *Cmty. of Christ Copyright Corp. v. Miller*, No. 07–0543–CV–W–GAF, 2007 WL 4333192, at *3 (W.D. Mo. Dec. 7, 2007). Enforcement of trademark laws also serves the public by "protect[ing] the ability of consumers to distinguish among competing producers," and incentivizing businesses to procure consumer goodwill by serving their customers' interests. *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 198 (1985). "Where the moving party has demonstrated, not only that the nonmoving party's products are confusingly similar, but that misrepresentations of origin are being made in the marketplace, the public interest favors injunctive relief." *Aveda Corp.*, 706 F. Supp. at 1431–32.

Here, an injunction serves both the interest in avoiding confusion and in maintaining

healthy market competition. Enjoining Block, Inc. "from using a business name that subsumes the name of its direct competitor," H&R Block, "would have the obvious benefit of avoiding any likely consumer confusion." *Storage Concepts, Inc.*, 2021 WL 1789205, at *12. "Further, the injunction would apply only to the trademark used by [Defendant]; [Defendant] remains free to continue competing in the [financial and tax industry], though under a different name, to the public's benefit." *Id.* Thus, the Court finds that the public interest favors an injunction.

### E.  Type and Scope of the Injunction

For all the reasons discussed above, Plaintiffs have established that Defendant's public use of "Block" and a green square logo in connection with the brands that offer services similar to those offered by H&R Block is likely to cause confusion. That confusion is likely to occur through Block, Inc.'s own use of "Block," and is likely to be amplified and worsened by third parties' use and linkage of "Block" to the services offered by Block, Inc.'s "building blocks" (*e.g.*, Cash App and Square) that compete with those offered by H&R Block. Some of that confusion is likely to be initial interest confusion that causes consumers to be interested in Cash App's tax or related services because they believe it is associated with H&R Block; some of that confusion is likely to be point-of-purchase confusion for those consumers who use Cash App because they are confused into thinking it comes from H&R Block; and some of that confusion is likely to be reverse confusion, as consumers and investors are deceived into believing that H&R Block is now one of the "building blocks" in Block, Inc.'s family of brands. Confusion is also likely among potential employees who may be looking for work with "Block," and among investors who may be confused, for instance, into believing that H&R Block is offering Cash App.

Because this confusion harms H&R Block's goodwill and ability to control its own brand

in the minds of consumers, potential employees and investors, this confusion is likely to cause irreparable harm to H&R Block if not enjoined during the pendency of this case.

To reduce this confusion and harm while Plaintiffs' claims are being litigated, the Court finds it appropriate to enjoin Defendant from certain public uses of "Block" and the green square logo in connection with its products and services that compete with H&R Block. These products and services include those related to (i) the preparation or filing of taxes, (ii) other financial services or products related to tax services (such as lines of credit or loans offered in advance of receiving a refund, accounts in which a refund can be deposited, the payment of payroll taxes, and debit cards through which taxpayers can spend their refunds), (iii) accounting, bookkeeping, and payroll services offered to small businesses, and (iv) charitable philanthropic, volunteer, public and community service, and humanitarian activities. To further reduce the likelihood of confusion, the Court enjoins Defendant from using "Block" in any public-facing way in connection with Defendant's brands that offer these services, such as Cash App. This tailored prohibition should help to break the linkage between "Block" and Cash App and limit further references by the media and others to "Block's Cash App."

The injunction will therefore prohibit Defendant from using "Block" and the green square logo "in connection with the public dissemination of any information concerning, or in connection with the promotion, advertising, distribution, marketing, offering, or sale of" certain products, services and brands. That will have the effect of prohibiting any use that is disseminated to or available for viewing by the public (*i.e.*, individuals outside of the company), including, without limitation: use on social media (including any social media accounts using "Block" or any confusingly similar name in the name of the account); use in press releases; use in statements to regulators and self-regulators (such as the Better Business Bureau); use in

statements or communications to consumers, investors, or media; use on websites; use in mobile applications; use in terms of service, privacy policies, or other documents that are available for view or inspection; and use in connection with employee recruitment.

The Court also wants to be clear about what the preliminary injunction will not require. The Court's injunction will not require Defendant to cease all use of the name "Block." Given the potential hardship that a name change would cause to Defendant, and the fact that the Court hopes that the injunction granted here will dramatically reduce the likelihood of confusion and harm to H&R Block during the pendency of this Case, the Court will not, at this time, require Defendant to change its legal name. In addition, the injunction does not require Defendant to violate any local, state, or federal laws. Accordingly, to the extent Defendant is legally required to use its legal name "Block, Inc." in a way that would otherwise be inconsistent with this Court's Order (such as in filings with the Securities and Exchange Commission or with state regulators), Defendant may continue to refer to its name as "Block, Inc." However, to reduce the risk of confusion, Defendant must not use its 'Block, Inc." legal name in such contexts more than is required. Furthermore, to the extent permitted by law, Defendant shall use a defined term for "Block, Inc." that does not contain the word "Block," so as to minimize, to the maximum extent possible, references to "Block" in such documents or uses.

The injunction also does not require Defendant to stop offering any products or services to the public. Although Defendant has argued that it would face some challenges in removing the green square logo from the taxes section of Cash App, Mr. Jennings testified that it would be possible to do so (*e.g.*, by changing the color of the Cash App Taxes logo and changing the branding once a consumer enters the taxes portion of the app). Moreover, nothing in this Order requires Defendant to cease any use of the green square logo for services that it has been offering

in connection with Cash App prior to December 1, 2021 (as long as it does not link or promote those services in connection with its new tax services).

