# EXHIBIT 4

# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

H&R BLOCK, INC. and HRB
INNOVATIONS, INC.,

               Plaintiffs,

    v.

BLOCK, INC.,

               Defendant.

Case No. 4:21-cv-00913-NKL

## [PROPOSED] ORDER DENYING PLAINTIFFS'

## MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

I. BACKGROUND FACTS .................................................................................4

    A.    Plaintiffs H&R Block & HRB Innovations ...........................................4

    B.    Defendant Block, Inc. .........................................................................5

    C.    The Parties' Brands ............................................................................6

II. ANALYSIS OF PLAINTIFF'S MOTION ....................................................7

    A.    The Preliminary Injunction Standard .................................................7

    B.    Likelihood of Success on the Merits ..................................................8

            1.    Strength of the Marks..............................................................9

                  a.    Word Marks ..................................................................9

                  b.    Green Square Logo .....................................................12

            2.    Similarity of the Marks. .........................................................13

                  a.    Similarity in the parties' branding (word marks and logo)............14

                  b.    Similarity in the parties' other uses (word marks)........................15

            3.    Evidence of Actual Confusion ................................................18

                  a.    Surveys (word marks and logos)................................19

                    b.    Social media posts about Defendant's name change (word marks) ...............................................................................22

                  c.    On-line articles and social media posts (word marks).................23

                    d.    Dr. Reibstein ...............................................................29

            4.    Intent to cause consumer confusion..........................................30

                  a.    Word mark ...................................................................30

                  b.    Logo .............................................................................30

            5.    Competitive Nature of the Goods .............................................31

                  a.    Word mark ...................................................................31

                  b.    Logo .............................................................................31

            6.    Sophistication of Consumers ..................................................32

            7.    Summary of Factors ...............................................................33

    C.    Irreparable Harm ...............................................................................34

    D.    Balance of Hardships ........................................................................36

    E.    Public Interest ...................................................................................40

III. CONCLUSION ...........................................................................................42

i

Plaintiffs H&R Block, Inc. and HRB Innovations, Inc. (collectively "Plaintiff" or "H&R Block") move for a preliminary injunction on their trademark infringement claims against Defendant Block, Inc. ("Defendant" or "Block") under Section 32 of the Lanham Act, 15 U.S.C. § 1114, Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and related Missouri state law claims. It alleges that Defendant has infringed its "H&R Block" and other "Block"-formative trademarks and green square logo by calling itself "Block, Inc." and by using a logo for its Cash App service, which includes a tax return filing feature, similar in appearance to Plaintiff's logo.

Plaintiff is well known for its income tax services, which it has historically provided though thousands of storefront locations that offer personalized service. Defendant owns several businesses, some of which provide financial services to consumers and merchants. Each operates under its own brand, such as Square (credit card acceptance services for merchants), Cash App (peer-to-peer money transfers), TIDAL (music streaming), and others. The tax filing service within the Cash App mobile app is called Cash App Taxes.

Plaintiff alleges five claims for relief: (1) infringement of a registered trademark under Section 32 of the Lanham Act; (2) unfair competition under Section 43(a) of the Lanham Act; (3) trademark infringement under Missouri common law; (4) unfair competition under Missouri common law; and (5) injunctive relief under Missouri Rev. Stat., Section 417.061. Each of Plaintiff's claims requires proof of a likelihood of consumer confusion.

A preliminary injunction "is an extraordinary remedy." *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). The injunction Plaintiff seeks—changing Defendant's name and requiring Cash App to replace its federally-registered logo with something else—is the same remedy Plaintiff would seek after trial. It is materially different from, and more severe in its effect on Defendant and its customers than, a preliminary injunction that, for example, would

1

merely restrain one competitor from running an advertisement that another competitor said was unfair. As such, Plaintiff faces a "heavy burden" to establish its entitlement to such an order at this stage of the case. *Dakota Indus., Inc. v. Ever Best Ltd.*, 944 F.2d 438, 440 (8th Cir. 1991).

After review of the extensive record and an evidentiary hearing, the Court concludes that Plaintiff has not met that heavy burden here. On the issue of likelihood of success on the merits, and its touchstone of a likelihood of consumer confusion, Plaintiff's initial evidence consisted of social media posts and Internet stories, including some that mention Defendant's new name and its brands. The Court has concerns with this form of evidence. Regardless, it does not find these *third-party* statements to constitute evidence of *consumer* confusion. Plaintiff supplemented the record with expert testimony, including surveys. None of the surveys took the form of an *Eveready* confusion survey, considered the "gold standard" for assessing consumer confusion. Plaintiff's surveys did not test Defendant's uses of its marks and therefore did not show any consumer confusion caused by them. Plaintiff's theory of the case would require the Court to depart from controlling law that focuses the inquiry on how the defendant is using its marks, in the marketplace for consumers. The Court declines to do so.

Defendant presented an *Eveready* survey that showed test subjects the uses Defendant makes of its marks in the marketplace. It showed virtually no confusion with Plaintiff. Further, at the hearing, Plaintiff's CEO admitted critical facts, including that Plaintiff has no evidence that Defendant's customers think they are doing business with Plaintiff, that Defendant's Cash App brand name and logo are not confusingly similar to the H&R Block name and logo, that Defendant's Square brand name and logo are not confusingly similar to Plaintiff's brands, and that Defendant's Block website is not confusingly similar to Plaintiff's website.

Based on the evidence, the Court concludes that Plaintiff failed to carry its heavy burden to establish a likelihood of success on the merits. That would be sufficient to deny the motion. But the three other injunction factors lead to the same result.

Given Plaintiff's failure to establish a likelihood of success, it is not entitled to a presumption of irreparable harm. Nor has Plaintiff offered any evidence on that factor, relying instead on the possibility that Defendant might someday experience an adverse event, like a data breach, which it theorizes consumers might associate with Plaintiff. This speculation is insufficient, particularly because the relief Plaintiff seeks effectively is the final relief in the case.

Nor has Plaintiff carried its burden of showing that the balance of hardships and the public interest factors favor an injunction. Plaintiff has identified no evidence of hardship other than the argument that it will be irreparably harmed, which it has not proven. In contrast, the proposed injunction would impose substantial hardships on Defendant, including forcing it to switch to a third name in three months, face significant challenges with regulators in processing a "temporary" name change while this case is litigated over the next several months, abandon and redesign its federally registered Cash App logo in which it has spent hundreds of millions of dollars developing goodwill over nearly a decade, and forfeit revenues from lost transactions.

Defendant's customers would also experience disruption in their financial affairs, including difficulty in accessing their money to buy food and pay medical bills, and prepare their tax returns on time. The Department of Justice approved Defendant's acquisition of the entity now branded as "Cash App Taxes" so that consumers would have a free option to file their tax returns. An injunction, especially the one Plaintiff suggested that would require removing the tax service from Cash App, would harm—and possibly destroy—that free service, given that it would be commercially infeasible to offer it as a standalone product under different branding.

3

Based on these conclusions, and as analyzed further below, the Court denies Plaintiff's motion for a preliminary injunction.

## I.  BACKGROUND FACTS[1]

### A.  Plaintiffs H&R Block & HRB Innovations

H&R Block has been in business for over 65 years.  J-1 (Jones Decl.) ¶ 4.  It is well known in the personal income tax preparation business.  It operates primarily through thousands of franchised storefront locations around the country, and it has mobile applications and computer software as well.  *Id.*  Its professionals personally assist several million taxpayers each year in filing their individual income tax returns.  *See id.*; Tr. at 53:2–7; 55:25–56:14; 57:8–9.

Plaintiff has trademark rights in multiple trademarks that incorporate the word BLOCK, including H&R BLOCK, BLOCK ADVISORS, BLOCKWORKS, and BLOCK HAS YOUR BACK that it uses in connection with tax and related financial services, including a debit card that lets customers access a tax refund.  *See* J-1 (Jones Decl.) ¶¶ 5, 21.  It also has a registered trademark for the use of a green square in connection with tax services.  *Id.* ¶ 20.  Plaintiff alleges that it also has common law trademark rights in the word BLOCK (alone) for income tax services.  *See* Compl. ¶¶ 59–60, Dkt. 1.  Plaintiff, however, does not have a federally-registered trademark in the word BLOCK alone.  Tr. at 59:9–12; *see also* Compl. ¶ 59.

Plaintiff also offers small business tax advice under the name Block Advisors, mobile banking services under the name "Spruce," and accounting and payroll support under the name "Wave."  J-1 ¶¶ 4, 13, 14; J-4 (Jones Rebuttal Decl.) ¶¶ 24–30.

---

[1] The parties have submitted briefs and supporting declarations.  *See* Dkts. 16–17; 38–43; 53–59; 80.  On February 10, 2022, the Court held a full-day hearing and received relevant testimony, the transcript of which is cited as "Tr."

4

### B. Defendant Block, Inc.

Defendant was founded in 2009 as Square, Inc. J-2 (Esperanza Decl.) ¶ 4. Its initial offering was a point-of-sale credit card reader and software that enables merchants to accept credit card payments. *Id.* ¶¶ 6–8. Over time, Defendant's business expanded to include other services, including tools to build websites, prepare invoices, bill customers, manage employee work shifts, and coordinate payroll. *Id.* ¶ 8. Defendant's businesses also offer business banking services, including accounts that can be integrated with its point-of-sale payment processing. *Id.*

Defendant has also developed and acquired other businesses. *Id.* ¶¶ 11–16. One of these is now known as Cash App. *Id.* ¶ 12; J-3 (Jennings Decl.) ¶ 4. Started in 2013 as Square Cash, Cash App is a peer-to-peer money transfer service that allows people to send money to friends, family, and others through their phones without needing a bank account or credit card. J-3 ¶¶ 3–4. From its formation in 2013, this business used a logo of a white dollar sign within a green squarish shape. *Id.* ¶ 5. In 2017, Square Cash changed its brand to Cash App and modified its logo slightly to its current use. *Id.* ¶ 6; D-18a (Cash App website).

Defendant owns registered trademarks on the name CASH APP (alone) as well as the combination of the name and logo. J-3 ¶ 6. More than 100 million people have downloaded Cash App and more than 40 million are active monthly users. *Id.* ¶ 7. Cash App now offers other services, such as a debit card, the ability to acquire the blockchain-based currency Bitcoin, to invest in fractional shares of corporate stock, and, as of this year, the option to prepare and file personal tax returns, known as "Cash App Taxes." *Id.* ¶¶ 4, 7, 15; Tr. at 190:1–4.

Defendant's other businesses include TIDAL, a music streaming service, Spiral, a business to promote the adoption of Bitcoin, a blockchain-based currency, and TBD, a decentralized finance platform in development, which is also based on blockchain technology. J-2 (Esperanza Decl.) ¶¶ 14–16; *see also* Tr. at 142:17–19.