Defendant has complained that an injunction here would be an inappropriate "mandatory" injunction, Tr. at 45:5–45:9 (Def.'s Opening Statement), but that is not correct. The injunction that the Court is entering is a classic prohibitory injunction. It restrains Defendant from engaging in certain activity and it returns the parties to the *status quo ante* prior to Defendant's name change, but without requiring Defendant to change its legal name at this stage. *See Miljas v. Promotions*, 536 F. Supp. 3d 409, 426 n.6 (S.D. Iowa 2021) ("Preliminary injunctions come in two different varieties: prohibitory and mandatory. A prohibitory injunction "restrains" a party from taking specified actions whereas a mandatory injunction 'orders a responsible party to 'take action.'") (citing *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 484 (1996); *Mastrovincenzo v. City of New York*, 435 F.3d 78, 89–90 (2d Cir. 2006); *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (A preliminary injunction that acts "to restrain [the alleged infringer] from further acts of possible infringement" is prohibitory and not a mandatory injunction).

### F. Bond

"Courts in this circuit have almost always required a bond before issuing a preliminary injunction, but exceptions have been made where the defendant has not objected to the failure to require a bond or where the damages resulting from a wrongful issuance of an injunction have not been shown." *Richland/Wilkin Joint Powers Auth. v. U. S. Army Corps of Eng'rs*, 826 F.3d 1030, 1043 (8th Cir. 2016) (internal citations omitted). District courts are given "much discretion in setting bond," but it must make findings to support its determination that the bond it requires is adequate considering the costs and damages that would result from a wrongfully issued

injunction. *Hill v. Xyquad, Inc.*, 939 F.2d 627, 632 (8th Cir. 1991). Although a district court must

expressly consider whether to require a bond, a district court is not required to impose one. *See*

*3M Co. v. Nationwide Source Inc.*, No. 20-cv-2694 (WMW/KMM), 2021 WL 141539, at *7 (D.

Minn. Jan. 15, 2022) (citing *Rathmann Grp. v. Tanenbaum*, 889 F.2d 787, 789 (8th Cir. 1989)).

Courts have also not required a bond where plaintiffs have demonstrated a high likelihood of

success on the merits. *See Storage Concepts, Inc.*, 2021 WL 1789205, at * 34.

 The injunction granted herein will require that Defendant stop using the infringing mark,

"Block" in consumer-facing materials, and stop using the green Cash App logo in connection

with its tax-related services of Cash App. Defendant has not provided any information as to the

cost associated with ceasing such use; indeed, Defendant has not even requested entry of a bond.

Furthermore, Defendant conceded that its original, complete name change cost only a fraction of

the amount it spends each year for the marketing of Cash App alone. Tr. 213. Under the

circumstances, the Court finds that no bond is required in this case. *See Nw. Bell Tel. Co. v.*

*Bedco of Minn., Inc.*, 501 F. Supp. 299, 304 (D. Minn. 1980) (requiring no bond "[c]onsidering

the strength of the case presented by the plaintiff, and the absence of any substantial harm

accruing to the defendant under the injunction").

<u>**Conclusion**</u>

 For the reasons stated above, the Court **GRANTS** H&R Block's Motion for a

Preliminary Injunction. **IT IS ORDERED**:

 1. Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Defendant Block,

Inc. (including its officers, agents, servants, employees, attorneys, and any and all other persons

who are in active concert or participation therewith) is hereby **ENJOINED AND**

**RESTRAINED**, during the pendency of this action, from using:

(a) the name "BLOCK," or any other name or word that is confusingly similar thereto, or

(b) the Cash App green square logo ( ), or any other logo that is confusingly similar to the H&R Block green square trademark ( ),

in connection with the public dissemination of any information concerning, or in connection with the promotion, advertising, distribution, marketing, offering, or sale of, any:

(i) product, service or brand related to the preparation or filing of taxes, including individual income, business, and payroll taxes;

(ii) financial or other product, service or brand related or adjacent to the preparation or filing of taxes (such as lines of credit or loans offered in advance of receiving a refund, accounts in which a refund can be deposited, and debit cards through which taxpayers can spend their refunds);

(iii) accounting, bookkeeping, or payroll product, service or brand offered to small businesses; or

(iv) charitable, philanthropic, volunteer, public and community service, and humanitarian activities.

Notwithstanding the foregoing, nothing in this Order shall require Defendant to violate any local, state, or federal laws. To the extent Defendant is legally required to use its "Block, Inc" legal name in any manner inconsistent with this Order (such as in public filings with the Securities and Exchange Commission or with state regulators), Defendant shall not be restricted from using the "Block, Inc." legal name; however, Defendant shall limit its use of the "Block, Inc." legal name to no more than is legally required and, to the extent permitted by law,

Defendant shall use a defined term for "Block, Inc." that does not contain the word "Block" so as to minimize, to the maximum extent possible, references to "Block" in such documents or uses.

2.      The Court has determined that no security shall be required under Rule 65(c) of the Federal Rules of Civil Procedure.

3.      This preliminary injunction shall continue until final resolution of this case or until modified by the Court.

Dated this __ day of March, 2022.