5

In December 2021, Square, Inc. announced that it was changing its corporate name to Block, Inc. J-2 ¶ 20. This was intended to "give [the name] Square back" to its merchant business and provide a unifying name for its family of businesses that share a mission to "create tools that help expand access to the economy," including its focus on blockchain technologies, and expanding Square into new dimensions. J-2 ¶¶ 5, 17–18; Tr. at 142:13–143:12.

Block has described its new name as allowing each business to stand on its own, with its own brand that does not use or depend on the corporate name. J-2 ¶¶ 17, 19; Tr. at 142:13–143:3; Compl. Ex. A. The company had already removed "Square" from the Cash App name in 2017. J-2 ¶ 12; Tr. at 192:24–193:4. Although the corporate name is not part of the brand of the customer-facing businesses, it is visible in the legal "fine print" of the websites and terms of service for those businesses, including the Cash App Terms of Service and Consent to Disclosure of Tax Return Information for Cash App Taxes. D-19 (Square website landing page); J-4 (Jones Rebuttal Decl.) Ex. 2; Tr. at 219:10–16; 197:17–198:25. The Block corporate brand also has its own website, available at block.xyz, and social media presence on platforms such as LinkedIn, Twitter, and Instagram. P-31, P-33 & D-34.

C.    **The Parties' Brands**

Plaintiff contends that some of Defendant's Square-branded offerings compete with H&R Block's offerings, namely, payroll services, invoicing, acceptance of online payments, business bank accounts, and debit cards. Dkt. 59 at 12; J-4 ¶¶ 16, 22, 24, 27. The respective parties' logos for these services are shown below:



J-2 (Esperanza Decl.) ¶ 16; J-4 ¶¶ 16, 26

Plaintiff also contends that features of Cash App offerings compete with its offerings. Dkt. 59 at 12. It emphasizes that Cash App's Taxes feature competes with Plaintiff's tax preparation services, which it offers through a free mobile app as well as storefront services and retail software. *See* J-1 (Jones Decl.) ¶¶ 4, 39; D-2 (Wind Decl.) ¶ 56. Plaintiff contends that Cash App's debit cards, direct deposit, and lending products compete with its products, and that Cash App's debit card and direct deposit competes with H&R Block's newly-launched Spruce. Dkt. 59 at 12; J-4 (Jones Rebuttal Decl.) ¶¶ 28–30. Plaintiff also contends that some Cash App services compete with Block Advisors, which targets its tax services to small businesses. *See* Tr. at 73:19–74:8; *cf.* J-9 (Jennings Sur-Rebuttal Decl.) ¶ 5 ("vast majority" of Cash App's customers are individuals). Their names and logos, as used in the marketplace, are shown below:




## II.     ANALYSIS OF PLAINTIFF'S MOTION

### A.     <u>The Preliminary Injunction Standard</u>

A preliminary injunction "is an extraordinary remedy." *Allied Servs., LLC v. Smash My Trash, LLC*, No. 21-cv-00249-SRB, 2021 WL 1671675, at *2 (W.D. Mo. Apr. 28, 2021) (quoting *Watkins Inc.*, 346 F.3d at 844 ). The moving party bears the complete burden of showing the four *Dataphase* factors: (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm absent relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. *Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.*, 815 F.2d 500, 503 (8th Cir. 1987) (citing *Dataphase Sys., Inc. v. CL Sys., Inc.,* 640 F.2d 109, 114 (8th Cir. 1981)). The Trademark Modernization Act establishes that a trademark owner that proves it is

7

likely to succeed on the merits is entitled to a presumption of irreparable harm, but does not provide presumptions regarding balance of the equities or public interest. 15 U.S.C.A. § 1116(a). Where, as here, "granting the preliminary injunction will give plaintiff substantially the relief it would obtain after a trial on the merits," plaintiff's burden of "demonstrating that a preliminary injunction is warranted is a heavy one." *Dakota Indus., Inc. v. Ever Best Ltd.*, 944 F.2d 438, 440 (8th Cir. 1991) (citing *Calvin Klein*, 815 F.2d at 503).

### B.    Likelihood of Success on the Merits

Each of Plaintiff's claims require proof of a likelihood of consumer confusion. *See USA Visionary Concepts, LLC v. MR Int'l, LLC*, No. 4:09-CV-00874-DGK, 2009 WL 10672094, at *3 (W.D. Mo. Nov. 17, 2009) (collecting cases) (likelihood of confusion is a necessary element of federal and state law trademark infringement and unfair competition claims). "[A] mere possibility [of confusion] is not enough; there must be a substantial likelihood that the public will be confused." *Vitek Sys., Inc. v. Abbott Labs.*, 675 F.2d 190, 192 (8th Cir. 1982).

Plaintiff's case rests principally on the notion that third-party references to Defendant's "Block" name are likely to cause confusion. However, a plaintiff must prove that "the defendant's actual practice is likely to cause confusion" in the minds of consumers "about the origin of the goods or services in question" or their affiliation with Plaintiff. *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.,* 543 U.S. 111, 117 (2004); *Everest Capital Ltd. v. Everest Funds Mgmt., LLC*, 393 F.3d 755, 759 (8th Cir. 2005) (same).

Six factors, known as the "*SquirtCo* factors," guide this assessment of whether confusion is likely: (1) the strength of the owner's mark; (2) the similarity of the owner's mark and the alleged infringer's mark; (3) the degree of competition between the products; (4) the alleged infringer's intent to "pass off" its goods as the trademark owner's; (5) incidents of actual confusion; and (6) the type of product, its cost, and conditions of purchase. *Everest Capital, 393*

8

F.2d at 759–60 (quoting *Luigino's, Inc. v. Stouffer Corp.*, 170 F.3d 827, 830 (8th Cir. 1999) and citing *SquirtCo v. Seven-Up Co.*, 628 F.2d 1086, 1091 (8th Cir. 1980)).

Trademark infringement must be considered "in light of what occurs in the marketplace, taking into account the circumstances surrounding the purchase of the goods." *Vitek Sys., Inc.*, 675 F.2d at 192. "A realistic evaluation of consumer confusion must attempt to recreate the conditions in which buying decisions are made, and the court should try to determine not what it would do, but what a reasonable purchaser in market conditions would do." *Calvin Klein*, 815 F.2d at 504 (vacating preliminary injunction).

The Court determines that Plaintiff is not likely to succeed on the merits because it has not shown that Defendant's use of its marks in the marketplace is likely to cause confusion.

### 1. Strength of the Marks

The strength of a trademark is measured by both its conceptual strength and its commercial strength. *Lovely Skin, Inc. v. Ishtar Skin Care Prods., LLC*, 745 F.3d 877, 888 (8th Cir. 2014). A mark's conceptual strength depends on whether it is classified as generic, descriptive, suggestive, arbitrary, or fanciful. *Gen. Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 625 (8th Cir. 1987). Arbitrary or fanciful marks are "afforded the highest level of protection"; generic marks "merit[] no trademark protection"; and "[s]uggestive and descriptive marks fall somewhere in between." *Duluth News-Tribune, a Div. of Nw. Publ'ns, Inc. v. Mesabi Publ'g Co.*, 84 F.3d 1093, 1096 (8th Cir. 1996).

### a. Word Marks

The H&R Block name is based on the names of the company's two founders. J-1 (Jones Decl.) ¶ 3. Surnames are classified as "descriptive marks requiring secondary meaning for protection under trademark law." *Fischer & Frichtel Custom Homes, LLC v. Fischer Mgmt.*, No. 4:21-cv-00470-MTS, 2021 WL 1750174, at *3 (E.D. Mo. May 4, 2021). Thus, the H&R Block

9

mark has some conceptual strength, but not as much as an arbitrary or fanciful mark. Plaintiff has used "H&R Block" for 65 years, its H&R Block mark is established in the market, and Plaintiff spends millions of dollars on advertising its H&R Block mark every year. J-1 ¶¶ 3, 4, 7. Plaintiff's "H&R Block" trademark is likely commercially strong for the same reasons.[2]

Plaintiff also claims unregistered "common law" trademark rights in "Block" alone. The evidence regarding Plaintiff's use of the unregistered word "Block" shows that such uses are nearly always made with the "H&R Block" name and logo.[3] Thus, even if customers may associate "Block" with H&R Block when seeing an H&R Block commercial, store, or product, that does not establish the strength of the term "Block" alone. *See Steak n Shake Co. v. Burger King Corp.*, 323 F. Supp. 2d 983, 986–90, 993–94 (E.D. Mo. 2004) (plaintiff failed to establish "common-law" rights in "steakburger" notwithstanding registrations that incorporated it, such as "Original Steakburgers," and long-standing use). Plaintiff's actions regarding the "Block" brand further show that the brand has limited reach if any, and none beyond the tax industry. Plaintiff does not use "Block" alone in its Search Engine Optimization, indicating that, when it comes to how it believes its own or potential customers search for H&R Block, it does not believe they would do so using the word "Block" alone. *See* D-2 (Wind Decl.) ¶¶ 58–60 & Ex. M.

The "recognition" survey H&R Block relies on, from Dr. Jay, does not establish strong rights in "Block" alone because its design does not support that broad conclusion. Dr. Jay asked

---

[2] Plaintiff argued that H&R BLOCK is famous and that Defendant conceded as much. Tr. at 233:11–12; 244:22–23. The Court is not aware that Defendant made that concession. However, the Court does not need to resolve the issue of fame to decide this motion.

[3] *See* Tr. at 101:5–114:20; D-3 (Dhar Decl.) ¶¶ 55–63; D-31 (H&R Block's social media accounts); Tr. at 115:9–23 (Pls.' CEO agreeing that all cited news articles refer to "H&R Block"); P-6ddd (Decl. of Pls.' attorney) (collecting articles that all reference "Block" and "H&R Block"); Tr. at 113:14–17 (even CEO's baseball jersey worn to internal employee events bears "H&R Block" logo on the sleeve, *see* P-15 (selected images of "Block" jersey)).

respondents whether they had seen or heard of several brands of tax products. She interpreted her results to mean that a significant percentage (45%) of the public recognized the word "BLOCK" to mean H&R Block. J-5 (Jay Rebuttal Decl.) ¶ 14. Defendant's expert, Dr. Wind, noted that Dr. Jay's survey gave respondents context clues that "primed" them to think about tax brands when they were asked whether they recognized the word "BLOCK," which artificially inflated the number of people who recognized "BLOCK" as H&R Block. D-4 (Wind Sur-Rebuttal Decl.) ¶¶ 56–61. Defendant responded with a sur-rebuttal survey that replicated Dr. Jay's methodology except for the priming: Respondents were not given any clues that the word "Block" was tied to tax products or services. *Id.* ¶¶ 63–72. There, fewer than 6% identified "BLOCK" as a brand or as connected to H&R Block. *Id.* ¶ 67. This difference of nearly 40% demonstrates what an improper "priming" effect Dr. Jay's context clues had on the results.

Even crediting Dr. Jay's results, they test recognition of only the word BLOCK when consumers are already thinking about tax services. *Id.* ¶¶ 56–61. Consumers will not typically encounter Defendant's name or logo in that context. Tr. at 142:8–145:6; *see, e.g.*, P-31 (Block, Inc. (@blocks) Twitter Account Page) (no mention of taxes); P-33 (Block, Inc. (@block.xyz) Instagram Account Page) (no mention of taxes); D-34 (Block, Inc. website) (no mention of taxes). Thus, the Court accords Dr. Jay's survey little weight.

Further, "block" is a commonplace word both in the English language and as a branding element for financial services, especially among those engaged in blockchain services, which entitles it to less protection than a distinctive mark. *SquirtCo*, 628 F.2d at 1091. Plaintiff's brands (including H&R Block and Block Advisors) have coexisted with over 60 other Block-formative brands in the financial services sector, including blockchain services, without confusion. *See* D-3 (Dhar Decl.) ¶¶ 65, 68 & Ex. M (listing more than 60 third-party trademarks

using "BLOCK," relating to financial goods and services); J-2 (Esperanza Decl.) ¶ 26 (citing a social media post that references six blockchain-related companies with "BLOCK" in their names); P-7 (MacAneney Decl.) ¶ 3 & Ex. A (listing over 200 trademarks using "BLOCK," including 12 related to blockchain technology).  Thus, the rights Plaintiff has in the tax sector do not extend under the crowded field doctrine to the financial services sector generally, especially as to uses for blockchain technologies.  *See* 2 McCarthy on Trademarks and Unfair Competition § 11:85 (5th ed.) ("In a 'crowded' field of look-alike marks, each member of the crowd is relatively 'weak' in its ability to prevent use by others in the crowd."); *Moose Creek, Inc. v. Abercrombie & Fitch Co.*, 331 F. Supp. 2d 1214, 1224 (C.D. Cal. 2004) (under the crowded field doctrine, "even an arbitrary mark may be classified as weak where there has been extensive third party use of similar marks on similar goods"), *aff'd*, 114 F. App'x 921 (9th Cir. 2004).

In sum, the record establishes: (1) the strength of Plaintiff's registered marks for tax services are strong; (2) the strength of Plaintiff's marks for general financial services are considerably weaker; and (3) if Plaintiff has common law rights to "Block" alone (which the Court need not decide at this stage), they are weaker still given that it is a "commonplace" word, *SquirtCo*, 628 F.2d at 1091, and that Plaintiff has not established it functions as a standalone source identifier, outside of contexts that reference H&R Block.  This factor tips in Plaintiff's favor for tax services, is neutral for financial services generally, and tips in Defendant's favor as to Plaintiff's ownership of the mark Block alone.

b.  <u>Green Square Logo</u>

H&R Block's logo is a green square.  As a registered mark that has achieved incontestability status, it is entitled to a presumption of validity.  *Lovely Skin, Inc.*, 745 F.3d at 882.  Conceptually, however, it is a weak mark: logos and icons that feature a green square are "commonplace," *SquirtCo*, 628 F.2d at 1091, including for financial services, *see, e.g.*, D-33; D-

12

3 (Dhar Decl.) Ex. N.  And green is of course the color of money.  There is no evidence in the record that Plaintiff uses the green square logo separately from its full "H&R Block" brand, suggesting again that it is weak as a standalone element.  J-4 (Jones Rebuttal Decl.) ¶¶ 12–17; *see R.G. Barry Corp. v. A. Sandler Co.*, 406 F.2d 114, 116 (1st Cir. 1969) (concluding that a "factor which appears to us to have exceptional significance" is that the "housemark rather than the trademark or product seems to have been relied upon to reveal the source of origin").  This actual use—"the impression that each mark in its entirety is likely to have on a purchaser"—is what must be evaluated, not "its elements separated and considered in detail."  *Sturgis Motorcycle Rally, Inc. v. Rushmore Photo & Gifts, Inc.*, 908 F.3d 313, 337 (8th Cir. 2018).

Given the facts of this case, this factor is at best neutral.

2.  <u>Similarity of the Marks.</u>

"Similarity of the marks ... must be considered as they are encountered in the marketplace, … taking into account the circumstances surrounding the purchase of the goods." *Vitek Sys., Inc.*, 675 F.2d at 192 (internal citations omitted); *Calvin Klein*, 815 F.2d at 503–04 (vacating grant of preliminary injunction where district court failed to consider defendant's mark in realistic marketplace context).  Thus, the Court cannot "consider the similarities between the component parts of the marks" in the abstract, but "must evaluate the impression that each mark in its entirety is likely to have on a purchaser exercising the attention usually given by purchasers of such products." *Duluth News-Tribune*, 84 F.3d at 1097 (citing *Gen. Mills*, 824 F.2d at 627); *see also Tyco Healthcare Grp. LP v. Kimberly-Clark Corp.*, 463 F. Supp. 2d 127, 135 n.35 (D. Mass. 2006) ("Unlike in a patent suit, … trademark infringement cannot be considered abstractly and without reference to the … [actual] use of the product.").  To assess this factor, the Court separately addresses how the marks appear in public settings.

13

<u>Similarity in the parties' branding (word marks and logo)</u>

Plaintiff frames the comparison as "Block vs. Block." *E.g.*, Tr. at 31:4–5. But Defendant markets its allegedly competitive products using the brands "Cash App" and "Square," not "Block." J-2 (Esperanza Decl.) ¶ 18; Tr. at 143:13–16, 182:8-11; 192:12–18; Dkt. 59 at 12. These terms are not similar in "sight, sound, [or] meaning" to "H&R Block," "Block Advisors," or "Spruce." *Gen. Mills, Inc.*, 824 F.2d at 627; Tr. at 122:13–123:12. Nor are the parties' respective logos confusingly similar; at the hearing, Plaintiff's CEO admitted that the Cash App name and logo are not confusingly similar to Plaintiff's name and logo. Tr. at 123:10–12.

As to Defendant's "Block" branding, it features a multi-colored, twisting cube logo. D-34 (website); *see also* Tr. at 95:3–6. A comparison of the parties' logos, websites, and Twitter profiles likewise shows them to be dissimilar, even though they share the common element "Block." *Sensient Techs. Corp. v. SensoryEffects Flavor Co.*, 631 F.3d 754, 765 (8th Cir. 2010) ("use of identical dominant words does not automatically equate to similarity between marks.").

| **Block's Website** | **H&R Block's Website** |
| --- | --- |

 

D-34 (Block's website); D-11 (H&R Block's website).

| **Block's Twitter Profile** | **H&R Block's Twitter Profile** |
|:---:|:---:|
|  |  |

Compl. ¶ 33; D-31 (H&R Block's social media accounts); *compare* D-2 (Wind Decl.) Ex. L

(H&R Block's Instagram, Twitter, Facebook, YouTube, and LinkedIn profiles) *with* J-1 (Jones

Decl.) Ex. H; P-31 (Block, Inc. (@blocks) Twitter page); P-33 (Block, Inc. (@block.xyz)

Instagram Page); *see also Gen. Mills, Inc.*, 824 F.2d at 627 (determining that Oatmeal Raisin

Crisp and Apple Raisin Crisp cereals are not confusingly similar in part because of differing

color schemes, lettering styles, and box designs).

      b.     <u>Similarity in the parties' other uses (word marks)</u>

Plaintiff contends that, even if Defendant does not use its name on products, consumers

will see "Block" elsewhere. For example, Plaintiff asserts that, in time, the developer name on

the Cash App mobile application download screen will change from "Square, Inc." to "Block,

Inc." *See* J-4 (Jones Rebuttal Decl.) ¶ 48. But Defendant credibly testified that it has no plans to

make such a change. *See* J-9 (Jennings Sur-Rebuttal Decl.) ¶ 14; Tr. at 182:5–17.

Plaintiff also points to the presence of "Block, Inc." in the Cash App Terms of Service, in

the Cash App Taxes Consent to Disclosure, in the copyright notice on the Square website, and

even in response to Better Business Bureau complaints. J-4 ¶ 60 & Ex. 2; Tr. at 192:21–193:4,

209:14–210:4; J-1 (Jones Decl.) ¶ 28; P-88 (Reibstein Reply Decl.) Ex. 6. As the survey results

Defendant submitted from Dr. Wind show, the presence or absence of "Block" in a copyright

notice on the Cash App Taxes website made no difference in net confusion; both versions yielded a mere 1% net confusion.  D-2 (Wind Decl.) ¶¶ 44–45.

Even in the absence of Dr. Wind's survey, it would not be reasonable to assume consumers would both see and be confused by copyright notices or other such uses.  *See Nelson-Ricks Cheese Co. v. Lakeview Cheese Co.*, 331 F. Supp. 3d 1131, 1149 (D. Idaho 2018) (finding that unauthorized use of a mark "in very small print" at the bottom of a package is unlikely to cause confusion among sophisticated consumers), *aff'd*, 775 F. App'x 350 (9th Cir. 2019); *Armstrong Cork Co. v. World Carpets, Inc.*, 597 F.2d 496, 504 (5th Cir. 1979) (fine print insufficient to show infringement as a matter of law); *Land O'Lakes Creameries, Inc. v. Oconomowoc Canning Co.*, 221 F. Supp. 576, 581 (E.D. Wis. 1963) (noting that "the purchasing public generally tends to look only to the prominent print of the label").

Defendant's use of the word "Block" in the legal fine print, distinct from the prominent, "attention-getting feature" of the Cash App and Square brands and logos, is not meaningful for assessing the similarity of the parties' marks.  *Armstrong Cork*, 597 F.2d at 504.  The decision in *Armstrong Cork* is instructive.  The owner of a registered trademark for WORLD challenged the junior user's proposed change of its corporate name to "Armstrong World Industries, Inc."  *Id.* at 498–99.  The Fifth Circuit found the trial court's injunction to be a clear error: "The mere fact that Armstrong's proposed corporate name contains the word World does not, of itself, make the name 'substantially similar' to World's trademark.  A mark must be viewed in its entirety and context.  It is the overall impression that counts."  *Id.* at 502.

To assess the overall impression, the court examined the label attached to the junior user's carpet.  *Id.* at 502–04.  It concluded that the use of the corporate name in fine print

16

was not enough to create a likelihood of confusion given that the "attention-getting feature" of the label was the junior user's brand—"Armstrong with a circled A." *Id.* at 504. "There is no showing that Armstrong is seeking to feature either the new name in its entirety or, more significantly, the term World to denominate or advertise its carpets." *Id.* at 505.

Additionally, Cash App cannot be purchased by walking into a store or from an online retailer like Amazon. The consumer has to find the app at Apple's App Store or Google Play. *See* J-9 (Jennings Sur-Rebuttal Decl.) ¶ 6. Defendant's Head of Product and Business for Cash App reviewed the 500 most-used search terms for finding the app in Google Play, which account for more than 97% of downloads. *Id.* ¶ 9. None included "H&R Block" or any variation of that term. *Id.* ¶ 9. Cash App's users are not using Plaintiff's marks to search for Cash App. Because "[a] realistic evaluation of consumer confusion must attempt to recreate the conditions in which buying decisions are made," *Calvin Klein, Inc.,* 815 F.2d at 504, confusion arising from these legal notices is particularly unlikely.

Plaintiff suggests that a different rule should apply when a defendant's corporate name is challenged. Dkt. 59 at 16 (citing *Nat'l Cust. Eng'g Inc. v. Lockheed Martin Corp.*, No. CV 96-8938-DDP, 1997 WL 363970 (C.D. Cal. Feb. 14, 1997); *Safeway Stores Inc. v. Safeway Props., Inc.*, 307 F.2d 495, 499 (2d Cir. 1962)); *see also* Tr. at 292:14–293:6. But in those cases, unlike here, the defendant's corporate name was the *only* identified brand used for its goods; there was no equivalent of a customer facing "Cash App" brand. *Id.* Moreover, in the unpublished *Lockheed* case, there was a finding of bad faith intent and a showing of actual confusion, none of which exist here. Unlike in the *Lockheed* case, in which the United States Patent and Trademark Office ("U.S.P.T.O") rejected the defendant's "MountainGate" mark as likely to cause confusion and the defendant continued to use it anyway, 1997 WL 363970 at **1, 4–5, here, "[t]he

17

[U.S.P.T.O.] trademark examining attorney searched the U.S.P.T.O. database of registered and pending marks and found no conflicting marks that would bar registration [of Block, Inc.] under Trademark Act Section 2(d)." Feb. 22, 2022 Non-Final Office Action, U.S. Trademark Application Serial No. 97151246.[4]

In sum, as *Armstrong Cork* demonstrated, a challenged corporate name, like any other challenged trademark, must be considered in the marketplace context presented by the defendant. 597 F.2d at 502. Because the parties' marketplace uses are dissimilar, this factor weighs heavily against finding that confusion is likely. *See, e.g.*, *Luigino's, Inc.*, 170 F.3d at 831-32 (affirming summary judgment that "Michelina's Lean 'N Tasty" was not likely to cause confusion with "Lean Cuisine" given names' different meaning and sound and "visually distinct" packaging).[5]

### 3. Evidence of Actual Confusion

Plaintiff presented no evidence of actual consumer confusion. Although it has been less than three months since Defendant announced its name change, Cash App has been used by tens of millions of customers and the news of Defendant's announcement has been widespread. J-3 (Jennings Decl.) ¶ 7; P-52 (@jack Tweet of name change, reflecting 6 million+ followers); P-58 (@blocks Tweet of name change). Yet there has been no evidence of actual customer confusion. Plaintiff has identified no instance where, for example, a Cash App customer contacted Plaintiff

---

[4] These governmental records are a matter of public record of which the Court can and does take judicial notice pursuant to Rule 201 of the Federal Rules of Evidence.

[5] This level of marketplace dissimilarity has been found sufficient to grant judgment on the pleadings. *See, e.g., Eastland Music Grp. LLC v. Lionsgate Entm't Inc.*, 707 F.3d 869, 871 (7th Cir. 2013); *Fortres Grand Corp. v. Warner Bros. Inc.*, 947 F. Supp. 2d 922, 930–31 (N.D. Ind. 2013), *aff'd*, 763 F.3d 696 (7th Cir. 2014); *Steak Umm Co., LLC v. Steak 'Em Up, Inc.*, 868 F. Supp. 2d 415, 432 (E.D. Pa. 2012); *Swatch, S.A. v. Beehive Wholesale, L.L.C.*, 888 F. Supp. 2d 738, 756 (E.D. Va. 2012), *aff'd*, 739 F.3d 150 (4th Cir. 2014); *R.J. Ants, Inc. v. Marinelli Ent., LLC*, 771 F. Supp. 2d 475, 500 (E.D. Pa. 2011); *George & Co., LLC v. Imagination Entm't Ltd.*, 2008 WL 2883771, *7 (E.D. Va. 2008), *aff'd*, 575 F.3d 383 (4th Cir. 2009); *Le Book Publ'g, Inc. v. Black Book Photo., Inc.*, 418 F. Supp. 2d 305, 311 (S.D.N.Y. 2005).

18

for support.  Plaintiff's CEO admitted that he is unaware of any Cash App or Square customer being confused as to the relationship between Block, or any of its products, and H&R Block.  Tr. at 90:18–91:3.  Similarly, Defendant's Cash App Head of Business and Product testified that he is unaware of any H&R Block customer contacting Defendant, or any consumer confusion as between Defendant and H&R Block, recently or since the launch for Cash App in 2013.  J-3 ¶ 10; Tr. at 194:16–22; *cf. Zerorez Franchising Sys., Inc. v. Distinctive Cleaning, Inc.*, 103 F. Supp. 3d 1032, 1044-45 (D. Minn. 2015) (finding that call center customer reports evidenced confusion).  These facts weigh significantly against a finding that confusion is likely.  The Court addresses below the parties' other evidence on this factor.

a.  <u>Surveys (word marks and logos)</u>

Survey evidence has been described as "probably the most accurate evidence of actual confusion."  *Woodsmith Publ'g Co. v. Meredith Corp.*, 904 F.2d 1244, 1249 (8th Cir. 1990); *Calvin Klein*, 815 F.2d at 504 (vacating preliminary injunction when court failed to adequately consider survey evidence).  Plaintiff did not submit any survey evidence testing Defendant's uses of its marks, despite having that opportunity.  *Cf.* J-5 (Jay Rebuttal Decl.) (testing recognition of BLOCK brand for taxes); J-6 (Butler Rebuttal Decl.) (testing news article).

In contrast, Defendant provided three consumer confusion surveys.  Its surveys, designed by Wharton Professor Yoram Wind, showed that no confusion with "H&R Block" is likely from Defendant's Cash App Taxes website, the Cash App name and logo, or the Block website.  D-2 (Wind Decl.) ¶¶ 41–46.  Dr. Wind used the *Eveready* format of showing Defendant's marketing materials and asking likely consumers about source, affiliation, and permission.  *Id.* ¶ 24.  The

*Eveready* format has been called the "gold standard" of assessing confusion. *See* 6 McCarthy on Trademarks and Unfair Competition, § 32:174 (5th Ed. 2021).[6]

In response, Plaintiff submitted a survey by Sarah Butler addressing the word "Block"—not as used by Defendant in the marketplace, but in a third-party article. J-6 ¶ 5. She showed respondents a *Forbes Advisor* article about Square's purchase of Credit Karma Taxes, which she altered to refer to "Block," and then asked questions to see if respondents remembered the article as being about H&R Block. J-6 ¶¶ 34–38, 41–42.

Plaintiff identified no precedent approving of a survey that tests confusion based on something other than a defendant's product, packaging, or marketing material. Where surveys test the defendant's marketing materials, but alter them to remove the context in which consumers encounter them in the marketplace, courts give them little or no weight. *See, e.g.*, *WE Media, Inc. v. Gen. Elec. Co.*, 218 F. Supp. 2d 463, 474 (S.D.N.Y. 2002) ("Germane survey evidence should make some effort to compare the impressions the marks have on potential customers under marketplace conditions."); *Limited v. Macy's Merch. Grp. Inc.*, 15-CV-3645 KMW, 2016 WL 4094913, at *9 (S.D.N.Y. Aug. 2, 2016) (giving survey "little weight" where survey stimulus removed the defendant's logo and URL from image shown respondents, depriving respondents of "context that they would unavoidably encounter in the actual

---

[6] Plaintiff also has not given the Court grounds to disregard Dr. Wind's surveys. Plaintiff argued that his surveys assess confusion at only a limited time. J-7 (Reibstein Rebuttal Decl.) ¶ 70; D-4 (Wind Sur-Rebuttal Decl.) ¶ 88. Plaintiff does not identify case law for this criticism. If valid, it would undermine all *Eveready* surveys, which are necessarily limited in duration. Plaintiff also argued that Dr. Wind's survey population was overinclusive because it included respondents who might do their taxes online instead of through just a mobile application. J-6 (Butler Rebuttal Decl.) ¶ 20. This criticism misunderstands the service; once a user has downloaded Cash App, he or she can use the Cash App website to complete and file tax returns online. D-4 ¶ 42. Even excluding those who qualified based solely on how they completed their returns would not alter his results. *Id.* ¶ 46. Dr. Wind's surveys showing 0-to-1% net confusion provide substantial evidence that confusion is not likely. D-2 (Wind Decl.) ¶¶ 41-46.

20

marketplace"), *aff'd*, 695 F. App'x 633 (2d Cir. 2017).[7]  This Court declines to be the first to accept a confusion survey that tests a hypothetical, third-party use of Defendant's mark, especially on a preliminary record and as the basis for awarding extraordinary relief.

Ms. Butler's survey merits little weight also because it suffers from methodological flaws.  When her initial results showed clear evidence of no confusion, she changed her survey to add an improperly leading question.  D-4 (Wind Sur-Rebuttal Decl.) ¶¶ 27–29; *see also* Tr. at 271:19–272:18.  "[A]n accumulation of errors can be an expert witness's down fall" because "[e]ach flaw decreases reliability and probative value and correspondingly increases prejudicial effect."  *Jacobs v. Fareportal, Inc.*, No. 8:17CV362, 2020 WL 6587245, at *10 (D. Neb. May 29, 2020) (internal quotation marks and citation omitted).

Ms. Butler's initial survey work further reason why her survey is entitled to little weight.  Her first survey, which she calls a "pilot," showed 200 respondents a *Yahoo! Finance* article concerning Cash App, in which all references to "Square" were changed to "Block."  J-6 (Butler Decl.) ¶ 39 n.49.  Although her questions gave respondents repeated chances to identify H&R Block as having been mentioned, *none* who saw the altered article that referred to "Block's Cash App" mentioned H&R Block.  D-4 ¶¶ 19–21.  These results show the minimal probative value of her ultimate survey.  Even if consumer reaction to a particular news story were relevant to actual

---

[7] *See also Kargo Global, Inc. v. Advance Mag. Pub., Inc.*, No. 06 Civ. 550 (JFK), 2007 WL 2258688, at *11 (S.D.N.Y. Aug. 6, 2007) (excluding survey using unrepresentative snippets of marketing material as stimulus); *Am. Footwear Corp. v. Gen. Footwear Co.*, 609 F.2d 655, 660 n.4 (2d Cir. 1979) (same); *Playtex Prods., Inc. v. Georgia-Pacific Corp*., 390 F.3d 158, 168 (2d Cir. 2004) (survey irrelevant because stimulus did not replicate marks as presented and packaged in the marketplace), *superseded on other grounds*, *Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97 (2d Cir. 2009); *Juicy Couture, Inc. v. L'Oreal USA, Inc.,* No. 04 CIV 7203 (DLC), 2006 WL 1012939, at *25 (S.D.N.Y. Apr. 19, 2006) (survey that did not show actual cosmetic product in its packaging had no value); *WE Media, Inc.,* 218 F. Supp. 2d at 474 (survey that "did not use pictures or advertisements that approximate what a potential customer would encounter in making her [purchase] choices" did not "provide support for [plaintiff's case").

21

confusion, the results from the pilot survey demonstrate that Ms. Butler's final survey results

shed light only on readers' perception of a single article, not all articles that generally mention

"Block."  It is also telling that it took Ms. Butler three attempts to obtain the results Plaintiff

sought.[8]  *See id.* ¶¶ 18–27; Tr. at 271:19–272:18.

Given that Plaintiff had ample opportunity to conduct surveys that might show consumer

confusion as to the word "Block" or the Cash App logo, its failure to do so weighs heavily

against finding a likelihood of confusion.  Dr. Wind's *Eveready* survey, showing no confusion,

reinforces that conclusion.

        b.      <u>Social media posts about Defendant's name change (word marks)</u>

With its initial Suggestions, Plaintiff offered a handful of social media posts by unknown

individuals reacting to Defendant's announcement of its name change as evidence of consumer

confusion (and a joke by one of Defendant's employees).  J-1 (Jones Decl.) ¶¶ 34–36, 44 & Exs.

M, N; Dkt. 41 (Ng Decl.).  In response, Defendant submitted posts by unknown individuals

reacting to Plaintiff's lawsuit, which stated that confusion is not likely.  D-3 (Dhar Decl.) ¶ 84 &

Ex. O.  This is not persuasive evidence of actual confusion or lack of it.  Nothing suggests that

these posters are Defendant's customers, and the majority recognized that Plaintiff and

Defendant are different entities.  *Id.* ¶¶ 71–83; *see also Two Hands IP LLC v. Two Hands Am.,

Inc.*, 21-cv-3855 (JGK), 2021 WL 4437975, at *10 (S.D.N.Y. Sept. 28, 2021) (rejecting social

media evidence of confusion because even if the posts demonstrate "confusion in the general

---

[8] In her Reply Declaration, Ms. Butler defended running her survey three times to get more
favorable results by citing an article that endorsed the use of "pilot" surveys.  *See* P-90 ¶ 24 & n.
24 (citing S. S. Diamond & J. B. Swann, *The Use of Pilot Tests and Pretests in Consumer
Surveys*, 12 Trademark and Deceptive Advertising Surveys: Law, Science, and Design)..  The
authors endorse using a pilot for different reasons—to ensure that a survey's results can be
reproduced and accurately measures what it purports to measure—and warn that it should not be
done for a "darker purpose," i.e., to obtain more favorable results.  Diamond & Swann at 12.

sense," there was no evidence that the confusion had "any potential or actual effect on consumers' purchasing decisions"); *Kinbook, LLC v. Microsoft Corp.*, 866 F. Supp. 2d 453, 469 (E.D. Pa. 2012), *aff'd*, 490 F. App'x 491 (3d Cir. 2013) (rejecting instances of purported confusion that were "highly speculative" and "relate only to confusion about the name or function of [defendant's] products, and in no way relate to actual confusion by consumers").

Even if each of Plaintiff's posts could be credited as evidence of confusion, it would be at most *de minimis* and non-actionable. *Duluth News-Tribune*, 84 F.3d at 1098 ("[E]ven several isolated incidents of actual confusion that occur initially upon the creation of a potentially confusing mark are insufficient to establish a genuine issue of material fact as to the likelihood of confusion."); *Move Press, LLC v. Peloton Interactive, Inc.*, Case No. LA CV18-01686 JAK, 2019 WL 4570018, at *14 (C.D. Cal. Sept. 5, 2019) (finding that nine "i[]solated, unauthenticated" social media posts were "anecdotal confusion … insufficient to support a finding [of] confusion"); *Kibler v. Hall*, 843 F.3d 1068, 1078-79 (6th Cir. 2016) (finding that no reasonable jury could find a likelihood of confusion based solely on a few instances of non-purchasing actual confusion on social media); *Heartsprings, Inc. v. Heartspring, Inc.*, 143 F.3d 550, 557–58 (10th Cir. 1998) (affirming district court's determination that anecdotal instances of purported confusion among "only random acquaintances" was entitled to "little weight").

c.    On-line articles and social media posts (word marks)

In its Reply Suggestions, Plaintiff introduced evidence of third-party social media posts "about 'Block' and 'Cash App Taxes,'" some that also referred to H&R Block. Dkt. 59 at 24. It discussed these other posts in its discussion of the *SquirtCo* factors under the heading "Actual Confusion Is Likely." *Id*. at 23. At the hearing, Plaintiff relied on these posts and other third-party articles to argue not that their authors were confused, but that these third-party references "will confuse others in the marketplace." Tr. at 287:2–6; *see also id.* at 79:19–83:11; P-25

23

(selected Tweets); J-4 (Jones Rebuttal Decl.) ¶ 45 (news articles); ¶¶ 57–59, 63 (social media

posts); Tr. 131:3–22 (comparisons of tax services that refer to "Block's Cash App Taxes)."[9]

The Court does not view this evidence as favoring Plaintiff. First, the *SquirtCo* "actual

confusion" factor focuses on "incidents of confusion or survey evidence." *LTJ Enters., Inc. v.*

*Custom Mktg. Co.*, 168 F. Supp. 3d 1202, 1215 (D. Minn. 2016) (citing *Frosty Treats Inc. v.*

*Sony Comput. Entm't Am. Inc.*, 426 F.3d 1001, 1009 (8th Cir. 2005)); *accord ZW USA, Inc. v.*

*PWD Sys., LLC*, 889 F.3d 441, 446 (8th Cir. 2018). It does not extend to, in Plaintiff's words,

speculation that "Actual Confusion Is Likely." Dkt. 59 at 19. Simply put, this factor looks to

actual confusion, not theories about future confusion. *Fischer & Frichtel*, 2021 WL 1750174 at

*6 (denying temporary restraining order where "observations of third parties" about defendant's

business name were "not evidence of actual confusion" but "merely point[ed] out the *possibility*

of future confusion") (emphasis in original); *Morrison Entm't Grp. Inc. v. Nintendo of Am., Inc.*,

56 F. App'x 782, 785 (9th Cir. 2003) (finding that the declarations plaintiff relied on did not

recount any specific instance of actual confusion, but instead "simply speculate[d] that there may

be some instances of future confusion").[10]

Second, Plaintiff's theory that confusion will arise from the writings of third parties—

whether social media, online articles, news services, or product reviews—runs counter to

---

[9] In closing arguments, Plaintiff argued that third parties—reporters and journalists—are likely to refer to Cash App as "Block's Cash App" because "there are so many cash apps," contending, for example, that "Venmo is described online as a cash app, Zelle is described as a cash app." Tr. at 240:13–18. Plaintiff did not introduce evidence that this commonly occurs. Moreover, there is nothing in the record that suggests that "cash app" is generically used to describe Venmo or Zelle. The only record evidence on this point is Defendant's registration for "Cash App" on the USPTO principal register, which is presumptive evidence that the mark is distinctive.

[10] Plaintiff also cites *First National Bank in Sioux Falls v. First National Bank S. Dak., SPC, Inc.*, 655 F. Supp. 2d 979 (D.S.D. 2009), as holding that confusion by non-consumers, such as vendors, is relevant to the confusion inquiry. *See* Tr. 287:25–288:5. Plaintiff has not presented any instances of confusion by vendors or prospective employees.

24

trademark law's requirement that confusion is actionable only if it results from the defendant's use of a mark.  *E.g.*, *KP Permanent Make-Up, Inc.*, 543 U.S. at 117 (infringement requires showing "the defendant's actual practice is likely to cause confusion" in the minds of consumers "about the origin of the goods or services in question"); *Everest Capital Ltd.*, 393 F.3d at 759 (infringement claims requires plaintiff to prove "Defendants' use of their marks was 'likely to cause confusion' as to the origin of their products and services"); *Roederer v. J. Garcia Carrion, S.A.*, 732 F. Supp. 2d 836, 864 (D. Minn. 2010) (defendants' use of its mark must "so resembles [Plaintiff's] use … that it is likely to cause confusion among consumers …"); *Rainbow Play Sys., Inc. v. GroundScape Techs., LLC*, 364 F. Supp. 2d 1026, 1034 (D. Minn. 2005) (focus is on whether "[Defendant's] use of its marks was likely to cause confusion …").

Third, Plaintiff has not pointed to any precedent allowing evidence of proximity of brand mentions in third-party articles to substitute for evidence of actual confusion, and the case law weighs heavily against such a theory.  *See Frosty Treats Inc.*, 426 F.3d at 1010 ("Confusion means more than that the junior user's mark merely calls to mind the senior user's mark."); *Roederer*, 732 F. Supp. 2d at 870 n.9 ("Such calling to mind [in media mentions and postings] does not equate to confusion for trademark purposes"); *Fortres Grand Corp. v. Warner Bros. Entm't Inc.*, 763 F.3d 696, 705 (7th Cir. 2014) (rejecting "internet chatter" from "web pages, tweets, and blog posts" as evidence of confusion because it was about the existence of the product, not whether consumers were confused).

In response to the Court's question at the hearing asking Plaintiff for precedent approving third-party references as the *cause* of a likelihood of confusion, Plaintiff identified *Heaven Hill Distilleries, Inc. v. Log Still Distilling, LLC*, No. 3:21-CV-190-BJB-CHL, 2021 WL 5985253

(W.D. Ky. Dec. 16, 2021), and later *Museum of Modern Art v. MOMACHA IP LLC*, 339 F. Supp. 3d 361 (S.D.N.Y. 2018). *See* Tr. at 242:10–242:18; 286:5–287:10.

But these decisions address evidence of third-party mentions on social media (and an industry website) in which the posters themselves were actually confused—not whether third-party posts could be the *cause* of confusion. *Heaven Hill*, 2021 WL 598253, at *24; *Museum of Modern Art*, 339 F. Supp. at 378–79. Where the plaintiffs did not offer survey evidence, those courts counted third-party expressions of their own confusion as actual confusion. *Id.* But Plaintiff does not rely on third-party posts and articles for that purpose. *E.g.,* Tr. at 287:2–5 ("My concern is not, Your Honor, that the posters on Twitter themselves were confused, it's that … these social media posts … will confuse others in the marketplace.").

In *Museum of Modern Art*, none of the evidence of confusion came from news stories. It consisted of social media posts by the defendant's customers. 339 F. Supp. 3d at 378–79. Thus, it did not hold that confusion will likely come from readers' impressions of news coverage.

In *Heaven Hill*, the defendants were descendants of a Kentucky bourbon distiller (J.W. Dant), who decades ago had sold the business. Defendants sought to reenter the market by intentionally linking their business to the J.W. Dant Bourbon brand owned by the plaintiff. *See* 2021 WL 5985253, at **1–4. The plaintiff offered social media posts and a story on an industry webpage to show that the defendant's intentionally misleading marketing campaign was having the desired effect, namely, that consumers and a trade website had believed what the defendants were publicly stating. *Id.* at *21,*24.

Here, Defendant has made no similar effort to link itself to Plaintiff. It does not use "Block" as any part of the branding or attention-getting features of its tax offerings. *See* J-3 (Jennings Decl.) ¶ 24; J-2 (Esperanza Decl.) ¶ 18; Tr. at 143:25–144:3; 194:3–7. As Plaintiff's

26

CEO admitted, "[Defendant is] not [itself] making those connections [with Plaintiff]."  Tr. at 82:6.  Rather, Plaintiff relies on association evidence that "is out of [defendant's] control," such as a "consumer … seeing headlines and tweets and … social media posts and making conclusions based on that."  *Id.* at 82:8–11.  Plaintiff has cited no authority that infringement can be based on uses over which the defendant has no control—particularly ones remote from the purchasing decision.  *See Citizens Nat'l Bank of Meridian v. Citizens Bank of Phila. Miss.*, 35 F. App'x 391, 2002 WL 761301, at *2 (5th Cir. 2002) ("Generalized confusion is not what courts look to, but rather, evidence of confusion in mistaken purchasing decisions.").[11]

Fourth, it is not clear that consumers will interpret the third-party social media in the ways Plaintiff suggests.  For example, Plaintiff's CEO testified that he interpreted the phrase "$HRB - $SQR Cash app taxes (Free)," which appears in Plaintiff's Exhibit 25, to mean that, by using a dash or minus sign, the poster was equating H&R Block ($HRB) with Cash App Taxes.  Tr. at 80:23–81:5.  But the post suggests otherwise.  For each stock listed on the left, there is an indicator ("+", "–", or both) of how its financial performance may be affected by the information on the right.  P-25 at 11.  For example, $WMT (Walmart) has a negative indicator based on the loss of an executive, whereas $ABBV (AbbVie) has a positive one based on FDA approval of its drug.  *Id.*  The reference Plaintiff points to reflects the poster's view that a free offering from Cash App Taxes may negatively affect Plaintiff's stock price—which is not an indicator of consumer confusion between the two, in fact it is the opposite.

---

[11]  During the hearing, Plaintiff cited *United States v. Hon*, 904 F.2d 803 (2d Cir. 1990), as "talk[ing] about confusion among the media also being something that is relevant. Tr. at 289:11–14.  *Hon* is a criminal counterfeiting case under 18 U.S.C. § 2320 that does not involve media confusion.

27

Similarly, Plaintiff offered three Tweets that mentioned Cash App Taxes along with the stock ticker symbols for Square, Intuit, and H&R Block ($SQ $INTU $HRB). P-25 at 6, 7, 9. But those Tweets suggest that the posters believe that all three companies are affected by the reported news, not confusion about which company offers what products or services. As H&R Block's CEO admitted during the hearing, he does not think viewers of the post would think it meant $HRB and $INTU are the same company. *See* Tr. at 128:7–24. The lack of evidence of how consumers would understand these posts confirms their lack of probative value.[12]

The Court's reluctance to accept Mr. Jones' interpretations for consumers at large is further confirmed by contrasting Ms. Butler's "pilot" survey results about the *Yahoo! Finance* Cash App article with her final survey results about the *Forbes Advisor* Credit Karma Taxes article. Although she altered both articles to reference "Block" as the owner of the service in question, none of the respondents who saw "Block" in the *Yahoo! Finance* article identified H&R Block as having been mentioned in the article. D-4 ¶¶ 12–17; 19–21. Plainly, context matters and readers may draw different impressions from different articles and posts.

Even if Plaintiff's evidence of third-party references to "Block" were probative of likely or actual confusion, the Court would give it little weight. Plaintiff has not introduced evidence regarding the extent to which relevant customers encounter, read, and consider these articles and posts, whether they are representative of all social media posts, reviews, and articles, how consumers would understand these third-party posts and articles, or whether that impression

---

[12] Plaintiff suggested at the hearing that some of these posts and articles also were evidence of actual confusion by investors and the media. Tr. at 288:10–289:14. However, examination of the articles and posts shows that to be at best ambiguous. For example, the financial news reporting service MT Newswires reported on Defendant's introduction of Cash App Taxes as news that is relevant to H&R Block does not make any statement that reflects confusion; the introduction of a free competing service *is* relevant to H&R Block. P-50.

would affect their purchasing decisions. Given these evidentiary gaps, the evidence Plaintiff

relies on is inherently less probative of confusion than would be consumer reactions to a

defendant's own marketing and product packaging or websites, which are a uniform part of the

customer purchase process.[13] *See, e.g.*, *Citizens Nat'l Bank of Meridian*, 35 F. App'x 391, 2002

WL 761301 at *2 ; *SLY Magazine LLC v. Weider Pubs. L.L.C.*, 529 F. Supp. 2d 425, 440

(S.D.N.Y. 2007) ("[T]rademark infringement protects only against mistaken purchasing

decisions and not against confusion generally.") (internal quotation marks omitted).

### d.   Dr. Reibstein

The Court similarly declines to credit the opinion of Plaintiff's expert, Dr. David

Reibstein, that future confusion between Cash App and H&R Block is likely due to "linkage" or

"association" between Block and Cash App, which will then cause consumers to confuse Cash

App with H&R Block. J-7 (Reibstein Rebuttal Decl.) ¶ 93. As with the other evidence of third-

party references to the parties' marks, which he relies upon, this is not evidence of "incidents of

actual confusion or survey evidence" under *SquirtCo*. *E.g., LTJ Enters*, 168 F. Supp. 3d at 1215.

Because Dr. Reibstein did not point to actual confusion, his opinion does not add weight to this

factor for Plaintiff.

Dr. Reibstein's theory also does not favor Plaintiff regarding confusion from the word

"Block" because he offers no evidence that *customers* of Cash App and Square will form

associations based on articles that mention both Cash App and Block. *See, e.g.*, *General Mills,*

*Inc.*, 824 F. 2d at 627 (noting that the focus belongs on "the ordinary purchaser, buying under the

---

[13] Plaintiff argues that news reports about Defendant should be treated differently because
Defendant's CEO is newsworthy. *See* J-7 (Reibstein Rebuttal Decl.) ¶ 89; Tr. at 206:3–7. The
Lanham Act has no exceptions or different standards for defendants with "celebrity" CEOs. If
customers are so deeply engaged with this CEO's views as to follow him on Twitter, it stands to
reason they would be less likely to associate his company's services with H&R Block.

normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods"); *Citizens Nat'l Bank of Meridian*, 35 F. App'x 391, 2002 WL 761301 at *2; *SLY Magazine LLC*, 529 F. Supp. 2d at 440. Defendant's expert, Dr. Ravi Dhar, opined that customer associations between Cash App and the term Block are not inevitable, D-5 (Dhar. Sur-Rebuttal Decl.) ¶ 5, and Dr. Reibstein did not refute that testimony.

4. <u>Intent to cause consumer confusion.</u>

a. <u>Word mark</u>

Plaintiff has presented no evidence that Block attempted to take advantage of H&R Block's brand or confuse customers. The Court assumes that Defendant had heard of H&R Block. Tr. at 152:14. However, mere awareness of Plaintiff's marks does not favor a finding of likelihood of confusion. *Luigino's, Inc.*, 170 F.3d at 831 ("Knowledge of another's product and an intent to compete with that product is not … equivalent to an intent … to mislead and to cause consumer confusion."); *Sensient Techs. Corp.*, 631 F.3d at 767 (same).

The lack of intent is shown by Defendant's decision not to use "Block" to brand its tax service or feature the name in promoting the service to customers, and by the dissimilarity of Defendant's multi-colored, twisted cube logo. J-2 (Esperanza Decl.) ¶¶ 18, 22–23.

b. <u>Logo</u>

The Court also finds no evidence that Defendant adopted the Cash App logo to trade on Plaintiff's name or reputation. Cash App has used the logo of a white dollar sign on a green square for nine years and has obtained a federal trademark registration for it. J-3 (Jennings Decl.) ¶¶ 5–6. The Cash App logo is used in combination with the Cash App word mark, and not on its own—meaning that its source identifier is always present. Tr. at 173:17–20; J-3 Ex. B at 1; D-7 (mobile app listings). Accordingly, the intent factor does not weigh in Plaintiff's favor.

30

5.     <u>Competitive Nature of the Goods</u>

    a.     <u>Word mark</u>

The Court finds that the parties do not use the word "Block" in competition with one another for their respective market positions or audience appeal. Because Plaintiff challenges Defendant's use of the "Block" name, this factor must consider what goods and services Defendant actually offers under that name. *See Davis v. Walt Disney Co*., 430 F.3d 901, 904 (8th Cir. 2005) (holding that the competitive proximity factor must be assessed based on the use of the mark in question, not based on the broader services offered by the parties). Defendant uses the name as a parent company and for corporate services to employees and investors, not for consumer-facing purposes. Tr. at 144:4–21. Its businesses include music streaming, Bitcoin promotion, credit-card processing (Square's flagship offering) and peer-to-peer payment (Cash App's core offering). *Id*. at 139:15–25; J-2 (Esperanza Decl.) ¶ 16. The parties do not dispute that Plaintiff offers none of those services. Tr. at 118:9–12; 119:11–13; 120:1–23.[14]

    b.     <u>Logo</u>

The competitive proximity of services offered under the parties' logos that use green squares is closer, given the taxes feature of Cash App. This factor weighs in Plaintiff's favor, but not significantly because of the different channels of distribution of the parties' products. *See, e.g.*, *ZW USA, Inc.*, 889 F.3d at 448 ("[T]he fact that the parties sell their respective products on different websites under different trade names cuts strongly against a likelihood of confusion.");

---

[14] Plaintiff mentions the use of "charitable services" in Defendant's intent-to-use trademark registration as another competitive field. Tr. at 161:18–162:5. However, this motion must be based on Defendant's "actual practice" in the marketplace, not what it might do in the future. *E.g., DaimlerChrysler AG v. Bloom*, 315 F.3d 932, 936 (8th Cir. 2003) ("[T]here can be no liability for trademark infringement" unless "the defendant has made an actual 'use' of the plaintiff's trademark.") (citation omitted).

*Steak n. Shake*, 323 F. Supp. 2d at 986, 989, 995 (describing differences in restaurants). Unlike competitive products that could be interchangeably purchased in grocery stores, Cash App can be acquired only in a mobile app store. *See* Tr. at 175:4–6. Consumers find it by searching for "Cash App." J-9 (Jennings Sur-Rebuttal Decl.) ¶ 8; Tr. at 175:20–176:5. *See also Fischer & Frichtel*, 2021 WL 1750174, at *6 (stating that the competitive marketplace analysis is not conducted "in a vacuum," and, "on balance, the sophistication of the customers and the lack of similarity between" the marks "outweighed any risk of confusion caused by the direct competition between the parties").

> 6. <u>Sophistication of Consumers</u>

This factor weighs against confusion, both as to the word "Block" and the Cash App logo. Plaintiff has not introduced evidence that Cash App or Square customers are inattentive or impulsive in using Cash App or Square. Cash App enables users to access and transfer their money. J-3 (Jennings Decl.) ¶¶ 2–3; Tr. at 26:21–25; 140:14–18; 189:14–190:14. The Court finds that customers will be careful and engaged in their decision to use Cash App. D-4 (Wind Sur-Rebuttal Decl.) ¶¶ 78–79.

That conclusion is reinforced by the case law. *See First Nat'l Bank in Sioux Falls v. First Nat'l Bank, S.D.*, 153 F.3d 885, 889 (8th Cir. 1998) (affirming district court finding that "consumers tend to exercise a relatively high degree of care in selecting banking services"); *JTH Tax, Inc. v. Freedom Tax, Inc.*, No. 3:19-CV-00085-RGJ, 2019 WL 2062519, at *8 (W.D. Ky. May 9, 2019) (finding consumers exercise care when selecting tax services); *First Premier Bank v. Papadimitriou*, No.14-CV-4055, 2015 WL 127845, at *6 (D.S.D. Jan. 7, 2015) (finding credit cards require high degree of consumer care); *interState Net Bank v. NetB@nk, Inc.*, 348 F. Supp.

2d 340, 355 (D.N.J. 2004) (holding that "consumers undoubtedly exercise a high degree of care in selecting banking and financial services and are likely to note difference[s] in names").[15]

### 7. Summary of Factors

"The ultimate inquiry is whether, considering all the circumstances, a likelihood of confusion exists that consumers will be confused about the source of the allegedly infringing product." *Hubbard Feeds, Inc. v. Animal Feed Supplement, Inc*., 182 F.3d 598, 602 (8th Cir. 1999) (citations omitted). "Likelihood of confusion is synonymous with a probability of confusion, which is more than a possibility of confusion." *Northland Ins. Cos. v. Blaylock*, 115 F. Supp. 2d 1108, 1122 (D. Minn. 2000) (citation omitted).

Here, the dissimilarity of the marks as the parties use them and the absence of evidence of actual confusion by Defendant's customers are weighty and compelling. There is no evidence of Defendant's intent to trade on Plaintiff's goodwill. To the extent the strength of Plaintiff's marks and the degree of competition favor Plaintiff, it is insufficient to outweigh the other factors. *See, e.g.*, *Luigino's, Inc.*, 170 F.3d at 830 (even though plaintiff's mark was strong and the parties' products were competitive, no likelihood of confusion given the dissimilarity between the marks' "overall impression"); *Sensient Tech. Corp.*, 613 F.3d at 766, 769 (same). As the court concluded in *Northland*, in denying a preliminary injunction:

> [G]iven the inherent differences in the nature of [the parties' marks in the marketplace], any reasonable … user would readily ascertain that defendant's [goods and services are] not affiliated with or sponsored by plaintiff. Any likelihood of confusion is relatively minimal absent a more specific demonstration of factual evidence to the contrary. Therefore, even though plaintiff[s] can

---

[15] Plaintiff cites cases holding that investors and employees are relevant to the likelihood of confusion inquiry. Evidence of such confusion may be relevant in some cases. Here, investors and employees are sophisticated and unlikely to make investments or apply for jobs without exercising care. *See Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 151 (2d Cir. 2003). The Court finds it implausible that a prospective employee would accidentally take a job with Defendant while thinking it was Plaintiff. The same is likewise true of investors.

demonstrate a mark strong enough to warrant protection …, the court finds that at this stage of the proceedings plaintiff[s have] failed to show a sufficient likelihood of confusion among consumers to justify the issuance of a preliminary injunction.

115 F. Supp. 2d at 1122. That is the case here.

### C.        Irreparable Harm

Because Plaintiff has not shown a likelihood of success on the merits, it is not entitled to a presumption of irreparable harm. *See* 15 U.S.C. § 1116(a). Nor has Plaintiff otherwise demonstrated it is likely to be irreparably harmed between now and trial (or the remaining few weeks of tax season) unless the Court orders the drastic remedy that Defendant must change its name and stop using the Cash App logo, at least with its taxes feature. Plaintiff's theory requires too many speculative leaps to grant the extraordinary remedy it seeks.

Plaintiff posits that future news coverage will link Cash App and "Block," leading Defendant's future customers to associate Cash App with "Block," in turn leading them to associate Cash App with H&R Block, and then confuse Defendant's consumers into thinking they are doing business with Plaintiff. *See* J-7 (Reibstein Rebuttal Decl.) ¶¶ 83–94.

Plaintiff also argues that, in the "event of a serious deficiency in the 'Cash App Taxes' product, such as a data breach, that results in widespread and negative media coverage," Plaintiff will be harmed irreparably because of "the historical record" linking Cash App and Square. J-7 (Reibstein Rebuttal Decl.) ¶¶ 3, 94; *see also* J-1 ¶ 45. This is speculative as to both the likelihood of data breach before trial, and the effect it might have on Plaintiff. Its survey expert, Ms. Butler, surveyed 200 respondents about an article from *Yahoo! Finance* titled "Square's Cash App vulnerable to hackers, customers claim: 'They're completely ghosting you,'" in which the tested version said "Block" instead of "Square." D-4 (Wind Sur. Rebuttal Decl.) ¶¶ 27–29. Yet no one who saw the article with the "Block" references said that the article was about Plaintiff. *Id.* ¶¶ 27–29.

34

When seeking a preliminary injunction, these layers of guesswork do not suffice.[16]  "The dramatic and drastic power of injunctive force may be unleashed only against conditions generating a presently-existing actual threat; it may not be used simply to eliminate a possibility of a remote future injury, or a future invasion of rights."  *Riley v. Crawford*, No. 06-4211-CV-C-NKL, 2007 WL 2002344, at *1 (W.D. Mo. July 5, 2007) (quoting *Rogers v. Scurr*, 676 F.2d 1211, 12l4 (8th Cir. 1981)).

As to the parties' logos, Plaintiff's claim of irreparable harm is likewise unsupported, given the many other green square logos for financial services with which Plaintiff has long been coexisting, including Cash App.  *See* Tr. at 72:24–73:1; D-3 (Dhar Decl.) ¶ 65; D-33 (green squares used by financial services companies).  The icon for the Credit Karma app, which included a free tax feature until 2020, was also a green rounded square with white lettering.  *See* D-32 (icon comparison).[17]  Plaintiff's "[f]ailure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction."  *Watkins*, 346 F.3d at 844.

---

[16] *See Guntert v. Zimmerman Const. Div., Inc. v. Gomaco Corp.*, No. 20-CV-4007-CJW-KEM, 2020 WL 6948364, at *10 (N.D. Iowa Oct. 14, 2020) (concluding that plaintiff's assertions of harm to loss of its goodwill where plaintiff presented no evidence beyond its CEO's conclusory statements were "too speculative and unsupported to warrant the drastic and urgent relief of a preliminary injunction"); *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 778 (8th Cir. 2012) (citations omitted) (the injury must be "certain and great and of such imminence that there is clear and present need for equitable relief"); *Graham Webb Int'l v. Helene Curtis Inc.*, 17 F. Supp. 2d 919, 924 (D. Minn. 1998) (citation omitted) ("Possible or speculative harm is not enough" to warrant a preliminary injunction); *Local Union No. 884, United Rubber, Cork, Linoleum, and Plastic Workers of America v. Bridgestone/Firestone, Inc.*, 61 F.3d 1347, 1355 (8th Cir. 1995) (finding that irreparable harm could not be premised on testimony that required multiple future facts to occur because such testimony was "wholly speculative"); *Goff v. Harper*, 60 F.3d 518, 521 (8th Cir. 1995) (finding no irreparable injury when "[e]ven assuming the harm alleged would be irreparable, the threat of this harm is too remote").

[17] Plaintiff suggests that Cash App is problematic because it is a "generic" or "descriptive" name. Tr. at 240:5.  Plaintiff has not introduced evidence to support this assertion.  Cash App's registered trademarks are evidence that the name has acquired secondary meaning and are recognized as a brand that is not generic or merely descriptive.

35

### D.    **Balance of Hardships**

Plaintiff has not shown that the balance of hardships tips in its favor.  Instead, the balance of hardships tips decidedly in favor of Defendant.  This is not a request to maintain the status quo.  It is not a case where a mark-holder seeks merely the temporary suspension of an ad campaign.  Plaintiff demands that Defendant change the name of its business, and either change the federally-registered logo for Cash App that it has used for years with more than 100 million customers or strip out the Cash App Taxes product and create a new, rebranded platform for it.

Where, as here, a party seeks what amounts to the complete relief it is seeking by its lawsuit, at the outset and before discovery, the party's burden is a heavy one.  *Dakota Indus., Inc.*, 944 F.2d at 440.  The Eighth Circuit has thus instructed district courts to exercise "[c]aution" in their deliberation of deciding whether the balance of factors "tips decidedly toward the movant."  *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1179 (8th Cir. 1998) (citation omitted); *see also Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) ("It is generally inappropriate for a federal court at the preliminary-injunction stage to give a final judgment on the merits.").  Plaintiff has not overcome this heavy burden.

As for its hardship, Plaintiff identifies only that it will suffer "irreparable harm to its brand and to the reputation it has built" based on the *ipse dixit* of its CEO as echoed by one of its experts, as Plaintiff asserted on irreparable harm.  Dkt. 17 at 24; J-1 (Jones Decl.) ¶ 40; J-7 (Reibstein Decl.) ¶¶ 93–94.  Plaintiff's irreparable harm argument is impermissibly speculative.  *See* J-1 ¶ 45; Tr. at 83:15–86:15. Such speculative burden arguments are likewise insufficient.  *See Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 35 (2d Cir. 1995) (finding that the balance of hardships tipped in defendant's favor, and denying plaintiff's preliminary injunction motion where it "would cause [defendant] considerable hardship far outweighing any speculative possibility that [plaintiff's] goods would be harmed by consumer confusion").

36

In contrast, the record confirms that the hardships a preliminary injunction would impose on Defendant are substantial. First, as to the company name Block, the injunction would, as a practical matter, effect a final decision on the merits. If Defendant were forced to change its company name now, it is unlikely to revert to the current name in a year, after trial. Even if Defendant were able to quickly decide on a new name, it would take significant time and resources to implement, including with regulators around the country. *See* Tr. at 146:3–17; 147:25–18; J-8 (Esperanza Sur-Reply Decl.) ¶¶ 18–25. Some regulators require advance notice of any name change and assert the right to approve any name change. J-2 (Esperanza Decl.) ¶ 29. In an extreme case, regulators could even revoke Block's licenses, which would cause substantial harm to the company and its customers. *Id.* Defendant would also have to secure a new domain name and social media rights and modify computer and IT systems, a process that would take time and could harm employee morale and recruiting. J-2 (Esperanza Decl.) ¶¶ 27–28. Such a rebranding injunction "may have the effect of making the preliminary injunction a permanent injunction." *FirstBank Sw. v. Heartland Fin. USA, Inc.*, No. 2:21-CV-024-Z, 2021 WL 3743806, at *7 (N.D. Tex. Aug. 24, 2021) (citation omitted); *see also Fischer & Fritchtel*, 2021 WL 1750174, at *8 (denying trademark TRO and finding, when balancing the equities, that forcing a nationwide rebranding would "require a significant investment of time and expense"); *Russell Rd. Food & Beverage, LLC v. Spencer*, No. 2:12-CV-01514–LRH-GWF, 2013 WL 321666, at *5 (D. Nev. Jan. 28, 2013) (the "balance of hardships tips in favor of" defendant based on "significant amounts in rebranding" and period where it may have "no presence").

Second, the hardships to Defendant from enjoining its use of the Cash App logo or removing the Cash App Taxes feature from the Cash App mobile application are also substantial. That logo is the icon on the smartphone screens of tens of millions of consumers, over 40 million

of whom tap on it each month to conduct transactions. *See* J-3 (Jennings Decl.) ¶ 25; Tr. at 181:17–24. Cash App has used its logo for close to a decade, and has invested significant efforts in marketing and building recognition of that logo. J-3 ¶¶ 5–8; Tr. at 184:7–25; 185:19–20; 195:1–8. Over this time, more than 100 million people have downloaded the Cash App mobile app, and become familiar with its name and logo. *See* J-3 ¶ 7; Tr. at 180:12–21. Changing its well-known logo would lead to concrete harm to Defendant in the form of lost transactions, customers, and goodwill. *See* J-3 ¶ 25. Indeed, it is not practical to assume that Cash App could change its logo without disrupting its customer relationships, which in turn would also disrupt those customers' ability to carry out critical personal financial transactions such as buying food or paying medical bills. Tr. at 195:11–23. Cash App also has a federally-registered trademark for the Cash App logo. *See* J-3 ¶ 6 & Ex. A. Enjoining Defendant from its use would impose an obvious and significant burden. *See Michael Jaudes Fitness Edge, Inc. v. Edge Fitness Clubs, LLC*, No. 4:19-cv-01987-AGF, 2019 WL 11318383, at *8 (E.D. Mo. Sep. 6, 2019) (denying injunction and noting that the Court "cannot ignore the fact that [Defendant] has a registered trademark entitling it to operate under its brand name").

Plaintiff suggests ways to reduce the obvious hardships on Cash App and its customers in the face of an injunction. For instance, Plaintiff suggests that Defendant could simply strip out the Cash App Taxes feature and offer it as a separate app, disconnected to Cash App's suite of integrated financial services, and using a different logo, such as a blue logo. Tr. at 226:2–6; 235:22–236:2. That would be commercially infeasible. *See id*. at 226:8–18 ("And so right now, it would be impossible for Cash App Taxes to be a separate application. [A user] has to go through Cash App account sign-up and provision [his or her] account with Cash App credentials to use Cash App Taxes[.]"). The value of Cash App Taxes to Defendant (and consumers) lies in

38

its integration with Cash App's other features, such as its money transfer, paycheck deposit, and debit card. The tax feature is also free. *See* J-3 (Jennings Decl.) ¶ 16. The hardship to Defendant would be significant and likely not commercially viable if, as Plaintiff requests, it were ordered to undertake substantial engineering efforts to develop and market a new "tax only" app, using a different logo, for a product feature that generates no revenue. The Court is reluctant to use a trademark injunction to compel such a corporate reorganization. And Plaintiff has proffered no evidence that changing the logo's color for the taxes feature from green to blue, which would impose a hardship on both Defendant (which has invested hundreds of millions of dollars in its green logo) and its customers (who may not recognize or trust a different logo), would somehow ameliorate any claimed confusion. To the contrary, Defendant's survey regarding the Cash App logo confirms that respondents did not associate it with H&R Block, and that changing the background color from green to blue had no impact on the confusion rate, which was 0% for both versions. *See* D-2 (Wind Decl.) ¶ 43. Plaintiff offered no survey evidence testing the Cash App logo at all, let alone a survey that reached a different result.

Plaintiff also suggests that Defendant could reconfigure the green square in its logo into a different shape, such as a circle or triangle. But because Google and Apple require mobile applications to be presented to consumers as squares with rounded corners, the Cash App mobile icon would still be presented on smartphones as a square with rounded corners. *See Apple Inc. v. Samsung Elec. Co.*, 786 F.3d 983, 995 (Fed. Cir. 2015) (addressing use of green square icons with rounded edges and white phone symbols on Apple smartphones and Samsung smartphones), *rev'd on other grounds*, 137 S. Ct. 429 (2016).

The Court is also particularly concerned with the hardships to Defendant's customers that an injunction would impose. Cash App has tens of millions of customers, including underbanked

individuals who rely on Cash App for critical financial transactions, and former Credit Karma Taxes customers who may rely on Cash App Taxes for tax filing services this year. *See* J-3 ¶¶ 15, 25; Tr. at 195:13–226:18. Given the commercial infeasibility of creating a standalone free tax product and the concrete risk that Cash App's tax feature would not survive an injunction, this harm to consumers is further reason why the balance of hardships tips decidedly in Defendant's favor. *See Stone Strong, LLC v. Stone Strong of Texas, LLC*, No. 4:21-CV-3160, 2021 WL 4710449, at *7 (D. Ne. Oct. 8, 2021) (in balancing hardships, court considers evidence that the defendant had "outstanding obligations to customers that would be disrupted by an injunction" and "those customers haven't done anything wrong").

In sum, Plaintiff has not met its burden on the balance of hardships. Plaintiff's requested injunction would impose significant burdens on Defendant's ability to offer a free tax product that serves the underbanked, and would disrupt customers' ability to carry out personal financial transactions. These concrete hardships far outweigh Plaintiff's opinion that Defendant's branding "has the potential to harm" Plaintiff's brand. *See* J-7 (Reibstein Decl.) ¶ 93.

### E. Public Interest

The public interest disfavors an injunction. "By the very nature of a trademark action, the value placed on free competition must be weighed against any individual's property interest in that trademark, so that the analytic focus should also be on the consumer's ability to obtain the lowest priced goods." *Calvin Klein*, 815 F.2d at 505 (citation omitted). That public interest extends to "avoiding monopolies and encouraging, not stifling, competition." *Id.* The Court must take into account the "broader economic implications" of granting the relief. *Id.*

The "broader economic implications" are that the requested preliminary injunction would impede competition and disrupt consumers' use of the free tax service Cash App offers to its tens of millions of customers, millions of whom are underserved. *See* Tr. at 172:4–10. The record

reflects that the logo change Plaintiff seeks would impede and confuse user access to Cash App. J-3 (Jennings Decl.) ¶ 25; Tr. at 195:9–23. Deleting the tax feature from within the Cash App stack of financial services, as Plaintiff has suggested, would be even more disruptive. The millions of Credit Karma Tax customers who now rely on Cash App for their previous year's tax returns, needed to complete this year's tax returns, would be frustrated or worse, likely increasing the chances of missed or incorrect tax filings for these customers. *See* J-3 ¶¶ 13, 15.

Additional concerns are at stake. Cash App Taxes became a Cash App feature in 2021 after the Department of Justice required then-owner Credit Karma Inc. to divest itself of the tax service if it wanted to be acquired by Intuit, and the Department of Justice then approved the sale of the service to Defendant. Tr. at 152:22–23; 86 Fed. Reg. 22,706 (Apr. 29, 2021).[18] The Justice Department sought to avoid "reduc[ing] existing and future competition, resulting in higher prices, lower quality, and reduced choice for [digital do-it-yourself] tax preparation products upon which millions of Americans rely." 86 Fed. Reg. at 22,706. It found that Defendant's plans to integrate Credit Karma's tax business into Cash App, which already had tens of millions of users, would create a viable, ongoing business that could "compete effectively" in the tax preparation market. *Id*. at 22,708.

The Department of Justice's concern with competition does not immunize Defendant against a claim of trademark infringement. But in assessing this factor, the Court must account for the public interest in preserving lower prices and offering alternatives to consumers who seek free tax preparation services, and must weigh that against the other factors. *See Dakota Indus,*

---

[18] These Department of Justice proceedings are a matter of public record of which the Court can and does take judicial notice pursuant to Rule 201 of the Federal Rules of Evidence.

*Inc.*, 944 F.2d at 441 (affirming that "the public's interest in being offered the widest range of merchandise in all price brackets would best be served by denying the injunction").

Plaintiff proffered no evidence on the public interest factor, other than to argue in circular fashion that the public interest will be served by "[e]nforcement of trademark law." Dkt. 17 at 30; Dkt. 59 at 27. But that presupposes infringement. Because Plaintiff has failed to prove a likelihood of success on the merits, the Court declines to credit Plaintiff's argument.

On this record, the Court finds that the public interest factor tips against Plaintiff.

## III. CONCLUSION

The Court concludes that Plaintiff has not met the heavy burden required to support the extraordinary relief of a preliminary injunction requiring Defendant to change its corporate name or the Cash App logo. Plaintiff's motion for a preliminary injunction is hereby denied.

Dated: _____        _____
                                  Hon. Nanette K. Laughrey
                                  United States District Court

Proposed by:

                                       By: ___ */s/ David Jermann* _____
                                               David Jermann
Margret Caruso (*pro hac vice*)        David A. Jermann, II (MO Bar #51389)
**QUINN EMANUEL URQUHART &**           **ARMSTRONG TEASDALE LLP**
**SULLIVAN LLP**                       2435 Grand Blvd., Suite 1500
555 Twin Dolphin Dr., 5th Floor        Kansas City, Missouri 64108
Redwood Shores, California 94065       djermann@atllp.com
margretcaruso@quinnemanuel.com

Robert M. Schwartz (*pro hac vice*)    Rachel Herrick Kassabian (*pro hac vice*)
**QUINN EMANUEL URQUHART &**           **QUINN EMANUEL URQUHART &**
**SULLIVAN LLP**                       **SULLIVAN LLP**
865 S. Figueroa Street, 10th Floor     555 Twin Dolphin Dr., 5th Floor
Los Angeles, California 90017          Redwood Shores, California 94065
robertschwartz@quinnemanuel.com        rachelkassabian@quinnemanuel.com

42